No. <u>26-8003</u>

# In the United States Court of Appeals
## for the District of Columbia Circuit

---

BARBARA J. LEE, et al.,
*Plaintiffs-Appellees*

v.

DONALD J. TRUMP, et al.,
*Defendants-Appellants*

**On Appeal from the United States District Court
for the District of Columbia, 1:21-cv-00400-APM**

*Consolidated Member Cases: 21-cv-00586 (APM); 21-cv-00858 (APM);
21-cv-02265 (APM); 22-cv-00010 (APM); 22-cv-00011 (APM);
22-cv-00034 (APM); 23-cv-00038 (APM)*

---

**PRESIDENT DONALD J. TRUMP'S PETITION FOR LEAVE TO APPEAL
INTERLOCUTORY ORDER PURSUANT TO 28 U.S.C. § 1292(B) AND
FEDERAL RULE OF APPELLATE PROCEDURE 5**

---

Jesse R. Binnall
Jason C. Greaves
Gerald A. Urbanek, Jr.
BINNALL LAW GROUP
717 King Street, Suite 200
Alexandria, Virginia 22314
(703) 888-1943
Michael J. Walsh, Jr.
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, D.C. 20004
(202) 799-4000

Jonathan M. Shaw
DHILLON LAW GROUP, INC.
2121 Eisenhower Ave, Suite 608
Alexandria, Virginia 22314
(703) 574-1206

Joshua Halpern, Esq.
JH LEGAL PLLC
1100 H Street, NW, Suite 840
Washington, D.C. 20005
(610) 405-5531

Caryn G. Schechtman
DLA PIPER LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, New York 10020-1104
(212) 335-4500

*Counsel for Defendant-Appellant President Donald J. Trump*

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................i

TABLE OF AUTHORITIES .........................................................................ii

INTRODUCTION ........................................................................................ 1

STATEMENT OF JURISDICTION................................................................4

QUESTION PRESENTED ...........................................................................4

RELIEF SOUGHT........................................................................................6

STATEMENT OF FACTS ............................................................................6

ARGUMENT .............................................................................................. 10

    I.    The certified orders present a controlling question of law. .................11

    II.    There is substantial ground for difference of opinion..........................12

    III.    Immediate appeal will materially advance the ultimate termination of the litigation. ..................................................................................17

CONCLUSION............................................................................................19

CERTIFICATE OF COMPLIANCE .........................................................21

ADDENDUM: CERTIFICATE AS TO PARTIES AND AMICI .........................22

CERTIFICATE OF SERVICE ...................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Am. Council of the Blind v. Paulson*,
  525 F.3d 1256, 1265 (D.C. Cir. 2008)...................................................................4

*APCC Servs., Inc. v. Sprint Commc'ns Co.*,
  297 F. Supp. 2d 90, 95–96 (D.D.C. 2003).......................................................11, 12

*Blassingame v. Trump*,
  87 F.4th 1, 4 (D.C. Cir. 2023) ....................................................................6, 7, 8

*Brandenburg v. Ohio*,
  395 U.S. 444 (1969) ...............................................................2, 8, 11, 12, 13

*Connick v. Myers*,
  461 U.S. 138, 145 (1983) ........................................................................1

*Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*,
  233 F. Supp. 2d 16, 19 (D.D.C. 2002)................................................................11

*Katz v. Carte Blanche Corp.*,
  496 F.2d 747, 755 (3d Cir. 1974) ..................................................................11

*Klinghoffer v. S.N.C. Achille Lauro*,
  921 F.2d 21, 24 (2d Cir. 1990) ....................................................................11

*Nixon v. Fitzgerald*,
  457 U.S. 731, 742 (1982) ........................................................................3

*Nwanguma v. Trump*,
  273 F. Supp. 3d 719 (W.D. Ky. 2017) .............................................................15

*Nwanguma v. Trump*,
  903 F.3d 604 (6th Cir. 2018)...................................................................2, 15

*Snyder v. Phelps*,
562 U.S. 443, 452 (2011) ................................................................. 1

*Speiser v. Randall*,
357 U.S. 513, 526 (1958) ................................................................ 15

*Trump v. United States*,
603 U.S. 593, 629 (2024) ......................................................... 1, 3, 15

*Yamaha Motor Corp., U.S.A. v. Calhoun*,
516 U.S. 199, 205 (1996) ................................................................. 6

**Statutes**

28 U.S.C. § 1292(b) .............................................................. 4, 10, 17

**Other Authorities**

16 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE
AND PROCEDURE § 3930 (3d ed. 2017) ........................................... 13, 16

Transcript of Oral Argument at 64:5–7, *Blassingame v. Trump*
(D.C. Cir. Dec. 7, 2022) (No. 22-5069) ............................................ 16

**Rules**

Fed. R. App. P. 3-4 .................................................................... 6

Fed. R. App. P. 5(a)(3) .............................................................. 10

# INTRODUCTION

This petition presents a question of exceptional constitutional importance: whether core political speech delivered by the sitting President of the United States—which the district court recognized "did not explicitly encourage the imminent use of violence or lawless action"—may nevertheless be penalized as unprotected "implicit" incitement based on inference, context, and alleged intent. President Trump respectfully submits that the answer is no.

Political speech lies at the heart of the First Amendment, and speech by the President addressing matters of national concern "occupies the highest rung of the hierarchy of First Amendment values." *See, e.g., Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)). The President's "extraordinary power to speak [freely] to his fellow citizens and on their behalf" is a fundamental aspect of our democracy. *Trump v. United States*, 603 U.S. 593, 629 (2024) (citation omitted). Yet, the erroneous decision below announced a novel theory of "implicit incitement"—based on a handful of statements at the end of a more than hour-long speech—that would permit civil liability and money damages for such presidential speech, without any explicit advocacy of imminent lawless action. If allowed to stand, that ruling threatens to chill core political speech.

1

The district court (Mehta, J.) recognized the exceptional importance of that question. It certified two related rulings for interlocutory review (attached as Exhibits 1 and 2, respectively), explaining that these cases (i) "raise an important question about the line between protected political expression and unprotected incitement," (ii) involve "matters of considerable public interest," (iii) and may be dispositive of the claims against President Trump. *Memorandum Opinion and Order, Lee, et al., v. Trump, et al.,* Case No. 21-cv-00400 (APM) (D.D.C. 2026), Doc 219 (Exhibit 2) at 3, 69–70. It further found that "exceptional circumstances" warrant immediate review and that all three statutory criteria under 28 U.S.C. § 1292(b) are satisfied. *Id.* at 69–70. Those determinations are correct—and confirm why this Court's review is urgently needed.

The decisions below rest on a novel and sweeping theory of "implicit incitement" that neither this Court nor any other appellate court has ever upheld as a basis to penalize core political speech. To the contrary, this Court has never interpreted incitement law, including under *Brandenburg v. Ohio*, 395 U.S. 444 (1969), to sustain liability for speech that does not specifically and explicitly advocate imminent violence. Nor has any court of appeals ever applied such a theory of "implicit incitement" to political speech. In fact, the Sixth Circuit reversed on interlocutory appeal the only similar district court decision. *See Nwanguma v. Trump*, 903 F.3d 604 (6th Cir. 2018). The district court's departure from settled First

Amendment law warrants this Court's immediate review—especially because, here, that departure imperils the President's longstanding constitutional power to "speak[] forcefully or critically in ways that [he] believes would advance the public interest." *Trump,* 603 U.S. at 629.

The question presented is purely legal, arises on the denial of a motion to dismiss, and is dispositive. As the district court recognized, Plaintiffs' claims "are predicated entirely on [President Trump's] speech." *Thompson v. Trump*, 590 F. Supp. 3d 46, 108 (D.D.C. 2022) (Exhibit 1). If his speech is protected—as *Brandenburg* and the Supreme Court's recent decision in *Counterman v. Colorado*, 600 U.S. 66 (2023), make clear it is—then all remaining claims against President Trump must be dismissed.

Nor is there any countervailing concern about delay. Further proceedings in the trial court will be stayed pending resolution of the President's interlocutory appeal as of right from the district court's recent denial of presidential immunity at summary judgement. *Nixon v. Fitzgerald*, 457 U.S. 731, 742 (1982) ("orders denying claims of absolute immunity are [immediately] appealable"). This Court's resolution of the First Amendment issue now will streamline—not prolong—this litigation by putting an end to this case once and for all and mooting the immunity appeal.

This is precisely the type of "exceptional" case § 1292(b) is enacted to address: a novel, dispositive constitutional question of national importance, on which there is no controlling precedent, and whose immediate resolution will materially advance the litigation to its conclusion. The petition should be granted.

**STATEMENT OF JURISDICTION**

This Court should entertain interlocutory appeals when a district court certifies that an order not otherwise appealable "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b); *see Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1265 (D.C. Cir. 2008). Because the court below properly so certified with respect to two related orders—one denying a motion to dismiss (Exhibit 1) and the other denying reconsideration of the first (Exhibit 2)—this Court should hear this appeal.

**QUESTION PRESENTED**

These consolidated actions seek to impose civil liability on President Donald J. Trump for a speech that he delivered on January 6, 2021, while serving as President of the United States, from the White House Ellipse, addressing matters of

profound national political concern. Plaintiffs allege that his speech—delivered to supporters assembled near the White House and specifically urging them to "peacefully and patriotically make [their] voices heard"—nonetheless constituted incitement of imminent lawless action. The district court, despite recognizing that President Trump's speech "did not explicitly encourage the imminent use of violence or lawless action," erroneously held that Plaintiffs had plausibly alleged unprotected incitement based on a theory of implicit advocacy derived from its review of the context, surrounding events, and alleged intent of the speech. *Thompson*, 590 F. Supp. 3d at 115. Recognizing the exceptional importance of its novel ruling, the court certified it for interlocutory appeal, explaining that these cases "raise an important question about the line between protected political expression and unprotected incitement," involve "matters of considerable public interest," and may be dispositive of the claims against President Trump. Exhibit 2 at 69–70.

The question presented for review is: Have Plaintiffs plausibly alleged that the final few paragraphs of President Trump's January 6, 2021 speech—which did not explicitly advocate imminent lawless action—constitute unprotected incitement under the First Amendment? [1]

---

[1] The district court framed the question presented as follows: "Have Plaintiffs plausibly alleged that President Trump's exhortations at the end of the Ellipse Speech—'We fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore,' and '[W]e're going to try to and give [weak Republicans] the kind of pride and boldness they need to take back our country'—

**RELIEF SOUGHT**

President Donald J. Trump asks that the Court grant interlocutory appeal as to the two related orders certified by the district court pursuant to 28 U.S.C. § 1292(b) and Rule 5 of the Federal Rules of Appellate Procedure.

**STATEMENT OF FACTS**

These consolidated actions seek civil damages from President Donald J. Trump based on his alleged role in the events of January 6, 2021, and, in particular, on a speech he delivered that day while serving as President of the United States.

As this Court summarized in *Blassingame v. Trump*, 87 F.4th 1, 4 (D.C. Cir. 2023), Plaintiffs allege that, in the months following the 2020 election, President Trump and others engaged in public advocacy concerning the election and its certification, including during a rally on the White House Ellipse on January 6, 2021. According to Plaintiffs, those events precipitated the events at the U.S. Capitol later that day.

---

moments before directing thousands of followers on an unpermitted march to the Capitol are inciting words that fall outside the protections of the First Amendment?" Exhibit 2 at 69. This mischaracterization of the President's speech aside, "it is the order that is appealable, and not the controlling question identified by the district court." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996) (citations omitted). The President intends to separately notice an appeal as of right with respect to the immunity issues. *See* Fed. R. App. P. 3-4.

The claims against President Trump rest primarily on a handful of "exhortations at the end of" a 75-minute speech he delivered at that rally ("Ellipse Speech"). Exhibit 2 at 69. As this Court described, the Ellipse Speech included statements addressing the election, urging his supporters not to concede, and encouraging engagement with Congress and state officials regarding the certification of electoral votes. The Ellipse Speech also included statements such as: "we're going to have to fight much harder"; "if you don't fight like hell, you're not going to have a country anymore"; and a statement that supporters would "walk down Pennsylvania Avenue" to the Capitol, coupled with a directive that they should "peacefully and patriotically make [their] voices heard." *Blassingame,* 87 F.4th at 6–9.

Plaintiffs further allege that the Ellipse Speech should be considered in light of surrounding context, including the President's prior public statements concerning the election, post-election litigation, and events preceding January 6. Plaintiffs also rely on certain of the President's post-Ellipse Speech statements, including social media posts made later that day, which also called for peace, as well as respect for law enforcement. *Thompson*, 590 F. Supp. 3d at 67; *Blassingame*, 87 F.4th at 10.

President Trump moved to dismiss, arguing that Plaintiffs lacked standing and that presidential immunity as well as the First Amendment barred their claims. On February 18, 2022, the United States District Court for the District of Columbia

denied President Trump's motion to dismiss. *See Thompson*, 590 F. Supp. 3d at 118. As relevant here, the court held that Plaintiffs had plausibly alleged that the Ellipse Speech constituted incitement of imminent lawless action under *Brandenburg v. Ohio*, 395 U.S. 444 (1969). That holding is wrong.

In doing so, the district court recognized that "[t]he President's words on January 6th did not explicitly encourage the imminent use of violence or lawless action." *Thompson*, 590 F. Supp. 3d at 115. The court nonetheless concluded that Plaintiffs had plausibly alleged *implicit* incitement based on context and other surrounding considerations, *id.*, even though public officials and politicians often use words like "fight" to exhort their supporters (see below at pg. 14), as President Trump did on July 13, 2024, right after he survived an assassination attempt in Butler, Pennsylvania.

The district court also erroneously rejected President Trump's assertion of presidential immunity. It held that certain of his alleged conduct fell outside the scope of his official duties for purposes of absolute immunity, while concluding that other actions—including certain post-January 6 statements—constituted official acts for which immunity applies. *Id.* at 82–84.

President Trump timely appealed the district court's denial of his presidential immunity defense. This Court affirmed on December 1, 2023. *See Blassingame*, 87 F.4th at 29. In that appeal, this Court addressed the scope of presidential immunity

as applied to the allegations in these cases, including distinctions between official and unofficial conduct. The Court did not reach the First Amendment issue presented here, but noted that the issue "remains in the case and could come before us at a later stage" through certification under 28 U.S.C. § 1292(b). *Id.* at 27; *see also id.* at 5, 11–12. On remand, the parties engaged in further proceedings, including discovery bearing on the immunity issues.

On January 24, 2025, President Trump moved for reconsideration of the district court's First Amendment ruling under Federal Rule of Civil Procedure 54(b), relying in part on the Supreme Court's intervening decision in *Counterman v. Colorado*, 600 U.S. 66 (2023). On March 31, 2026, the district court denied reconsideration. Exhibit 2 at 59–70. In the same decision, the district court correctly certified for interlocutory appeal both (1) its February 18, 2022, order denying the motion to dismiss and (2) its March 31, 2026, denial of reconsideration of that ruling, pursuant to 28 U.S.C. § 1292(b). *Id.* at 69–70. The court found that its rulings present a controlling question of law, that substantial grounds for difference of opinion exist, and that immediate appeal may materially advance the litigation. In certifying both orders, the court emphasized that these cases "raise an important question about the line between protected political expression and unprotected incitement," involve

"matters of considerable public interest," and may result in the dismissal of the

claims against President Trump if resolved in his favor. [2] *Id.*

**ARGUMENT**

Section 1292(b) authorizes interlocutory review by this Court where an order

"involves a controlling question of law as to which there is substantial ground for

difference of opinion and [where] an immediate appeal from the order may

materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

The district court correctly concluded that all three criteria are satisfied here—and

this case exemplifies the "exceptional circumstances" warranting immediate review.

At bottom, this petition presents a purely legal, outcome-determinative

constitutional question concerning the scope of First Amendment protection for core

political speech by the sitting President of the United States. That question is novel,

dispositive, and of profound public importance.

---

[2] The district court's certification of the Order in addition to the denial of reconsideration was proper and timely. Fed. R. App. P. 5(a)(3) ("If a party cannot petition for appeal unless the district court first enters an order granting permission to do so or stating that the necessary conditions are met, the district court may amend its order, either on its own or in response to a party's motion, to include the required permission or statement. In that event, the time to petition runs from entry of the amended order.").

## I.  The certified orders present a controlling question of law.

A "controlling question of law is one that would require reversal if decided incorrectly or that could materially affect the course of litigation with resulting savings of the court's or the parties' resources." *APCC Servs., Inc. v. Sprint Commc'ns Co.*, 297 F. Supp. 2d 90, 95–96 (D.D.C. 2003) (citing *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*, 233 F. Supp. 2d 16, 19 (D.D.C. 2002)). "Controlling questions of law include issues that would terminate an action if the district court's order were reversed." *Id.* at 96; *see also Katz v. Carte Blanche Corp.*, 496 F.2d 747, 755 (3d Cir. 1974) (a question is "controlling" if error in its resolution would warrant dismissal). At the same time, "[t]he resolution of an issue need not necessarily terminate an action in order to be 'controlling,' but instead may involve a procedural determination that may significantly impact the action." *APCC Servs.*, 297 F. Supp. 2d at 96 (citing *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 24 (2d Cir. 1990)).

The question presented directly satisfies that standard. The district court recognized that "Plaintiffs' claims are predicated entirely on [President Trump's] speech." *Thompson v. Trump*, 590 F. Supp. 3d 46, 108 (D.D.C. 2022). The viability of those claims therefore turns on whether the Ellipse Speech is protected under *Brandenburg v. Ohio*, 395 U.S. 444 (1969), as informed by the Supreme Court's decision in *Counterman v. Colorado*, 600 U.S. 66 (2023). If the Ellipse Speech is

11

protected, as it should be, Plaintiffs' claims against President Trump must be dismissed. That includes Plaintiffs' § 1985(1) claims and related claims under D.C.-law, all of which depend on the premise that the Speech constitutes unprotected incitement. Reversal would therefore terminate this litigation as to President Trump without the need for further discovery or trial.

The question is also purely legal and presented in a posture ideally suited for interlocutory review. It arises from the denial of a motion to dismiss (and reconsideration thereof), which the district court resolved as a matter of law while accepting Plaintiffs' allegations as true. *See Thompson*, 590 F. Supp. 3d 46, 70 (D.D.C. 2022). No further factual development is necessary to determine whether the alleged speech falls within the protection of *Brandenburg*. Accordingly, this question presents a textbook "controlling question of law" appropriate for certification.

## II.    At a minimum, there is substantial ground for difference of opinion.

"A substantial ground for difference of opinion is often established by a dearth of precedent within the controlling jurisdiction and conflicting decisions in other circuits." *APCC Servs.*, 297 F. Supp. 2d at 107. "A substantial ground for dispute also exists where a court's challenged decision conflicts with decisions of several other courts." *Id.* Moreover, "[t]he level of uncertainty required to find a substantial ground for difference of opinion should be adjusted to meet the importance of the

question in the context of the specific case." 16 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3930 (3d ed. 2017). Thus, when "'proceedings that threaten to endure for several years depend on an initial question of jurisdiction. . . or the like,' certification may be justified even if there is a relatively low level of uncertainty." *APCC Servs.*, 297 F. Supp. 2d at 107 (quoting 16 WRIGHT, MILLER & COOPER, FEDERAL PRACTICE & PROCEDURE, § 3930 at 422 (1996)).

Each of those considerations is present here. The district court's erroneous ruling rests on a theory of "implicit incitement"—that speech may lose First Amendment protection even in the absence of explicit advocacy of imminent lawless action. This Court has never adopted such a theory, and no federal court of appeals has ever upheld a case of implicit incitement. The absence of controlling precedent on a question of this importance is itself sufficient to establish substantial grounds for disagreement.

The ruling also reflects a marked departure from established First Amendment principles. The district court recognized that the Ellipse Speech "did not explicitly encourage the imminent use of violence or lawless action." *Thompson*, 590 F. Supp. 3d at 115. It nonetheless concluded that Plaintiffs had somehow plausibly alleged incitement based on context, surrounding events, and allegations regarding intent. That reasoning eliminates the core protections secured in *Brandenburg* and will chill

future presidential speech. *Brandenburg* demands clear, directed advocacy of imminent lawless action, not speech using words like "fight" that can be recharacterized after the fact through "context" and "intent." *Brandenburg* certainly does not allow for liability based on the retrospective parsing of a mere handful of statements "at the end of" a 75-minute speech. Exhibit 2 at 69. The First Amendment does not permit a civil damages case to proceed against the President of the United States based on a district court's hindsight-driven reinterpretation of political speech. Indeed, allowing retrospective liability for phrases like "fight like hell" risks subjecting virtually every President, public official, or candidate to suit, because such rhetoric permeates American politics. *See, e.g.*, Full Transcript of Biden's State of the Union Speech, *N.Y. Times* (Mar. 8, 2024) ("I'll keep fighting like hell")[3]; 167 Cong. Rec. 5667, 5678 (2021) ("Mr. SWALWELL[:] We're going to fight like hell.")[4]; *id.* at 5678 ("Mr. SCHUMER[:] Democrats are going to fight like hell.").

The constitutional stakes are at their apex here. This case involves speech by the President of the United States speaking to the public on matters of national concern. If such speech—which the district court conceded lacked any explicit call

---

[3] *Full Transcript of Biden's State of the Union Speech*, THE NEW YORK TIMES (March 8, 2024), https://www.congress.gov/118/meeting/house/116942/documents/HHRG-118-JU00-20240312-SD001.pdf.
[4] 167 CONG. REC. S667-S682 (February 12, 2021), https://www.govinfo.gov/content/pkg/CREC-2021-02-12/html/CREC-2021-02-12-pt1-PgS667-3.htm.

for imminent violence—can be deemed unprotected based on a district court's after-the-fact view of inference and context, then no political speech is safe from retrospective liability. The Supreme Court has repeatedly warned against such outcomes, emphasizing that First Amendment does not permit such chilling of protected expression, particularly in the political sphere. *See Fed. Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 469 (2007); *see also Counterman*, 600 U.S. at 77–78 (noting the "prospect of chilling non-threatening expression, given the . . . predictable tendency to steer 'wide[ ] of the unlawful zone.'") (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)). The decision below thus threatens not just to resolve this case, but to reshape the boundary between protected and unprotected presidential speech and infringe on the President's ability to "boldly and fearlessly carry out his duties." *Trump*, 603 U.S. at 640. At a minimum, those consequences establish substantial grounds for disagreement requiring this court's review.

The novelty of the district court's approach further underscores the existence of substantial grounds for disagreement. The only similar decision appears to be *Nwanguma v. Trump*, 273 F. Supp. 3d 719 (W.D. Ky. 2017), which the Sixth Circuit reversed on interlocutory appeal. *See Nwanguma v. Trump*, 903 F.3d 604 (6th Cir. 2018). That reversal confirms that reasonable jurists can—and do—disagree about the viability of such theories.

This Court's own proceedings confirm the existence of substantial doubt. During argument in *Blassingame v. Trump*, a member of the Court observed that if "you just print out the [President's January 6th] speech … and read the words … it doesn't look like it would satisfy the [*Brandenburg*] standard." Tr. of Arg. at 64:5–7, *Blassingame v. Trump* (D.C. Cir. Dec. 7, 2022) (No. 22-5069). After all, the President implored those gathered to "peacefully and patriotically make their voices heard"—which is exactly the opposite of what one would say if they intended to promote violence. *See Counterman*, 600 U.S. at 76 ("[T]he First Amendment precludes punishment, whether civil or criminal, unless the speaker's words were 'intended' (not just likely) to produce imminent disorder."). At a minimum, then, there exists sufficient judicial uncertainty here to establish a substantial ground for difference of opinion.

Finally, the extraordinary importance of the First Amendment question presented reinforces the conclusion that the § 1292(b) standard is satisfied. This case involves core political speech by the President of the United States on matters of national concern. Where, as here, "proceedings that threaten to endure for several years depend on" a threshold legal question, Wright & Miller § 3930, certification is appropriate even at a relatively modest level of uncertainty, a threshold that is easily cleared here. Further, where that question implicates the constitutional

16

protection of presidential speech, as here, the case for interlocutory review is at its strongest.

### III.  Immediate appeal will materially advance the ultimate termination of the litigation.

The third requirement of § 1292(b) is that "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). That requirement is satisfied where, as here, interlocutory review would eliminate or substantially narrow the issues for trial and avoid unnecessary expenditure of resources.

This litigation has been pending since 2021. Resolution of the First Amendment question in President Trump's favor would terminate the claims against him outright. That alone satisfies § 1292(b). Where, as in this case, a single legal ruling would dispose of the case as to a party, interlocutory review is the only efficient course.

Immediate review will also prevent substantial and unnecessary delay. This case has already involved appellate proceedings concerning presidential immunity, and additional appellate review will follow on the district court's immunity ruling. Allowing interlocutory review of the First Amendment issue now will permit this Court to address a dispositive legal question alongside—and in coordination with—

ongoing and anticipated appellate proceedings on immunity, rather than requiring piecemeal litigation and successive appeals.

Deferring review, by contrast, would risk precisely the inefficiencies that § 1292(b) is designed to avoid. Absent immediate review, the parties and the courts would expend substantial resources litigating claims that may, and should, be ultimately barred as a matter of law. Section 1292(b) was enacted to prevent precisely that result. Granting this petition will avoid unnecessary discovery, motion practice, and trial proceedings based on a legal theory that should be rejected.

The constitutional stakes further underscore the importance of immediate review. This case concerns the scope of First Amendment protection for political speech by the President of the United States on matters of national importance. As the district court explained in certifying its orders:

> "These lawsuits involve the sitting President of the United States, raise an important question about the line between protected political expression and unprotected incitement, and involve matters of considerable public interest. Further, resolving the First Amendment issue in favor of President Trump may accelerate these proceedings against him and result in the dismissal of the cases."

Exhibit 2 at 69–70. That assessment is correct. Immediate review will materially advance the ultimate termination of this litigation and provide needed guidance on an important First Amendment question.

**CONCLUSION**

For the foregoing reasons, President Trump respectfully requests that the Court grant his petition, and grant leave to appeal under FRAP 5 and 28 U.S.C. § 1292(b) both the February 18, 2022 Memorandum Opinion and Order and the March 31, 2026 Memorandum Opinion and Order.

Dated: April 10, 2026

Respectfully submitted,

/s/ *Jesse R. Binnall*
Jesse R. Binnall
Circuit Bar No. 62429
**Binnall Law Group PLLC**
717 King Street, Suite 200
Alexandria, Virginia 22314
Telephone: (703) 888-1943
jesse@binnall.com

Joshua Halpern
(Member application pending)
**JH Legal PLLC**
1100 H Street, NW, Suite 840
Washington, D.C. 20005
Telephone: (610) 405-5531
jhalpern@jhlegalpllc.com

Jonathan M. Shaw
Circuit Bar No. 56548
**Dhillon Law Group, Inc.**
2121 Eisenhower Ave, Suite 608
Alexandria, Virginia 22314
Telephone: (703) 574-1206
jshaw@dhillonlaw.com

Jason C. Greaves
Circuit Bar No. 63336
Gerald A. Urbanek, Jr.
(Member Application Pending)
**Binnall Law Group PLLC**
717 King Street, Suite 200
Alexandria, Virginia 22314
Telephone: (703) 888-1943
gerald@binnall.com

Michael J. Walsh, Jr.
Circuit Bar No. 49228
**DLA PIPER LLP (US)**
500 Eighth Street, NW
Washington, D.C. 20004
Telephone: (202) 799-4000
mike.walsh@us.dlapiper.com

Caryn G. Schechtman
(Member application pending)
**DLA PIPER LLP (US)**
1251 Avenue of the Americas, 27th Floor
New York, New York 10020-1104
Telephone: (212) 335-4500
caryn.schechtman@us.dlapiper.com

*Counsel for Defendant-Appellant*
*President Donald J. Trump*

**CERTIFICATE OF COMPLIANCE**

Undersigned counsel certifies that this Petition complies with the type-volume limitation of Federal Rule of Appellate Procedure 5(c)(1) because, excluding the parts of the Petition exempted by Federal Rule of Appellate Procedure 32(f), it contains 4,114 words.

Undersigned counsel certifies that this Petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: April 10, 2026                                       Respectfully submitted,

/s/ *Jesse R. Binnall*
Jesse R. Binnall

*Counsel for Defendant-Appellant*
*President Donald J. Trump*

21

# ADDENDUM

## CERTIFICATE AS TO PARTIES AND AMICI

Pursuant to Circuit Rule 5(a), President Donald J. Trump, Defendant-Appellant, provides this addendum in accordance with Circuit Rule 28(a)(1)(A). President Donald J. Trump, an individual, is not required to provide a disclosure statement pursuant to Fed. R. App. P. 26.1 or Circuit Rule 26.1. Pursuant to Circuit Rule 28(a)(1)(A), Defendant-Appellant provides the following certification of parties, intervenors, and *amici* which appeared before the district court and/or before this Court:

## DEFENDANTS

Defendants appearing before the district court and/or before this Court include President Donald J. Trump, in his personal capacity; Donald J. Trump For President, Inc.; Make America Great Again PAC; Stop the Steal L.L.C.; Proud Boys; Proud Boys International, L.L.C.; Oath Keepers; Warboys LLC; Enrique Tarrio; Ethan Nordean; Joseph R. Biggs; Zachary Rehl; Charles Donohoe; Dominic J. Pezzola; Stewart Rhodes; Thomas E. Caldwell; Jessica Watkins; Kelly Meggs; Alan Hostetter; Erik Scott Warner; Felipe Antonio Martinez; Derek Kinnison; Ronald Mele; John Does 1-10; and the United States of America.

## PLAINTIFFS

Plaintiffs appearing before the district court and/or before this Court include Bonnie Watson Coleman; Pramila Jayapal; Maxine Waters; Jerrold Nadler; Henry C. Johnson; Stephen I. Cohen; Barbara J. Lee; Veronica Escobar; Marcia Kaptur; Governor Latson; Danny McElroy; Melissa Marshall; Michael Fortune; Jason Deroche; Reginald Cleveland; Conrad Smith; James Blassingame; Sidney Hemby; Eric Swalwell; Briana Kirkland; Bobby Tabron; DeDivine K. Carter; Marcus J. Moore; and Sandra Garza, individually and as the personal representative of the Estate of Brian Sicknick.

## INTERESTED PARTIES

Interested parties appearing before the district court and/or before this Court include Daniel J. Scavino, Jr.

## MOVANTS

Movants appearing before the district court are Evan H. Caminker; Andrew Kent; Sheldon Nahmod; Daphna Renan; Peter M. Shane; Floyd Abrams; Erwin Chemerinsky; Martha Minow; Laurence H. Tribe; and Jared Holt.

## *AMICUS CURIAE*

*Amicus Curiae* appearing before the district court and/or before this Court include the United States of America; Evan H. Caminker; Vicki C. Jackson; Andrew

23

Kent; Sheldon Nahmod; Daphna Renan; Peter M. Shane; Campaign Legal Center Action; and Reconstruction Era Scholars.

**NON-PARTY PETITIONERS**

Non-party Petitioners appearing before the district court and/or before this Court include the United States of America.

**NON-PARTY RESPONDENTS**

Non-party Respondents appearing before the district court and/or this Court include Event Strategies Incorporated and Megan Powers.

Dated: April 10, 2026         Respectfully submitted,

/s/ *Jesse R. Binnall*
Jesse R. Binnall

*Counsel for Defendant-Appellant*
*President Donald J. Trump*

**CERTIFICATE OF SERVICE**

I certify that on April 10, 2026, a copy of the foregoing petition and addendum was filed with the Clerk of the Court and that all counsel of record will be served copies by electronic mail.

/s/ *Jesse. R. Binnall*
Jesse R. Binnall

*Counsel for Defendant-Appellant*
*President Donald J. Trump*

# EXHIBIT 1

Memorandum Opinion and Order

*Bennie G. Thompson, et al. v. Donald J. Trump, et al.*, Case No. 1:21-cv-00400
(APM) (D.D.C. February 18, 2022)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BENNIE G. THOMPSON et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 21-cv-00400 (APM) |
| ) | |
| DONALD J. TRUMP et al., ) | |
| ) | |
| Defendants. ) | |

| | |
|---|---|
| ERIC SWALWELL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 21-cv-00586 (APM) |
| ) | |
| DONALD J. TRUMP et al., ) | |
| ) | |
| Defendants. ) | |

| | |
|---|---|
| JAMES BLASSINGAME & ) | |
| SIDNEY HEMBY, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 21-cv-00858 (APM) |
| ) | |
| DONALD J. TRUMP, ) | |
| ) | |
| Defendant. ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

## I.    INTRODUCTION

January 6, 2021 was supposed to mark the peaceful transition of power.  It had been that way for over two centuries, one presidential administration handing off peacefully to the next. President Ronald Reagan in his first inaugural address described "the orderly transfer of authority" as "nothing less than a miracle."[1]  Violence and disruption happened in other countries, but not here.  This is the United States of America, and it could never happen to our democracy.

But it did that very afternoon.  At around 1:30 p.m., thousands of supporters of President Donald J. Trump descended on the U.S. Capitol building, where Congress had convened a Joint Session for the Certification of the Electoral College vote.  The crowd had just been at the Ellipse attending a "Save America" rally, where President Trump spoke.  At the end of his remarks, he told rally-goers, "we fight, we fight like hell, and if you don't fight like hell, you're not going to have a country anymore."  The President then directed the thousands gathered to march to the Capitol—an idea he had come up with himself.  About 45 minutes after they arrived, hundreds of the President's supporters forced their way into the Capitol building.  Many overcame resistance by violently assaulting United States Capitol Police ("Capitol Police") with their fists and with weapons.  Others simply walked in as if invited guests.  As Capitol Police valiantly fought back and diverted rioters, members of Congress adjourned the Joint Session and scrambled to safety.

---

[1] President Reagan said on that day:

> To a few of us here today, this is a solemn and most momentous occasion; and yet, in the history of our Nation, it is a commonplace occurrence.  The orderly transfer of authority as called for in the Constitution routinely takes place as it has for almost two centuries and few of us stop to think how unique we really are.  In the eyes of many in the world, this every-4-year ceremony we accept as normal is nothing less than a miracle.

President Ronald W. Reagan, First Inaugural Address (Jan. 20, 1981), https://www.reaganfoundation .org/media/128614/inaguration.pdf (last visited Feb. 17, 2022).

So, too, did the Vice President of the United States, who was there that day in his capacity as President of the Senate to preside over the Certification. Five people would die, dozens of police officers suffered physical and emotional injuries and abuse, and considerable damage was done to the Capitol building. But, in the end, after law enforcement succeeded in clearing rioters from the building, Congress convened again that evening and certified the next President and Vice President of the United States. The first ever presidential transfer of power marred by violence was over.

These cases concern who, if anyone, should be held civilly liable for the events of January 6th. The plaintiffs in these cases are eleven members of the House of Representatives in their personal capacities and two Capitol Police officers, James Blassingame and Sidney Hemby ("*Blassingame* Plaintiffs"). Taken together, they have named as defendants: President Trump; the President's son, Donald J. Trump Jr.; the President's counsel, Rudolph W. Giuliani; Representative Mo Brooks; and various organized militia groups—the Proud Boys, Oath Keepers, and Warboys— as well as the leader of the Proud Boys, Enrique Tarrio.

Plaintiffs' common and primary claim is that Defendants violated 42 U.S.C. § 1985(1), a provision of a Reconstruction-Era statute known as the Ku Klux Klan Act of 1871. The Act was aimed at eliminating extralegal violence committed by white supremacist and vigilante groups like the Ku Klux Klan and protecting the civil rights of freedmen and freedwomen secured by the Fourteenth Amendment. Section 1985(1) is not, however, strictly speaking a civil rights provision; rather, it safeguards federal officials and employees against conspiratorial acts directed at preventing them from performing their duties. It provides:

> If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or

3

> to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties.

42 U.S.C. § 1985(1). The statute, in short, proscribes conspiracies that, by means of force, intimidation, or threats, prevent federal officers from discharging their duties or accepting or holding office. A party injured by such a conspiracy can sue any coconspirator to recover damages. *Id.* § 1985(3).

Plaintiffs all contend that they are victims of a conspiracy prohibited by § 1985(1). They claim that, before and on January 6th, Defendants conspired to prevent members of Congress, by force, intimidation, and threats, from discharging their duties in connection with the Certification of the Electoral College and to prevent President-elect Joseph R. Biden and Vice President–elect Kamala D. Harris from accepting or holding their offices. More specifically, they allege that, before January 6th, President Trump and his allies purposely sowed seeds of doubt about the validity of the presidential election and promoted or condoned acts of violence by the President's followers, all as part of a scheme to overturn the November 2020 presidential election. Those efforts culminated on January 6th, when the President's supporters, including organized militia groups and others, attacked the Capitol building while Congress was in a Joint Session to certify the Electoral College votes. Notably, Plaintiffs allege that President Trump's January 6 Rally Speech incited his supporters to commit imminent acts of violence and lawlessness at the Capitol. Plaintiffs all claim that they were physically or emotionally injured, or both, by the acts of the conspirators.

Plaintiffs advance other claims, as well. Swalwell alleges a violation of § 1986, a companion provision to § 1985. 42 U.S.C. § 1986. That statute makes a person in a position of power who knows about a conspiracy prohibited by § 1985, and who neglects or refuses to take

4

steps to prevent such conspiracy, liable to a person injured by the conspiracy. Swalwell claims that President Trump, Trump Jr., Giuliani, and Brooks violated § 1986 by refusing to act to prevent the violence at the Capitol. Swalwell and the *Blassingame* Plaintiffs also advance numerous common law torts and statutory violations under District of Columbia law.

All Defendants have appeared except the Proud Boys and Warboys. Defendants have moved to dismiss all claims against them. They advance a host of arguments that, in the main, seek dismissal for lack of subject matter jurisdiction or for failure to state a claim. The parties have submitted extensive briefing on a range of constitutional, statutory, and common law issues. The court held a five-hour-long oral argument to consider them.

After a full deliberation over the parties' positions and the record, the court rules as follows: (1) President Trump's motion to dismiss is denied as to Plaintiffs' § 1985(1) claim and certain District of Columbia–law claims and granted as to Swalwell's § 1986 claim and certain District of Columbia–law claims; (2) Trump Jr.'s motion to dismiss is granted; (3) Giuliani's motion to dismiss is granted; (4) the Oath Keepers' motion to dismiss is denied; and (5) Tarrio's motion to dismiss is denied. Separately, Brooks has moved to substitute the United States as the proper party under the Westfall Act. The court declines to rule on that motion and instead invites Brooks to file a motion to dismiss, which the court will grant for the same reasons it has granted Trump Jr.'s and Giuliani's motions.

## II.     BACKGROUND

### A.     Facts Alleged

This summary of the alleged facts is drawn from the complaints in all three cases. There is substantial overlap, but there are some differences. The court has not referenced every fact alleged across the three complaints; this factual recitation is meant to summarize the main

allegations. Additionally, a citation to one complaint should not be understood to mean that the allegation is not present in the other complaints. The court has limited the citations in the interest of efficiency. Additional facts will be referenced as appropriate in the Discussion section.

As is required on a motion to dismiss, the court assumes these facts to be "true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). These are *not* the court's factual findings.

### 1. *The Weeks Following the Election*

#### a. <u>False claims of election fraud and theft</u>

President Trump began to sow seeds of doubt about the validity of the November 2020 presidential election in the weeks leading up to Election Day. Am. Compl., *Blassingame v. Trump*, No. 21-cv-00858 (APM) (D.D.C.), ECF No. 3 [hereinafter *Blassingame* Compl.], ¶ 13. He claimed, among other things, that there would be "fraud," the election was "rigged," and his adversaries were "trying to steal" victory from him. *Id.* ¶¶ 13, 16; Compl., *Swalwell v. Trump*, No. 21-cv-00586 (APM) (D.D.C.), ECF No. 1 [hereinafter *Swalwell* Compl.]; Mot. for Leave to File Am. Compl., ECF No. 11, Am. Compl., ECF No. 11-1, [hereinafter, *Thompson* Compl.], ¶ 33.[2]

On election night, the President claimed victory before all the votes were counted. He tweeted that "they are trying to STEAL the Election. We will never let them do it." *Blassingame* Compl. ¶ 17. He also would say in a primetime television address the next day, "If you count the legal votes, I easily win. If you count the illegal votes, they can try to steal the election from us." *Swalwell* Compl. ¶ 33.

---

[2] Subsequent citations to filings from these three dockets omit the case name and number. Context and/or the title of the filing should make clear to which docket a particular filing belongs.

The President's allies joined him in making similar claims.  For example, on November 5, 2020, Brooks tweeted that he "lack[ed] faith that this was an honest election."  *Id.* ¶ 78. On November 6, 2021, Trump Jr. tweeted that his father's campaign was uncovering evidence of voter fraud and that the media was creating a false narrative that voter fraud was not real.  *Id.* ¶ 69. On November 7, 2020, one of President Trump's lawyers, Rudolph Giuliani, held a press conference in suburban Philadelphia, during which he asserted that there was rampant voter fraud in Philadelphia and Pittsburgh, which accounted for the President's loss in Pennsylvania. *Thompson* Compl. ¶ 38.

### b.        Efforts to influence state and local election officials

The President also took his case directly to state and local election officials.  These meetings occurred by phone and in person, and centered mostly on Georgia, Michigan, and Pennsylvania.  *Swalwell* Compl. ¶¶ 39, 45, 49, 52.  In some instances, these efforts were followed by threatening words and conduct by some supporters.

In Georgia, for example, the President called Georgia's Secretary of State an "enemy of the people" and tweeted about him over a dozen times.  *Swalwell* Compl. ¶ 49.  The Secretary and his family were then targeted by some of the President's supporters with threats of violence and death.  *Id.* ¶ 50.  Another Georgia state official pleaded with the President to condemn death threats made to election workers in Georgia, but he refused to do so.  *Blassingame* Compl. ¶ 29.

In another instance, in Michigan, on December 5, 2020, the President falsely declared that he had won almost every county in the state.  *Swalwell* Compl. ¶ 40.  The next day armed protesters went to the home of Michigan's Secretary of State, demanding she overturn the election results. *Thompson* Compl. ¶ 50.  During these weeks, the President also tweeted criticism of Republican

7

governors in Arizona and Georgia, claiming that "[i]f they were with us, we would have already won both." *Swalwell* Compl. ¶ 36.

During these efforts, and aware of the threats directed against state election officials, the President tweeted, "People are upset, and they have a right to be." *Thompson* Compl. ¶ 52.

The President's allies, including Brooks and Giuliani, continued to support the President's campaign to undo the election results. Brooks, for example, tweeted false claims that President-elect Joe Biden had not won Georgia, and he also announced that he would object to certifying the Electoral College ballots from Georgia. *Swalwell* Compl. ¶ 82. Giuliani also continued his efforts, falsely suggesting in mid-November that irregularities in Detroit were the reason for the President's loss. *Thompson* Compl. ¶ 42. He asked then–Deputy Secretary of Homeland Security Ken Cuccinelli to seize voting machines. *Swalwell* Compl. ¶ 62. A Trump campaign attorney even suggested that an election official should be shot. *Thompson* Compl. ¶ 48.

c.    "Stop the Steal" rallies

Dozens of protests sprung up around the country. *Blassingame* Compl. ¶ 22. Two in Washington, D.C., turned violent. On the evening of November 14, 2020, multiple police officers were injured and nearly two dozen arrests were made. *Id.* ¶ 26. Then, on December 12, 2020, supporters of the President clashed with District of Columbia police, injuring eight of them, which led to over 30 arrests, many for acts of assault. *Id.* ¶ 28. The President was aware of these rallies, as he tweeted about them, and he would have known about the violence that accompanied them. *Id.* ¶¶ 25, 27.

Organized militia groups attended these events in Washington, D.C. One of them was the Proud Boys. During a pre-election debate, the moderator asked whether President Trump would denounce white supremacist groups. When the President asked, "[W]ho would you like me to

condemn?," Vice President Biden suggested the "Proud Boys," to which the President responded, "Proud Boys, stand back, and stand by." *Thompson* Compl. ¶ 30. Tarrio, the head of the Proud Boys, tweeted in response, "Standing by sir." *Id.*

Another militia group that came to Washington, D.C., for these rallies was the Oath Keepers. At the December rally, an Oath Keepers leader told the assembled crowd, the President "needs to know from you that you are with him, [and] that if he does not do it while he is commander in chief, we're going to have to do it ourselves later, in a much more desperate, much more bloody war." *Id.* ¶ 54.

### 2.     *Preparations for the January 6 Rally*

On December 19, 2020, President Trump announced that there would be a rally in Washington, D.C., on January 6th, the day of the Certification of the Electoral College: "Big protest in D.C. on January 6th. Be there, will be wild!" *Swalwell* Compl. ¶ 86. The President and his campaign were involved in planning and funding the rally. He participated in selecting the speaker lineup and music, and his campaign made direct payments of $3.5 million to rally organizers. *Thompson* Compl. ¶¶ 68–69. Significantly, the rally was not permitted for a march from the Ellipse. *Id.* ¶ 90. The President and his campaign came up with the idea for a march to the Capitol. *Id.* ¶ 69.

Pro-Trump message boards and social media lit up after the President's tweet announcing the January 6 Rally. Some followers viewed the President's tweet as "marching orders." One user posted, referring to the President's debate statement to the Proud Boys, "standing by no longer." *Swalwell* Compl. ¶ 88; *Thompson* Compl. ¶ 57. Other supporters explicitly contemplated "[s]torm[ing] the [Capitol]," and some posted about "Operation Occupy the Capitol" or tweeted using the hashtag #OccupyCapitols. *Swalwell* Compl. ¶ 89; *Thompson* Compl. ¶ 62.

The President knew that his supporters had posted such messages.  He and "his advisors actively monitored the websites where his followers made these posts." *Thompson* Compl. ¶ 66. News outlets, including Fox News, discussed them, as well. *Id.*  On December 28, 2020, in widely publicized remarks, a former White House aide predicted, "there will be violence on January 6th because the president himself encourages it." *Id.*

Trump's allies also worked to promote the January 6 Rally.  Trump Jr. posted a video on Instagram asking his followers to "Be Brave. Do Something." *Swalwell* Compl. ¶ 74.  Giuliani tweeted a video purporting to explain how Vice President Mike Pence could block the certification of the election results. *Id.* ¶ 65.  Brooks posted on social media on the eve of the rally that the President "asked [him] personally to speak & tell the American people about the election system weaknesses that the Socialist Democrats exploited to steal this election." *Id.* ¶ 84.

At the same time, members of the Proud Boys and the Oath Keepers began their preparations for the rally in earnest.  On December 19 and 25, 2020, leaders of the Oath Keepers announced that they had "organized an alliance" and "orchestrated a plan" with the Proud Boys. *Thompson* Compl. ¶ 63.  Tarrio said that the Proud Boys would turn out in "record numbers." *Id.* ¶ 64.  The groups also secured tactical and communications equipment. *Id.* ¶ 65.  The Oath Keepers recruited additional members and prepared them with military-style training. *Id.* ¶ 127.

> 3.       *January 6th—The Riot at the Capitol Building*

The "Save America" rally on the Ellipse began at about 7:00 a.m. *Blassingame* Compl. ¶ 58.  Brooks took the stage around 8:50 a.m. *Swalwell* Compl. ¶ 84.  The Congressman said, among other things, that "[w]e are great because our ancestors sacrificed their blood, their sweat, their tears, their fortunes, and sometimes their lives," and that "[t]oday is the day American patriots start taking down names and kicking ass!" *Id.* ¶¶ 106, 108.  After Brooks finished, Giuliani spoke.

He repeated that the "election was stolen" and said that it "has to be vindicated to save our country." *Id.* ¶ 113. Then, in the context of discussing how disputes over election fraud might be resolved, he proclaimed, "Let's have trial by combat!" *Id.* ¶ 114. Trump Jr. gave the last speech before the President took to the podium. He spent much of his remarks claiming that the Republican Party belongs to Donald Trump. He also warned Republican members of Congress, "If you're gonna be the zero, and not the hero, we're coming for you, and we're gonna have a good time doing it." *Id.* ¶¶ 117–119.

At about noon, President Trump took the stage. *Id.* ¶ 121. The court will discuss the President's speech in much greater detail later in this opinion, so recites only portions here. The President spoke for 75 minutes, and during that time, he pressed the false narrative of a stolen election. He suggested that Vice President Pence could return Electoral College ballots to the states, allowing them to recertify Electors, which would bring about an election victory. He urged rally-goers to "fight like hell," and he told them that "you're allowed to go by very different rules" when fraud occurs. *Swalwell* Compl. ¶¶ 126, 128. Early in the speech he referenced a march to the Capitol and said he knew the crowd would be going there to "peacefully and patriotically" make their voices heard. An hour later, he punctuated his speech by saying that the election loss "can't have happened and we fight, we fight like hell, and if you don't fight like hell, you're not going to have a country anymore." *Thompson* Compl. ¶ 88. He then directed his supporters to the Capitol. The crowd at various points responded, "Fight Like Hell. Fight for Trump," and at other points, "Storm the Capitol," "Invade the Capitol Building," and "Take the Capitol right now." *Blassingame* Compl. ¶ 61; *Thompson* Compl. ¶ 88.[3] Responding to the President's call, thousands marched to the Capitol building after he finished his remarks.

---

[3] As discussed later, these Complaints make different allegations about the timing of these shouts and chants.

11

Meanwhile, Congress had convened a Joint Session at 1:00 p.m. to certify the Electoral College vote. *Thompson* Compl. ¶ 93. Outside the building, some supporters already had begun confrontations with Capitol Police. Even before the President's speech had concluded, the Proud Boys, operating in small groups, had begun to breach the outer perimeter of the Capitol. *Blassingame* Compl. ¶ 66; *Thompson* Compl. ¶¶ 98–100. The Ellipse crowd began to arrive by 1:30 p.m. *Blassingame* Compl. ¶ 69. As their numbers grew, the crowd overwhelmed police and exterior barriers and entered the Capitol by 2:12 p.m. *Swalwell* Compl. ¶ 134. The Oath Keepers were among the crowd. *Thompson* Compl. ¶ 126. The Joint Session was suspended, and the Vice President and members of Congress were evacuated. *Id.* ¶ 111; *Swalwell* Compl. ¶¶ 135–136. Police officers, including the *Blassingame* Plaintiffs, were injured as violent confrontations continued with the President's supporters.

### 4. The President's Response

After his speech, the President returned to the White House and watched the events at the Capitol unfold on television. *Thompson* Compl. ¶ 106. Despite pleas from advisors and Congressmen, the President did not immediately call on his supporters to leave the Capitol building. *Blassingame* Compl. ¶¶ 114, 116; *Thompson* Compl. ¶ 123. At about 2:24 p.m., after rioters had entered the Capitol, he sent a tweet critical of the Vice President for lacking "the courage to do what should have been done to protect our Country and our Constitution." *Blassingame* Compl. ¶ 116. Eventually, two hours later, the President would tell his supporters to stand down. He tweeted a video calling on them to "[g]o home. We love you. You're very special." *Id.* ¶ 125.

The President sent one more tweet that day. After police had cleared the Capitol, around 6:00 p.m., the President said: "These are the things and events that happen when a sacred landslide

election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long. . . . Remember this day forever!" *Id.* ¶ 127.

The House of Representatives would later pass a single Article of Impeachment accusing President Trump of "Inciting an Insurrection," but the Senate would acquit him after he left office.

### B.      Procedural History

#### 1.      Thompson v. Trump

The *Thompson* case was the first to come before the court on February 16, 2021. *See* Compl., ECF No. 1. The plaintiffs in that case are ten members of the House of Representatives.[4] Although the case is captioned *Thompson v. Trump*, the court will refer to these plaintiffs as the "Bass Plaintiffs"—after the second named plaintiff, Representative Karen R. Bass—because the lead plaintiff, Representative Bennie G. Thompson, voluntarily dismissed his claims after his appointment to serve as the chair of the Select Committee to Investigate the January 6th Attack on the United States Capitol. *See* Notice of Voluntary Dismissal, ECF No. 39. Although all are elected officials, the Bass Plaintiffs have filed suit in their personal capacities. *See Thompson* Compl.

The Bass Plaintiffs have named six defendants: President Trump, Giuliani, the Oath Keepers, Proud Boys International, Warboys LLC, and Tarrio. *Id.* They assert a single claim against all Defendants: a violation of 42 U.S.C. § 1985(1). *Id.* at 60. All Defendants except the Proud Boys and Warboys have appeared and moved to dismiss the claim against them. *See* Def. Oath Keepers' Mot. to Dismiss, ECF No. 20 [hereinafter *Thompson* Oath Keepers' Mot.]; Def. Giuliani's Mot. to Dismiss, ECF No. 21, Mem. of P. & A. in Supp. of Def.'s Mot. to Dismiss, ECF No. 21-1 [hereinafter *Thompson* Giuliani Mot.]; Def. Trump's Mot. to Dismiss, ECF No. 22, Mem.

---

[4] The plaintiffs are Representatives Karen R. Bass, Stephen I. Cohen, Veronica Escobar, Pramila Jayapal, Henry C. Johnson, Jr., Marcia C. Kaptur, Barbara J. Lee, Jerrold Nadler, Maxine Waters, and Bonnie M. Watson Coleman.

in Supp. of Def. Trump's Mot. to Dismiss, ECF No. 22-1 [hereinafter *Thompson* Trump Mot.];

Def. Tarrio's Notice of Intention to Join Mots. to Dismiss, ECF No. 64.

    *2.*   Swalwell v. Trump

  Representative Eric Swalwell filed his action on March 5, 2021, also in his personal

capacity.  *Swalwell* Compl.  He named as defendants President Trump, Trump Jr., Brooks, and

Giuliani.  His Complaint advances a host of federal and District of Columbia–law claims against

all Defendants:  (1) violation of § 1985(1) (Count 1); (2) violation of 42 U.S.C. § 1986 (Count 2);

(3) two counts of negligence per se predicated on violations of District of Columbia anti-rioting

and disorderly conduct criminal statutes (Counts 3 and 4); (4) violation of the District of Columbia

anti-bias statute, D.C. Code § 22-3701 *et seq.* (Count 5); (5) intentional infliction of emotional

distress (Count 6); (6) negligent infliction of emotional distress (Count 7); (7) aiding and abetting

common law assault (Count 8); and (8) negligence (Count 9).  *Id.* at 45–62.

  Each Defendant except Brooks has moved to dismiss all claims against him.  *See* Def.

Giuliani's Mot. to Dismiss, ECF No. 13, Mem. of P. & A. in Supp. of Def.'s Mot. to Dismiss, ECF

No. 13-1 [hereinafter *Swalwell* Giuliani Mot.]; Defs. Trump & Trump Jr.'s Mot. to Dismiss, ECF

No. 14, Mem. in Supp. of Trump & Trump Jr.'s Mot. to Dismiss, ECF No. 14-1 [hereinafter

*Swalwell* Trump Mot.].

  Brooks has moved for a scope-of-office certification under the Westfall Act, 28 U.S.C.

§ 2679.  *See* Pet. to Certify Def. Mo Brooks Was Acting Within Scope of His Office or

Employment, ECF No. 20.  Under the Westfall Act, if the Attorney General certifies that a tort

claim against an employee of government—including a member of Congress—arises from conduct

performed while "acting within the scope of his office or employment," the United States is to be

substituted as the defendant.  28 U.S.C. § 2679(d)(1).  Brooks asked the Attorney General for a

Westfall Act certification, but he declined the request. *See* U.S. Resp. to Def. Mo Brooks's Petition to Certify He Was Acting Within Scope of His Office or Employment, ECF No. 33 [hereinafter U.S. Resp. to Brooks]. Notwithstanding the Attorney General's denial, the Westfall Act authorizes a court to make the requisite certification. *See* 28 U.S.C. § 2679(d)(3) ("In the event that the Attorney General has refused to certify scope of office or employment under this section, the employee may at any time before trial petition the court to find and certify that the employee was acting within the scope of his office or employment."). Brooks seeks such relief from the court.

3.      Blassingame v. Trump

The third action is brought by James Blassingame and Sidney Hemby, two Capitol Police officers who were on duty and injured on January 6th. They name only President Trump as a defendant. *Blassingame* Compl. They advance numerous federal and District of Columbia–law claims: (1) directing assault and battery (Count 1); (2) aiding and abetting assault and battery (Count 2); (3) directing intentional infliction of emotional distress (Count 3); (4) two counts of negligence per se predicated on violations of District of Columbia anti-rioting and disorderly conduct criminal statutes (Counts 4 and 5); (5) punitive damages (Count 6); (6) violation of § 1985(1) (Count 7); and (7) civil conspiracy in violation of common law (Count 8). *See id.* at 36–48.

Defendant Trump has moved to dismiss all counts against him. Def. Trump's Mot. to Dismiss, ECF No. 10, Def.'s Mem. in Supp. of His Mot. to Dismiss, ECF No. 10-1 [hereinafter *Blassingame* Trump Mot.].

4.      *The Motions to Dismiss*

Defendants' arguments for dismissal are the same across all three cases. Generally, all Defendants contend the following: (1) Plaintiffs lack standing to sue under Article III of the

Constitution; (2) the First Amendment bars Plaintiffs' claims; and (3) Plaintiffs have failed to state claims under § 1985(1) and District of Columbia law.  President Trump advances a number of contentions that are specific to him: (1) he is absolutely immune from suit; (2) the political question doctrine renders these cases nonjusticiable; (3) the Impeachment Judgment Clause bars civil suits against a government official, like him, acquitted following impeachment; and (4) the doctrines of res judicata and collateral estoppel premised on his acquittal by the Senate preclude all of Plaintiffs' claims.

The court held oral argument on January 10, 2022, on Defendants' motions.  *See* Hr'g Tr., ECF No. 63.

## III.   DISCUSSION

This section consists of two subparts:  a discussion of (1) whether the court has subject matter jurisdiction to hear these actions, and if it does, (2) whether Plaintiffs have stated cognizable claims.  The court begins, where it must, with determining whether it has jurisdiction to hear these matters.

### A.      Subject Matter Jurisdiction

Defendants' challenge to the court's subject matter jurisdiction requires the court to make four inquiries:  (1) whether Plaintiffs have Article III standing to sue, (2) whether President Trump enjoys absolute immunity from suit, (3) whether the cases present a political question that is nonjusticiable as to President Trump, and (4) whether the claims against President Trump are barred by the Impeachment Judgment Clause.[5]  The court also addresses in this portion of the

---

[5] President Trump raises another contention under the rubric of Article III standing but misclassifies it.  He insists that Swalwell and the Bass Plaintiffs cannot bring suit under § 1985(1) because such a claim "is only available to specific federal officials," which does not include members of Congress.  *Thompson* Trump Mot. at 16.  Therefore, he says, "Plaintiffs are not of a class of individuals who have *standing* to bring a claim under § 1985(1)."  *Id.* at 18 (emphasis added).  This type of argument is commonly referred to as "statutory standing."  *See Lexmark Int'l, Inc. v. Static*

opinion President Trump's res judicata and collateral estoppel defenses, which, although not jurisdictional in nature, logically fit here because they are premised on his acquittal following impeachment.

The court holds that (1) all Plaintiffs have plausibly established Article III standing, (2) President Trump is not absolutely immune from suit, except as to Swalwell's § 1986 failure-to-act claim (Count 2), (3) the political question doctrine does not bar the court's review, (4) the Impeachment Judgment Clause does not foreclose the claims against President Trump, and (5) the doctrines of res judicata and collateral estoppel do not preclude litigation of the case or any claim or fact against President Trump.  The court takes up these issues in the order listed.

### 1.      Article III Standing

The Article III standing arguments made by Defendants are of two varieties.  First, President Trump maintains that Swalwell and the Bass Plaintiffs "have not alleged a particularized injury causally connected to Mr. Trump."  *Thompson* Trump Mot. at 15; *Swalwell* Trump Mot. at 16–17 (arguing that Swalwell "failed to allege any concrete injury caused by Defendants").  Second, the Oath Keepers contend that the Bass Plaintiffs lack standing to sue in their personal capacities to redress the alleged interference with their official duty to attend and participate in the Certification of the Electoral College vote.  *Thompson* Oath Keepers' Mot. at 17.  Neither contention has merit.

---

*Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014).  The Supreme Court has made clear, however, that a question of statutory standing does not implicate the court's subject matter jurisdiction, that is, the court's power to hear a case. *See id.*  Rather, a dispute as to statutory standing simply requires a court to determine whether a plaintiff "has a cause of action under the statute."  *Id.* at 128.  It is therefore an argument properly addressed pursuant to Federal Rule of Civil Procedure 12(b)(6), not Rule 12(b)(1).  The court thus takes up President Trump's statutory standing argument below in the section addressing whether Swalwell and the Bass Plaintiffs have stated a claim under § 1985(1).

a.      The elements of standing

A plaintiff in federal court bears the burden of showing that she meets the "irreducible constitutional minimum" of Article III standing: (1) injury in fact, (2) causation, and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). To establish standing at the motion to dismiss stage, the plaintiff "must state a plausible claim that [she has] suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (internal quotation marks omitted). The court must accept the well-pleaded allegations of the complaint as true and draw all inferences in favor of the plaintiff. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

The primary question the court faces concerns "injury in fact, the first and foremost of standing's three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (internal quotation marks and alteration omitted). In one sense that inquiry here is easy; in another, it is a bit more complicated. The easy establishment of a concrete injury is in *Blassingame* and as to one Plaintiff in *Thompson*. "If a defendant has caused physical . . . injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). The *Blassingame* Plaintiffs claim to have suffered physical injury. *Blassingame* Compl. ¶ 83 ("Officer Hemby was crushed against the doors on the east side trying to hold the insurrectionists back."); *id.* ¶ 88 (alleging Officer Hemby suffered "cuts and abrasions" over his face and hands); *id.* ¶ 109 ("The insurrectionists struck Officer Blassingame in his face, head, chest, arms, and what felt like every part of his body.").[6] So, too, does Bass Plaintiff Jayapal. *See*

---

[6] Although President Trump does not contest the *Blassingame* Plaintiffs' standing except for a cursory mention in the one-page motion to which he attaches his memorandum, Def. Trump's Mot. to Dismiss, ECF No. 10; *see generally Blassingame* Trump Mot., the court nevertheless addresses it. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)

18

*Thompson* Compl. ¶¶ 197, 203, 208 (alleging that she had a recent knee-replacement surgery and the evacuation from the House Gallery caused her to suffer "throbbing pain in her greatly swollen knee," and that she "endured significant pain and experienced setbacks in her knee replacement surgery recovery"). Because only one plaintiff must establish standing in *Thompson*, the court need not inquire as to the other Bass Plaintiffs. *See In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012).

The more challenging question surrounding injury in fact relates to Swalwell in his individual case. He does not allege any physical injury, only emotional harm. *Swalwell* Compl. ¶¶ 149, 223 (claiming "severe emotional distress"). For his common law claims, such harm is sufficient to establish an injury in fact. *See, e.g.*, *TransUnion LLC*, 141 S. Ct. at 2211 n.7 (acknowledging that emotional or psychological injury suffices for the tort of intentional infliction of emotional distress). But not automatically so for his claims under § 1985(1) and § 1986 of the Ku Klux Klan Act. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (stating that "a plaintiff must demonstrate standing for each claim he seeks to press" (internal quotation marks omitted)). As to those claims, a question remains whether emotional harm is sufficiently "concrete" to establish Article III standing. *Spokeo*, 578 U.S. at 340. To determine "whether [such an] intangible harm" is sufficiently concrete, courts must consider "both history and the judgment of Congress." *Id.* As to history, "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* at 341. And, as to Congress's judgment, courts must ask "whether Congress has permissibly sought to 'elevate to the status of legally cognizable

(stating that federal courts have an "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party").

injuries concrete *de facto* injuries that were previously inadequate in law[.]'" *Magruder v. Capital One, Nat'l Ass'n*, 540 F. Supp. 3d 1, 7 (D.D.C. 2021) (quoting *Spokeo*, 578 U.S. at 341).

The parties have devoted scant attention to these questions. The court has considered them, however, and concludes that emotional harm is sufficiently concrete to establish Article III standing for claims asserted under § 1985(1) and § 1986. Starting with history, the alleged intangible harm here—emotional distress—has long been accepted as a basis for certain types of suits in American courts. "Emotional harm has long-standing recognition as a compensable injury as a parasitic harm to personal injury or property damage claims, usually referred to as a claim for pain and suffering." Betsy J. Grey, *The Future of Emotional Harm*, 83 FORDHAM L. REV. 2605, 2610 (2015). Additionally, "[c]ommon law . . . traditionally recognized emotional harm claims as a component of trespassory torts like assault, false imprisonment, and defamation, allowing a presumption of damages without a showing of related physical injury." *Id.* This common law tradition dovetails with the plain text of § 1985(1) and Congress's reasons for enacting it. The statute creates a cause of action for a person "injured in his person or property" due to a proscribed conspiracy. 42 U.S.C. § 1985(3). The statute makes no distinction between physical and emotional injury, and in that sense it aligns with the common law tradition of permitting recovery for emotional distress for certain torts without a showing of physical injury. And, though the statute "was enacted by a Congress acutely aware of the massive and frequently violent resistance in the southern states to federal Reconstruction after the Civil War," *Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1334 (7th Cir. 1977), courts have broadly interpreted § 1985(1) consistent with its "terms and legislative intent . . . , which [are] directed against efforts to impede governmental operations by interfering with officials in the discharge of their duties." *Lawrence v. Acree*, 665 F.2d 1319, 1329 (D.C. Cir. 1981) (Wald, J., concurring) (citing *Stern*, 547 F.2d 1329). Permitting

recovery for emotional harm arising from such interference is consistent with that intent. The court thus concludes that "history and the judgment of Congress" support recognizing emotional harm as a concrete injury to establish standing to bring claims under § 1985(1) and § 1986.

This conclusion is buttressed, at least implicitly, by two D.C. Circuit decisions. In both *Barr v. Clinton*, 370 F.3d 1196 (D.C. Cir. 2004), and *Hall v. Clinton*, 285 F.3d 74 (D.C. Cir. 2002), the court faced claims brought under § 1985(1). In *Barr*, the court dismissed the claim based on the statute of limitations and the First Amendment, 370 F.3d at 1202–03, and in *Hall*, it dismissed based on the statute of limitations alone, 285 F.3d at 82. In both cases, the plaintiff alleged emotional distress as their injury, *Barr*, 370 F.3d at 1200; *Hall*, 285 F.3d at 77, yet in neither did the court address whether emotional harm was a concrete injury for purposes of Article III. Perhaps that is because the sufficiency of such injury was so obvious it did not need to be addressed. *Barr* and *Hall* therefore support the court's conclusion.

President Trump also contests whether Swalwell and the Bass Plaintiffs have plausibly demonstrated the second element of standing—causation. He contends that their claimed injuries were caused not by his challenged actions, but by "the independent and intervening acts of third-party rioters." *Swalwell* Trump Mot. at 16. He also contends that causation is lacking because "Plaintiffs did not properly allege a conspiracy." *Thompson* Trump Mot. at 15. But these arguments misconstrue the standing inquiry. In "reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003); *see also Weissman v. Nat'l R.R. Passenger Corp.*, 21 F.4th 854, 857 (D.C. Cir. 2021) (citing *City of Waukesha*, 320 F.3d 228). Thus, in assessing Plaintiffs' standing here, the court must assume that Plaintiffs have successfully pleaded an

actionable conspiracy under § 1985(1): that is, President Trump did conspire "to prevent, by force, intimidation, or threat," (1) President Biden and Vice President Harris "from accepting or holding any office, trust, or place of confidence under the United States" and (2) members of Congress from lawfully discharging their constitutional and statutory duties with respect to certifying the Electoral College vote. Viewed in this way, it is apparent that Plaintiffs' injuries are "fairly traceable" to President Trump's alleged actions as a coconspirator, and "not the result of the *independent* action of some third party not before the court." *Lujan*, 504 U.S. at 560 (cleaned up) (emphasis added).

Finally, Plaintiffs' injuries are redressable with money damages. The court therefore is satisfied that Plaintiffs have sufficiently alleged the requisite elements of standing.[7]

### b.    Legislator standing

The Oath Keepers take a different tack on standing. They assert that the Bass Plaintiffs' injuries are *institutional* in nature—that is, they derive exclusively from their positions as members of the House. The Oath Keepers contend that if their injuries are so understood, the Bass Plaintiffs, as individual members, lack standing to vindicate an institutional injury. Oath Keepers Mot. at 17–26. The court might agree with this line of argument if the Bass Plaintiffs were claiming no more than that the riot interfered with their abilities to carry out their legislative duties. But that is not what they allege. They do not advance an institutional injury, such as the "dilut[ion] [of] their Article I voting power." *Raines v. Byrd*, 521 U.S. 811, 817 (1997) (internal quotation marks omitted). Their injuries are instead personal: emotional distress in the main, as well as physical

---

[7] Certain Plaintiffs seek injunctive relief in addition to damages. *See Swalwell* Compl. at 64; *Thompson* Compl. at 62. The standing inquiry for injunctive relief is different, as it requires a plaintiff to establish a likelihood of *future* harm. *In re Navy Chaplaincy,* 697 F.3d at 1178 ("It is sufficient that plaintiffs have demonstrated a 'likelihood of injury that rises above the level of unadorned speculation—that is, a realistic danger that [they] will suffer future harm." (internal quotation marks omitted)). Plaintiffs have not plausibly pleaded at this stage any likelihood of future injury.

injury to Jayapal.  *Thompson* Compl. ¶ 265 ("During the time when the Capitol was under attack, each of the Plaintiffs named above suffered emotional harm.").  Personal harm is the basis for their standing and, as discussed, it is sufficient for purposes of Article III.[8]

> 2.      *Presidential Immunity*

The court turns next to the question of presidential immunity.  President Trump contends that under the Supreme Court's decision in *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), he is absolutely immune from damages liability in all three cases because his alleged conduct fell within the "outer perimeter" of his official presidential responsibilities.  *See Swalwell* Trump Mot. at 8–11; *Thompson* Trump Mot. at 8–11; *Blassingame* Trump Mot. at 7–13.  This is not an easy issue. It is one that implicates fundamental norms of separation of powers and calls on the court to assess the limits of a President's functions.  And, historical examples to serve as guideposts are few. After careful consideration, the court concludes that, on the facts alleged, absolute immunity does not shield President Trump from suit, except as to Swalwell's § 1986 failure-to-act claim.

> a.      The scope of a President's absolute immunity against damages liability

The court's discussion naturally begins with the Supreme Court's decision in *Nixon v. Fitzgerald*.  In that case, a former federal employee sued President Richard Nixon and various Executive Branch officials for damages arising from his termination from employment. *Fitzgerald*, 457 U.S. at 733–39.  The plaintiff claimed that President Nixon was directly involved in his firing and that the action was undertaken in retaliation for his having publicly revealed during

---

[8] It is understandable why the Oath Keepers interpreted the Bass Plaintiffs' claimed injury to include an impairment of their official duties.  Their Complaint states that "each of the Plaintiffs named above was hindered and impeded in the discharge of his or her official duties and suffered the deprivation of the right to be free from intimidation and threats in the discharge of his or her official duties, as explicitly protected under the Ku Klux Klan Act."  *Thompson* Compl. ¶ 265.  That certainly sounds like an institutional injury.  In any event, the Bass Plaintiffs have expressly disavowed such a theory of standing.  Bass Pls.' Omnibus Mem. of Law in Opp'n to Defs.' Mots. to Dismiss, ECF No. 29, at 20 ("Plaintiffs, however, are *not* seeking damages for an impaired ability to certify the results of the election.").

congressional hearings cost overruns in the Department of the Air Force. *See id.* The plaintiff asserted two statutory claims and one claim under the First Amendment against President Nixon, who by that point no longer occupied the Office of the President. *See id.* After the D.C. Circuit declined to dismiss the case on the ground of absolute presidential immunity, the Supreme Court took up the question of the "scope of immunity available to a President of the United States." *Id.* at 741.

The Court held that President Nixon enjoyed absolute immunity from the plaintiff's suit: "[W]e hold that petitioner, as former President of the United States, is entitled to absolute immunity from damages liability predicated on his official acts." *Id.* at 749. The Court continued: "We consider this immunity a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers." *Id.* Central to the Court's determination was the "unique position in the constitutional scheme" that the President occupies. *Id.* The Court observed that, "as the chief constitutional officer of the Executive Branch," the President is "entrusted with supervisory and policy responsibilities of the utmost discretion and sensitivity." *Id.* at 750. Those responsibilities include taking care that the laws be faithfully executed; conducting foreign affairs; and managing the Executive Branch. *Id.*; *see also Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020) (describing the President's "duties, which range from faithfully executing the laws to commanding the Armed Forces," as "of unrivaled gravity and breadth"). Though the Court had previously held that qualified immunity struck the proper separation-of-powers balance for cabinet officers, the Court said that "[t]he President's unique status under the Constitution distinguishes him from other executive officials." *Fitzgerald*, 457 U.S. at 750. For a President, "diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government." *Id.* at 751. Indeed, because the

President must concern himself with "matters likely to 'arouse the most intense feelings,'" "there exists the greatest public interest in providing an official the maximum ability to deal fearlessly and impartially with the duties of his office." *Id.* at 752 (internal quotation marks omitted). The Court also weighed the "sheer prominence" of the President's office, which makes him "an easily identifiable target for suits for civil damages." *Id.* at 752–53. "Cognizance of this personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Id.*

The Court then defined the scope of a President's absolute immunity. It observed that "the sphere of protected action must be related closely to the immunity's justifying purposes." *Id.* at 755. That principle militated in favor of expansive immunity: "In view of the special nature of the President's constitutional office and functions, we think it appropriate to recognize absolute Presidential immunity from damages liability for acts within the 'outer perimeter' of his official responsibility." *Id.* at 756. The Court recognized that given the "broad variety of areas, many of them highly sensitive," of presidential discretionary responsibility, in "many cases it would be difficult to determine which of the President's innumerable 'functions' encompassed a particular action." *Id.* Such function could not, however, be defined by probing the President's motive for the contested action or by simply claiming a violation of law. The plaintiff in *Fitzgerald*, for example, could not avoid the immunity bar by alleging that the President's motive for terminating him was retaliatory, and thus unlawful, and therefore fell outside the outer perimeter of his duties. *See id.* at 756. Such a "construction would subject the President to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose." *Id.* President Nixon thus enjoyed absolute immunity from suit because it was clearly within his constitutional and

statutory authority to prescribe reorganizations and reductions in force within a military branch—

the stated reason for Plaintiff's termination. *Id.* at 757. Such action "lay well within the outer

perimeter of [a President's] authority." *Id.*

*Fitzgerald* thus established a scope of presidential immunity for civil money damages that

is unquestionably capacious, though not categorical. The Supreme Court contemplated that, at

least, there might be *some* actions by a President that would fall outside the outer perimeter of his

official responsibilities and expose him to a civil suit. What lay beyond the outer perimeter would

come into some focus fifteen years later in *Clinton v. Jones*.

There, President Bill Clinton, while in office, faced a suit by Paula Jones that, in the main,

alleged that he had engaged in sexually inappropriate conduct while he was the Governor of

Arkansas and had retaliated against her for rebuffing his advances. *Clinton v. Jones*, 520 U.S. 681,

686 (1997).[9] Such acts, the Court said, were "unrelated to any of his official duties as President

of the United States and, indeed, occurred before he was elected to that office." *Id.* at 686.

President Clinton nevertheless urged the Court to hold that "the Constitution affords the President

temporary immunity from civil damages litigation arising out of events that occurred before he

took office." *Id.* at 692. The Court rejected the President's call for "temporary immunity." *Id.*

It reasoned that the principal rationale for affording certain public servants absolute immunity was

to enable "such officials to perform their designated functions effectively without fear that a

particular decision may give rise to personal liability," and that such rationale did not apply to

"unofficial conduct." *Id.* at 693–94. The Court emphasized that in defining the scope of immunity

---

[9] *Clinton v. Jones* also involved a claim of defamation that arose while President Clinton was in office. The claim was that "persons authorized to speak for the President publicly branded [the plaintiff] a liar by denying that the incident had occurred." 520 U.S. at 685. The question of immunity as to the defamation claim was not before the Court, though it did observe in passing that the defamation claim "may involve conduct within the outer perimeter of the President's official responsibilities." *Id.* at 686 & n.3.

it had taken a "functional approach," and that "immunities are grounded in the nature of the function performed, not the identity of the actor who performed it." *Id.* at 694–95 (internal quotation marks omitted). It concluded: "With respect to acts taken in his 'public character'—that is, official acts—the President may be disciplined principally by impeachment, not by private lawsuits for damages. But he is otherwise subject to the laws for his purely private acts." *Id.* at 696.[10]

### b.   The parties' positions on official-acts immunity

Guided by the foregoing principles, the court turns to the parties' arguments. President Trump bears the burden of establishing that he is immune from suit. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1140 (D.C. Cir. 2015).

The complained-of actions of the President in these matters can be generally framed as falling into three categories: his pre–January 6th tweets, the January 6 Rally Speech, and his failure to promptly act once the Capitol was breached by rioters. President Trump argues that these acts fall into two presidential "functions": (1) the constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const., art. II, § 3, and (2) speaking on matters of public concern. *Swalwell* Trump Mot. at 8–11; *Blassingame* Trump Mot. 12; Reply in Supp. of Def. President Trump's Mot. to Dismiss, ECF No. 43 [hereinafter *Thompson* Trump Reply], at 3–6. Across his various briefs, President Trump describes these functions in different ways. With respect to faithful execution of the laws, President Trump says that he "had an ever-present duty to ensure that the election laws were followed, including the certification process." *Thompson* Trump Reply

---

[10] The Court also made clear in *Clinton*, and later in *Vance v. Trump*, that the "dominant concern" for crafting broad immunity in *Fitzgerald* "was not mere distraction but the distortion of the Executive's 'decisionmaking process' with respect to official acts that would stem from 'worry as to the possibility of damages.'" *Vance*, 140 S. Ct. at 2426 (quoting *Clinton*, 520 U.S. at 694 n.19). President Trump alludes to a "distraction" rationale in his papers, *see Thompson* Trump Mot. at 9, but he does not seriously advocate for it, recognizing instead that the "distortion" rationale is the predominant reason for affording a President absolute immunity from civil suit for official acts.

at 3.  Quoting from a law review student note, he says that enforcing election laws is "at the core of the executive branch's duty to faithfully execute the law."  *Id.* (internal quotation marks and citation omitted).  As to speaking on matters of public concern, the President argues that he "was engaged in discretionary action pursuant to his Constitutional duty to ensure that the laws were faithfully executed by petitioning Congress not to certify the electors from States with ongoing election challenges."  *Blassingame* Trump Mot. at 10–11.  Elsewhere he contends that the speech and social media posts complained of by Plaintiffs all addressed matters of public concern and thus are "within the outer perimeter of the Presidential office."  *Thompson* Trump Reply at 5.  "[A] political speech by the President is not at the 'outer perimeter' of his duties," he says; rather, "it is at dead center."  *Swalwell* Trump Mot. at 9.

The court finds that President Trump's Take Care Clause argument is misleading and wrong as a matter of law, and that his contention with respect to speech of public concern is too simplistic.

i.      <u>*The Take Care Clause*</u>

Article II, Section 3 vests in the President the authority to "take Care that the Laws be faithfully executed."  Those are "sweeping words," *Myers v. United States*, 272 U.S. 52, 122 (1926), but they do not confer limitless presidential authority or the authority to encroach on the powers vested in the co-equal branches, *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–88 (1952).  Presidential authority remains constrained by the Constitution and the laws that Congress enacts.  *See id.* at 587 ("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker."); *id.* at 588 ("The President's order does not direct that a congressional policy be executed in a manner

28

prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President.").

President Trump cites no constitutional provision or federal statute that grants or vests in the President (or the Executive Branch) any power or duty with respect to the Certification of the Electoral College vote, at least in the manner in which he conceives it. That is because there is none. The Constitution spells out the respective responsibilities of various actors in the election of the President.[11] The Constitution provides that States are to select Electors who will cast votes for President and Vice President, and the Electors transmit a tally of those votes to the President of the Senate. U.S. Const. art. II, § 1, cl. 3; *id.* amend. XII. The President of the Senate "in the presence of the Senate and House of Representatives" shall "open all the certificates and the votes shall then be counted." *Id.* amend. XII. A sitting President is prescribed no role.

The Electoral Count Act, Pub. L. No. 49-90, 24 Stat. 373 (1887), fills in procedural details not addressed in the Constitution. It, too, prescribes no role for a sitting President. A Joint Session of the Senate and the House of Representatives must meet "at the hour of 1 o'clock in the afternoon" on "the sixth day of January succeeding every meeting of the electors." 3 U.S.C. § 15. The President of the Senate, as the presiding officer, opens the certificates of the electoral votes and hands them to tellers appointed by each House, who make a list of the votes. *Id.* When announcing each certificate, the President of the Senate calls for objections, which if made must be in writing and signed by one Senator and one member of the House of Representatives. *Id.* Thereafter, the Senate and the House withdraw to their respective chambers to consider each objection, and "each Senator and Representative may speak to such objection or question five minutes, and not more than once[.]" *Id.* § 17. The presiding officer must cut the debate off after

---

[11] The below summary is pulled, some of it verbatim, from Judge Friedrich's decision in *United States v. Sandlin*, No. 21-cr-88 (DLF), 2021 WL 5865006, at *4 (D.D.C. Dec. 10, 2021).

29

two hours. *Id.* He also has the "power to preserve order" during the session. *Id.* § 18. The Act even details where the presiding officer, the Speaker, the Senators, the Representatives, the tellers, and others are to sit in the chamber. *Id.* § 16. And it commands that the session "not be dissolved until the count of electoral votes shall be completed and the result declared." *Id.* As this summary demonstrates, a sitting President has no expressly identified duty to faithfully execute the laws surrounding the Certification of the Electoral College. So, perhaps it is not surprising that President Trump does not identify *any* law relating to the Certification that he was purportedly executing through his tweets and the January 6 Rally Speech.

Nor does he identify any authority that would support his assertion that merely exhorting non–Executive Branch officials to act in a certain way is a responsibility within the scope of the Take Care Clause. Scholars have emphasized that the Take Care Clause is written in the passive voice ("take Care that the Laws be faithfully executed"). They have interpreted that construction to mean that the Framers envisioned not that the President personally would implement the laws but that their actual execution would be carried out by others subject to the President's direction and supervision. *See, e.g.*, Andrew Kent et al., *Faithful Execution and Article II*, 132 HARV. L. REV. 2111, 2126 (2019); Gillian E. Metzger, *The Constitutional Duty to Supervise*, 124 YALE L.J. 1836, 1875 (2015). The President's Take Care Clause duty therefore does *not* extend to government officials over whom he has no power or control. Here, the Vice President, acting as President of the Senate, and members of Congress had constitutionally and statutorily prescribed duties to carry out the Certification. Their actions are those of a co-equal branch, not subject to

Executive Branch control.  President Trump's advocacy of the scope of their duties and how they should be performed therefore falls outside even the expansive Take Care Clause.[12]

In summoning authority in aid of this argument, President Trump leaves out critical context.  President Trump relies on a law review note for the general proposition that "enforcing election laws . . . [strikes] at the core of the executive branch's duty to faithfully execute the law." *Thompson* Trump Reply at 3 (quoting Alton L. Lightsey, Note, *Constitutional Law:  The Independent Counsel and Supreme Court's Separation of Powers Jurisprudence*, 40 U. FLA. L. REV. 563, 573 (1988)).  What President Trump omits from that quote, however, makes his citation grossly misleading.  The full quote reads: "However, enforcing election laws *through litigation* [strikes] at the core of the executive branch's duty to faithfully execute the law.   It must therefore belong solely to the executive."  Lightsey, *supra*, at 573 (emphasis added).  Including "through litigation" completely changes the meaning of the sentence.  The President can enforce election laws through litigation initiated by the Department of Justice or the Federal Election Commission, agencies over which he has appointment authority.  The case the Lightsey note cites, *Buckley v. Valeo*, makes that clear:  "A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'"  424 U.S. 1, 138 (1976).  This case, of course, does not involve litigation to enforce federal election laws, and so the President's reliance on the Lightsey note is inapt.

---

[12] To be clear, the court does not mean to say that there is no conceivable circumstance in which the President would have a role in faithfully executing the laws pertaining to the Certification of the Electoral College.  The court's holding is limited to President Trump's contention that his mere exhortation to carry out Certification duties in a particular way falls within the Take Care Clause.

<em>ii.      Speech on matters of public concern</em>

The court turns next to President Trump's assertion that his alleged actions all involve speech on matters of public concern and therefore are well within the President's duties.  As he puts it: "It is enough that the nature of the activity, a speech by the President, is the type of activity normal and customary to the presidency.  Indeed, it was not at the outer perimeter of the President's duties—it was dead center."  *Thompson* Trump Reply at 2.

The court agrees with President Trump in two respects.  First, speech is unquestionably a critical function of the presidency.   "The President of the United States possesses an extraordinary power to speak to his fellow citizens and on their behalf."  *Trump v. Hawaii*, 138 S. Ct. 2392, 2417–18 (2018); *see also Columbia Broad. Sys., Inc. v. FCC*, 454 F.2d 1018, 1020 (D.C. Cir. 1971) ("The President's extensive use of the media cannot, of course, be faulted, for there can be no doubt that in the distillation of an informed public opinion such appearances play a very basic role.").  Second, his pre–January 6th tweets and the January 6 Rally Speech addressed matters of public concern:  the outcome of the 2020 Presidential Election and election integrity.  Whatever one thinks of the President's views on those subjects, they plainly were matters of public concern. *See Snyder v. Phelps*, 562 U.S. 443, 453 (2011) ("Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." (internal quotation marks and citations omitted)); *Rankin v. McPherson*, 483 U.S. 378, 387 (1987) (stating the arguably "inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern").

But to say that speaking on matters of public concern is a function of the presidency does not answer the question at hand: Were President Trump's words in this case uttered in performance of official acts, or were his words expressed in some other, unofficial capacity? The President's proposed test—that whenever and wherever a President speaks on a matter of public concern he is immune from civil suit—goes too far. It mirrors what the Supreme Court has said cannot be the basis for absolute immunity: "[T]o construct an immunity from suit for unofficial acts grounded purely in the identity of [the President's] office is unsupported by precedent." *Clinton*, 520 U.S. at 695. And the Supreme Court has recognized different capacities in which the person occupying the Office of the President can act: "Presidents and other officials face a variety of demands on their time, . . . some private, some political, and some as a result of official duty." *Id.* at 705 n.40.[13] Thus, to say that the President spoke on a matter of public concern does not dispositively answer the question of whether he enjoys absolute immunity for such speech.

Consider some examples. At a rally promoting his reelection, an incumbent President touts his policy accomplishments and makes promises about a second term, but during his speech he instructs members of the crowd to "punch" a protester "in the face right now." Or, take a President who speaks at a party fundraising event before a group of high-dollar donors, where he not only discusses pending legislation but also falsely and with malice accuses a political opponent who is

---

[13] This observation was made as part of the Supreme Court's rejection of the "distraction" theory as justifying absolute immunity:

> There is, no doubt, some truth to Learned Hand's comment that a lawsuit should be "dread[ed] . . . beyond almost anything else short of sickness and death." We recognize that a President, like any other official or private citizen, may become distracted or preoccupied by pending litigation. Presidents and other officials face a variety of demands on their time, however, some private, some political, and some as a result of official duty. While such distractions may be vexing to those subjected to them, they do not ordinarily implicate constitutional separation-of-powers concerns.

*Clinton*, 520 U.S. at 705 n.40 (citation omitted).

blocking the legislation of running a child-trafficking operation.  Or, consider a President who appears at a campaign event for a candidate of his party who is running for Congress, and during his remarks touts the candidate because his election will help advance his agenda, but also calls on the crowd to destroy property as a sign of support.  In each of these scenarios, the conduct of the President comes in the context of words uttered on matters of public concern, but it is doubtful that anyone would consider the President immune from tort liability for harm resulting from his speech. To be sure, these scenarios may seem far-fetched, but they illustrate an important point:  blanket immunity cannot shield a President from suit merely because his words touch on matters of public concern.  The context in which those words are spoken and what is said matter.

For their part, Plaintiffs urge the court to reject President Trump's claim of absolute immunity for two reasons:  first, because they "allege that he was acting solely in his personal capacity as a *candidate*," and second, because he "engaged in serious misconduct that obstructed a co-equal branch of government, removing his actions from the outer bounds of permissible presidential conduct."  Bass Pls.' Omnibus Mem. of Law in Opp'n to Defs.' Mots. to Dismiss, ECF No. 29 [hereinafter *Thompson* Pls.' Opp'n], at 65 (internal quotation marks omitted); *see also* Pl. Swalwell's Combined Opp'n to Defs.' Mots. to Dismiss, ECF No. 23 [hereinafter *Swalwell* Opp'n], at 11 (arguing that "Trump conflates his role as a candidate with his role as President"); *Blassingame* Pls.' Opp'n to Def.'s Mot. to Dismiss, ECF No. 21 [hereinafter *Blassingame* Pls.' Opp'n], at 6 ("Article II does not provide Trump with immunity for inciting an insurrection.").  These formulations present their own set of problems.

For one, the line between President and candidate will not always be clear.  A first-term President is, in a sense, always a candidate for office.  It is not the least bit unusual for first-term Presidents to comment on public policy or foreign affairs at campaign events, or, in this day, to

announce policy changes by tweet during an election year.   Plaintiffs offer no principled constitutional basis on which to discern how to categorize such acts.[14]

As for their contention that immunity cannot extend to a President that incites a mob to attack a co-equal branch of government, while having surface appeal, it too runs into an analytical problem.  If what Plaintiffs mean to say is that an alleged violation of law by a President cannot fall within the outer perimeter of his official duties, the Supreme Court rejected that very argument in *Fitzgerald*.  Such a "construction," the Court said, "would subject the President to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose. Adoption of this construction thus would deprive absolute immunity of its intended effect." *Fitzgerald*, 457 U.S. at 756–57.  Plaintiffs' position also runs up against the Court's admonition that a test for immunity that depends upon "a President's motives" "could be highly intrusive." *Id.* at 756.  Predicating an immunity determination on whether President Trump intended to cause a riot arguably would require just such an inquiry.[15]

---

[14] At oral argument and in a post-hearing filing, Plaintiffs proposed that the court could rely on an Office of Legal Counsel Opinion from 1982, Payment of Expenses Associated with Travel by the President and Vice President, 6 Op. O.L.C. 214 (1982), to distinguish between a President's official duties and campaign activities. *See* Hr'g Tr. 33; Pls.' Notice of Suppl. Authority, ECF No. 59 (on *Thompson* docket).  That Opinion adopts a "reasonable connection" to "official purposes" test to differentiate the two capacities. 6 Op. O.L.C. at 216.  The court is skeptical that a test rooted in statutory and administrative rules on spending of appropriations can define the scope of a *constitutional* immunity.

[15] That said, the court would be remiss in not pointing out that there is at least some historical support for Plaintiffs' position.  In *Fitzgerald*, the Court found persuasive Justice Story's analysis on presidential immunity.  457 U.S. at 749 (quoting 3 J. STORY, COMMENTARIES OF THE CONSTITUTION OF THE UNITED STATES § 1563, at 418–19 (1st ed. 1833)).  Justice Story also commented on the open question of "whether, under the constitution, any acts are impeachable, except such, as are committed under colour of office." 2 Commentaries § 799.  In other words, does the constitutional remedy of impeachment extend to official acts only, or can it be based on unofficial conduct?  In addressing this issue, Justice Story did not formulate a firm opinion, but he did make the following observation:

> In the argument upon Blount's impeachment, it was pressed with great earnestness, that there is not a syllable in the constitution, which confines impeachments to official acts, and it is against the plainest dictates of common sense, that such restraint should be imposed upon it. *Suppose a judge should countenance, or aid insurgents in a meditated conspiracy or insurrection against the government. This is not a judicial act*; and yet it ought certainly to be impeachable.

### iii.    *The President's challenged acts*

Rather than apply the parties' proffered categorial rules to the immunity question, the court thinks the better course is to evaluate the defense on the specific facts alleged and, based on those facts, determine whether President Trump's words were spoken in furtherance of a presidential function. That is the approach that the D.C. Circuit took in *Banneker Ventures, LLC v. Graham*, a case in which then–Board Member of the Washington Metropolitan Area Transit Authority ("WMATA") Jim Graham asserted absolute immunity from a suit accusing him of improperly interfering with a developer's ultimately unsuccessful project negotiations with WMATA. 798 F.3d 1119, 1139 (D.C. Cir. 2015). The court viewed Graham's immunity defense, in part, through the lens of federal common law and asked whether Graham's alleged conduct fell within the scope of his official duties. *Id.* at 1140. It applied the "within the outer perimeter of [an official's] line of duty" test as demarcating the line between Graham's official and unofficial acts. *Id.* (quoting *Barr v. Matteo*, 360 U.S. 564, 575 (1959)). The trial court had found that all of Graham's alleged tortious acts were immune, but the D.C. Circuit criticized the trial court for "conceiv[ing] of the inquiry at too high a level" and for not "analyzing each challenged act." *Id.* at 1141; *id.* ("At a high enough level of generality, almost any act that has any relationship to an overarching duty . . . will be immunized."). "The appropriate focus," the court wrote, "is on the relationship between 'the act complained of' and the corresponding 'matters committed by law to [the official's] control or supervision.'" *Id.* (quoting *Barr*, 360 U.S. at 573). The court noted that

---

*Id.* § 802 (emphasis added). Justice Story's mention of "Blount's impeachment" refers to the impeachment of Senator William Blount of Tennessee in 1797, who stood accused of conspiring with British officials and others in a plot to establish British control over the Spanish-controlled territories of Louisiana and the Floridas. The House impeached Blount, but the Senate ultimately dismissed the charges because Blount had already been expelled and the Senate concluded it no longer had jurisdiction over him. *See Impeachment Trial of Senator William Blount, 1799*, U.S. SENATE, https://www.senate.gov/about/powers-procedures/impeachment/impeachment-blount htm (last visited Feb. 8, 2022). This tidbit of history does lend some credence to the notion that a high government official who "aid[s] insurgents in a meditated conspiracy or insurrection against the government" is not acting in an official capacity.

36

"[o]ne way that an official acts manifestly beyond his authority is through the use of 'manifestly excessive means,' even if he does so in the conduct of duties otherwise within his official purview." *Id.* at 1141 (citation omitted). The court emphasized that the burden of establishing immunity rests on the official claiming it. *Id.* at 1140.

Concededly, the scope-of-duty evaluation undertaken in *Graham* was quite rigorous, and such rigor arguably should not apply here with equal force. This case involves the President of the United States, not a board member of a public agency. (*Barr*, on which *Graham* relied, involved the acting director of a federal agency.) There are separation-of-powers considerations at play here that were not present in *Graham*. Nevertheless, the court believes that *Graham*'s basic approach applies; that is, in evaluating a presidential claim of absolute immunity the court must consider the relationship of the challenged conduct to the claimed corresponding function of the President.

In undertaking this analysis, the court starts from the following premise, as to which there should be no dispute: The Office of the President has no preference for who occupies it. Article II of the Constitution, which defines the powers and duties of the President, is agnostic as to whether a sitting President is elected to a new term. So, too, is federal statutory law. A function of the presidency therefore is *not* to secure or perpetuate incumbency. Plaintiffs' allegations against President Trump accuse him of doing just that: devoting his last weeks in office to continuing his term as President of the United States through the Electoral College vote and certification process, even though he did not prevail in the general election.

Among his first alleged acts following the general election were tweets criticizing state officials for not doing enough to enable him to prevail in their states. *Swalwell* Compl. ¶ 36 (criticizing the governors of Arizona and Georgia and saying, "If they were with us, we would

37

have already won both").  The President also directly contacted local election officials and state legislators in Michigan, Pennsylvania, and Georgia to allegedly pressure them to overturn their election results.  *Id.* ¶¶ 37–54.  These efforts included urging local Michigan officials to reverse their certification of election results, *id.* ¶ 38, and saying to Georgia's Secretary of State, "I just want to find 11,780 votes, which is one more than we have," *id.* ¶ 53.  He would later call that Georgia state official an "enemy of the people."  *Thompson* Compl. ¶ 47.  President Trump also filed multiple lawsuits in jurisdictions in which he did not prevail.  *Id.* ¶ 36.  Those suits plainly were directed at securing incumbency.  They, like his tweets and direct outreach to state election officials, were not official acts.

The same is true with respect to his tweets regarding rallies that occurred in Washington, D.C., in November and December 2020.  Those tweets did not advocate any policy changes or legislation.  Rather, they expressly stated or implied that the rallies would help him remain President.  *Blassingame* Compl. ¶¶ 23, 25, 26 (tweeted photo of rally captioned "We will WIN!"); *id.* ¶ 27 (tweet stating "WE HAVE JUST BEGUN TO FIGHT!!!").

That, too, was the purpose of the January 6 Rally.  President Trump invited people to Washington, D.C., for the event.  *Id.* ¶ 32.  In a tweet referencing the January 6 Rally, he encouraged his followers to "Never give up."  *Swalwell* Compl. ¶ 56.  On the eve of the January 6 Rally, the President's tweets turned to Vice President Pence.  *Blassingame* Compl. ¶ 38.  The President expressed the view that the Vice President had the power, as President of the Senate, to reject states' Electoral College certifications and return them to be recertified.  *Id.*  The clear purpose of such recertification would be to allow Electoral College votes to be recast in his favor: "All Mike Pence has to do is send them back to the States, AND WE WIN."  *Id.*  These tweets were not official acts but issued to help him "win."

38

Nor did planning for the January 6 Rally involve official duties. Those acts took place largely through President Trump's campaign organization. In mid-December, the campaign used campaign funds to pay Event Strategies, Inc., the company that would secure the permit for the January 6 Rally. *Blassingame* Compl. ¶ 31. The campaign's Director of Finance was listed as the "VIP Lead" for the rally, *Swalwell* Compl. ¶ 97, and a "top Trump campaign fundraiser oversaw the logistics, budgeting, funding and messaging" for the rally, *Thompson* Compl. ¶ 68. The Trump campaign and various related entities paid more than $3.5 million to assist in organizing. *Blassingame* Compl. ¶ 39. President Trump also allegedly participated directly in the planning. He was involved in decisionmaking about the speaking lineup and music selection. *Thompson* Compl. ¶ 69. And, critically, to the surprise of rally organizers, President "Trump and his campaign proposed that the rally include a march to the Capitol," even though the permit they had obtained did not allow for one. *Id.* ¶¶ 69, 90 (alleging that the permit expressly provided: "This permit does not authorize a march from the Ellipse"). Organizing the January 6 Rally involved no presidential function.

And then there is the January 6 Rally Speech itself. The court has considered it in its entirety, analyzing it beyond the words quoted in the Complaints. The court will go into greater detail about the Speech later in this opinion. For present purposes it suffices to say that while the Speech did touch on matters of public concern (namely President Trump's pledge to work on election laws in a second term), the main thrust of the Speech was not focused on policy or legislation. It was to complain about perceived cases of election fraud that led President-elect Biden to win more votes in closely contested states, to urge members of Congress to object to certain state certifications, and to exhort the Vice President to return those certifications to those states to be recertified. Much like the tweets leading up to the January 6 Rally, the words spoken

by the President—without delving into the motivation behind them—reflect an electoral purpose, not speech in furtherance of any official duty.

To deny a President immunity from civil damages is no small step.  The court well understands the gravity of its decision.  But the alleged facts of this case are without precedent, and the court believes that its decision is consistent with the purposes behind such immunity. Subjecting a president to potential liability for the acts described in the Complaints will not "diver[t] . . . the President's attention during the decisionmaking process" with "needless worry as to the possibility of damages actions stemming from any particular official decision."  *Clinton*, 520 U.S. at 694 n.19.  After all, the President's actions here do not relate to his duties of faithfully executing the laws, conducting foreign affairs, commanding the armed forces, or managing the Executive Branch.  They entirely concern his efforts to remain in office for a second term.  These are unofficial acts, so the separation-of-powers concerns that justify the President's broad immunity are not present here.  "If the Judiciary may severely burden the Executive Branch by reviewing the legality of the President's official conduct, and if it may direct appropriate process to the President himself, it must follow that the federal courts have power to determine the legality of his unofficial conduct."  *Id.* at 705.  The court therefore may "determine the legality" of President Trump's acts that are alleged to have given rise to Plaintiffs' injuries on January 6th.

*iv.*      *Section 1986 claim*

The foregoing comes with one important caveat:  President Trump is immune as to Swalwell's failure-to-act claim under § 1986.  That provision states:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned [in section 1985 of this title], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such

40

> wrongful act, which such person by reasonable diligence could have
> prevented.

42 U.S.C. § 1986. The statutory provision is unique. It requires persons with knowledge of a conspiracy proscribed in § 1985 and with the means to prevent the conspiracy to take affirmative actions to do so. A person who refuses or neglects to exercise such power is liable for damages to those persons whose injuries could have been prevented.

Swalwell alone asserts a claim under § 1986 against President Trump. He alleges that President Trump knew about the alleged § 1985 conspiracy, had the power to prevent it, and failed to exercise "reasonable diligence" to avoid harm. Specifically, he asserts that "when it was clear that rioters had stormed the Capitol, and Congress was unable to certify the results of the Electoral College vote, [President Trump] had the power to stop the rioters but refused and, instead, encouraged them." *Swalwell* Compl. ¶ 190. That allegation, it would seem, makes out a § 1986 claim against the President.

But the President cannot be held liable for his failure to exercise his presidential powers, at least under § 1986. Just as he is immune for acts that fall within the outer perimeter of his official responsibilities, so too must he be immune for alleged failures to exercise that official responsibility. Were it otherwise, Presidents routinely would be subject to suit for not doing more or for not acting at all. Absolute immunity would be gutted if a plaintiff could avoid it simply by alleging a failure to exercise presidential power. The court therefore dismisses Swalwell's § 1986 claim.[16]

---

[16] If Swalwell contends that President Trump is liable under § 1986 because he himself is an alleged coconspirator and had the power to stop the conspiracy, the court is dubious that § 1986 can sustain such a construction. If accepted, it would mean that any coconspirator of a § 1985 conspiracy with some degree of authority is likewise liable under § 1986. The court is skeptical that Congress intended such an interpretation. In any event, Swalwell does not specifically articulate a reading of § 1986 that would rest on the President's failure to act *before* the rally-goers stormed the Capitol. *See Swalwell* Compl. ¶ 90.

3.      *The Political Question Doctrine*

President Trump raises a related jurisdictional argument:   these cases present a nonjusticiable political question.  *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012) (stating that, when a case involves a political question, "a court lacks the authority to decide the dispute").  The political question doctrine removes from the purview of the courts cases that "revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."  *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).  The doctrine bars a court's "jurisdiction only when the Constitution textually commits 'the issue' to be adjudicated in the case 'to a coordinate political department,' or when there is 'a lack of judicially discoverable and manageable standards for resolving it.'"  *Hourani v. Mirtchev*, 796 F.3d 1, 8 (D.C. Cir. 2015) (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993)).  President Trump's effort to morph this case into one presenting a political question fails.

For starters, the court already has held that the President's actions leading up to the riot at the Capitol building were not undertaken in his official capacity.  To that extent, these cases implicate no policy choice or value determination committed to the Executive Branch.  That holding alone takes this case outside of the political question doctrine.

But even if the court uses the doctrine's analytical framework, President Trump fares no better.  He first argues that because this suit is "based upon the words or action of the President," an adjudication "would improperly regulate the executive department, in violation of Article II, § 1 which requires that the executive power be exercised solely by the President."  *Thompson* Trump Mot. at 11–12.  If by that argument the President means that any suit touching on presidential speech gives rise to a political question, that cannot be, because the Constitution says

nothing about a President's speech. Moreover, the Supreme Court has never held that just because a case involves review of a President's claimed exercise of his general Article II executive powers it is nonjusticiable. That is not the law. *See, e.g.*, *Youngstown Sheet & Tube*, 343 U.S. at 587 (rejecting claimed presidential authority to seize steel mills based on Article II's grant of Executive power in the President).

The President next argues that to adjudicate these cases would force the court "to make a value determination about what is or is not proper for the President to say during a political speech when advocating for governmental action." *Thompson* Trump Mot. at 12. It is true that, in a sense, an adjudication here might involve a "judgment" of the President's speech, "[b]ut that has never been enough, by itself, to trigger the political question doctrine's jurisdictional bar." *Cf. Hourani*, 796 F.3d at 8 (stating that the fact that a judgment might implicate the acts of a foreign nation, by itself, does not create a nonjusticiable political question). A suit against the President often has political overtones, but "courts cannot avoid their responsibility merely 'because the issues have political implications.'" *Zivotofsky*, 566 U.S. at 196 (quoting *INS v. Chadha*, 462 U.S. 919, 943 (1983)).

President Trump also tries a different approach. He suggests that because he was impeached by the House but acquitted by the Senate for his actions relating to January 6th, a judicial inquiry of his conduct raises a political question because it might "displace the Senate as the final arbiter on the subject of impeachment, showing disrespect for a co-equal branch." *Blassingame* Trump Mot. at 14. But, of course, this court is in no sense conducting a review of the impeachment proceedings; nor could it do so. *See Nixon*, 506 U.S. at 230–31 (holding that a court lacks the constitutional authority to review the Senate's impeachment trial procedures). Its concern is with the President's potential civil liability for the events of January 6th. The mere fact

43

that these cases and the impeachment proceedings pertain to the same subject matter does not

implicate the political question doctrine.

### 4. The Impeachment Judgment Clause

President Trump also seeks dismissal based upon his impeachment proceedings in a

different way:  he contends that the Impeachment Judgment Clause forecloses civil liability of

someone who is not convicted following an impeachment trial.  The court understands this

argument to challenge its subject matter jurisdiction.  The Impeachment Judgment Clause

provides:

> Judgment in Cases of Impeachment shall not extend further than to
> removal from Office, and disqualification to hold and enjoy any
> Office of honor, Trust or Profit under the United States: but the Party
> convicted shall nevertheless be liable and subject to Indictment,
> Trial, Judgment and Punishment, according to Law.

U.S. Const. art. I, § 3, cl. 7.  According to the President, because the Impeachment Judgment

Clause speaks only to further action against a "Party convicted," and is silent as to a person not

convicted, it follows that the Clause "forbids further litigation of the same claims by those

**acquitted** by the Senate." *Thompson* Trump Mot. at 13.

In support of this reading, the President invokes the *expressio unius est exclusio alterius*

canon of statutory interpretation, which means that "expressing one item of [an] associated group

or series excludes another left unmentioned." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80

(2002) (alteration in original) (citation omitted); *Thompson* Trump Mot. at 13.  But that canon does

not apply.  For one, the President cites no case in which the Supreme Court has used that canon of

*statutory* construction to directly interpret a clause of the Constitution, and the court has struggled

to find one. *Cf. U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 793 n.9 (1995) (relying on one

Framer's commentary to observe that "the Framers were well aware of the *expressio unius*

argument that would result from their wording of the Qualifications Clauses”); *Salamanca Twp. v. Wilson*, 109 U.S. 627, 628 (1883) (applying canon to interpretation of state constitution); *Pine Grove Twp. v. Talcott*, 86 U.S. 666, 675 (1873) (same).  Even if the canon were to apply, “it has force only when the items expressed are members of an ‘associated group or series,’ justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence.” *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (citation omitted); *see also Echazabal*, 536 U.S. at 81 (“The canon depends on identifying a series of two or more terms or things that should be understood to go hand in hand, which [is] abridged in circumstances supporting a sensible inference that the term left out must have been meant to be excluded.”).  The Impeachment Judgment Clause does not contain an “associated group or series” or “two or more terms or things”; it only addresses the non-preclusive effect of a conviction following impeachment.  The Supreme Court has said that “[w]e do not read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it.” *Barnhart*, 537 U.S. at 168.  President Trump offers no evidence to support a conclusion that the Framers intended for the absence of any reference to an acquitted officer following impeachment to mean that such official could not be subject to judicial process.

In fact, the historical evidence is to the contrary.  An Office of Legal Counsel (OLC) Opinion from 2000, which the President himself cites, provides a helpful summary.  *See* Whether a Former President May Be Indicted and Tried for the Same Offense for Which He Was Impeached by the House and Acquitted by the Senate, 24 Op. O.L.C. 110, 113 (2000).  That opinion concludes, “We are unaware of any evidence suggesting that the framers and ratifiers of the Constitution chose the phrase ‘the party convicted’ with a negative implication in mind.” *Id.* at 120.

> Indeed, if the Impeachment Judgment Clause were intended to imply that acquittal by the Senate would block criminal prosecution for the same offenses, one would expect that at least one participant in the process of framing and ratifying the Constitution would have pointed out this negative implication.  We are aware of none.

*Id.* at 121–24.  The court finds the OLC's exhaustive historical recitation of the origins of the Impeachment Disqualification Clause to be persuasive.  The court therefore draws no negative implication from the words of the Impeachment Judgment Clause that would bar civil liability of a President acquitted following impeachment.[17]

### 5.     *Res Judicata and Collateral Estoppel*

President Trump attempts to make one last use of his impeachment proceedings: he contends that his acquittal bars litigation of the present claims on the grounds of res judicata and collateral estoppel.  *Thompson* Trump Mot. at 13–14.  He devotes scant attention to this argument in *Thompson* and *Swalwell*—largely one conclusory paragraph in each motion, *id.* at 14; *Swalwell* Trump Mot. at 14–15—but devotes more attention to it in *Blassingame*, *Blassingame* Trump Mot. at 14–18.  The court addresses it as if fully raised in all three cases.

The doctrine of res judicata, also known as claim preclusion, provides that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."  *Allen v. McCurry*, 449 U.S. 90, 94 (1980).

> Under the doctrine of res judicata . . . a subsequent lawsuit will be barred if there has been prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, and

---

[17] In his *Blassingame* motion, President Trump makes a further argument.  He contends that the Impeachment Judgment Clause's use of the word "Indictment" to start the series "Indictment, Trial, Judgment and Punishment, according to Law" underscores that "an individual *convicted* is only potentially liable for follow on criminal charges brought by the government rather than a civil suit on the same issues."  *Blassingame* Trump Mot. at 21 (emphasis added).  The court already has rejected the contention that the Impeachment Judgment Clause implicitly forecloses further action against an acquitted individual.  President Trump does not, however, make the alternative argument that, even if an *acquitted* official can be subject to some judicial process, the word "Indictment" implies that such process can only be criminal and not civil in nature.  *See id.* at 21–22.  The court therefore does not address that contention.

(3) there has been a final, valid judgment on the merits, (4) by a
court of competent jurisdiction.

*Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006).  The related doctrine of collateral

estoppel, or issue preclusion, provides that "once a court has decided an issue of fact or law

necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different

cause of action involving a party to the first case."  *Allen*, 449 U.S. at 94.

> [C]ollateral estoppel bars successive litigation of an issue of fact or
> law when "(1) the issue is actually litigated; (2) determined by a
> valid, final judgment on the merits; (3) after a full and fair
> opportunity for litigation by the parties or their privies; and (4) under
> circumstances where the determination was essential to the
> judgment, and not merely dictum.".

*Capitol Servs. Mgmt., Inc. v. Vesta Corp.*, 933 F.3d 784, 794 (D.C. Cir. 2019) (citation omitted).

Applying these preclusion doctrines strikes the court as more complicated that it might

seem at first blush.  Plaintiffs, for instance, argue that the President's Senate impeachment trial is

not a prior "litigation" because the term "litigation" is defined to mean the resolution of disputes

in a court of law.  *See Thompson* Pls.' Opp'n at 73.  But the Supreme Court has recognized that

preclusion principles can bind an Article III court based on a final judgment from an administrative

agency acting in a judicial capacity.  *See B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S.

138, 148 (2015) ("Both this Court's cases and the Restatement make clear that issue preclusion is

not limited to those situations in which the same issue is before two *courts*.").  And, there is a more

than colorable argument to be made that the Senate acts in a judicial capacity when "try[ing]" an

official on an Article of Impeachment.  *See, e.g.*, *In re Comm. on the Judiciary, U.S. House of*

*Representatives*, 951 F.3d 589, 596 (D.C. Cir. 2020) ("The constitutional text confirms that a

Senate impeachment trial is a judicial proceeding."), *vacated and remanded sub nom. Dep't of*

*Just. v. House Comm. on the Judiciary*, 142 S. Ct. 46 (2021).  Plaintiffs also argue that the "claims"

47

here are different because they rest on federal and District of Columbia law, as opposed to the sole charge of "Incitement of Insurrection" lodged against the President by the House. *See Thompson* Pls.' Opp'n at 73; *Blassingame* Pls.' Opp'n at 19. But Plaintiffs read the "same claim" element too narrowly, because "[w]hether two cases implicate the same cause of action turns on whether they share the same 'nucleus of facts.'" *Apotex, Inc. v. FDA*, 393 F.3d 210, 217 (D.C. Cir. 2004) (citation omitted). The impeachment trial and this case clearly do.

Still, the court thinks that neither doctrine applies for several reasons. First, the text of the Impeachment Judgment Clause does not support their application. As discussed, that Clause expressly contemplates that a person impeached and convicted could face a criminal trial. *See Nixon*, 506 U.S. at 234 ("[T]he Framers recognized that most likely there would be two sets of proceedings for individuals who commit impeachable offenses—the impeachment trial and a separate criminal trial."). The court also has concluded that neither the text nor the history of the Clause forecloses a subsequent proceeding, criminal or civil, for a person acquitted following impeachment. *See supra* pp. 44–46. If that is correct, it would be an odd result to then say that the acquitted individual could use the non-conviction by the Senate to have preclusive effect, which would thwart any second proceeding. To accept the President's application of res judicata and collateral estoppel here would add an implicit preclusion bar to the Impeachment Judgment Clause where there is none.

Second, although it is not a settled question, the court doubts that any Plaintiff is in privity with the House of Representatives if one deems the House as the opposing party in an impeachment trial. The *Blassingame* Plaintiffs certainly are not in privity with members of the House. Swalwell and the Bass Plaintiffs are members of the House, but in voting for the Article of Impeachment and, in Swalwell's case, prosecuting it, those Plaintiffs were acting in their legislative capacities

as representatives of their constituents.  The Supreme Court has long recognized that the law treats members of Congress differently depending on the capacity in which they are acting.  *See, e.g.*, *Raines*, 521 U.S. at 820–21 (distinguishing between personal and institutional injuries for purposes of a legislator's standing); *United States v. Brewster*, 408 U.S. 501, 507 (1972) ("The immunities of the Speech or Debate Clause were not written into the Constitution simply for the personal or private benefit of Members of Congress . . . .").  Here, they seek relief not as legislators but for injuries they suffered personally.

Third, applying preclusion principles here would require the court to assess the adequacy of the Senate proceedings, an inquiry that is nonjusticiable.  *See Nixon*, 506 U.S. at 229–30, 237–38 (declining to decide whether the authority conferred on the Senate "to try all Impeachments" precluded certain Senate impeachment procedures).  For instance, assessing whether Plaintiffs here had "a full and fair opportunity for litigation" for purposes of collateral estoppel would require the court to evaluate the adequacy of the Senate procedures used during the President's impeachment trial.  *See* Restatement (Second) of Judgments § 28(3) (Am. L. Inst. 1982) (stating that issue preclusion may not apply where "differences in the quality or extensiveness of the procedures followed in the two courts or by factors relating to the allocation of jurisdiction between them").  This the court cannot do.

Finally, it is impossible to discern whether there was a "final, valid judgment on the merits" for purposes of res judicata, *Smalls*, 471 F.3d at 192, and what issues of fact or law the Senate deemed "necessary to its judgment" for purposes of collateral estoppel, *Allen*, 449 U.S. at 94.  The Senate made no written findings, and individual Senators were not required to explain the reason for their vote for acquittal.  In fact, if the court looks beyond the pleadings, several Senators, including Senate Minority Leader Mitch McConnell, publicly stated that they voted to acquit

49

because the Senate lacked jurisdiction to punish a former President.  *See Swalwell* Opp'n at 36.

An acquittal on jurisdictional grounds arguably does not constitute a "judgment on the merits" for

purposes of res judicata.  *Cf. Kasap v. Folger Nolan Fleming & Douglas, Inc.*, 166 F.3d 1243,

1248 (D.C. Cir. 1999) (stating that "dismissals for lack of jurisdiction are not decisions on the

merits and therefore have no *res judicata* effect on subsequent attempts to bring suit in a court of

competent jurisdiction").  Nor would such an acquittal have any bearing on this court's jurisdiction

for purposes of collateral estoppel.

The court therefore holds that neither res judicata nor collateral estoppel bars these suits or

precludes litigation of any issue or fact.

## B.      Failure to State a § 1985(1) Claim

Having concluded that all claims against Defendants, except one (Swalwell's § 1986

claim), are justiciable, the court now turns to the question of whether Plaintiffs have stated a claim

under § 1985(1).  All Defendants argue that Plaintiffs have not.  Their arguments are as follows:

(1) Swalwell and the Bass Plaintiffs lack statutory standing to bring suit under § 1985(1);

(2) Swalwell and the Bass Plaintiffs are not "covered federal officials" under § 1985(1);[18] (3) no

Plaintiff can state a claim because members of Congress were not discharging a "duty" on

January 6th; and (4) Plaintiffs have failed to allege a plausible conspiracy among Defendants and

others.  The court rejects the first three arguments outright.  As to the fourth, the court finds that

Plaintiffs have pleaded a plausible § 1985(1) conspiracy against President Trump, the Oath

Keepers, and Tarrio, but not Trump Jr. and Giuliani.

---

[18] President Trump does not advance these first two arguments against the *Blassingame* Plaintiffs, and because statutory standing is not jurisdictional, *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–28 (2014), the court treats them as forfeited as to the *Blassingame* Plaintiffs.

### 1.   *Statutory Standing*

Inquiry into a plaintiff's statutory standing asks whether the plaintiff "has a cause of action under the statute." *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 & n.4 (2014). That question requires a court "to determine the meaning of the congressionally enacted provision creating a cause of action." *Id.* at 128. In doing so, the court "appl[ies] traditional principles of statutory interpretation." *Id.* The ultimate question is not whether in the court's "judgment Congress *should* have authorized [the plaintiff's] suit, but whether Congress in fact did so." *Id.*

Section 1985 authorizes a "party" that is "injured in his person or property" to bring suit to recover damages for such injury against any "one or more of the conspirators" of a conspiracy proscribed by § 1985(1). 42 U.S.C. § 1985(3). No one makes the argument that such broad text might permit a suit by anyone who can satisfy the requirements of Article III, and likely for good reason: The Supreme Court in *Lexmark* rejected such an expansive reading of the remedial provision of the Lanham Act, which authorizes suit by "'any person who believes that he or she is likely to be damaged' by a defendant's false advertising." *Lexmark*, 572 U.S. at 129 (quoting 15 U.S.C. § 1125(a)). Instead, the court relied on "two relevant background principles": the "zone of interests and proximate causality." *Id.* at 129. Applying those principles, the Court held, "supplies the relevant limits on who may sue." *Id.* at 134. In this case, there can be no genuine dispute at this stage that Defendants' alleged acts were the proximate cause of Plaintiffs' claimed injuries, and so the court does not dwell on that requirement. The court focuses on the zone of interests.

The Supreme Court has "presume[d]" that "a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" *Id.* at

129 (citation omitted).   Though originally formulated in the context of challenges under the Administrative Procedure Act, the Court has "made clear" that the zone-of-interests analysis "applies to all statutorily created causes of action."  *Id.*  A court should look to "the interests protected" by the statute to determine whether a plaintiff comes with its zone of interests.  *Id.* at 131.

The interests protected by § 1985(1) are decidedly broad.  As the Seventh Circuit observed in *Stern v U.S. Gypsum*:

> [W]e think it important to note here that Congress, in enacting what became § 1985(1), did not fashion a narrow and limited remedy applicable only to the southern states in 1871.  The outrageous conditions there at that time were, no doubt, what induced Congress to act, but it chose to do so with a statute cast in general language of broad applicability and unlimited duration.

547 F.2d at 1335 (citations omitted).  The court also noted that the Supreme Court had accorded the Reconstruction-Era civil rights statutes "a sweep as broad as [their] language."  *Id.* at 1336 (alteration in original) (quoting *United States v. Price*, 383 U.S. 787, 801 (1966)).  Viewed in this way, the Seventh Circuit had little trouble concluding that § 1985(1)'s protections extended to an Internal Revenue Service Agent who claimed the defendants had conspired to defame and discredit him to his superiors.  *Id.* at 1335–36.  It strains credulity to think that Reconstruction-Era members of Congress meant to protect low-level Executive Branch employees but not themselves.

The statutory text supports this conclusion.  Section 1985(1) makes unlawful conspiracies whose object is a person who occupies "any office, trust, or place of confidence under the United States" or is "any officer of the United States."  42 U.S.C. § 1985(1).  The words used by Congress here are decidedly expansive and, on their face, would seem to encompass members of Congress.  President Trump nevertheless insists that these words must be read in tandem with their usage in the Constitution.  President Trump thus maintains that the word "officer" includes only persons

"appoint[ed] by the President, or of one of the courts of justice[,] or heads of departments authorized by law to make such an appointment." *Thompson* Trump Mot. at 16–17 (quoting *United States v. Mouat*, 124 U.S. 303, 307 (1888)). Similarly, he contends that the phrase "any office, trust, or place of confidence" must be read consistent with Article I, § 1, which states that "no Senator or Representative, or Person holding an Office of Trust or Profit under the United States," shall serve as an Elector. *Thompson* Trump Mot. at 16. Because the Constitution distinguishes between members of Congress and a "Person holding an Office of Trust or Profit under the United States," he asserts, the Bass Plaintiffs and Swalwell do not hold "any office, trust, or place of confidence" for purposes of § 1985(1). *Id.* at 17–18. He also focuses on the modifier "under the United States" and points to Article I, § 6, which disqualifies "a Member of either House during his Continuance in Office" from "holding any Office under the United States." *Id.* at 17. So, in short, President Trump argues that because the Bass Plaintiffs and Swalwell are not identified as among those protected by § 1985(1), they cannot bring a claim under it.

The court doubts that Congress intended to use the Constitution as a dictionary for interpreting the words found in § 1985(1). President Trump points to no case or legislative history to support his preferred reading. To the contrary, cases like *Stern* have read the scope of § 1985(1) broadly, consistent with its words. *Cf.* 1 Op. O.L.C. 274, 276 (1977) (opining, in the context of interpreting § 1985(1)'s identically worded, companion criminal statute, 28 U.S.C. § 372, that "[t]he broad purpose of protecting the Federal presence as fully as possible therefore supports a broad, rather than a narrow, reading of the word 'office'"). This court does the same.

Moreover, the Supreme Court has not reflexively imported constitutional meanings into federal statutes, as President Trump urges the court to do. *Lamar v. United States*, 240 U.S. 60 (1916), is illustrative. There, a defendant who presented himself as a member of the House of

53

Representatives was convicted of impersonating "an officer of the United States." *Lamar*, 240

U.S. at 64.  On appeal, the defendant asserted, much like President Trump does here, "that the

interpretation of the Constitution was involved in the decision that a Congressman is an officer of

the United States." *Id.*  The Court soundly rejected that argument, saying "[a]s to the construction

of the Constitution being involved, it obviously is not." *Id.* at 65.  "[W]ords may be used in a

statute in a different sense from that in which they are used in the Constitution." *Id.*  The pertinent

question, the Court said, was what "officer" meant not in the Constitution but in the criminal code.

*Id.*  The same is true here.

To conduct that inquiry the court focuses on the meaning of the words used in § 1985(1).

Courts "normally interpret[] a statute in accord with the ordinary public meaning of its terms at

the time of its enactment. After all, only the words on the page constitute the law adopted by

Congress and approved by the President." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1738

(2020).  Starting with the word "office," the Bass Plaintiffs have convincingly shown that

Reconstruction-Era dictionaries defined that term to include legislators.  One law dictionary

defined "office" to mean "a right to exercise a public function or employment, and to take the fees

and emoluments belonging to it," and identified as an example of a "political office" "the office

of the president of the United States, of the heads of departments, [or] of *the members of the*

*legislature*."  JOHN BOUVIER, LAW DICTIONARY, ADAPTED TO THE CONSTITUTION AND LAWS OF

THE UNITED STATES OF AMERICA, AND OF THE SEVERAL STATES OF THE UNION 259 (5th ed. 1855)

(emphasis added).[19]  That same dictionary defines "officer" to include "members of congress." *Id.*

at 260.  Other dictionaries from that period are to the same effect.  2 ALEXANDER M. BURRILL, A

LAW DICTIONARY AND GLOSSARY 257 (2d ed. 1867) (defining "office" to mean any "position or

---

[19] According to a Westlaw search, the Supreme Court has cited various editions of Bouvier's *Law Dictionary* over
50 times, most recently in 2019 in *Peter v. NantKwest, Inc.*, 140 S. Ct. 365, 372 (2019).

station in which a person is employed to perform certain duties," including "[a] station or employment conferred by election of the people"); EDWARD HOPPER & J.J.S. WHARTON, LAW LEXICON, OR DICTIONARY OF JURISPRUDENCE: EXPLAINING THE TECHNICAL WORDS AND PHRASES EMPLOYED IN THE SEVERAL DEPARTMENTS OF ENGLISH LAW 537 (2d ed. 1860) (defining an "office" as "that function by virtue whereof a person has some employment in the affairs of another, whether judicial, ministerial, *legislative*, municipal, ecclesiastical" (emphasis added)).

The Reconstruction-Era Congress also would have understood the term "trust" to include members of Congress.  In fact, the term had a meaning broader than the term "office."  It included "a confidence reposed in one person for the benefit of another."  BURRILL, *supra*, at 549.  And, though the term "place of confidence" does not appear in the legal dictionaries of the day, its natural meaning must be as all-encompassing as "trust."  There can be little doubt that the plain text of § 1985(1) reaches members of Congress.[20]

President Trump pushes back on none of this definitional history.[21]  Instead, he cites Supreme Court and lower court decisions that use the term "federal officer" in describing the persons protected under § 1985(1).  *Thompson* Trump Reply at 18.  For instance, he cites *Kush v. Rutledge*, in which the Court, when describing the "classes of prohibited conspiracy" under § 1985, said that § 1985(1) made unlawful interference with "the performance of official duties by federal

---

[20] The Bass Plaintiffs also convincingly cite legislative history to buttress their argument that members of Congress are within the reach of § 1985(1).  *Thompson* Pls.' Opp'n at 22–27.  The court need not recite that legislative history here because the meaning of the words found in § 1985(1) plainly encompasses members of Congress.

[21] President Trump does cite a law review article for the proposition that "in common law, an office of trust or profit referred exclusively to those in the employ in the executive, judiciary, or the church," and did not include legislators. *Thompson* Trump Mot. at 17–18 (citing Benjamin Cassady, *"You've Got Your Crook, I've Got Mine": Why the Disqualification Clause Doesn't (Always) Disqualify*, 32 QUINNIPIAC L. REV. 209, 278–79 (2014)).  But this is just another argument to tie § 1985(1)'s terms to similar words in the Constitution.  The cited law review article was reviewing the historical underpinning of the Impeachment Clause, which states that "Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any *Office of honor, Trust or Profit* under the United States."  Art. I, § 3, cl. 7 (emphasis added); *see also* Cassady, *supra*, at 277 ("This interpretation—that legislators are not officers who hold offices of 'honor, Trust or Profit'—is buttressed by the text, history, and structure of the Constitution.").  But for the reasons already discussed, the meaning of the terms in § 1985(1) is not bound by the meaning of similar terms in the Constitution.

officers." 460 U.S. 719, 724 (1983). Similarly, the Ninth Circuit in *Canlis v. San Joaquin Sheriff's Posse Comitatus* said that "the clear import of [§ 1985(1)'s] language is that the statute's protections extend exclusively to the benefit of federal officers." 641 F.2d 711, 717 (9th Cir. 1981). Other courts have put forth the same formulation. *See Miller v. Indiana Hosp.*, 562 F. Supp. 1259, 1281 (W.D. Pa. 1983) (observing that "§ 1985(1) . . . only protects federal officers"); *Lobosco v. Falsetti*, No. 09-1455 (JAP), 2010 WL 4366209, at *3 (D.N.J. Oct. 28, 2010) (citing *Miller*, 562 F. Supp. 1259); *Diulus v. Churchill Valley Country Club*, 601 F. Supp. 677, 681 (W.D. Pa. 1985) ("Section 1985(1), by its terms, proscribes only conspiracies which interfere with the performance of official duties by federal officers."). From these cases President Trump asserts that "the phrase, 'office, trust, or place of confidence under the United States' in § 1985(1) is all merged to mean federal officer." *Thompson* Trump Reply at 19.

But no case says any such thing. A reading of the above-cited cases makes evident that the courts were using "federal officer" as shorthand for persons protected under § 1985(1) and, in the lower-court decisions, to distinguish such persons from state and local officials or private citizens. Of course, the term "federal officer" never appears in § 1985(1), and none of the cited cases engages in a textual analysis of § 1985(1) at all. The definitional shorthand of "federal officer" is of no use in the present case. And, in the end, President Trump's argument still requires equating "officer" with the meaning of the term as used in the Constitution. The court already has rejected that equivalency. The question here is whether the Reconstruction-Era Congress would have understood members of Congress to occupy an "office, trust, or place of confidence under the United States" or qualify as an "officer of the United States." They certainly would have.

The court therefore finds that members of Congress plainly are within § 1985(1)'s zone of interests. Swalwell and the Bass Plaintiffs therefore have statutory standing to advance a claim.

56

2.    *Whether Plaintiffs Are "Covered Federal Officials" Under § 1985(1)*

President Trump advances a variation of the above argument, which the foregoing discussion largely resolves.  He contends that to successfully plead a § 1985(1) claim a plaintiff must allege conspiratorial action directed against a "covered federal official," and because members of the House do not so qualify, Swalwell and the Bass Plaintiffs fail to state a claim. *Thompson* Trump Mot. at 26 n.8; *Swalwell* Trump Mot. at 29 n.12.  For the same reasons the court found Swalwell and the Bass Plaintiffs to have statutory standing, the court rejects the instant contention:   the plain words of § 1985(1), as they would have been understood during the Reconstruction Era, reach members of Congress.  Therefore, a conspiracy to interfere with the discharge of their duties, by force, intimidation, or threat states a § 1985(1) claim.

But there is a bit more to say here.  The Bass Plaintiffs advance an additional theory for stating a claim under § 1986 that does not depend on their occupying an office or position protected under § 1985(1).  They contend that the alleged conspiracy also was designed to "prevent, by force, intimidation, or threat any person from *accepting or holding* any office, trust, or place of confidence under the United States."  42 U.S.C. § 1985(1) (emphasis added).  Those persons that the alleged conspiracy prevented from "accepting or holding" such office were President-elect Biden and Vice President–elect Harris.  *See Thompson* Pls.' Opp'n at 30–31 (explaining that the "broader aim of the conspiracy was to prevent President Biden and Vice President Harris from 'accepting or holding'" their elected offices).  The court agrees with this alternative theory.  The Offices of the President and the Vice President unquestionably qualify as "any office, trust, or place of confidence under the United States."  Persons seeking to "accept[] or hold[]" those offices therefore are, in President Trump's terms, "covered federal officials."   So, even if the Bass Plaintiffs are not "covered federal officials," President-elect Biden and Vice President–elect Harris

57

are, and a conspiracy directed at preventing them from accepting or holding office states a § 1985(1) claim. Under this alternative theory of conspiracy, the Bass Plaintiffs would be able to seek damages as "person[s]" injured by that alleged conspiracy. 42 U.S.C. § 1985(3).

      3.      *Whether Members of Congress Were Discharging a "Duty" on January 6th*

The Oath Keepers advance an argument that no other Defendant does. They maintain that members of Congress were not discharging any "duty" on January 6th. *Thompson* Oath Keepers' Mot. at 4–8. They contend that the Constitution requires the opening of electoral ballots "in the presence of . . . the House of Representatives," U.S. Const. amend. XII, and therefore vests in individual members no duty but only "the *opportunity* to observe" the Electoral College vote. *Id.* at 7–8. In the Oath Keepers' view, because § 1985(1) prohibits conspiracies to prevent federal officials from "discharging any duties," the Bass Plaintiffs cannot state a claim.

This reading of the Constitution defies common sense. The House of Representatives can only act through its individual members. The Certification of the Electoral College vote, in particular the opening of Electoral ballots, cannot proceed "in the presence" of the House unless its individual members show up. Concededly, the Constitution does not expressly require a member to appear for the Certification. But the Constitution lacks such express appearance requirements as a general matter. Article I, which establishes the Congress and defines its powers, nowhere requires that an individual Senator or Representative appear for any particular proceeding. Article I, § 7, for example, which sets forth the process for passing legislation, does not require a Senator or Representative to cast a vote, but no one would reasonably say that the Constitution affords them only an "opportunity" to vote but no duty. The Oath Keepers' argument is also too myopic. It ignores the Electoral Count Act, which does define roles for individual Senators and Representatives in the certification process, including making objections to ballots

and, importantly, debating and voting on such objections. *See supra* pp. 29–30. Swalwell and the Bass Plaintiffs allege that they were at the Capitol on January 6th for those very purposes. *Swalwell* Compl. ¶ 10 (alleging that Swalwell "was at the Capitol performing his official duties as a member . . . to count the Electoral College votes and certify the winner of the 2020 Presidential election"); *Thompson* Compl. ¶¶ 12–21 (alleging that, for example, one member Plaintiff "was present in the Capitol on January 6, 2021, prepared to discharge her duties of tallying ballots of the Electoral College and certifying the results of the 2020 presidential election").

The Oath Keepers' reading also is inconsistent with the broad scope of § 1985(1). Under their reading, only expressly mandated acts qualify as a "duty," and everyday discretionary acts— like voting on legislation or nominees, speaking to the press, or meeting with a constituent—would not. A member of Congress is not *required* to do any of those things. To read § 1985(1) to not reach such acts would eviscerate its purpose.

The court also notes that the Oath Keepers' argument does nothing to defeat the Bass Plaintiffs' alternative theory of liability under § 1985(1): that the charged conspiracy was intended to prevent the President-elect and the Vice President–elect from "accepting or holding" office. On this alternative theory, it does not matter whether members of the House had a "duty."

Finally, the Oath Keepers make two additional arguments that the court quickly dismisses. First, they contend that the Bass Plaintiffs have pleaded themselves out of a claim because they allege that the Joint Session of Congress was in recess at the time rioters entered the Capitol building and, therefore, the "delay" in the proceedings occasioned on January 6th was due to "this internal reason," not Defendants' conduct. *Thompson* Oath Keepers' Mot. at 9. That argument makes little sense for it does not matter what initially caused the Joint Session to recess or when it occurred: the alleged interference occurred during the hours that it took to remove the Oath

59

Keepers and others from the Capitol building, when the Bass Plaintiffs otherwise would have been discharging their duty to certify election results. Second, the Oath Keepers argue that "Plaintiffs further allege that each member in his or her personal capacity were delayed, but this states no constitutional violation as a matter of law because the Constitutional provisions asserted in the complaint do not speak to or address delay of the proceeding." *Id.* It is not at all clear what the Oath Keepers mean by this. The Bass Plaintiffs assert that the Oath Keepers' conduct both prevented and delayed discharge of their duties; § 1985(1) requires no textual hook in the Constitution to define the interfered-with duty, although there is one here, or the ways in which someone might prevent such duty from being discharged.

### 4. Pleading of a Conspiracy

The court now reaches the most significant of Defendants' sufficiency-of-pleading contentions: that all Plaintiffs have failed to plead a plausible conspiracy. Section 1985(1) is a conspiracy statute, and so pleading a plausible conspiracy is an essential element of all Plaintiffs' § 1985(1) claims.

Before evaluating the sufficiency of the allegations, the court must address two arguments made by Trump and Giuliani about the pleading requirements. Invoking the standard under Rule 9(b), they have insisted that Plaintiffs must plead conspiracy with "particularity." *See, e.g.*, *Thompson* Trump Mot. at 25; *Thompson* Giuliani Mot. at 10. Not so. The Supreme Court in *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 169 (1993), held that Rule 9(b)'s heightened pleading standard applies only to the two instances identified in the Rule: "the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b). *Leatherman*, 507 U.S. at 168 (rejecting heightened pleading standard for a claim under § 1983). Neither circumstance applies here.

Second, Trump and Giuliani contend that Swalwell and the Bass Plaintiffs must plead "actual malice" as part of their § 1985(1) claim because they are public officials. *Thompson* Trump Mot. at 26; *Thompson* Giuliani Mot. at 11. Again, not so. The element of "actual malice" derives from defamation claims against public figures. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). Courts have applied an "actual malice" requirement to claims under § 1985, but only when the conspiracy involved defamatory conduct. *See Barr*, 370 F.3d at 1202–03 ("Both the Supreme Court and this court have made clear that the constitutional protections available to defendants charged with defaming public officials may extend to other civil actions alleging reputational or emotional harm from the publication of protected speech."). No such conduct is alleged here. Plus, a state-of-mind element that would require Plaintiffs to prove that a defendant made a statement with "knowledge that it was false or with reckless disregard of whether it was false or not" would make little sense in the context of a claim for conspiracy to interfere with discharge of a federal legislator's duties through force, intimidation, or threat. *New York Times Co.*, 376 U.S. at 279–80.

### a.    Principles of civil conspiracy

With these two issues out of the way, the court turns to describing the general principles of civil conspiracy. The term "conspiracy," particularly in the minds of non-lawyers, likely conjures images of people meeting secretly to hatch a plan to violate the law. That is certainly one type of conspiracy. But the law does not require such a degree of deliberation, formality, or coordination. Conspiracies can be, and often are, established with far less direct proof.

"A civil conspiracy is defined as an agreement between two or more people to participate in an unlawful act or a lawful act in an unlawful manner." *Hobson v. Wilson*, 737 F.2d 1, 51 (D.C. Cir. 1984). The agreement can be either express *or* tacit. *Halberstam v. Welch*, 705 F.2d 472, 476

61

(D.C. Cir. 1983). So, a plaintiff "*need not* show that the members entered into any express or formal agreement, or that they directly, by words spoken or in writing, stated between themselves what their object or purpose was to be, or the details thereof, or the means by which the object or purpose was to be accomplished." 3B FED. JURY PRAC. & INSTR. § 167:30, Westlaw (database updated Jan. 2022) (quoting federal standard jury instruction for claims brought under § 1985(3) (emphasis added)). It is enough "that members of the conspiracy in some way or manner, or through some contrivance, positively or tacitly[,] came to a mutual understanding to try to accomplish a common and unlawful plan." *Id.* All coconspirators must share in the general conspiratorial objective, though they need not know all the details of the plan or even possess the same motives. *Hobson*, 737 F.2d at 51. They need not know the identities of other coconspirators. *Id.* In short, a civil conspiracy requires a showing "that there was a single plan, the essential nature and general scope of which were known to each person who is to be held responsible for its consequences." *Id.* at 51–52 (cleaned up). And, to be actionable, there must be an overt act in furtherance of the conspiracy that results in injury. *Id.* at 52.

At this stage of the case—on motions to dismiss—Plaintiffs' burden to establish a conspiracy is lighter than it would be following discovery. A plaintiff at this stage must draft a complaint "with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. Such factual matter must establish "plausible grounds to infer an agreement" but not "a probability requirement at the pleading stage." *Id.* The standard for pleadings "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Id.*

b.       The alleged conspiracy

Before assessing the sufficiency of Plaintiffs' pleadings, it is important to bear in mind what the alleged unlawful conspiracy is and what it is not.  It is not that Defendants conspired to sow doubt and mistrust about the legitimacy of the electoral process and results of the 2020 presidential election.  Nor is it that Defendants worked together to influence, pressure, or coerce local officials, members of Congress, and the Vice President to overturn a lawful election result. Though many Americans might view such conduct to be undemocratic or far worse, neither example is an actionable conspiracy under § 1985(1).  The conspiracy alleged is that Defendants agreed "to prevent, by force, intimidation, or threat," (1) Swalwell and the Bass Plaintiffs from discharging their duties in certifying the results of the presidential election and (2) the President-elect and Vice President–elect from "accepting or holding" their offices.[22]  It is this conspiracy that Plaintiffs must plausibly establish through well-pleaded facts.  The court begins with a detailed summary of those facts and then, assuming those facts to be true, assesses their sufficiency as to each coconspirator.

i.       *Summary of allegations*[23]

According to Plaintiffs, in the months leading up to January 6th, President Trump and his allies created the conditions that would enable the violence that happened that day.  The President's role during this period was multifaceted.  It included regularly issuing false tweets insisting, among other things, that the elections in those states and localities where he had not prevailed were rampant with voter fraud; that he actually had won in those places when in truth he had lost; that

---

[22] The *Blassingame* Plaintiffs do not allege that the conspiracy's purpose was to prevent them from discharging their duties, but they do allege that they were injured as a result of the conspiracy to disrupt the Certification of the Electoral College vote.  *Blassingame* Compl. ¶ 226.

[23] In this section, the court does not include citations to the Complaints to support these facts to avoid cluttering up the text.  There is no dispute that the Complaints make these allegations.

"big city . . . crooks" had plotted to "steal votes"; that if certain Republican governors had done more he would have won; and that a voting-machine vendor had helped rig elections.  President Trump also directly contacted state and local election officials in places where he had lost to convince them to take steps to reverse their election results.  And, he invited supporters to come to Washington, D.C., for a rally on January 6th, the day of the Certification of the Electoral College vote.  President Trump directly participated in rally planning, and his campaign committee provided substantial funding and organizational assistance.  Giuliani and Trump Jr. aided the President in the foregoing efforts.  They coordinated with him, spread similar disinformation, contacted state and local election officials, and agreed to speak at the January 6 Rally.

According to the Complaints, President Trump convinced his supporters that the election had been stolen from him and, importantly, them.  These supporters included organized groups, such as the Proud Boys and the Oath Keepers.  Some supporters, responding to President Trump's tweets, engaged in acts of intimidation toward state and local election officials.  For example, after President Trump said that a Georgia election official was an "enemy of the people," that official received threats of violence and assassinations.  When another Georgia official asked President Trump to condemn these actions, urging him to "Stop inspiring people to commit acts of violence," and warned that "Someone is going to get shot, someone is going to get killed," the President remained silent.  Another state election official had armed protesters descend on her home.

Some supporters organized and attended rallies, including two in Washington, D.C., on November 14, 2020, and December 12, 2020.  The Proud Boys and the Oath Keepers attended these District of Columbia–based events.  At the December 12 rally, an Oath Keepers leader said that President Trump "needs to know from you that you are with him, [and] that if he does not do it now while he is Commander in Chief, we're going to have to do it ourselves later, in a much

64

more desperate, much more bloody war." Violence also broke out in connection with these rallies. Police clashed with some of the President's supporters. Dozens were arrested, persons were stabbed, police were injured, and property destroyed.

President Trump first promoted the January 6 Rally on December 19, 2020, announcing on Twitter: "Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild!" Some of the President's supporters interpreted the President's tweet as a call to violence. Some followers on the message board TheDonald.win openly talked of bringing weapons to Washington, D.C., and engaging in acts of violence. Some on Twitter and Facebook posted about "Operation Occupy the Capitol" and used hashtags such as #OccupyCapitols. The Proud Boys and the Oath Keepers, for their part, began active planning for January 6th, including reaching an agreement to work together. Oath Keepers leaders announced on Facebook "an alliance" and "a plan with the Proud Boys." Tarrio posted on the social media site Parler that the Proud Boys would "turn out in record numbers on Jan 6th" but would be "incognito" and "spread across downtown DC in smaller teams." The Proud Boys and the Oath Keepers prepared for the January 6 Rally by obtaining tactical equipment, communications equipment, and bear mace.

On the eve and the morning of the January 6 Rally, the President tweeted yet again that the election had been rife with fraud and insisted that the Vice President could send ballots back to the states for recertification. He also tweeted that Washington, D.C., "is being inundated by people who don't want to see an election victory stolen by emboldened Radical Left Democrats. Our Country has had enough, they won't take it anymore!"

Supporters, including the Proud Boys and Oath Keepers, arrived at the Ellipse for the January 6 Rally before 9:00 a.m. They heard from various speakers, including Giuliani and

65

Trump Jr. (more on their statements below), both of whom repeated false claims about the election being stolen and asserted that the Vice President could block the Certification.  President Trump spoke last.[24]  He gave a 75-minute speech based on the false premise that he had won the election and that it had been stolen from him and those gathered.  At the start, he said that "Our country has had enough.  We will not take it anymore and that's what this is all about.  And to use a favorite term that all of you people really came up with, we will 'stop the steal.'"  Early in the speech he alluded to rally-goers marching to the Capitol building.  The President told the assembled crowd that "Mike Pence is going to have to come through for us.  And if he doesn't, that will be a sad day for our country because you're sworn to uphold our Constitution.  Now it is up to Congress to confront this egregious assault on our democracy."  He continued:

> And after this, we're going to walk down—and I'll be there with you—we're going to walk down. We're going to walk down any one you want, but I think right here. We're going to walk down to the Capitol, and we're going to cheer on our brave senators, and congressmen and women. And we're probably not going to be cheering so much for some of them because you'll never take back our country with weakness.
>
> You have to show strength, and you have to be strong.  We have come to demand that Congress do the right thing and only count the electors who have been lawfully slated, lawfully slated.  I know that everyone here will soon be marching over to the Capitol building to peacefully and patriotically make your voices heard.  Today we will see whether Republicans stand strong for integrity of our elections, but whether or not they stand strong for our country, our country.

The President's call for a march to the Capitol was not, however, authorized.  It was something that he and his campaign had devised.  The Rally's permit said: "This permit does not authorize a march from the Ellipse."

---

[24] A full transcript of the President's remarks can be found on the *Thompson* docket.  Def. Oath Keepers' Mot. for Leave to File Am., Suppl. Ex. in Supp. of the Oath Keepers' Mot. to Dismiss, ECF No. 57, Ex. 2, ECF No. 57-2.

As the President's speech continued, the crowd grew increasingly animated. The President told them that if the Vice President did not send ballots back for recertification, "you will have a President of the United States for four years . . . who was voted on by a bunch of stupid people who lost all of these states. You will have an illegitimate president. That is what you will have, and we can't let that happen." At some point after, the crowd began shouting "Storm the Capitol," "Invade the Capitol Building," and "Take the Capitol Right Now." They also began to chant "Fight Like Hell" and "Fight for Trump."[25] At the conclusion of his speech, the President told the rally-goers: "I said, 'Something's wrong here. Something's really wrong. Can't have happened.' And we fight like hell and if you don't fight like hell, you're not going to have a country anymore." Almost immediately after, he told the crowd:

> So, we're going to walk down Pennsylvania Avenue . . . and we're going to the Capitol and we're going to try and give—the Democrats are hopeless. They're never voting for anything. But we're going to try to give our Republicans, the weak ones, because the strong ones don't need any of our help, we're going to try and give them the kind of pride and boldness they need to take back our country. So, let's walk down Pennsylvania Avenue.

Meanwhile, before the President's speech had concluded, the Proud Boys had already breached the outer perimeter of the Capitol grounds. One Proud Boys member shouted, "Let's take the fucking Capitol!," to which one responded, "Don't yell it, do it." They then broke into smaller groups and began breaking through exterior barricades. By the time the crowd arrived from the Ellipse, those barricades had been compromised. The crowd eventually overwhelmed Capitol police and was able to enter the building. Some rioters told Capitol police officers, "[W]e

---

[25] There is a conflict between two Complaints as to when these shouts and chants took place. According to the Bass Plaintiffs, the chants to lay siege to the Capitol took place during the President's speech and shouts to fight for the President took place after he concluded speaking. *Thompson* Compl. ¶ 88. The *Blassingame* Plaintiffs say just the opposite. Their version is that the chants regarding the Capitol took place after the President concluded his remarks and the shouts to fight for him occurred during his speech. *Blassingame* Compl. ¶ 61. The court does not attempt to resolve that factual conflict here.

are listening to Trump—your boss" and "We were invited here by the President of the United States." Some entered the House chamber, and others, the Speaker of the House's office. The Oath Keepers entered the building in a military-style formation, dressed in paramilitary equipment, helmets, and reinforced vests. One message exchanged among them said: "We have a good group. We have about 30–40 of us. We are sticking together and sticking to the plan." As a result of rioters entering and remaining in the Capitol, Congress and the Vice President were prevented from proceeding with the Certification of the Electoral College vote as planned.

President Trump had not, as promised, joined the crowd at the Capitol. Instead, he was already back at the White House by the time rioters entered the Capitol. He began watching live televised reports of the siege. He first tweeted a video of his Rally Speech. Then, about fifteen minutes *after* rioters had entered the Capitol building, President Trump tweeted:

> Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify correct set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify. USA demands truth!

Rioters at the Capitol building repeated the tweet on megaphones. Minutes later, the President called Senator Mike Lee looking for Senator Tommy Tuberville; Senator Lee informed the President that the Vice President was being evacuated by the Secret Service and that he had to go. Later, when House Leader Kevin McCarthy spoke to the President by phone and urged him to call off the rioters, the President responded: "Well, Kevin, I guess these people are more upset about the election than you are." About a half hour after rioters had entered the Capitol building, the President tweeted: "Please support our Capitol Police and Law Enforcement. They are truly on the side of our Country. Stay peaceful!" Approximately 90 minutes later, at 4:17 p.m., the President tweeted a video in which he again repeated that the election had been stolen but told his

supporters to go home. He said to them, "I know your pain. I know you're hurt," and added, "We love you. You're very special." At 5:40 p.m., law enforcement finally cleared the Capitol building. At 6:00 p.m., the President sent another tweet:

> These are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long. Go home with love & in peace. Remember this day forever!

Congress would resume the Certification later that night and would complete it at 3:41 a.m. the next day.

### ii.      *President Trump*

Viewing the foregoing well-pleaded facts in the light most favorable to Plaintiffs, and drawing all reasonable inferences in their favor, *see Hurd v. District of Columbia*, 864 F.3d 671, 675 (D.C. Cir. 2017), the court concludes that the Complaints establish a plausible § 1985(1) conspiracy involving President Trump. That civil conspiracy included the Proud Boys, the Oath Keepers, Tarrio, and others who entered the Capitol on January 6th with the intent to disrupt the Certification of the Electoral College vote through force, intimidation, or threats.

Recall, a civil conspiracy need not involve an express agreement; so, the fact that President Trump is not alleged to have ever met, let alone sat down with, a Proud Boy or an Oath Keeper to hatch a plan is not dispositive. A tacit agreement—one that is "implied or indicated . . . but not actually expressed"—is enough. *Tacit*, MERRIAM-WEBSTER'S DICTIONARY, https://www .merriam-webster.com/dictionary/tacit (last visited Feb. 8, 2022). The key is that the conspirators share the same general conspiratorial objective, or a single plan the essential nature and general scope of which is known to all conspirators. *See Hobson*, 737 F.2d at 51–52. Multiple factors make President Trump's involvement in the alleged § 1985(1) conspiracy plausible.

69

First, a court "must initially look to see if the alleged joint tortfeasors are pursuing the same goal—although performing different functions—and are in contact with one another." *Halberstam*, 705 F.2d at 481. Both elements are present here. The President, the Proud Boys, the Oath Keepers, and others "pursu[ed] the same goal": to disrupt Congress from completing the Electoral College certification on January 6th. That President Trump held this goal is, at least, plausible based on his words and actions. He repeatedly tweeted false claims of election fraud and corruption, contacted state and local officials to overturn election results, and urged the Vice President to send Electoral ballots back for recertification. The President communicated directly with his supporters, inviting them to Washington, D.C., to a rally on January 6th, the day of the Certification, telling them it would be "wild." He directly participated in the rally's planning, and his campaign funded the rally with millions of dollars. At the rally itself, the President gave a rousing speech in which he repeated the false narrative of a stolen election. The crowd responded by chanting and screaming, "Storm the Capitol," "Invade the Capitol," "Take the Capitol right now," and "Fight for Trump." Still, the President ended his speech by telling the crowd that "we fight like hell and if you don't fight like hell, you're not going to have a country anymore." Almost immediately after these words, he called on rally-goers to march to the Capitol to give "pride and boldness" to reluctant lawmakers "to take back our country." Importantly, it was the President and his campaign's idea to send thousands to the Capitol while the Certification was underway. It was not a planned part of the rally. In fact, the permit expressly stated that it did "not authorize a march from the Ellipse." From these alleged facts, it is at least plausible to infer that, when he called on rally-goers to march to the Capitol, the President did so with the goal of disrupting lawmakers' efforts to certify the Electoral College votes. The Oath Keepers, the Proud Boys, and others who forced their way into the Capitol building plainly shared in that unlawful goal.

70

Second, it is also plausible that the President was aware of the essential nature and general scope of the conspiracy. *See Hobson*, 737 F.2d at 51–52. He knew the respective roles of the conspirators: his was to encourage the use of force, intimidation, or threats to thwart the Certification from proceeding, and organized groups such as the Proud Boys and the Oath Keepers would carry out the required acts. The President expressed knowledge of the Proud Boys during a presidential debate, in which he said, "Proud Boys, stand back and stand by." He also likely knew of the Oath Keepers based on the group's public profile at pro-Trump rallies in Washington, D.C. It is reasonable to infer that the President knew that these were militia groups and that they were prepared to partake in violence for him. The same is true of other supporters. The President and his advisors allegedly "actively monitored" websites where supporters made violent posts, and such posts were discussed on Fox News, a media outlet regularly viewed by the President. He also would have known about violent threats made against state election officials, which he had refused to condemn. The President thus plausibly would have known that a call for violence would be carried out by militia groups and other supporters.

Third, Plaintiffs' allegations show a call-and-response quality to the President's communications, of which the President would have been aware. The Complaints contain numerous examples of the President's communications being understood by supporters as direct messages to them and, in the case of the January 6 Rally, as a call to action. When he told the Proud Boys to "stand back, and stand by," Tarrio tweeted in response, "Standing by sir." After publicly criticizing state election officials, some of those election officials became the object of threats of violence. When the President tweeted an invitation to the January 6 Rally, pro-Trump message boards and social media lit up with some supporters expressing a willingness to act violently, if needed. Based on these allegations, it is reasonable to infer that before January 6th

71

the President would have known about the power of his words and that, when asked, some of his supporters would do as he wished. On January 6th they did so. When he called on them to march to the Capitol, some responded, "Storm the Capitol." Thousands marched down Pennsylvania Avenue as directed. And, when some were inside the Capitol, they told officers, "We were invited here by the President of the United States." Even the President's counsel conceded that an invitation to commit a tort and the acceptance to do so would establish a civil conspiracy. Hr'g Tr. at 67–68; *see also id.* at 56–57 (same concession by Giuliani's counsel); *id.* at 82 (same concession by the Oath Keepers' counsel). A plausible causal connection between the President's words and the response of some supporters is therefore well pleaded. *Cf. Hobson*, 737 F.2d at 54 (observing that "the flow of information back and forth, coupled with evidence of efforts to impede plaintiffs' rights . . . conceivably could have sufficed to permit a jury to infer that an agreement existed among certain persons . . . to disrupt plaintiffs' activities").

Fourth, the President's January 6 Rally Speech can reasonably be viewed as a call for collective action. The President's regular use of the word "we" is notable. To name just a few examples: "We will not take it anymore"; "We will 'stop the steal'"; "We will never give up"; "We will never concede"; "We will not take it anymore"; "All Mike Pence has to do is send it back to the states to recertify, and we become president"; "[W]e're going to have to fight much harder"; "We can't let that happen"; "We're going to walk down . . ."; "We fight like hell"; "We're going to walk down Pennsylvania Avenue." "We" used repeatedly is this context implies that the President and rally-goers would be acting together towards a common goal. That is the essence of a civil conspiracy.

And, finally, a tacit agreement involving the President is made all the more plausible by his response to the violence that erupted at the Capitol building.[26]  Approximately twelve minutes after rioters entered the Capitol building, the President sent a tweet criticizing the Vice President for not "hav[ing] the courage to do what should have been done to protect our Country."  Rioters repeated that criticism at the Capitol, some of whom saw it as encouragement to further violence.  It is reasonable to infer that the President would have understood the impact of his tweet, since he had told rally-goers earlier that, in effect, the Vice President was the last line of defense against a stolen election outcome.  The President also took advantage of the crisis to call Senator Tuberville; it is reasonable to think he did so to urge delay of the Certification.  And then, around 6:00 p.m., after law enforcement had cleared the building, the President issued the following tweet: "These are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long.  Go home with love & in peace.  Remember this day forever!"  A reasonable observer could read that tweet as ratifying the violence and other illegal acts that took place at the Capitol only hours earlier.  *See Hobson*, 737 F.2d at 53 (agreeing that "evidence of a pattern of mutually supportive activity over a period of time provides a reasonable basis for inferring that parties are engaged in a common pursuit" (cleaned up)).

The President argues that, at most, Plaintiffs have pleaded that the President "made political statements . . . at a rally meant to persuade political officials."  *Thompson* Trump Mot. at 27.  But that contention misses the forest for the trees.  It ignores the larger context of the Rally Speech.

---

[26] With respect to the President's post–Rally Speech conduct, the court for present purposes considers only those acts that plausibly were undertaken in his unofficial capacity.  Circuit precedent suggests that immunized action (or inaction) cannot be considered.  *See Banneker Ventures*, 798 F.3d at 1145 (instructing trial court on remand to "evaluate whether the actions that it concludes would *not be immunized*, taken together, state a claim against Graham for tortious interference or civil conspiracy" (emphasis added)).

For months, the President led his supporters to believe the election was stolen. When some of his supporters threatened state election officials, he refused to condemn them. Rallies in Washington, D.C., in November and December 2020 had turned violent, yet he invited his supporters to Washington, D.C., on the day of the Certification. They came by the thousands. And, following a 75-minute speech in which he blamed corrupt and weak politicians for the election loss, he called on them to march on the very place where Certification was taking place. The President's narrow characterization of his conduct accounts for none of this.

The President also contends that a conspiracy involving him not only is "far-fetched, but it is also in direct opposition to many of the statements made by Mr. Trump at the very rally." *Id.* at 28. The only portion of the Speech he cites to support that proposition is that, early on, he said that rally-goers soon would be "marching over to the Capitol building to peacefully and patriotically make your voices heard." *See id.* The President certainly uttered those words. But he also uttered others, which he ignores. Immediately before directing them to the Capitol, he told rally-goers that they would need to "fight like hell and if you don't fight like hell, you're not going to have a country anymore." When those supporters did "fight like hell," just as he had told them to, the President did not demand they act "peacefully and patriotically." He instead tweeted that "Mike Pence didn't have the courage to do what should have been done to protect our Country." Later, he referred to those who had attacked the Capitol as "great patriots," and told them to, "Remember this day forever!" These other statements by the President stand in stark contrast to his passing observation that rally-goers would soon be "peacefully and patriotically" marching to the Capitol. Those three words do not defeat the plausibility of Plaintiffs' § 1985(1) claim at this stage.

74

The President also dismisses two allegations as weak and speculative that purport to tie him to the Proud Boys and the Oath Keepers. The court relies on neither at this juncture but thinks one may prove significant in discovery. The first is an allegation that "a person associated with the Trump White House communicated with a member of the Proud Boys by phone." *Thompson* Compl. ¶ 70. The court agrees that this is a speculative allegation and has not considered it. The other concerns the President's confidant, Roger Stone. Stone posted on Parler in late December that he had met with the President "to ensure that Donald Trump continues as our president." Shortly thereafter, Stone spoke with Tarrio, and later he used the Oath Keepers as his security detail for the January 6 Rally. The court does not rely on these allegations to establish the President's knowledge of the Proud Boys or the Oath Keepers. Other alleged facts make that inference plausible. That said, Stone's connections to both the President and these groups in the days leading up to January 6th is a well-pleaded fact. Discovery might prove that connection to be an important one.

The President also suggests that, at most, Plaintiffs have pleaded independent, parallel conduct that does not make out a plausible conspiracy under *Twombly*. *Thompson* Trump Reply at 21–22. But that argument ignores the multiple ways in which the President interacted with his supporters, including organized groups. The Complaints detail how the President's tweets led to threats of violence against state election officials; how his tweet inviting supporters to Washington, D.C., on January 6th was understood by some to be a call to action; and how he called on thousands to participate in an unauthorized march on the Capitol building that ended in acts of violence. That is a pattern of mutually supportive activity that supports a plausible conspiracy. *Hobson*, 737 F.2d at 53. Such mutually supportive activity distinguishes this case from *Twombly*, in which the Court

held that the complaint failed to allege a conspiracy because market factors, not concerted action, were a more plausible explanation for the alleged conduct. *See Twombly*, 550 U.S. at 566–69.

Finally, the President argues that Plaintiffs cannot construct a conspiracy based on "Mr. Trump's political activity," which is protected speech. *Thompson* Trump. Mot. at 28. The court addresses the President's First Amendment defense below.

### iii.    Giuliani

The court reaches a different conclusion as to Giuliani. There is little doubt that Plaintiffs have adequately pleaded that Giuliani was involved in a conspiracy to "engage[] in a months-long misinformation campaign to convince Trump's supporters that the election had been illegally stolen." *Thompson* Pls.' Opp'n at 42. But, as the court stated earlier, such a conspiracy does not violate § 1985(1). What Plaintiffs must plausibly establish is that Giuliani conspired to prevent Congress from discharging its duties on January 6th by force, intimidation, or threat. There, they fall short.

In addition to his pre–January 6th actions—which alone do not establish Giuliani as a § 1985(1) conspirator—Plaintiffs point to two of Giuliani's acts that occurred on January 6th: (1) his rally speech, in which he said, "So, let's have trial by combat" and "We're going to fight to the very end to make sure that doesn't happen," and (2) a phone call that he made to members of Congress, urging them to delay the Certification. *Thompson* Pls.' Opp'n at 42–43. These allegations, individually and taken together, do not "nudge[]" Plaintiffs' § 1985(1) claim against Giuliani "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

As to his rally remarks, the court believes Giuliani's words are not enough to make him part of a § 1985(1) conspiracy. Critically, Giuliani uttered no words that resembled a call to action. "Trial by combat" was not accompanied by a direction to do anything. And, given the speaker,

76

those words were not likely to move the crowd to act.  There is no allegation that anyone took Giuliani's words as permission to enter the Capitol.   And there are no allegations that Giuliani at any time before January 6th uttered words advocating or inspiring violence.  Indeed, as discussed further below, the court holds that Giuliani's rally remarks are constitutionally protected speech. Nor is Giuliani alleged to have been involved in rally planning or known that the President would direct the crowd to march to the Capitol.  And he did not express solidarity with the rally-goers after some violently assaulted police and forced their way into the Capitol.  Giuliani's words at the rally are not sufficiently additive to make him a § 1985(1) coconspirator.

Neither are his phone calls to lawmakers on January 6th after the Capitol was breached. There is some conflict among Plaintiffs on this allegation.  The Bass Plaintiffs allege that such calls were made "while the insurrection was ongoing."  *Thompson* Compl. ¶ 138.   The *Blassingame* Plaintiffs, on the other hand, say that two such calls occurred at 7:00 p.m., after law enforcement had cleared the Capitol.  *Blassingame* Compl. ¶ 128.  Whatever the timing of those calls, they at most establish Giuliani as an opportunist, not someone who shared in the same general conspiratorial objective as others *before* the violence at the Capitol occurred.  Though Giuliani unquestionably was a central figure in the President's efforts to sow doubt and mistrust in the election's outcome, the court cannot say, based on the facts alleged, that he plausibly shared the common conspiratorial goal of violently disrupting the Certification.

iv.     <u>Trump Jr.</u>

The court reaches the same conclusion as to Trump Jr.  The allegations against him are even thinner than those against Giuliani.  Before January 6th, he sent false and misleading tweets about the election and publicly criticized officials who did not support his father.  He also spoke at the rally, during which he repeated false claims about election fraud and theft.  He also warned

77

Republicans who failed to back the President, "we're coming for you, and we're gonna have a good time doing it." As discussed below, the court believes these words to be protected speech. That is all Plaintiffs have attributed to Trump Jr.[27] He is not alleged to have participated in rally planning, known that the President would direct a march to the Capitol, or expressed support for the rioters and their actions. The allegations against Trump Jr. are insufficient to make him a coconspirator in a plan to disrupt Congress from performing its duties.

*v.*      *The Oath Keepers*

The Oath Keepers also challenge the sufficiency of the conspiracy allegations against them. But that argument goes nowhere. At a minimum, the alleged facts establish a § 1985(1) conspiracy between the Oath Keepers and the Proud Boys. After the President's announcement of the January 6 Rally, a leader of the group posted a Facebook message that he had "organized an alliance between Oath Keepers . . . and Proud Boys. We have decided to work together and shut this shit down." Days later, another leader posted on Facebook that the Oath Keepers had "orchestrated a plan with the Proud Boys." Those statements, if true, would be direct evidence of a civil conspiracy. The Complaints also detail each group's preparations for January 6th, and they allege that members from each group forcibly entered the Capitol building intent on disrupting the Certification. These well-pleaded allegations easily establish a plausible § 1985(1) conspiracy between the two groups.

The Oath Keepers make two primary contentions. First, they maintain that the *Thompson* complaint lacks sufficient details, such as names of the leaders who posted to Facebook, to establish a conspiracy. *Thompson* Oath Keepers' Mot. at 14. But Rule 8's notice-pleading rules

---

[27] Swalwell also includes in his Complaint a photograph of Trump Jr. from May 2019 that purports to show him wearing a t-shirt bearing the symbol of a militia group known as the Three Percenters. Swalwell Compl. ¶ 96. The Three Percenters are among the groups alleged to have stormed the Capitol. But this effort to tie Trump Jr. to the alleged conspiracy is tenuous, at best.

apply here, and the Oath Keepers have not cited any case that requires the specificity they demand to survive a motion to dismiss.  Second, they complain that they are being held responsible for the acts of the group's members.  *See id.* at 15.  Plaintiffs, however, have pleaded sufficient facts to establish *respondeat superior* liability at this stage.

*vi.*      *Tarrio*

Tarrio's role in the conspiracy is established through well-pleaded allegations.  It is reasonable to infer that, as the leader of the Proud Boys, he would have participated in forming the announced "alliance" and "orchestrated plan" with the Oath Keepers.  *Thompson* Compl. ¶ 63.  He also said that the Proud Boys would be there in "record numbers on Jan 6th," would be "incognito," and would "spread across downtown DC in smaller teams."  *Id.* ¶ 64.  It is also reasonable to infer that he would have been involved in the Proud Boys' collection of tactical vests, military-style communication equipment, and bear mace.  *Id.* ¶ 65.  These allegations are sufficient to plausibly establish Tarrio as a conspirator.

*            *            *

To sum up, the court holds that Plaintiffs have successfully pleaded a § 1985(1) conspiracy claim against President Trump, the Oath Keepers, and Tarrio.  They have fallen short as to Giuliani and Trump Jr.

**C.      Failure to State a § 1986 Claim**

The court already has held that President Trump is immune from suit as to Swalwell's § 1986 claim.  The question remains whether Swalwell has stated such a claim against the other defendants, Giuliani and Trump Jr.  He has not.

Recall, § 1986 provides a cause of action against anyone who has "knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be

79

committed, and having the power to prevent or aid in preventing the commission of the same, neglects or refuses so to do." 42 U.S.C. § 1986. Thus, if Giuliani or Trump Jr. "knew of a [§ 1985(1)] conspiracy, were in a position to prevent the implementation of that conspiracy, and neglected or refused to prevent it, they are liable under § 1986." *Park v. City of Atlanta*, 120 F.3d 1157, 1160 (11th Cir. 1997). Swalwell's pleading falls short in two respects. First, it fails to plead sufficient facts establishing that Giuliani or Trump Jr. knew of a tacit plan to prevent members of Congress from discharging their duties. The Complaint does not, for example, allege either was involved in the planning of the January 6 Rally or knew in advance that the President would call on rally-goers, including organized groups, to march on the Capitol while Congress was in session. Second, it does not allege that Giuliani or Trump Jr. had the "power" to prevent such conspiracy. Few courts appear to have addressed this element, but those finding the requisite power to be present have done so where the defendant was a government official or employee with some formal authority to act. *See, e.g.*, *Peck v. United States*, 470 F. Supp. 1003, 1013 (S.D.N.Y. 1979) (FBI agents); *Santiago v. City of Philadelphia*, 435 F. Supp. 136, 156 (E.D. Pa. 1977) (mayor and city managing director who had "some authority, though limited, to control policies and practices"), *abrogated on other grounds by Chowdhury v. Reading Hosp. & Med. Ctr.*, 677 F.2d 317 (3d Cir. 1982). Giuliani and Trump Jr., as personal lawyer to the President and the President's son, respectively, evidently do not so qualify. Swalwell's Complaint thus fails to plead a § 1986 claim against Giuliani and Trump Jr.

### D.    The First Amendment Defense

The court thus far has held that President Trump is not immune from suit as to Plaintiffs' § 1985(1) claim and that Plaintiffs have successfully pleaded such claim against him. The question remains, however, whether that claim (and others) can move forward when, as here, the President's

alleged conspiratorial acts are predicated entirely on his speech. This is a substantial constitutional question. The First Amendment grants all citizens expansive protections in what they can say, but that protection must be particularly guarded when it comes to the President of the United States. As the Supreme Court has repeatedly reminded, a President's position in our system of government is unique and his duties and responsibilities "are of unrivaled gravity and breadth." *Vance*, 140 S. Ct. at 2425. A President could not function effectively if there were a risk that routine speech might hale him into court. Only in the most extraordinary circumstances could a court *not* recognize that the First Amendment protects a President's speech. But the court believes this is that case. Even Presidents cannot avoid liability for speech that falls outside the expansive reach of the First Amendment. The court finds that in this one-of-a-kind case the First Amendment does not shield the President from liability.

### 1.     The First Amendment and Speech on Matters of Public Concern

The Supreme Court has spoken in soaring terms about the First Amendment's protection of speech on matters of public concern. "Expression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.'" *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (citation omitted). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964). The First Amendment embodies our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.*, 376 U.S. at 270. Such speech may "well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* "Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases. An advocate must be free to stimulate his

81

audience with spontaneous and emotional appeals for unity and action in a common cause." *Claiborne Hardware*, 458 U.S. at 928.

Protection for speech on matters of public concern is decidedly capacious, but it is not unbounded. "The presence of protected activity . . . does not end the relevant constitutional inquiry. Governmental regulation that has an incidental effect on First Amendment freedoms may be justified in certain narrowly defined instances." *Id.* at 912. But when considering liability in such "narrowly defined instances," courts must tread carefully. When, as here, liability is based in part on "a public address—which predominantly contained highly charged political rhetoric—[the court must] approach this suggested basis of liability with extreme care." *Id.* at 926–27. Such care extends even when, as in this case, the allegation is that speech produced violence. "When violence occurs during activity protected by the First Amendment, that provision mandates 'precision of regulation' with respect to 'the grounds that may give rise to damages liability' as well as 'the persons who may be held accountable for those damages.'" *McKesson v. Doe*, 141 S. Ct. 48, 50 (2020) (quoting *Claiborne Hardware*, 458 U.S. at 916–17).

Thus, the court's task here is to determine whether a "narrowly defined instance" applies to President Trump's speech such that he "may be held accountable" for the damages it may have caused. Plaintiffs here advance two such "narrowly defined instances": (1) the President participated in an unlawful conspiracy and (2) the President's January 6 Rally Speech incited violence. *Thompson* Pls.' Opp'n at 49–56; *Swalwell* Opp'n at 18–19; *Blassingame* Pls.' Opp'n at 36–39. The court considers in turn each of these grounds for denying President Trump's speech First Amendment protection.

a.      Participation in an unlawful conspiracy

Plaintiffs say that "conspiratorial statements and agreements in furtherance of unlawful actions are not protected by the First Amendment." *Thompson* Pls.' Opp'n at 50.  They cite various cases for various propositions, including that the First Amendment does not authorize "knowing association with a conspiracy," *id.* at 50 (quoting *Scales v. United States*, 367 U.S. 203, 229 (1961)); it does not confer a right to "impede or obstruct" a government employee's "performance of duty by threats," *id* (quoting *United States v. Varani*, 435 F.2d 758, 762 (6th Cir. 1970)); it does not protect "speech integral to criminal conduct," *Blassingame* Pls.' Opp'n at 18 (quoting *United States v. Alvarez*, 567 U.S. 709, 717 (2012)); and it does not "immunize[] [speech] from regulation when [it] is used as an integral part of conduct which violates a valid statute," *id.* at 18–19 (quoting *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 514 (1972)).

But the court finds these broad-stroke principles inapt here.  For one, cases like *Scales*, *Varani*, and *Alvarez* involve criminal conspiracies, which the Supreme Court seems to have put in its own category.  Plaintiffs sometimes suggest that the President engaged in *criminal* conduct, but what is before the court is a civil conspiracy, and it would be imprudent for the court to assess whether factual allegations in a *civil* complaint make out *criminal* conduct.  Even the low probable-cause standard is higher than Rule 8's plausibility standard.  Other cases, like *California Motor Transport*, arise in the context of economic regulation, involving, for example, statutes barring monopolization or concerted activity, where the speech at issue usually is not on matters of public concern.  Speech used to facilitate the fixing of prices or the manipulation of markets is naturally afforded less First Amendment protection than a presidential speech on a matter of public concern.

Speech on matters of public concern may even be protected if it is part of a concerted violation of law.  That is the lesson of the Supreme Court's decision in *Claiborne Hardware*.

83

There, Mississippi state courts had found the NAACP; its state field secretary, Charles Evers; and others liable for losses incurred by white merchants as a result of a boycott—a kind of civil conspiracy—that violated state law "on three separate conspiracy theories."  458 U.S. at 891. Indeed, the Mississippi Supreme Court had found that the defendants "had *agreed* to use force, violence, and 'threats' to effectuate the boycott."  *Id.* at 895.  The Supreme Court observed that the boycott was "supported by speeches and nonviolent picketing" aimed at expressing dissatisfaction with "the social structure that denied them rights to equal treatment and respect"— plainly matters of public concern.  *Id.* at 907.  The Court, in assessing the defendants' plea for First Amendment protection, did not dismiss it out of hand merely because the defendants had conspired to violate state law.  Rather, in recognition of the weighty First Amendment values at stake, the Court narrowed the scope of inquiry to whether any of the business losses were caused by speech that was not otherwise protected under the First Amendment—namely, speech that caused violence or constituted threats of violence.  *Id.* at 916.  Once the Court identified speech that might so qualify, it did not declare the speech unprotected because it was part of a conspiracy; instead, it evaluated the speech under the narrow "incitement" standard announced in *Brandenburg v. Ohio*, 395 U.S. 444 (1969).

The court here must follow the same path the Court did in *Claiborne Hardware*. President Trump's speech cannot be deemed unprotected merely because Plaintiffs have alleged it to be part of a conspiratorial agreement to violate a civil statute.  Instead, because his speech is on a matter of public concern, it will lose its First Amendment protection only if it meets the stringent *Brandenburg* "incitement" standard.  *See Tri-Corp Housing, Inc. v. Bauman*, 826 F.3d 446, 449 (7th Cir. 2016) (recognizing that public officials have the right to "urge their constituents to act in particular ways . . . , as long as they refrain from making the kind of threats that the Supreme Court

treats as subject to control under the approach of *Brandenburg*" (citation omitted)).  It is to that inquiry the court now turns.

b.        *Brandenburg* and incitement

A trio of Supreme Court cases has come to define the incitement exception to the First Amendment.  They are *Brandenburg*, *Hess v. State of Indiana*, and *Claiborne Hardware*.  A brief discussion of each helps to frame the determination this court must make.

*Brandenburg* involved the conviction of a member of the Ku Klux Klan under Ohio's Criminal Syndicalism statute.  395 U.S. at 444.[28]  Two films of the defendant were introduced at trial.  One showed him among twelve hooded Klansmen, surrounding a large wooden cross, which they burned.  Words uttered on the film included statements disparaging of Black and Jewish people.  The defendant also said the following: "We're not a revengent organization, but if our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race, it's possible that there might have to be some revengeance taken.  We are marching on Congress July the Fourth, four hundred thousand strong . . . ."  *Id.* at 446.  Seen on the film, and introduced into evidence, were a pistol, shotgun, and ammunition.  *Id.* at 445–46.  The second film was along the same lines.  *Id.* at 447.  The Supreme Court overturned the defendant's conviction, finding the films to be protected speech.  Articulating what is now termed the "*Brandenburg* test," the Court said that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."  *Id.*  Thus, *Brandenburg* has come to stand for the proposition that "mere advocacy" of

---

[28] Numerous states passed criminal syndicalism laws in the early part of the 20th century "with the purpose of making it illegal for individuals or groups to advocate radical political and economic changes by criminal or violent means." Dale Mineshima-Lowe, *Criminal Syndicalism Laws*, THE FIRST AMENDMENT ENCYCLOPEDIA, https://www.mtsu.edu /first-amendment/article/942/criminal-syndicalism-laws (last visited Feb. 8, 2022).

the use of force or violence is protected speech; only when speech is directed at inciting imminent lawless action, and likely to do so, does it lose the cloak of the First Amendment's protection.

Four years later, in *Hess v. State of Indiana*, the Court applied *Brandenburg* to a defendant convicted under Indiana's disorderly conduct statute. 414 U.S. 105, 105–06 (1973). The defendant was participating in a demonstration of between 100 and 150 people when the sheriff gave an order to clear the streets. As the sheriff passed him, Hess was standing off the street and said words to the effect of "We'll take the fucking street later" or "We'll take the fucking street again." *Id.* at 107. Witnesses testified that Hess did not appear to be exhorting the crowd to go back into the street, was not addressing any particular person, and though loud, was no louder than anyone else in the area. *Id.* Applying *Brandenburg*, the Court overturned Hess's conviction. The Court observed that Hess's statement was "[a]t best, . . . counsel for present moderation, at worst, it amounted to nothing more than advocacy of illegal action at some indefinite future time." *Id.* at 108. The Court said that, because Hess was not directing his statement to any person or group of persons, it could not be said he was advocating any action. *Id.* Also, "since there was no evidence or rational inference from the import of the language, that his words were intended to produce, and likely to produce, imminent disorder," his words could not be punished based on the mere "tendency to lead to violence," as the Indiana Supreme Court had held. *Id.* at 108–09 (citation omitted).

The last of the three cases is *Claiborne Hardware*, the facts of which the court already has briefly discussed. The Court evaluated Charles Evers's speech in the context of the boycott, during which he said to several hundred people, referring to boycott violators, "If we catch any of you going in any of them racist stores, we're gonna break your damn neck." 458 U.S. at 902. In another speech Evers warned that "the Sheriff could not sleep with boycott violators at night," an

86

implicit threat to Black persons that retaliation for shopping at white establishments could come at any moment without the protection of law enforcement. *Id.* The Court held that the "emotionally charged rhetoric of Charles Evers' speeches did not transcend the bounds of protected speech set forth in *Brandenburg*." *Id.* at 928. The court acknowledged that Evers had used "strong language" and observed that if his "language had been followed by acts of violence, a substantial question would be presented whether Evers could be held liable for the consequences of that lawful conduct." *Id.* However, "[w]hen such appeals do not incite lawless action, they must be regarded as protected speech." *Id.* The Court also said that "[i]f there were other evidence of his authorization of wrongful conduct, the references to discipline in the speeches could be used to corroborate that evidence." *Id.* at 929. But because there was no evidence that "Evers authorized, ratified, or directly threatened acts of violence," his words could not be used for such purpose. *Id.* The Court therefore vacated the damages award against Evers.

The Supreme Court has not had occasion to apply the *Brandenburg* test in the 40 years since *Claiborne Hardware*. Scholars have given it attention, but few federal appellate court decisions have applied it. The parties have not cited any D.C. Circuit case applying *Brandenburg*, and the court has not found one.[29] One treatise has distilled *Brandenburg* into a three-part test, requiring proof that "(1) the speaker *subjectively intended incitement*; (2) in context, the words used were *likely to produce* imminent, lawless action; and (3) the words used by the speaker *objectively encouraged* and urged and provoked *imminent* action." 5 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure § 20.15(d),

---

[29] The D.C. Circuit addressed *Brandenburg* in *National Organization for Women v. Operation Rescue*, but in the context of evaluating the terms of an injunction, not applied to any particular speech. 37 F.3d 646, 657 (D.C. Cir. 1994).

Westlaw (database updated May 2021).  An en banc panel of the Sixth Circuit articulated a similar three-part test:

> The *Brandenburg* test precludes speech from being sanctioned as incitement to riot unless (1) the speech explicitly or implicitly encouraged the use of violence or lawless action, (2) the speaker intends the speech will result in the use of violence or lawless action, and (3) the imminent use of violence or lawless action is the likely result of his speech.

*Bible Believers v. Wayne County*, 805 F.3d 228, 246 (6th Cir. 2015) (en banc).  The court does not take a position on whether defining *Brandenburg*'s standard as a three-part test is useful, or even accurate.[30]  The key to the *Brandenburg* exception is incitement:  whether the speech "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447.

In making that evaluation, both the words spoken and the context in which they are spoken matter.  The Supreme Court said as much in *Young v. American Mini Theaters*:

> The question whether speech is, or is not, protected by the First Amendment often depends on the content of the speech.  Thus, the line between permissible advocacy and impermissible incitation to crime or violence depends, not merely on the setting in which speech occurs, but also on exactly what the speaker had to say.

427 U.S. 50, 66 (1976).  Similarly, the Court in *FCC v. Pacifica Foundation* observed that the

> classic exposition of the proposition that both the content and the context of speech are critical elements of First Amendment analysis is Mr. Justice Holmes' statement for the Court in *Schenck v. United States*[:] . . . "[T]he character of every act depends upon the circumstances in which it is done . . . . The most stringent protection of free speech would not protect a man falsely shouting fire in a theater and causing a panic . . . ."

---

[30] The Rotunda and Nowak treatise's three-factor test has been called into question insofar as it requires inquiry into whether the speaker "objectively encouraged and urged and provoked imminent action."  The Sixth Circuit has declined to wholly embrace such an "objective" element, except insofar as the *Brandenburg* inquiry must focus on "the words used by the speaker . . . , not how they may be heard by a listener." *Nwanguma v. Trump*, 903 F.3d 604, 613 (6th Cir. 2018).

438 U.S. 726, 744 (1978) (quoting *Schenck v. United States*, 249 U.S. 47, 52 (1919)).

Bearing the foregoing principles in mind, the court turns to evaluate President Trump's speech under *Brandenburg*.

### c.    President Trump's speech

Plaintiffs do not contend that President Trump's words prior to the January 6 Rally Speech (almost entirely through tweets) meets the *Brandenburg* incitement exception. They focus on the Rally Speech, so the court does, too, starting with a summary of what he said.[31]

The President spoke for 75 minutes. He spun a narrative in which he told those present that the election was "rigged" and "stolen," and not just from him, but from *them*. He told attendees at the start that "*our* election victory" had been taken away, "*we* won this election," and "[*w*]*e* didn't lose." He urged on the crowd, "We will never give up. We will never concede. It doesn't happen. You don't concede when there's theft involved. . . . We will not take it anymore . . . . [W]e will 'stop the steal.'" He said that elections in "Third World Countries" are "more honest" than the election that had just taken place. The President said all of this within the first few minutes of his remarks.

He then told the crowd what had to happen for them to "win" the election. "[I]f Mike Pence does the right thing, we win the election." "All Mike Pence has to do is send it back to the states to recertify, and we become president, and you are the happiest people." And he warned what would happen if the Vice President did not act: "[W]e're stuck with a president who lost the election by a lot, and we have to live with that for four more years. We're not going to let that happen."

---

[31] The court has considered the Rally Speech in its entirety. *See supra* note 24. The recitation below summarizes those remarks as they were made chronologically, and it omits citations for ease of reading.

The President identified who was to blame for the "stolen" and "rigged" election: "radical left Democrats," "weak Republicans," "the fake news," and "Big tech," among others.  He specifically identified those who he thought were the "weak Republicans" who would bear responsibility for a lost election:   then–Senate Majority Leader McConnell, Representative Elizabeth Cheney, and Governor Brian Kemp (calling him "one of the dumbest governors in the United States").  He accused the media of "suppressing thought" and "suppress[ing] speech" and said it "was the enemy of the people.  It's the biggest problem we have in this country."  He told the crowd,

> [W]e're going to have to fight much harder, and Mike Pence is going to have to come through for us.  And if he doesn't, that will be a sad day for our country because you're sworn to uphold our Constitution.  Now it is time for Congress to confront this egregious assault on our democracy.

It was at this point that the President first said anything about a march to the Capitol.  He said,

> [A]fter this, we're going to walk down—and I'll be there with you— we're going to walk down to the Capitol, and we're going to cheer on our brave senators, and congressmen and women.  And we're probably not going to be cheering so much for some of them because you'll never take back our country with weakness.  You have to show strength, and you have to be strong.

He then said, "We have come to demand that Congress do the right thing and only count the electors who have been lawfully slated, lawfully slated," and he added that "everyone here will soon be marching to the Capitol building to peacefully and patriotically make your voices heard."

Moments later, he focused the crowd's attention on the Certification.  Referring to the Capitol, he said,

> [W]e see a very important event though, because right over there, right there, we see the event going to take place. . . .  We're going to see whether or not we have great and courageous leaders or whether

90

or not we have leaders that should be ashamed of themselves throughout history, throughout eternity, they'll be ashamed. And you know what? If they do the wrong thing, we should never ever forget that they did. Never forget. We should never ever forget.

The President continued, telling the crowd repeatedly that the election had been stolen. "We've amassed overwhelming evidence about a fake election," he said to them. Changes in election procedure at the state level had "paved the way for fraud on a scale never seen before." He then recited a litany of false claims about the ways in which the election had been stolen in Pennsylvania (e.g., over 200,000 more ballots cast than voters), Wisconsin (e.g., postal service workers were told to backdate 100,000 ballots), Georgia (e.g., election officials pulled "boxes . . . and suitcases of ballots out from under a table"), Arizona (e.g., 36,000 ballots were cast by noncitizens), Nevada (e.g., more than 42,000 double votes), and Michigan (e.g., thousands and thousands of ballots were improperly backdated). In the midst of reciting these examples of fraud, the President regularly alluded to what the Vice President had to do. He told rally-goers that, if Mike Pence failed to act, "You will have an illegitimate president, that's what you'll have. And we can't let that happen." He said, "I'm not hearing good stories" about the Vice President. And he again told those assembled that the election was a fraud: "this is the most fraudulent thing anybody's—This is a criminal enterprise. This is a criminal enterprise." And, he said that when fraud occurs "it breaks up everything, doesn't it? What you catch somebody in a fraud, you're allowed to go by very different rules. So I hope Mike has the courage to do what he has to do."

In the final moments of his speech, the President spoke about the country's future. He said he had to be "careful" in saying he was confident in our nation's future: "If we allow this group of people to illegally take over our country, because it's illegal when the votes are illegal, when the way they got there is illegal, when the States that vote are given false and fraudulent information." He also warned that, because of a potential change in administration, "the

91

[immigrant] caravans are forming again. They want to come in again and rip off our country. Can't let it happen."

Finally, the President told them he suspected impropriety on election night itself: "Something's wrong here. Something's really wrong. Can't have happened." And then he said: "And we fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore." Moments later, he concluded and told those assembled:

> So we're going to, we're going to walk down Pennsylvania Avenue, I love Pennsylvania Avenue, and we're going to the Capitol and we're going to try and give—the Democrats are hopeless. They're never voting for anything, not even one vote. But we're going to try to give our Republicans, the weak ones, because the strong ones don't need any of our help, we're going to try and give them the kind of pride and boldness that they need to take back our country. So let's walk down Pennsylvania Avenue.

d.      *Brandenburg* applied to the January 6 Rally Speech

The President's words on January 6th did not explicitly encourage the imminent use of violence or lawless action, but that is not dispositive. In *Hess*, the Supreme Court recognized that words can *implicitly* encourage violence or lawlessness. In reversing Hess's conviction, the Court held that there was "no evidence or *rational inference* from *the import* of the language" intended to produce, or likely to produce, imminent disorder. 414 U.S. at 109 (emphasis added). By considering the "import of the language," and the "rational inferences" the words produce, the Court signaled that there is no safe haven under *Brandenburg* for the strategic speaker who does not directly and unequivocally advocate for imminent violence or lawlessness, but does so through unmistakable suggestion and persuasion. Federal appellate courts have understood the *Brandenburg* exception to reach implicit encouragement of violent acts. *See, e.g.*, *Bible Believers*, 805 F.3d at 246 (inquiring as the first element whether "the speech explicitly or implicitly encouraged the use of violence or lawless action").

92

Having considered the President's January 6 Rally Speech in its entirety and in context, the court concludes that the President's statements that, "[W]e fight.  We fight like hell and if you don't fight like hell, you're not going to have a country anymore," and "[W]e're going to try to and give [weak Republicans] the kind of pride and boldness that they need to take back our country," immediately before exhorting rally-goers to "walk down Pennsylvania Avenue," are plausibly words of incitement not protected by the First Amendment.  It is plausible that those words were implicitly "directed to inciting or producing imminent lawless action and [were] likely to produce such action."  *Brandenburg*, 395 U.S. at 447.

The "import" of the President's words must be viewed within the broader context in which the Speech was made and against the Speech as a whole.  Before January 6th, the President and others had created an air of distrust and anger among his supporters by creating the false narrative that the election literally was stolen from underneath their preferred candidate by fraud and corruption.  Some of his supporters' beliefs turned to action.  In the weeks after the election, some had made threats against state election officials and others clashed with police in Washington, D.C., following pro-Trump rallies.  The President would have known about these events, as they were widely publicized.  Against this backdrop, the President invited his followers to Washington, D.C., on January 6th.  It is reasonable to infer that the President would have known that some supporters viewed his invitation as a call to action.  President Trump and his advisors "actively monitored" pro-Trump websites and social media.  *Thompson* Compl. ¶ 66.  These forums lit up in response to the rally announcement.  Some supporters explicitly called for violence on January 6th (e.g., calling for "massing hangings and firing squads").  Others took direct aim at the Certification itself (e.g., stating that people in the Capitol should "leave in one of two ways: dead or certifying Trump the rightful winner") or at law enforcement ("Cops don't have 'standing' if

they are laying on the ground in a pool of their own blood."). *Thompson* Compl. ¶¶ 56–63; *Swalwell* Compl. ¶ 89; *Blassingame* Compl. ¶¶ 33–34. These violent posts were discussed "by media outlets regularly viewed by President Trump, including Fox News." *Thompson* Compl. ¶ 66. The prospect of violence had become so likely that a former aide to the President predicted in a widely publicized statement that "there will be violence on January 6th because the President himself encourages it." *Id.* Thus, when the President stepped to the podium on January 6th, it is reasonable to infer that he would have known that some in the audience were prepared for violence.

Yet, the President delivered a speech he understood would only aggravate an already volatile situation. For 75 uninterrupted minutes, he told rally-goers that the election was "rigged" and "stolen," at one point asserting that "Third World Countries" had more honest elections. He identified who the culprits were of the election fraud: "radical Left Democrats" and "weak" Republicans. They were the ones who had stolen *their* election victory, he told them. He directed them not to "concede," and urged them to show "strength" and be "strong." They would not be able to "take back [their] country with weakness." He told them that the rules did not apply: "When you catch somebody in a fraud, you're allowed to go by very different rules." And they would have an "illegitimate President" if the Vice President did not act, and "we can't let that happen." These words stoked an already inflamed crowd, which had heard for months that the election was stolen and that "weak politicians" had failed to help the President.

So, when the President said to the crowd at the end of his remarks, "We fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore," moments before instructing them to march to the Capitol, the President's speech plausibly crossed the line into unprotected territory. These words did not "amount[] to nothing more than illegal action at some indefinite future time." *Hess*, 414 U.S. at 108. President Trump's words were, as Justice

94

Douglas termed it, "speech . . . brigaded with action." *Brandenburg*, 395 U.S. at 456 (Douglas, J., concurring).  They were plausibly "directed to inciting or producing imminent lawless action and [were] likely to incite or produce such action." *Hess*, 414 U.S. at 108–09.

In his motions, President Trump largely avoids any real scrutiny of the actual words he spoke or the context in which they were spoken.  His tack entails essentially three arguments.  First, citing Justice Stevens's dissent in *Morse v. Frederick*, 551 U.S. 393, 442–43 (2007), he contends that Plaintiffs' attempt to fit President Trump's speech in the *Brandenburg* box improperly relies on how its listeners interpreted the speech rather than his actual words.  *See Blassingame* Trump Mot. at 25 (citing *Morse*, 551 U.S. at 442–43 (Stevens, J., dissenting) (observing that the distinction between advocacy and incitement "could not depend on how" others understood speech; to hold otherwise would leave "'the speaker . . . wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning'" (quoting *Thomas v. Collins*, 323 U.S. 516, 535 (1945)))).  The court has no quarrel with the proposition that an incitement-speech inquiry cannot turn on the subjective reaction of the listener.  *See Nwanguma v. Trump*, 903 F.3d 604, 613 (6th Cir. 2018) ("It is the words used by the speaker that must be the focus of the incitement inquiry, not how they may be heard by a listener.").[32]   In conducting the inquiry above the court assiduously avoided relying on any allegations that Plaintiffs made about any person's reaction to the President's January 6 Rally Speech.  (And, Plaintiffs did make such allegations.  *See, e.g.*, *Thompson* Compl. ¶¶ 88, 122; *Blassingame* Compl. ¶¶ 61, 93.)  The court's conclusion rests on the words spoken and their context, including the audience to whom the President spoke and when he spoke to them.

---

[32] The court takes no position on whether the subjective reaction of a listener might have *some* relevance to the inquiry.

Next, the President focuses on the fact that when he first alluded to marching to the Capitol, he said he expected rally-goers "to peacefully and patriotically make your voices heard." *Blassingame* Trump Mot. at 25. Those words are a factor favoring the President. *See Nwanguma*, 903 F.3d at 611–12 (holding that the allegation that candidate Trump's repetition of the words "get 'em out of here," directed at protesters attending a campaign rally, were inciting words was "undercut[]" by the accompanying words "don't hurt 'em"). That is why the court recited those words in summarizing his Speech. But the President's passing reference to "peaceful[] and patriotic[]" protest cannot inoculate him against the conclusion that his exhortation, made nearly an hour later, to "fight like hell" immediately before sending rally-goers to the Capitol, within the context of the larger Speech and circumstances, was not protected expression.

Finally, President Trump plays a game of what-aboutism, citing fiery speeches from Democratic legislators, including Plaintiff Waters, which he says likewise would not be protected speech if the court were to find, as it has, that the President's is not. *Thompson* Trump Reply at 8, 11–13. The court does not find such comparators useful. Each case must be evaluated on its own merits, as the court has done above. If the President's larger point is that a speaker only in the rarest of circumstances should be held liable for political speech, the court agrees. *Cf. Bible Believers*, 805 F.3d at 244 (observing in a case involving religious expression that "[i]t is not an easy task to find that speech rises to such a dangerous level that it can be deemed incitement to riot"). That is why the court determines, as discussed below, that Giuliani's and Trump Jr.'s words are protected speech. But what is lacking in their words is present in the President's: an implicit call for imminent violence or lawlessness. He called for thousands "to fight like hell" immediately before directing an unpermitted march to the Capitol, where the targets of their ire were at work, knowing that militia groups and others among the crowd were prone to violence. *Brandenburg*'s

96

imminence requirement is stringent, and so finding the President's words here inciting will not lower the already high bar protecting political speech.[33]

*      *      *

The nineteenth century English philosopher John Stuart Mill was a fierce advocate of free speech. But Mill understood that not all speech should be protected. In his work *On Liberty*, Mill wrote, "No one pretends that actions should be as free as opinions. On the contrary, even opinions lose their immunity, when the circumstances in which they are expressed are such as to constitute their expression a positive instigation to some mischievous act." JOHN STUART MILL, ON LIBERTY 100 (London, John W. Parker & Son, 2d ed. 1859). As an example Mill offered the following:

> An opinion that corn-dealers are starvers of the poor, or that private property is robbery, ought to be unmolested when simply circulated through the press, but may justly incur punishment when delivered orally to an excited mob assembled before the house of a corn-dealer, or when handed about among the same mob in the form of a placard.

*Id.* at 100–01. President Trump's January 6 Rally Speech was akin to telling an excited mob that corn-dealers starve the poor in front of the corn-dealer's home. He invited his supporters to Washington, D.C., after telling them for months that corrupt and spineless politicians were to blame for stealing an election *from them*; retold that narrative when thousands of them assembled on the Ellipse; and directed them to march on the Capitol building—the metaphorical corn-dealer's house—where those very politicians were at work to certify an election that he had lost. The

---

[33] President Trump additionally has argued that, if the court were to hold that he could be potentially liable under § 1985(1) for his speech, such an interpretation would raise overbreadth and void-for-vagueness concerns. *Thompson* Trump Mot. at 21–22. But such challenges make little sense, as the President cannot seriously contend that § 1985(1) either sweeps in too much protected speech (an overbreadth challenge) or does not provide fair notice of what it prohibits (void for vagueness). In any event, the President does not develop either argument, devoting only a half-page to them. *See id.* The court therefore declines to address them any more than it has. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

97

Speech plausibly was, as Mill put it, a "positive instigation of a mischievous act."  Dismissal of Plaintiffs' claims on First Amendment grounds is not warranted.

e.        Giuliani and Trump Jr.

As the court already has said, it finds that Giuliani's and Trump Jr.'s words spoken before and on January 6th are protected expression.  None of their words, explicitly or implicitly, rose to the level of a call for imminent use of violence or lawless action.  That is true even of Giuliani saying, "Let's have trial by combat."  That statement was made in the context of his assertion that the election was rife with criminal fraud, and that he was "willing to stake "[his] reputation," and the President would too, "on the fact we're going to find criminality."  But Giuliani never said anything about where or when the "trial by combat" would occur.  Giuliani's statement is therefore, at most, "advocacy of illegal action at some indefinite future time." *Hess*, 414 U.S. at 108.  The "trial by combat" line is surely provocative, but it is not unprotected speech. *See Claiborne Hardware*, 458 U.S. at 928 (holding that where "spontaneous and emotional appeals for unity and action in a common cause . . . . do not incite lawless action, they must be regarded as protected speech").

Accordingly, the court dismisses all federal and District of Columbia–law claims brought by Swalwell and the Bass Plaintiffs against Giuliani and Trump Jr.

f.        Oath Keepers

The Oath Keepers also contend that the § 1985(1) claim against them must be dismissed because their alleged acts were protected speech, assembly, and petitioning. *Thompson* Oath Keepers Mot. at 27–28.  The court quickly dispenses with this argument.  "The First Amendment does not protect violence." *Claiborne Hardware*, 458 U.S. at 916.  The Oath Keepers are alleged to have acted violently by breaching the Capitol building, "with the rest of the riotous mob,"

98

wearing "paramilitary equipment, helmets, reinforced vests and clothing with Oath Keepers paraphernalia, moving in a regimented manner as members of the military are trained." *Thompson* Compl. ¶ 126. Such actions, if true, are not entitled to First Amendment protection.

The court also notes that, if the court were to dismiss the § 1985(1) claim against the Oath Keepers for failing to overcome a First Amendment defense, Plaintiffs could easily cure any deficiency through amendment. "The security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government." *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 716 (1931). The court can take judicial notice that ten members of the Oath Keepers, including its leader Stewart Rhodes, have been charged with seditious conspiracy. *See Thompson v. Linda & A., Inc.*, 779 F. Supp. 2d 139, 144 n.2 (D.D.C. 2011) ("The Court may take judicial notice of public records like docket sheets and other court documents."); Indictment, *United States v. Rhodes*, No. 22-cr-15 (APM) (D.D.C.), ECF No. 1. There is no First Amendment protection for such alleged conduct.

### F.      District of Columbia–law claims

What remains to address are President Trump's motions to dismiss the District of Columbia–law claims asserted by Swalwell and the *Blassingame* Plaintiffs. (Recall, the Bass Plaintiffs advance only a single federal claim under § 1985(1).) The court considers these arguments solely as to President Trump because the court already has dismissed those claims brought by Swalwell against Giuliani and Trump Jr. on First Amendment grounds. The court takes up the District of Columbia–law claims in the order in which they appear in Swalwell's Complaint, followed by any unique claims asserted by the *Blassingame* Plaintiffs. The court will note in the header when the claims overlap.

99

1.      *Negligence Per Se Based on Violation of District of Columbia Criminal Statutes (*Swalwell *Counts 3 and 4 and* Blassingame *Counts 4 and 5*)

Swalwell and the *Blassingame* Plaintiffs advance two similar claims, which Swalwell styles as "Negligence *Per Se*" and the *Blassingame* Plaintiffs style as "Violation of Public Safety Statute." *Swalwell* Compl. at 50–51; *Blassingame* Compl. at 40–41.  The court understands these claims to advance a theory under District of Columbia law that violations of criminal statutes can create civil liability.  *See Marusa v. District of Columbia*, 484 F.2d 828, 834 (D.C. Cir. 1973) (setting forth "guidelines for determining whether violation of a criminal statute can create civil liability").  The court will refer to these as Plaintiffs' "negligence per se" claims.[34]  Here, Swalwell and the *Blassingame* Plaintiffs seek to predicate liability on alleged violations of D.C. Code § 22-1322, which prohibits inciting of a riot, and D.C. Code § 22-1321, which prohibits acts of disorderly conduct.

At oral argument, the court expressed skepticism that the negligence per se counts state claims under District of Columbia law.  *See* Hr'g Tr., at 180–90.  But the court's skepticism is nowhere matched by an argument in President Trump's motions to dismiss.  The court has searched in vain for a contention that these claims must be dismissed because a violation of the referenced criminal statutes fails to state a cause of action.  The President's motions do not address this theory of liability generally or Plaintiffs' negligence per se claims specifically, let alone advance the concerns the court raised during oral argument.  *See Swalwell* Trump Motion at 32–37; *Blassingame* Trump Motion at 33–41.  The closest the President's brief comes to addressing these claims is when he argues that President Trump owed no duty to Swalwell, *see Swalwell* Trump

---

[34] The court recognizes that calling these claims "negligence per se" is a bit of a misnomer because both depend on knowing and willful violations of the criminal law.  Nevertheless, District of Columbia law does recognize that violations of certain types of criminal statutes may give rise to civil liability under the rubric of "negligence *per se*" if the statute is intended to promote safety.  *See McCracken v. Walls-Kaufman*, 717 A.2d 346, 354 (D.C. 1998).

100

Mot. at 33–34, but that argument is not made in the context of negligence per se law.[35]   The President briefly addresses the anti-riot and disorderly conduct laws, but his argument is that those statutes do not reach political speech.  *Blassingame* Trump Mot. at 33.  But the court already has held that the President's January 6 Rally Speech was not protected expression.

Ultimately, notwithstanding the court's expressed doubts about the validity of the negligence per se claims, it is not the court's job to raise arguments that a party has not.  Accordingly, the negligence per se counts survive the motions to dismiss.

### 2.    *District of Columbia Anti-Bias Statute (*Swalwell *Count 5)*

Swalwell also puts forth a claim under the District of Columbia anti-bias statute, D.C. Code § 22-3704.  That statute provides a civil cause of action for, as relevant here, "any person who incurs injury to his or her person or property as a result of an intentional act that demonstrates an accused's prejudice based on the actual or perceived . . . political affiliation of a victim of the subject designated act," "[i]rrespective of any criminal prosecution or result of a criminal prosecution."   The statute defines "designated act" to mean a "criminal act, including . . . assault . . . and . . . inciting . . . assault."  D.C. Code § 22-3701(2).  Swalwell alleges that President Trump committed these crimes and that they were "motivated by [Swalwell's] political affiliation as a political opponent of Donald Trump."  *Swalwell* Compl. ¶ 210.

The court expressed doubt at oral argument that prejudice based on "affiliation as a political opponent of Donald Trump" qualifies as "political affiliation" for purposes of the District of Columbia anti-bias law.  *See* Hr'g Tr., 190–91.  The term "affiliation" is undefined in the statute; its ordinary meaning is "the state of belonging to a particular religious or political group."

---

[35] District of Columbia law seems to recognize that a qualifying public-safety criminal statute itself may create a duty, in some cases to the public at large.  *See, e.g.*, *Zhou v. Jennifer Mall Restaurant, Inc.*, 534 A.2d 1268, 1275 (D.C. 1987) (holding that violation of statute that imposes criminal sanctions on tavern keepers for serving intoxicated patrons created a duty extending to the general public).

101

*Affiliation*, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary /affiliation (last visited Feb. 10, 2022).  Opposing the President of the United States would not seem to fit that definition.  But President Trump does not make this argument.  *See Swalwell* Trump Mot. at 35–36.  So, the court declines to dismiss on that ground.

President Trump advances two other arguments.  First, he contends that Swalwell's anti-bias claim fails "for all the reasons discussed elsewhere, especially since, incredibly, he alleges the use of political language he finds offensive gives rise not only to a cause of action but an actual crime."  *Id.*  To the extent the court already has rejected arguments made "elsewhere," it rejects them here, again.  As for President Trump's contention that offensive political language cannot give rise to an anti-bias cause of action, that mischaracterizes what the statute says and what Swalwell pleads.  The statute does not make political speech a crime or actionable.  Rather, it provides a cause of action for the victim of a crime that is motivated by bias.  Here, Swalwell alleges that he was the victim of a criminal assault or incitement of an assault that was motivated by his "political affiliation."  *Swalwell* Compl. ¶¶ 209–214.[36]  The claim therefore cannot be dismissed on the ground that the statute makes offensive political speech unlawful.

Second, President Trump argues that the statute only allows for recovery for injury to an individual's "person or property," D.C. Code § 22-3704, and that Swalwell only seeks recovery "for psychological or emotional harm," which is "fatal to his bias claim."  *Id.* at 35–36.  But that argument goes nowhere because the anti-bias law expressly permits recovery of "[a]ctual or nominal damages for economic or non-economic loss, including damages for emotional distress."

---

[36] In his reply brief, President Trump recharacterizes Swalwell's anti-bias claim as alleging that because the President committed "all of the other torts" alleged in the Complaint and "because he committed these torts with prejudice, President Trump is liable under § 22-3704."  Reply in Supp. of Defs. Trump & Trump Jr.'s Mot. to Dismiss, ECF No. 44 [hereinafter *Swalwell* Trump Reply], at 29.  But that is not what Swalwell has alleged, nor what the statute permits as a ground for recovery.  The "designated act" must be "a criminal act," not a mere tort, D.C. Code § 22-3701(2), and Swalwell accuses the President of predicate criminal, not tortious, acts, *Swalwell* Compl. ¶¶ 213–214.

D.C. Code § 22-3704(a)(2).[37]  Swalwell therefore can proceed with his claim under the District of Columbia anti-bias law.

> 3.   *Intentional and Negligent Infliction of Emotional Distress (*Swalwell *Counts 6 and 7)*

Swalwell asserts a claim of intentional infliction of emotional distress (IIED) and an additional claim of negligence infliction of emotional distress (NIED).  To state a claim for IIED, a plaintiff must allege "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff [to suffer] severe emotional distress." *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 163 (D.C. 2013).  To state a claim for NIED, a plaintiff must plead that (1) the defendant acted negligently, (2) the plaintiff suffered either a physical impact or was within the 'zone of danger' of the defendant's actions, and (3) the plaintiff suffered emotional distress that was "serious and verifiable." *Wright v. United States*, 963 F. Supp. 7, 18 (D.D.C. 1997) (quoting *Jones v. Howard Univ., Inc.*, 589 A.2d 419, 424 (D.C. 1991)).[38] President Trump argues that Swalwell's pleading falls short on the first and third elements on both claims.  *Swalwell* Trump Mot. at 36–37.  The court agrees as to the third element of both claims.

"Severe emotional distress" for purposes of a IIED claim is a high bar.  It "requires a showing beyond mere 'mental anguish and stress' and must be 'of so acute a nature that harmful physical consequences are likely to result.'"  *Competitive Enterprise v. Mann*, 150 A.3d 1213, 1261 (D.C. 2016).  "Serious and verifiable" distress for an NIED claim is a lower bar, but it must manifest in some concrete way, such as "by an external condition or by symptoms clearly

[37] In the penultimate line of his reply brief, President Trump asserts: "Even still, calling someone a radical left Democrat does not amount to prejudice." *Swalwell* Trump Reply at 29.  This seems to be an argument challenging the sufficiency of Swalwell's pleading of the element of prejudice.  Because it is raised for the first time in the reply brief in a single, unadorned sentence, the court declines to consider it.

[38] The District of Columbia Court of Appeals has moved away from the physical "zone of danger" requirement for some NIED claims, but that exception is limited to cases in which the defendant had a relationship with the plaintiff, or had undertaken obligations to the plaintiff, of a nature that necessarily implicates the plaintiff's well-being. *See Sibley v. St. Albans Sch.*, 134 A.3d 789, 798 (D.C. 2016).  That line of cases obviously is not implicated here.

indicative of a resultant pathological, physiological, or mental state." *Jones v. Howard Univ., Inc.*, 589 A.2d 419, 424 (D.C. 1991) (emphasis omitted). Swalwell's pleading meets neither of these standards. His pleading is largely conclusory. *Swalwell* Compl. ¶ 223 (alleging that "Defendants' actions caused severe emotional distress"); *id.* ¶ 226 (alleging that "plaintiff suffered severe emotional distress"). Swalwell does, however, describe his thoughts and emotions when he was in the House chamber, heard rioters pounding on the door and smashing glass to enter, and saw Capitol police draw their weapons and barricade the entrances. *Id.* ¶ 224. He states that, during these events, he texted his wife, "I love you very much. And our babies." *Id.* ¶ 225. The court does not minimize the trauma and shock Swalwell felt on January 6th, but his pleading simply does not meet the high bar for either an IIED or NIED claim. Those counts will be dismissed.

Before moving to the next claim, the court notes that the *Blassingame* Plaintiffs also brought an IIED claim (Count 3). They have voluntarily dismissed that claim. *Blassingame* Pls.' Opp'n at 32 n.12. That count will be dismissed without prejudice.

> 4.   *Aiding and Abetting Common Law Assault* (Swalwell *Count 8 and* Blassingame *Count 2)*

Next, the court takes up Plaintiffs' common law assault claims based on an aiding-and-abetting theory of liability. *Swalwell* Compl. ¶¶ 237–252; *Blassingame* Compl. ¶¶ 163–168. President Trump's motion in *Swalwell* does not separately address the aiding-and-abetting-assault claim, but he extensively addresses it in his *Blassingame* motion. *See generally Swalwell* Trump Mot.; *Blassingame* Trump Mot. at 33–40. The court will exercise its discretion and consider those arguments in both cases.[39]

---

[39] President Trump contends for the first time in his *Swalwell* reply brief that aiding and abetting a tort is not a recognized cause of action under District of Columbia law. *Swalwell* Trump Reply at 25–26. That argument comes too late, and the court declines to consider it.

*Halberstam v. Welch* remains the high-water mark of the D.C. Circuit's explanation of aiding-and-abetting liability. The court there articulated two particular principles pertinent to this case. It observed that "the fact of encouragement was enough to create joint liability" under an aiding-and-abetting theory, but "[m]ere presence . . . would not be sufficient." 705 F.2d at 481. It also said that "[s]uggestive words may also be enough to create joint liability when they plant the seeds of action and are spoken by a person in an apparent position of authority." *Id.* at 481–82. A "position of authority" gives a "suggestion extra weight." *Id.* at 482.

Applying those principles here, Plaintiffs have plausibly pleaded a common law claim of assault based on an aiding-and-abetting theory of liability. A focus just on the January 6 Rally Speech—without discounting Plaintiffs' other allegations—gets Plaintiffs there at this stage. President Trump's January 6 Speech is alleged to have included "suggestive words" that "plant[ed] the seeds of action" and were "spoken by a person in an apparent position of authority." He was not "merely present." Additionally, Plaintiffs have plausibly established that had the President not urged rally-goers to march to the Capitol, an assault on the Capitol building would not have occurred, at least not on the scale that it did. That is enough to make out a theory of aiding-and-abetting liability at the pleadings stage.

President Trump urges the court to scrutinize Plaintiffs' aiding-and-abetting theory under the five factors set forth in the Restatement (Second) of Torts § 876(b), as cited in *Halberstam*. *Blassingame* Trump Mot. at 36–37. The five Restatement factors are (1) the nature of the act encouraged, (2) the amount and kind of assistance given, (3) the defendant's absence or presence at the time of the tort, (4) his relation to the tortious actor, and (5) the defendant's state of mind. The *Halberstam* court also considered as an additional, sixth factor the duration of the assistance

105

provided.  *Halberstam*, 705 F.2d at 484.  Evaluating Plaintiffs' theory under these six factors only supports the plausibility of President Trump's liability as an aider and abettor.

*Nature of the act encouraged.*  The nature of the act here—violent and lawless conduct at the Capitol incited by President Trump's Rally Speech—supports a finding that President Trump "substantial[ly]" contributed to the underlying tort.  *Halberstam*, 705 F.2d at 484.  President Trump contends that this factor favors him because he admonished the crowd to "be peaceful, well before any violence was conducted by anyone listening to the speech," thus attenuating the "temporal connection" between his words and the tortious act.  *Blassingame* Trump Mot. at 36.  But that contention ignores the President's later words encouraging the crowd, "We fight.  We fight like hell and if you don't fight like hell, you're not going to have a country anymore," occurring only moments before he sent rally-goers on a march to the Capitol ("So let's walk down Pennsylvania Avenue").

*Amount and kind of assistance given.*  The court in *Halberstam* observed that this was a "significant factor," using as an illustration a case in which the aider and abettor through his words had "sparked" the action.  705 F.2d at 484.  That is precisely what is alleged to have happened here.  President Trump resists this view, arguing he "was not even present at the time of the conduct, nor did he provide any equipment, information, or any other kind of assistance." *Blassingame* Trump Mot. at 37–38.  This, however, ignores Plaintiffs' theory, which the court has found plausible, that the President's words at the rally sparked what followed.

*Presence at the time of the tort.*  For the reasons already discussed, the fact President Trump was not at the Capitol itself does not allow him to avoid potential aiding-and-abetting liability. *See Halberstam*, 705 F.2d at 484 (noting that presence is not a requirement); *id.* at 488 (finding liability even though the defendant was not present at the time of the assisted act).

106

*Relation to the tortfeasor*.  *Halberstam* says that an aider and abettor's "position of authority len[ds] greater force to his power of suggestion."  *Id.* at 484.  The application of that factor here requires little discussion.  The President nevertheless pushes back, asserting that because the tortfeasors were not known to the President, this factor cuts in his favor.  *Blassingame* Trump Mot. at 37.  Leaving aside that Plaintiffs have pleaded that the President did *know* about organized militia groups, *Halberstam* makes clear that the aider and abettor need not have a personal relationship with the tortfeasor to be in a position of authority.  *Halberstam*, 705 F.2d at 484 (citing *Cobb v. Indian Springs, Inc.*, 522 S.W.2d 383 (Ark. 1975) (finding aiding-and-abetting liability where a security guard urged a young driver with a new car to give the car a high-speed test run that injured a bystander)).

*State of mind*.  As to this factor, the court has found that Plaintiffs have plausibly alleged that the President was of one mind with organized groups and others to participate in violent and unlawful acts to impede the Certification.  Thus, this factor is supported by more than, as the President contends, his alleged pleasure in watching news coverage of the events as they unfolded at the Capitol building.  *Blassingame* Trump Mot. at 37.

*Duration of the assistance provided*.  The *Halberstam* court considered an additional, sixth factor, the duration of the assistance provided.  This factor also weighs against President Trump.  True, the Rally Speech itself was relatively short in duration, but the invitation for the Rally came two weeks earlier.  The duration is longer still if the court considers his tweets prior to that invitation.  Importantly, even President Trump admits that his "sporadic tweets and speeches" present a "stronger argument" for "conspiracy" liability.  *Id.* at 37–38.  That duration also supports aiding-and-abetting liability.

107

Accordingly, the court holds that Swalwell and the *Blassingame* Plaintiffs have stated a claim for common law assault based on an aiding-and-abetting theory of liability.

>5.     *Negligence (*Swalwell *Count 9)*

The last of Swalwell's claims is negligence.  Swalwell alleges that "[i]n directing a crowd of thousands to march on the Capitol—particularly considering their violence-laden commands— the Defendants owed a duty of care to the Plaintiff and to everyone in the Capitol to exercise reasonable care in directing the mob's actions." *Swalwell* Compl. ¶ 255.  He further contends that President Trump breached that duty by, among other things, urging rally-goers to "fight like hell." *Id.* ¶ 257.  Thus, under Swalwell's negligence claim, the President's lack of care with his words caused others to riot, resulting in his injuries.  Importantly, such a theory is analytically distinct from the theory that underlies Swalwell's § 1985(1) and aiding-and-abetting theories, which rest on the President's *intentional* use of words to encourage violence or lawlessness.  *See Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 916 (D.C. Cir. 2015) (observing that "intent and negligence are regarded as mutually exclusive grounds for liability" (alterations omitted) (quoting *District of Columbia v. Chinn*, 839 A.2d 701, 706 (D.C. 2003))).

When, as here, a plaintiff seeks to hold a defendant liable for negligence for injuries resulting from intervening criminal acts, "heightened foreseeability factors directly into the duty analysis because a defendant is only liable for the intervening criminal acts of another if the criminal act is so foreseeable that a duty arises to guard against it." *Bd. of Trustees of Univ. of D.C. v. DiSalvo*, 974 A.2d 868, 871 (D.C. 2009) (internal quotation marks omitted).  The crux of heightened foreseeability is a showing of the defendant's "increased awareness of the danger of a *particular criminal act*." *Id.* at 872 (emphasis added).  "It is not sufficient to establish a general possibility that the crime would occur, because . . . the mere possibility of crime is easily

108

envisioned and heightened foreseeability requires more precision." *Id.* at 872–73. Such precision involves, "if not awareness of the precise risk, close similarity in nature or temporal and spatial proximity to the crime at issue." *Id.* at 874. Thus, for example, in *DiSalvo*, the D.C. Court of Appeals said that, to establish a duty, the plaintiff "had to establish that [the university] had an increased awareness of the risk of a violent, armed assault in the parking garage." *Id.* at 872. Similarly, in *Sigmund v. Starwood Urban Retail VI, LLC*, to establish a duty, the D.C. Circuit demanded proof of similar crimes in a case in which the plaintiff was injured by a pipe bomb in his building's garage. 617 F.3d 512, 516 (D.C. Cir. 2010).

Accordingly, to establish that President Trump had a duty to Swalwell to take care of the words he used in the Rally Speech, Swalwell must plead facts establishing that the President had an increased awareness of a risk of a violent assault at the Capitol. Not surprisingly, he does not meet this demanding standard. He therefore cannot advance a theory of negligence liability based on the theory that the President's lack of care in selecting his words caused his injuries. His only viable theory is to show that President Trump acted intentionally, which he has sufficiently pleaded.

### 6.    *The* Blassingame *Plaintiffs' Additional "Claims"*

The *Blassingame* Plaintiffs advance three counts not asserted by Swalwell: (1) directing assault and battery (Count 1); (2) punitive damages (Count 6); and (3) civil conspiracy (Count 8). As to the first of these unique "claims," the court does not understand the difference, in this case, between "directing" an assault and aiding and abetting one. They seem one and the same. Nevertheless, the court will not dismiss Count 1; Plaintiffs may be able to clarify and refine this claim through discovery. Count 6—punitive damages—is not a freestanding claim, but a type of damages, so it is dismissed, without prejudice to seeking such damages, if liability is established

109

and if appropriate.   And, Count 8—civil conspiracy—is "not independently actionable" under District of Columbia law; rather, it is a "means for establishing vicarious liability."   *See Halberstam*, 705 F.2d at 479.   Count 8 is therefore dismissed, without prejudice to seeking to use civil conspiracy as a theory of vicarious liability.

### G.      Brooks's Motion for Westfall Act Certification

At long last, the court arrives at the final matter before it:  Brooks's request for certification under the Westfall Act.  Under that Act, if the Attorney General certifies that a federal employee "was acting within the scope of his office or employment at the time of the incident out of which [a] claim arose," the employee shall be dismissed from the action and the United States substituted as the defendant.  28 U.S.C. § 2679(d)(1).  Such certification and substitution do not, however, extend to an action brought against an employee for a "violation of a statute of the United States under which such action against an individual is otherwise authorized."  *Id.* § 2679(b)(2)(B).  In this matter, the Attorney General refused to certify that Brooks was acting within the scope of his office, i.e., in his legislative capacity, when he gave his speech at the January 6 Rally.  U.S. Resp. to Brooks at 1.  The congressman nevertheless asks the court to make the requisite certification as to Swalwell's tort claims.  28 U.S.C. § 2679(d)(3) (authorizing courts to certify a defendant-employee's acts as within the scope of office or employment).

The court need not grapple with this issue.  A dispute over certification under the Westfall Act does not appear to be a question regarding the court's subject matter jurisdiction, so the court is not required to consider it before the merits.  The court instead invites Brooks to file a motion to dismiss for failure to state a claim.  The court is prepared to grant such motion for the same reasons it dismisses all claims against Giuliani and Trump Jr.:  Brooks's remarks on January 6th were political speech protected by the First Amendment for which he cannot be subject to liability.

110

**IV.     CONCLUSION AND ORDER**

For the foregoing reasons, the court holds as follows with respect to each of the three actions:

*Thompson v. Trump.* Giuliani's motion to dismiss is granted and the motions to dismiss of President Trump, the Oath Keepers, and Tarrio are denied.

*Swalwell v. Trump.* The motions to dismiss of Trump Jr. and Giuliani are granted as to all claims. The motion to dismiss as to President Trump is denied as to:

> (1) the § 1985(1) claim (Count 1)
>
> (2) the negligence per se claims (Counts 3 and 4)
>
> (3) violation of the District of Columbia's anti-bias law (Count 5), and
>
> (4) aiding and abetting assault (Count 8)

and granted as to:

> (5) the § 1986 claim (Count 2)
>
> (6) intentional infliction of emotional distress (Count 6)
>
> (7) negligent infliction of emotional (Count 7) distress, and
>
> (8) negligence (Count 9).

The court defers ruling on Brooks's Westfall Act certification petition and instead invites him to file a motion to dismiss, which the court will grant.

*Blassingame v. Trump.* President Trump's motion to dismiss is denied as to:

> (1) the § 1985(1) claim (Count 7)
>
> (2) directing/aiding and abetting assault (Counts 1 and 2)
>
> (3) violations of public safety statutes (i.e, negligence per se) (Counts 4 and 5)

and granted as to:

111

(4) intentional infliction of emotional distress (Count 3)

(5) punitive damages (Count 6)

(6) civil conspiracy in violation of common law (Count 8).


Dated:  February 18, 2022

                       Amit P. Mehta
           United States District Court Judge

# EXHIBIT 2

Memorandum Opinion and Order

*Barbara J. Lee, et al. v. Donald J. Trump, et al.*, Case No. 1:21-cv-00400 (APM)
(D.D.C. March 31, 2026)

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | ) | |
| **BARBARA J. LEE et al.,** | ) | **Case No. 21-cv-00400 (APM)** |
| | ) | |
| **Plaintiffs,** | ) | **Consolidated Member Cases:** |
| | ) | 21-cv-00586 (APM) |
| **v.** | ) | 21-cv-00858 (APM) |
| | ) | 21-cv-02265 (APM) |
| **DONALD J. TRUMP et al.,** | ) | 22-cv-00010 (APM) |
| | ) | 22-cv-00011 (APM) |
| **Defendants.** | ) | 22-cv-00034 (APM) |
| | ) | 23-cv-00038 (APM) |

**MEMORANDUM OPINION**

**I.     INTRODUCTION**

These consolidated civil cases are among the last vestiges of litigation concerning the events at the United States Capitol on January 6, 2021.  In February 2022, this court denied President Donald J. Trump's motion to dismiss, ruling that Plaintiffs had plausibly alleged that President Trump's acts leading up to and on January 6, including his rally speech on the Ellipse ("Ellipse Speech" or "Speech"), were not official acts and therefore he did not enjoy presidential immunity from suit.  *See Thompson v. Trump*, 590 F. Supp. 3d 46, 73–84 (D.D.C. 2022).[1]  The court also held that words spoken during the Ellipse Speech plausibly amounted to incitement and were not protected under the First Amendment.  *See id.* at 108–18.

President Trump then sought interlocutory review of the court's immunity ruling. The D.C. Circuit affirmed, and President Trump elected not to appeal that decision. *See Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023).  The case then returned to this court.

---

[1] The court ruled, however, that President Trump was immune from suit as to Plaintiff Swalwell's failure-to-act claim under 42 U.S.C. § 1986. *Thompson*, 590 F. Supp. 3d at 84–85 ("Just as he is immune for acts that fall within the outer perimeter of his official responsibilities, so too must he be immune for alleged failures to exercise that official responsibility.").

President Trump opted to take discovery bearing on immunity, and the parties engaged in such discovery for nearly a year. Now, the question of official-acts immunity is once more teed up for this court, but this time under the more rigorous summary judgment standard.

But that is not all. President Trump also asks the court to reconsider its ruling rejecting his First Amendment defense. According to him, a subsequent Supreme Court decision, *Counterman v. Colorado*, 600 U.S. 66 (2023), clarified the law on incitement and confirms that the Ellipse Speech was protected political expression. President Trump asks the court to walk back its previous decision or, if it declines to do so, to certify the First Amendment question for interlocutory review.

And the Department of Justice has joined the fray. More than four years after the first of these suits was brought, the Department filed a Westfall Act Certification ("Certification") signed by the Attorney General's designee. The Certification asserts that the acts by President Trump alleged in the various complaints fell within the scope of his employment as President of the United States. Under the Westfall Act, the Attorney General's act of certification requires that the United States be substituted as the defendant for tort claims brought against a federal employee. The consequence of substitution in this case would be two-fold. It would immunize President Trump from tort liability because he could no longer be held personally responsible. And it would require dismissal of the tort claims altogether, as no Plaintiff filed pre-suit notice as required under the Federal Tort Claims Act. Plaintiffs have moved to strike the Certification. If granted, the United States would not be substituted as the defendant and the tort claims against President Trump would remain intact.

Those are the three primary pending motions. There are also two motions seeking to admit or exclude certain evidence from the court's consideration of the immunity question. Furthermore,

the parties have submitted lengthy statements and counterstatements of undisputed facts to support their positions on immunity.  Together, they total over 650 pages and contain what seems an endless stream of evidentiary objections.  The court has considered those statements in their entirety, their supporting evidence, and the parties' objections.[2]

For the reasons set forth below, the court rules as follows: (1) President Trump's summary judgment motion with respect to official-acts immunity is denied except as to certain conduct that falls within the outer perimeter of a President's responsibilities; (2) President Trump's motion for reconsideration is denied, but the court certifies its First Amendment rulings for interlocutory review; and (3) Plaintiffs' motion to strike the United States' Westfall Act Certification is granted. Further, to the extent the court has relied on evidence covered by the two evidentiary motions, the court (4) grants Plaintiffs' motion requesting judicial notice and (5) denies Defendant's motion objecting to the court's consideration of the final report of the U.S. House Select Committee to Investigate the January 6 Attack on the U.S. Capitol.

This opinion will proceed as follows.  Section II addresses the controlling legal principles, starting with a summary of the two appellate rulings on presidential immunity that followed this court's ruling: (1) the D.C. Circuit's opinion in *Blassingame* and (2) the Supreme Court's decision in *Trump v. United States*, 603 U.S. 593 (2024).  Section II closes with a discussion of President Trump's contention that *Trump* altered *Blassingame*'s immunity framework and related legal disputes.  Section III addresses the merits of the immunity question.  Sections IV and V, respectively, address President Trump's motion to reconsider his First Amendment defense and Plaintiffs' motion to strike the Westfall Act Certification.

---

[2] Instead of identifying the various filings in the body of this opinion or in footnotes, they are listed in an Appendix. The corresponding CM/ECF docket entries and short-cite abbreviations are found there, too.

The court does not lead with a factual or procedural overview, as the court presumes readers' familiarity with the background set forth in *Blassingame*, 87 F.4th at 6–12, and *Thompson*, 590 F. Supp. 3d at 63–69.  It is incorporated here by reference.

## II.      LEGAL PRINCIPLES

### A.      *Blassingame v. Trump*

A unanimous panel in *Blassingame* concluded that, on a motion to dismiss, President Trump had not "demonstrated an entitlement to official-acts immunity for his actions leading up to and on January 6 as alleged in the complaints."  87 F.4th at 5.  In so holding, the court began by distilling three "governing principles" from the Supreme Court's two major cases on presidential immunity from civil suit, *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), and *Clinton v. Jones*, 520 U.S. 681 (1997).  "First, the President is entitled to official immunity from civil damages liability based on actions within the 'outer perimeter' of official presidential responsibility, including discretionary acts within the concept of duty associated with the presidency." *Blassingame*, 87 F.4th at 14.  "[A]n act lies within the outer perimeter of an official's duties if it is 'the kind of act not manifestly or palpably beyond [the official's] authority, but rather having more or less connection with the general matters committed by law to his control or supervision.'" *Id.* at 13 (second alteration in original) (quoting *Martin v. D.C. Metro. Police Dep't*, 812 F.2d 1425, 1429 (D.C. Cir. 1987)).  "Second, the President is subject to civil damages suits based on actions taken in an unofficial, private capacity to the same extent as any private citizen." *Id.* at 14.  "And third, the President's actions do not fall beyond the outer perimeter of official responsibility merely because they are unlawful or taken for a forbidden purpose.  Rather, the President's official immunity insulates all of his official actions from civil damages liability, regardless of their legality or his motives." *Id.*

With these three principles in mind, the *Blassingame* court rejected President Trump's assertions that his alleged conduct fell within the outer perimeter of his official duties "because they amounted to speech on matters of public concern" and because "they came within his constitutional duty under the Take Care Clause." *Id.* As to his first argument, the court recognized that the President "possesses an extraordinary power to speak to his fellow citizens and on their behalf" and that "many uses of the presidential bully pulpit fall comfortably 'within the "outer perimeter" of [the President's] official responsibility.'" *Id.* at 14–15 (alteration in original) (first quoting *Trump v. Hawaii*, 585 U.S. 667, 701 (2018); then quoting *Nixon*, 457 U.S. at 756). But merely speaking on a matter of public concern is not, by itself, enough to enjoy official-acts immunity. Context matters. As the court explained, "an immunity for all presidential speech on matters of public concern—without regard to the context in which the President speaks—would be grounded purely in 'the identity of the actor who performed it' rather than 'the nature of the function performed,'" "a result that is 'unsupported by precedent.'" *Id.* at 16 (quoting *Clinton*, 520 U.S. at 695). The critical contextual question in this case, the court observed, is whether "the President is speaking (or engaging in conduct) in an official capacity as office-holder or instead in an unofficial capacity as office-seeker." *Id.* at 19. That distinction follows from the fact that the presidency is agnostic as to "who will occupy the office next." *Id.* at 17. "Campaigning to *attain* [the Office of the President] . . . is not an official function *of* the office." *Id.* An incumbent President engaged in "campaign-related activity" therefore is acting beyond the "outer perimeter" of his official responsibilities and is not entitled to absolute immunity from civil damages. *See id.* at 18–19 (offering as examples of non-official acts a nomination acceptance speech at a party convention, the running of a "campaign ad fully funded by a candidate's campaign," and a "speech at a reelection campaign rally").

As to President Trump's second argument—that he was carrying out his duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3—the court quickly disposed of it. *Blassingame*, 87 F.4th at 23. That assertion, "at least without more, assumes the answer to the question whether he acted in an official capacity as office-holder or in a private capacity as office-seeker." *Id.* at 24. Again, context matters. For example, the President "could exhort Congress to do its duty under the Electoral Count Act in a campaign ad, or he could do the same in the State of the Union address"; the latter arguably would be taken in furtherance of the President's Take Care Clause responsibilities, but the former would not. *Id.* The court concluded that President Trump "had made no argument as to why his actions alleged here should be treated more like the State of the Union than the campaign ad," and thus his invocation of the Take Care Clause ultimately did "not add anything to his claim of immunity in the circumstances of the cases before [it]." *Id.*

Importantly, the panel offered guidance on how to distinguish the acts of an incumbent President as "office-holder" from those as "office-seeker." Context, not motive, is the key consideration. *See id.* at 20–21. "An assessment of whether the President is engaged in official functions or unofficial reelection campaign activity . . . does not turn on whether the activity was subjectively undertaken in some measure to enhance the President's re-election prospects or profile. The inquiry instead is an objective one, 'grounded in' a context-specific assessment of 'the nature of the function performed.'" *Id.* (quoting *Clinton*, 520 U.S. at 695). "That context may be substantially informed by the way in which the President and the executive branch themselves treat the activity in question." *Id.* at 21. Put succinctly, if an act is "clothed in the trappings of an official function based on objective indicia, it more likely constitutes an official act for immunity purposes than if it bears the hallmarks of re-election campaign activity." *Id.* Relevant "objective indicia" include whether "an activity is organized and promoted by official White House channels

6

and government officials and funded with public resources." *Id.* The content of a speech might be relevant, too. "In certain circumstances, for instance, it could serve to confirm what an objective assessment of the context makes evident." *Id.* at 22. "But the crux of the inquiry . . . concerns the context in which the President speaks, not what precisely he says or whether it might advance his re-election prospects." *Id.* And when performed, the inquiry "should be fashioned and carried out with appropriate sensitivity to the important interests at stake." *Id.* at 20.

The court also defined the applicable burden and standard of proof. The President "bears the burden of establishing that he is entitled to official-act immunity." *Id.* at 30. "[T]hat burden will be met if, based on an appropriately objective, context-specific assessment, his alleged actions can reasonably be understood as the official actions of an office-holder rather than the unofficial actions of an office-seeker." *Id.* But "when a President's actions viewed objectively and in context may reasonably be understood only as re-election campaign activity, a court not only may, but must deny immunity." *Id.* at 21–22. And if it is a close call, doubts are resolved in favor of the President. *See id.* at 21 ("When an appropriately objective, context-specific assessment yields no sufficiently clear answer in either direction, the President . . . should be afforded immunity.").

To illustrate these principles, the court considered the remarks President Trump delivered at the "Salute to America" event held at the National Mall on July 4, 2019—a date by which he had "formally announced his candidacy for re-election." *Id.* at 22. Among the objective indicia the court identified were that (1) the rally was "publicly funded" through National Park Service and Department of Defense resources, (2) the government "promoted" the event through National Park Service channels and on the White House official Twitter account, (3) the White House dedicated a page on its website to the event, (4) "its primary organizers were government officials from the White House and the Department of Interior," (5) government officials attended the event,

and (6) the White House posted the President's remarks on its website. *Id.* at 22–23. The court did not definitively opine on whether the President's speech would be an official act for purposes of immunity but said that it would be treated as such "if it could reasonably be understood in that way." *Id.* at 23. The court added that "[w]hether his remarks addressed matters of public concern would not—and we believe should not—decide the issue." *Id.*

Ultimately, as to the conduct alleged in Plaintiffs' complaints, the court held that, because President Trump had not made any effort to show through objective, context-specific indicia that the alleged acts were official, dismissal on grounds of presidential immunity was not warranted. *See id.* at 30. It then remanded the case to this court to make an immunity determination at the summary judgment stage. *Id.* at 29–30. President Trump did not appeal the decision.

## B.    *Trump v. United States*

Seven months after *Blassingame*, the Supreme Court ruled in *Trump v. United States*. That decision addressed whether a former President is absolutely immune from criminal prosecution for conduct alleged to encompass official acts while in office. 603 U.S. at 605–06. That case, like this one, involved President Trump's conduct leading up to and on January 6. *See id.* at 602–03.

The Court held that "the nature of Presidential power requires that a former President have some immunity from criminal prosecution for official acts during his tenure in office." *Id.* at 606. The Court identified the degree of immunity afforded to three categories of conduct. At one end are activities "within his exclusive sphere of constitutional authority" for which "the President is absolutely immune from criminal prosecution." *Id.* at 609. The Court identified as examples the President's authority to pardon, remove inferior officers, and recognize foreign countries. *Id.* at 608–09. At the other are unofficial acts for which "there is no immunity." *Id.* at 615. And then there is the wide gulf in between. For conduct in that category, the President enjoys "at least a

8

*presumptive* immunity from criminal prosecution for . . . acts within the outer perimeter of his official responsibility." *Id.* at 614. Such presumptive immunity "is required to safeguard the independence and effective functioning of the Executive Branch, and to enable the President to carry out his constitutional duties without undue caution." *Id.* That presumption can be overcome if "the Government can show that applying a criminal prohibition to that act would pose no 'dangers of intrusion on the authority and functions of the Executive Branch.'" *Id.* at 615 (quoting *Fitzgerald*, 457 U.S. at 754).

As the D.C. Circuit did in *Blassingame*, the Court offered guidance on how to distinguish official acts from unofficial ones. The inquiry "begins with assessing the President's authority to take [the] action" in dispute. *Id.* at 617. The Court there simply acknowledged the expansive array of conduct that fits within the "outer perimeter" of the President's official responsibilities. *See id.* at 617–18. The court next emphasized that the President's motives and the alleged illegality of the conduct are not relevant to the inquiry. *Id.* at 618–19. And finally, for actions that "cannot be neatly categorized as falling within a particular Presidential function," the "necessary analysis is . . . fact specific." *Id.* at 628. That includes Presidential speech. "[M]ost of a President's public communications," the Court said, "are likely to fall comfortably within the outer perimeter of his official responsibilities." *Id.* at 629. But there may be "contexts in which the President, notwithstanding the prominence of his position, speaks in an unofficial capacity—perhaps as a candidate for office or party leader." *Id.* Where there is ambiguity as to speech, an "objective analysis of 'content, form, and context' will necessarily inform the inquiry." *Id.* (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). That analysis "must be fact specific and may prove to be challenging." *Id.* Relevant considerations may include "what else was said contemporaneous to

the excerpted communications" or, as relevant to this case, "who was involved in transmitting the electronic communications and in organizing the rally." *Id.* at 630.

The Supreme Court categorized some of the conduct alleged in the indictment. President Trump's discussions with the Department of Justice about investigative and prosecutorial decisionmaking were within the President's exclusive authority and therefore subject to absolute immunity from prosecution. *Id.* at 619–21. As to his "conversations" with Vice President Mike Pence during which President Trump allegedly pressured the Vice President to reject legitimate electoral votes or return them to state legislatures, the President was presumptively immune. *Id.* at 621–25. "Whenever the President and Vice President discuss their official responsibilities," the Court explained, "they engage in official conduct." *Id.* at 623. To prosecute such acts, the government would have to overcome the presumption of immunity. *Id.* at 623–25. The indictment's remaining allegations would be subject to a "fact specific" inquiry, performed by the district court in the first instance, to determine whether they were official or unofficial. *Id.* at 628–30. That would include President Trump's interactions with persons outside the Executive Branch, such as state election officials and legislators; his communications with the public via tweets; and the January 6 Ellipse Speech. *Id.* at 621, 625–30.

The district court, however, never finally performed that inquiry after President Trump won re-election, resulting in the indictment's dismissal.

## C.      Official-Acts Immunity Legal Framework

The foregoing discussion of *Blassingame* and *Trump* provides the backdrop for the parties' present legal disputes. The court starts with President Trump's contention that the Supreme Court in *Trump* made an important modification to the immunity framework that the D.C. Circuit adopted

in *Blassingame*. The court then turns to the parties' competing views of how the court should apply the legal principles articulated in both *Trump* and *Blassingame* to the evidence.

        *1.*        *Whether* Trump *Alters the* Blassingame *Immunity Framework*

Recall that *Blassingame* requires the court to undertake an "objective, context-specific assessment" to determine whether the President is acting as an office-holder versus office-seeker. *Blassingame*, 87 F.4th at 30. That inquiry looks primarily to whether the conduct is "clothed in the trappings of an official function based on objective indicia." *Id.* at 21; *see also id.* at 33 (Katsas, J., concurring) ("Unless speaking at some specific campaign or political event, he will thus likely be 'clothed in the trappings' of his Office . . . ."). The content of speech, while sometimes relevant, plays a secondary role. "In certain circumstances, for instance, it could serve *to confirm* what an objective assessment of the context makes evident." *Id.* at 22 (majority opinion) (emphasis added). "But the crux of the inquiry . . . concerns the context in which the President speaks, not precisely what he says or whether it might advance his re-election prospects." *Id.*; *see also id.* at 32 (Katsas, J., concurring) ("Because the President may deliver the 'same essential message' at an official or unofficial event, the immunity cannot turn on what he says.").

President Trump argues that the Supreme Court in *Trump* modified, if not inverted, this approach. According to him, under *Trump*, "content needs to drive the analysis," not context. Oral Argument Hr'g Tr., ECF No. 211 [hereinafter Hr'g Tr.], at 9:10-13; *see also id.* at 10:8-24; Def.'s SJ Mem. at 9 n.5. President Trump sees the Supreme Court making this subtle but important paradigm shift when it concluded that "the President's communications to the Attorney General and to the Vice President were exercises of fundamental Article II power." Hr'g Tr. at 9:15-18. The Court made that determination, he argues, "solely by reference to the subject matter, the contents of the communication." *Id.* at 9:18-20; *see also id.* at 11:8-12, 13:20–14:3. He also points

to what he describes as "the first time that the Supreme Court articulates the broad scope of the bully pulpit power." *Id.* at 15:12-14; *see also id.* at 15:19-20.  While *Blassingame* endorsed the proposition that "when the President is running or speaking in a particular function, like a campaign function or acceptance speech, . . . he's no longer exercising the bully pulpit," the Supreme Court did not adopt that dichotomy.  *Id.* at 15:22–16:4.  The Court's complete embrace of the bully pulpit power, he maintains, cannot be squared with *Blassingame*'s office-holder/office-seeker distinction.  *Id.* at 16:5-8.

This court declines to veer from the *Blassingame* framework.  For one, it cannot do so.  This court is bound by D.C. Circuit precedent unless "intervening Supreme Court authority . . . 'effectively overrule[s], *i.e.*, eviscerate[s], the law of our circuit.'"  *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1334 (D.C. Cir. 2024) (citation omitted).  *Trump* does not overrule—effectively or otherwise—*Blassingame*.  And it does not "clearly dictate a departure from circuit law."  *Bahlul v. United States*, 77 F.4th 918, 926 (D.C. Cir. 2023).  *Blassingame* therefore must mark the way for this court's analysis.

For another, President Trump's argument is based on a strained reading of *Trump*.  It is true that the Court found him absolutely immune from prosecution for his discussions with the Department of Justice and presumptively immune for his conversations allegedly pressuring the Vice President.  *Trump*, 603 U.S. at 619–24.  Such conduct easily fell within the "outer perimeter" of his official responsibilities.  *See id.*  But that conclusion rested less on the content of the President's speech than on the fact that the acts in question indisputably were of an official character based on the actors involved and the actors' prescribed constitutional duties—in other words, contextual factors.  The Court explained as to President Trump's interactions with Department of Justice officials that "[i]nvestigative and prosecutorial decisionmaking is 'the

12

special province of the Executive Branch.'" *Id.* at 620 (quoting *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)). The same was true of the President's alleged threat to remove the Attorney General, which the Court said "implicates 'conclusive and preclusive' Presidential authority." *Id.* at 620–21. And as to his "conversations" and "discussions" with the Vice President, the Court's reasoning rested largely on the singularity of the Vice President as "one of the President's closest advisers" and "[a]s the President's second in command." *Id.* at 621–23. That special relationship was enough for the Court to conclude that "[w]henever the President and Vice President discuss their official responsibilities, they engage in official conduct." *Id.* at 623. Context, not content, drove the Court's analysis.

Nor did the Court place the President's exercise of the bully pulpit on the same footing as acts "within the scope of his exclusive authority." *Id.* at 608. Like the D.C. Circuit in *Blassingame*, the Court acknowledged that "*most* of a President's public communications are likely to fall comfortably within the outer perimeter of his official responsibilities." *Id.* at 629 (emphasis added); *accord Blassingame*, 87 F.4th at 15 (observing that "many uses of the presidential bully pulpit fall comfortably within the outer perimeter of [the President's] official responsibility" (alteration in original) (internal quotation marks omitted)); *id.* at 33 (Katsas, J., concurring) ("The Court's approach recognizes that presidential speech on matters of public concern will very often be official—and thus immunized."). But the Court recognized that there may "be contexts in which the President, notwithstanding the prominence of his position, speaks in an unofficial capacity—perhaps as a candidate for office or party leader." *Trump*, 603 U.S. at 629. When such uncertainty is present, courts must perform an "objective analysis" that is "fact specific" and informed by "'content, form, and context.'" *Id.* (quoting *Snyder*, 562 U.S. at 453). In this court's

13

view, there is no daylight between that formulation and the "objective, context-specific assessment" required by *Blassingame*.

The court's analysis of the factual record therefore will proceed using the metes and bounds drawn in *Blassingame*, informed by the Supreme Court's conclusions and reasoning in *Trump*.

### 2. The Parties' Disputes Over Blassingame*'s Application*

But before the court gets there, there is more to say about *Blassingame*.  The parties do not see eye to eye on its legal principles and standards.

According to President Trump, *Blassingame* sets "only a very low bar" to overcome: he is "entitled to summary judgment . . . unless it is absolutely clear that his actions *cannot* be reasonably understood as official acts."  Def.'s SJ Mem. at 4.  In making the assessment, the court cannot "pick among competing understandings of the facts," *id.* at 7, or "weigh competing inferences," Def.'s SJ Reply at 6; rather, if the President's actions can reasonably be understood as official, he is entitled to immunity even if such understanding may not be "the only or the best" one.  *Id.*  Thus, according to President Trump, "Plaintiffs may only defeat immunity if they provide exceedingly unambiguous evidence, uncontradicted by President Trump, to show that the only reasonable way to understand his actions was as 'manifestly and palpably' unofficial."  Def.'s SJ Mem. at 6.

Plaintiffs respond that President Trump's framing of the inquiry "is not the law."  Pls.' SJ Opp'n at 12.  They take issue with characterizations such as "very low threshold," "absolutely clear," and "exceedingly unambiguous."  *Id.* at 11–12.  Plaintiffs instead posit that the "touchstone of the inquiry is reasonableness."  *Id.* at 12.  Mere ambiguity as to the conduct's status does not confer immunity.  *See id.*  The court must "carefully pars[e] the evidence" and then determine what reasonable inferences can be drawn from it.  *Id.*  Immunity must be denied, they emphasize,

"[w]hen a President's actions viewed objectively and in context may *reasonably* be understood only as re-election campaign activity." *Id.* (quoting *Blassingame*, 87 F.4th at 21–22).

This back-and-forth was largely unnecessary. That is because *Blassingame*'s standards and directives are quite clear. To start, it is President Trump's burden to establish that he is entitled to official-acts immunity. *Blassingame*, 87 F.4th at 30. This is not, as he suggests, a mere "burden of production," Def.'s SJ Reply at 6; at this stage, it is a burden of proof, *Blassingame*, 87 F.4th at 30 (observing that the Supreme Court in *Nixon* did not create "any President-specific exception to the 'general rule' that [President Trump] must 'plead and prove . . . a defense'" (quoting *Taylor v. Sturgell*, 553 U.S. 880, 907 (2008))). Further, the Rule 56(a) standard governs. Under that standard, President Trump—as the movant and the party that bears the burden of proof—must establish that the record reveals "no genuine dispute as to any material fact" and that he "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If he makes a "properly supported motion for summary judgment," Plaintiffs "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). If there is conflicting evidence, it is not the court's job to make credibility determinations or weigh the evidence. *Id.* at 255. Rather, the non-movant's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* Plaintiffs' burden, therefore, is not as President Trump contends to present "exceedingly unambiguous evidence" to defeat summary judgment on the question of immunity. Def.'s SJ Mem. at 6. Rather, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

What factual showing, then, does President Trump have to make to prevail at this stage? Again, he must establish that there are no genuine disputes of material fact and, based on such

15

record, that his "actions can reasonably be understood as the official actions of an office-holder rather than the unofficial actions of an office-seeker." *Blassingame*, 87 F.4th at 30.  Put differently, the court must ask, "[I]s it reasonable to think"—based on an undisputed set of material facts—that President Trump "was exercising his official responsibilities as President, or was he instead engaging in reelection campaign activity as a presidential candidate?"  *Id.*  If the inquiry "yields no sufficiently clear answer in either direction, the President . . . should be afforded immunity." *Id.* at 21.  But if the record shows that the conduct "may reasonably be understood only as re-election campaign activity, a court not only may, but must deny immunity."  *Id.* at 21–22. So, although Plaintiffs are correct that "[t]he touchstone of the inquiry is reasonableness," Pls.' SJ Opp'n at 12, if the President shows on an undisputed factual record that one reasonable construction of his conduct is official—it need not be the only or best one—he is entitled to immunity for such acts.

It bears emphasizing that the court's present task is not to cast an up or down vote on official-acts immunity with respect to the complaints as a whole or as to any claim.  It is to assess whether the record evidence, under the summary judgment standard, proves the discrete acts alleged in the complaint and, if it does, then to assess whether that conduct falls within the outer perimeter of the President's responsibilities.  That is the lesson of *Trump.*  Plaintiffs here, like the prosecutors in *Trump*, cannot prove their claims based on immunized official acts.  *Cf.* 603 U.S. at 630 ("Presidents therefore cannot be indicted based on conduct for which they are immune.").  The court therefore must parse the complaints and the factual record and determine which alleged acts are official and which are not.  The grouping of similar acts is permitted—the Court did so in *Trump*—but if the evidence is unique as to a particular act or set of acts within a grouping, that difference must figure into the court's calculus.

16

One last observation about the controlling legal principles.  The parties spill much ink over the following line from *Blassingame*: "an act lies within the outer perimeter of an official's duties if it is 'the kind of act not manifestly or palpably beyond [the official's] authority, but rather having more or less connection with the general matters committed by law to his control or supervision.'" 87 F.4th at 13 (alteration in original) (citation omitted).  The Court approvingly cited it in *Trump*. *See* 603 U.S. at 618.  President Trump wields the phrase "manifestly or palpably beyond [the President's] authority" as if it sets a near insurmountable hurdle to demonstrating that a presidential act is unofficial. *See, e.g.*, Def.'s SJ Mem. at 4–6, Def.'s SJ Reply at 5–10.  Plaintiffs, by contrast, argue that "*Blassingame*'s single use of this phrase was not announcing a new standard of proof but rather explaining that an act may be beyond the 'outer perimeter' of an official's duties if it is 'manifestly or palpably beyond [his] authority.'"  Pls.' SJ Opp'n at 14 (quoting *Blassingame*, 87 F.4th at 13).

Plaintiffs are correct.  The "manifestly or palpably beyond" descriptor in *Blassingame* merely adds texture to the line between acts that lie within the outer perimeter and those that lie without.  That is clear from the contrast drawn by the clause that follows—"but rather having more or less connection with the general matters committed by law to his control or supervision."  An act "manifestly or palpably beyond" an official's authority is one bearing no reasonable nexus to the duties and responsibilities of the office.  That text does not impose an insuperable barrier to finding that a presidential act does not enjoy absolute immunity.

## III.    OFFICIAL-ACTS IMMUNITY

Now, the merits.  The court addresses the arguments in the order in which they appear in President Trump's summary judgment brief.  First, starting with the Ellipse Speech, the President contends based on content alone that the remarks were official because he was exercising authority

17

under the Constitution's Recommendations Clause, U.S. Const. art. II, § 3, and speaking on a matter of public interest. Def.'s SJ Mem. at 7–18. Only after does he address the contextual evidence, which he asserts also establishes the Speech was official. *Id.* at 18–26. Second, President Trump maintains that his outreach to state and local officials in the election's aftermath was official because he undertook those acts pursuant to his constitutional duty to "take care that the laws be faithfully executed." *Id.* at 27–28. Third, he claims that the tweets Plaintiffs cite from his @realDonaldTrump Twitter account were official acts based on both context and content. *Id.* at 28–36. And fourth, he argues that his response (or lack thereof) to the rioting at the Capitol was conduct within the outer perimeter of his official responsibilities and therefore cannot be relied on to support Plaintiffs' claims. *Id.* at 37. Plaintiffs dispute each of these contentions. *See generally* Pls.' SJ Opp'n.

### A.    January 6 Ellipse Speech

#### 1.    *The Recommendations Clause and Speech on a Matter of Public Interest*

President Trump begins his defense of the Ellipse Speech as official by focusing solely on what he said: "the speech, standing alone, demonstrates that [he] is entitled to absolute civil immunity." Def.'s SJ Mem. at 20. He insists that his remarks on January 6 were an exercise of three Presidential functions: (1) providing information and making recommendations to Congress pursuant to the Recommendations Clause, (2) using the "bully pulpit" to address matters of public concern, and (3) communicating with the Vice President about his official duties as the presiding officer of the Joint Session of Congress. *Id.* at 7–20. The court describes each argument in greater detail before explaining why each fails.

The Recommendations Clause states that the President "shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such

18

Measures as he shall judge necessary and expedient." U.S. Const. art. II, § 3. President Trump maintains that "on its face [the Ellipse] speech falls within President Trump's 'conclusive and preclusive' authority to provide recommendations to Congress and to advise Congress on matters of significant national concern." Def.'s SJ Mem. at 8–9. He says that the audience for the Ellipse Speech "expressly included Senators and Members of Congress, who were the only persons positioned to take measures in response to the concerns raised." *Id.* at 11. He offered them "'Information of the State of Union' by addressing concerns of widespread voter fraud and by providing to Congress evidence of election irregularities," *id.* at 10, and he proposed various election-reform "Measures," such as "an end to ballot harvesting, requirements for voter identification, and a ban on universal mail-in balloting," *id.* at 12. He also suggested "an avenue for Congress to reject the certification of the 2020 election." *Id.* at 13. That these recommendations were made in a public address does not matter: "the Constitution imposes no specific requirement as to how, when, or why the President shall fulfill this function." *Id.* at 11.

As to the bully pulpit, President Trump emphasizes the "'extraordinary power to speak to his fellow citizens and on their behalf'" and states that "in January 2021 there was no matter more pressing to the American public than the outcome of the 2020 president election." *Id.* at 17 (quoting *Trump*, 603 U.S. at 629). The Ellipse Speech therefore fell comfortably within the outer perimeter of his Presidential responsibilities. *Id.* at 17–18.

And with respect to communicating with the Vice President, President Trump highlights that "the Ellipse Speech repeatedly called upon Vice President Mike Pence to perform his constitutional and statutory duties by refusing to certify the election results." *Id.* at 19. He places this aspect of the Speech on the same footing as his conversations with the Vice President that the Supreme Court deemed to be official conduct. *See id.* (citing *Trump*, 603 U.S. at 622–23).

19

These lead contentions share a common defect: they rely solely on the content of the President's Ellipse Speech. For that reason alone, the court rejects them. The D.C. Circuit in *Blassingame* was clear that whether the Ellipse Speech was an official act must be determined from an "objective, context-specific assessment." *See* 87 F.4th at 30 (discussing allegations relating to the January 6 rally). The Speech's content is not "off-limits," but "the crux of the inquiry . . . concerns the context in which the President speaks, not what precisely he says or whether it might advance his re-election prospects." *Id.* at 22. President Trump's singular focus on the content of the Ellipse Speech disregards *Blassingame*'s clear instruction. And as discussed, nothing in *Trump* altered the context-driven nature of the inquiry.

President Trump's Recommendations Clause and bully pulpit arguments also cannot be squared with *Blassingame* for additional reasons. The latter is foreclosed: President Trump made that same assertion about the bully pulpit before the D.C. Circuit—i.e., when the President speaks on a matter of public concern, he enjoys official-acts immunity—and the court rejected it. *Id.* at 14–16. The decision in *Trump* did not disturb that holding. *See* 603 U.S. at 629. As to the former, it fails for the same reason the D.C. Circuit rejected his Take Care Clause argument: "at least without more, [it] assumes the answer to the question whether he acted in an official capacity as office-holder or in a private capacity as office-seeker." *Blassingame*, 87 F.4th at 24. An incumbent President seeking re-election could offer recommendations to Congress during the State of the Union and then make the very same recommendations the next day at a campaign rally. *See id.* Only by looking at context can a court determine whether the remarks are official or unofficial. President Trump "has made no argument as to why [the Ellipse Speech] should be treated more like the State of the Union than [a] campaign [speech]. His invocation of the [Recommendations] Clause thus ultimately does not add anything to his claim of immunity . . . ." *Id.*

20

The court is also guided by the Supreme Court's view of the Ellipse Speech. The indictment against President Trump alleged that he falsely asserted during the Speech "that certain States wanted to recertify their electoral votes and that the Vice President had the power to send those States' ballots back for recertification." *Trump*, 603 U.S. at 628 (citing Indictment, *United States v. Trump*, No. 23-cr-257-TSC (D.D.C.), ECF No. 1 [hereinafter Indictment], ¶¶ 103–104).[3] The Court did not declare the Ellipse Speech an official act based on that allegation alone. *Id.* at 628–30. Rather, it said that its status may depend on a "factbound analysis" of its "content, form, and context" and left it to the district court to make that determination in the first instance. *Id.* at 629–30. If the Supreme Court did not view the President's reference to the Vice President's purported "power" as rendering the Ellipse Speech categorically official, this court will not either.

### 2. Objective, Context-Specific Assessment

The court now turns to do what *Blassingame* instructed: perform an "appropriately objective, context-specific assessment" of whether the Ellipse Speech "can reasonably be understood as the official actions of an office-holder rather than the unofficial actions of an office-seeker." *Blassingame*, 87 F.4th at 30. Because the burden of proof rests on President Trump, the court begins with the evidence adduced by him. There is not much of it. The court then evaluates the proof supplied by Plaintiffs, which requires a longer discussion.

### a. President Trump's evidence

President Trump submits five objective facts as context: (1) per "normal practice and procedures, White House staff vetted the speech as an official communication"; (2) "White House officials helped plan the President's involvement in the event"; (3) the "[t]iming and location were

---

[3] Paragraph 104 of the indictment quotes verbatim portions of the Ellipse Speech addressing the Vice President's purported authority to return electoral votes to state legislatures. Indictment ¶ 104(a), (b). President Trump cites to these same portions of the Ellipse Speech in his Statement of Undisputed Material Facts. *See* Def.'s Stmt. at 182–83 ¶ 52 (citing Def.'s SJ Mot., Ex. 42, ECF No. 144-47, at 4–5, 17–18).

designed to affect public policy and Congressional action"; (4) the content of the Ellipse Speech urged the Vice President and Congress to carry out their duties in a manner President Trump believed was consistent with the Constitution; and (5) the speech was nationally televised.[4]  Def.'s SJ Mem. at 20–26.  These factual contentions, individually and collectively, are not enough to carry his burden.

*Vetting of the Ellipse Speech*.  President Trump's assertion that White House staffers treated the Ellipse Speech as an official act, *id.* at 20–22 (citing Def.'s Stmt. at 186–98 ¶¶ 53–56), rests on the following evidence: (1) a declaration from Senior Advisor to the President, Stephen Miller, Def.'s SJ Mot., Ex. 43, ECF No. 144-48 [hereinafter Miller Decl.], and his deposition testimony in this matter, Def.'s SJ Mot., Ex. 44, ECF No. 144-49, at 64:1–71:24; (2) the absence of a Hatch Act warning on the draft of the Speech circulated internally for review, Def.'s SJ Mot., Exs. 44a & 44b, ECF Nos. 144-50 & 144-51; and (3) that among the distribution recipients was Patrick Philbin, a Deputy White House Counsel who did not suggest that the Ellipse Speech should be treated as subject to the Hatch Act, *id.*; Def.'s Stmt. at 198 ¶ 56.

This record evidence does not establish as an undisputed fact that "White House staff vetted the speech as an official communication."  That fact is very much in dispute.

The court disregards portions of Miller's declaration that contain legal arguments or his legal opinion of the Ellipse Speech's contents.  *See, e.g.*, Miller Decl. ¶¶ 6–8, 11–15 ("In my view, all of these aspects of the speech constituted official conduct.").[5]  These are not appropriate

---

[4] President Trump also adds to this list a legal assertion that the court "may not consider a President's allegedly improper motives or allegations of illegality."  Def.'s SJ Mem. at 26.  The court agrees and has not done so.

[5] At least one of Miller's statements conflicts with the law.  He says that "[w]hether an activity or speech was considered 'official' depended more on the content and objectives of the President's remarks or appearance, rather than the nature of the event or its location."  Miller Decl. ¶ 6.  Miller seems to attribute this understanding to advice from the White House Counsel's Office.  *See id.* ¶¶ 5–6.  Regardless of the source, the law says just the opposite. *See, e.g.*, *Trump*, 603 U.S. at 618 ("[C]ourts may not inquire into the President's motives."); *Blassingame*, 87 F.4th at 22 ("[T]he crux of the inquiry . . . concerns the context in which the President speaks, not what precisely he says or whether it might advance his re-election prospects.").

considerations. *See Davis v. City of Little Rock*, 122 F.4th 326, 332 (8th Cir. 2024) ("On summary judgment, courts 'consider only admissible evidence and disregard portions of various affidavits and depositions that . . . purport to state legal conclusions as fact.'" (alteration in original) (citation omitted)); *cf. United States v. BCCI Holdings (Lux.), S.A.*, 977 F. Supp. 1, 6 (D.D.C. 1997) ("[L]egal conclusions 'cloaked' as facts are not sufficient to create a genuine issue of material fact.").

Miller does submit one statement that resembles an objective fact: "[B]ecause of the official character of the January 6, 2021 speech, the electronic trail of the final versions of the speech were routed through the White House system and subjected to the protocols and reviews of other official statements or speeches of President Trump." *Id.* ¶ 16. But this causal assertion ("because of the official character") conflicts with his own statements and other evidence. In the same declaration, Miller said that "*all* speeches regardless of whether they were 'official' or 'unofficial'" were reviewed by "the White House Counsel's Office and other White House staff." *Id.* ¶ 8 (emphasis added). Other witnesses confirmed that process. Ross Worthington, who drafted the Ellipse Speech, and Robert Gabriel, Miller's assistant, testified before the U.S. House Select Committee to Investigate the January 6 Attack on the U.S. Capitol ("Select Committee"). Worthington stated that "any speech, whether it's political or official," "would generally be moved up to the White House systems." Pls.' SJ Opp'n, Ex. 58, ECF No. 152-11 [hereinafter Worthington Dep.], at 16:22–17:5. Gabriel confirmed that even "a political speech" would "go through an official White House process." *Id.*, Ex. 121, ECF No. 152-74 [hereinafter Gabriel Dep.], at 18:1-11.[6] Thus, the fact that a draft of the Ellipse Speech was routed through official White House

---

[6] President Trump has objected on hearsay grounds to the admissibility of testimony before the Select Committee. *See* Notice of Position on Evidentiary Disputes, ECF No. 212, at 5. But President Trump concedes that, at summary judgment, the court may consider evidence that is "admissible or can be converted into admissible form." *Id.* at 3.

channels, including to Philbin, is not by itself objective evidence that staff treated it as an official act of the President.  Nor has President Trump presented any evidence that Philbin's silence upon receiving draft remarks customarily would have been understood by others as conveying his legal opinion that the remarks were official.

Further, there is evidence tending to show that President Trump's speechwriters deemed the Ellipse Speech to be *un*official and handled it as such.  The White House speechwriting team "drafted both official speeches and political/campaign speeches."  Def.'s CounterStmt. at 417 ¶ 314.  "[U]nofficial speeches were 'generally' drafted on personal devices."  *Id.* at 410 ¶ 300 (Def.'s Resp.).  And Google Docs "was 'generally' used for the drafting of political speeches." *Id.* at 412 ¶ 301 (Def.'s Resp.).  Consistent with these protocols, Worthington worked on an "early draft" of the Ellipse Speech on his personal device using Google Docs.  *Id.* at 420–21 ¶¶ 320, 322. Gabriel told the Select Committee that he and Worthington had used "their personal [email] accounts" in connection with the Ellipse Speech.  *Id.* ¶ 321.  This evidence creates a genuine dispute of fact as to President Trump's contention that, per "normal practice and procedures, White House staff vetted the speech as an official communication."[7]

The absence of a Hatch Act warning on the internal White House circulation of the Ellipse Speech is not disputed, but what meaning to ascribe to that fact is.  Def.'s Stmt. at 192 ¶ 54. President Trump points out that, two days before the Ellipse Speech, he delivered a rally speech in Dalton, Georgia for a political event.  *Id.* at 197 ¶ 55.  The internal circulation of the Dalton draft

---

Testimony before the Select Committee easily can be "converted into admissible form" by calling the witness to testify at trial.  Contrary to President Trump's contention, there is no requirement that a party attempt first to depose the witness before their testimony from another proceeding may be considered on summary judgment. *See id.* at 5.  The court therefore will consider any testimony submitted of a witness who appeared before the Select Committee.

[7] Worthington's and Gabriel's use of personal devices and email accounts is consistent with their subjective beliefs that the purpose of the Ellipse Speech was "political."  Worthington Dep. at 115:15-18; Gabriel Dep. at 38:8-11.

remarks bore a prominent Hatch Act warning.[8] *Id.*; *see also* Def.'s SJ Mot., Ex. 44b, ECF No. 144-51.  President Trump infers from the absence of that same warning on the internally circulated draft Ellipse Speech that staff deemed it to be official.  *See* Def.'s SJ Mem. at 21–22.  But there is evidence to the contrary.  In testimony before the Select Committee, Miller likened the Ellipse Speech to the "one in Georgia."  Pls.' SJ Opp'n, Ex. 57, ECF No. 152-10, at 131:7-12 (stating the Ellipse Speech was a "rally" and "we had already done one in Georgia").  All agree that the Dalton speech was unofficial political activity.  *See* Def.'s CounterStmt. at 54 ¶ 41 (conceding the Dalton event was "political rally").  If, as Miller testified, the Ellipse Speech and the Dalton remarks were viewed in the same way, then the absence of a Hatch Act warning on the Ellipse Speech's distribution does not establish that staff viewed the Speech as official.

Accordingly, President Trump's evidence does not establish as an undisputed fact that White House staff treated the Ellipse Speech as an official Presidential act.

*Planning of the Ellipse Speech*.  President Trump asserts that "White House personnel were involved in the logistics and planning of [the] Ellipse Speech."  Def.'s SJ Mem. at 22 (citing Def.'s Stmt. at 105–07, 154–56 ¶¶ 34–36, 41, 42).  That is a gross exaggeration.  The record firmly establishes that the White House's participation was negligible.  *See Trump*, 603 U.S. at 630

---

[8] That warning was as follows:

> **NOTE: HATCH ACT RESTRICTIONS APPLY.**  This speech will be delivered at a political event and thus Hatch Act restrictions apply.  Accordingly, per instruction from the White House Counsel's Office, review for issues beyond accuracy (such as for political consistency or effective messaging) should not be performed by noncommissioned officers or using official equipment and office space.  Commissioned officers should not use official equipment to review for issues beyond accuracy (such as for political consistency or effective messaging).  If you have any questions pertaining to Hatch Act restrictions with respect to review of these remarks, please be sure to consult with your designated ethics officer.

Def.'s Stmt. at 197 ¶ 55.

(stating that "who was involved . . . in organizing the rally[] could be relevant to classification" of the Ellipse Speech).

President Trump identifies only *one* meaningful contribution made by any White House employee to organizing or planning the Save America Rally ("Rally") on January 6. *See* Def.'s SJ Mem. at 22 (citing Def.'s Stmt. at 105–07 ¶¶ 34–36). That came from Tony Ornato, the White House Deputy Chief of Staff. Days before the event, Ornato sent an email to the Secretary of the Interior, David Bernhardt, seeking a waiver of a usual National Park Service restriction that prohibits the placement of any event structures within the 150-foot-wide vista sight line from the White House to the Jefferson Memorial. Def.'s Stmt. at 105–07 ¶¶ 34–36 (citing Def.'s SJ Mot., Exs. 22 & 23, ECF Nos. 144-27 & 144-28). Ornato did so at the request of the event "host," who was unable to secure a waiver on their own. Def.'s SJ Mot., Ex. 22, ECF No. 144-27 (noting that the event organizer was "trying to get a center stage position" and forwarding a "brief synopsis from the host," and indicating that the National Park Service had declined to allow the stage to be set at the center of the Ellipse). Without the waiver, the event stage would have been 30 feet off-center of the White House. *Id.* Ornato wrote that centering the stage to position it directly in front of the White House was the "desire of the White House and the President as well." *Id.* The National Park Service granted the requested waiver. Def.'s SJ Mot., Ex. 23, ECF No. 144-28. This is the only evidence of any material White House involvement in planning the event.[9]

---

[9] President Trump cites a handful of other exhibits, but none help him. *See* Def.'s SJ Mem. at 22 (citing Def.'s Stmt. at 154–56 ¶¶ 41–42, in turn citing additional Exhibits 24, 29, 30, 30a, 31–33). Exhibit 24 is an email request directed to two White House staffers from former Campaign official Caroline Wren asking that the President meet with two people on January 6, Texas Attorney General Ken Paxton and the private donor who largely underwrote the Rally's expenses, Julie Fancelli. Def.'s SJ Mot., Ex. 24, ECF No. 144-29. President Trump has not included an exhibit showing whether the White House ever responded to this request. Exhibit 30 is an email from a White House staffer to two private individuals inquiring whether they wished to have VIP seating for the Rally; when those individuals said they would, the staffer said he would "forward [their] names to those keeping the list." Def.'s SJ Mot., Ex. 30, ECF No. 144-35. President Trump does not identify who kept the list. Exhibit 31 is a "Guest Guidance Memo" for "March to Save America Attendees," whose authorship is unidentified but lists Wren, among others, as points of

As discussed in the next subsection, nearly all the planning and preparation for the Rally was done by non-government actors.  There was hardly any contribution by White House or other executive branch personnel.  President Trump's assertion that "White House officials helped plan the President's involvement in the event" therefore is not supported by the record evidence.

*The Event's Time and Location.*  According to President Trump, "the date, location, and timing of the Ellipse Speech confirms" that it was an official event.  Def.'s SJ Mem. at 23 (citing Def.'s Stmt. at 163 ¶ 44).  He notes that January 6 was the day a Joint Session of Congress convened to count and certify States' electoral votes, and the President spoke before the Joint Session convened.  *Id.*  And, he adds, "the iconic backdrop of the White House . . . was itself a significant indicator of its official nature."  *Id.* at 24.

These might be persuasive points if the Executive Branch had any role in selecting the "date, location, and timing" of the event.  But it did not.  The event organizer, Women for America First (WAF), conceived the idea of holding a rally on January 6, even before President Trump's "Be there, will be wild" tweet on December 19.  Def.'s SJ Mot., Ex. 19, ECF No. 144-23

---

contact.  Def.'s SJ Mot., Ex. 31, ECF No. 144-36.  Exhibit 32 is a document titled "Participant Instructions," whose authorship also is not identified.  Def.'s SJ Mot., Ex. 32, ECF No. 144-37.  Exhibit 33 is an email from one event organizer, Megan Powers, to another, Justin Caporale, copying one White House staff member; the White House staffer does not participate in the discussion.  Def.'s SJ Mot., Ex. 33, ECF No. 144-38.  Finally, President Trump cited to Exhibit 30a, but did not attach it.

President Trump argues that these exhibits demonstrate that organizers outside the White House used non-campaign emails to organize the rally and that White House staffers used their official accounts "when planning the Save America Rally."  Def.'s Stmt. at 156 ¶ 42.  But the fact that Rally organizers used non-campaign emails to communicate does not establish any greater role by the White House in the event.  And the fact that White House staffers used their official email addresses is of no moment, because the more significant point is that the emails' substance underscores the White House's lack of involvement in "planning the [Rally]."

Exhibit 29 illustrates this point.  *See* Def.'s Stmt. at 154 ¶ 41.  The exhibit is an email string between Rally organizers and White House officials discussing a draft "Guidance" to be issued by the Office of the Press Secretary to credentialed media about the Rally.  Def.'s SJ Mot., Ex. 29, ECF No. 144-34.  The communications show that Rally organizers were responsible for naming the event and that Hannah Salem, a private consultant, would be the media's point of contact for additional information.  *Id.*  A White House official eventually decided to hold off on issuing the Guidance after "talk[ing] with Hannah."  *Id.*  President Trump offers no proof that the Office of the Press Secretary ever sent a final Guidance to credentialed media.

27

[hereinafter A. Kremer Dep.], at 47:11–49:11 (deposition of WAF leader, Amy Kremer, before the Select Committee). WAF also decided to hold the Rally on the Ellipse, after it first considered but rejected Freedom Plaza as a location because that venue decreased the likelihood that the President would attend due to security concerns. *See* Def.'s CounterStmt. at 263–65 ¶ 182 (objecting only on rejected admissibility grounds, *see supra* n.6); Pls.' SJ Opp'n, Ex. 72, ECF No. 152-25, at 21:22–28:12 (deposition of Justin Caporale before the Select Committee); Pls.' SJ Opp'n, Ex. 73, ECF No. 152-26, at 94:25–96:17 (deposition of Kylie Kremer before the Select Committee). And WAF initiated the request for an exception to place the event stage in front of the White House. *See* Def.'s SJ Mot., Ex. 23, ECF No. 144-28. And as for the timing of the Ellipse Speech, that, too, was determined by WAF. Def.'s SJ Mot., Ex. 21, ECF No. 144-26 [hereinafter Rally Permit], at 3 (rally permit indicating speeches would begin at 9:00 a.m.). Thus, the undisputed facts establish that the White House was not involved in setting the "date, location, and timing of the Ellipse Speech." Def.'s SJ Mem. at 23.

*Content of the Ellipse Speech*. The court already has discussed at length what role the Ellipse Speech's content plays under the *Blassingame* framework. That does not need to be repeated. But President Trump also argues that the organizing purpose for the Save America Rally "was not to promote President Trump's re-election or to advance any private agenda, but rather to petition members of Congress to take action regarding the administration of the November 2020 election and to raise concerns regarding election fraud and election integrity." *Id.* at 24–25 (citing Def.'s Stmt. at 75 ¶ 29). But the testimony that President Trump cites from Amy Kremer, a WAF leader, does not establish that contention as an undisputed fact. She testified that the Rally was conceived to "have our voices heard" and urge Senators not to certify the Electoral College results on January 6. A. Kremer Dep. at 49:16–50:2. WAF knew that some members of the House were

28

going to "contest the electoral college," but they "needed Senators to be involved." *Id.* at 49:24–50:2. "So our objective was to put pressure on the Senators, because they couldn't do it without the Senators." *Id.* at 50:1-2. Contrary to President Trump's assertion, then, the Rally did have a "private agenda"—WAF's—and that agenda aligned with the President's private interest as office-seeker to retain the Presidency. The President's own evidence does not establish as an undisputed fact that the Rally's purpose "was not to promote [his] re-election or advance any private agenda." Def.'s SJ Mem. at 24.

*Nationally Televised*. According to President Trump, the fact that the Ellipse Speech was a "nationally televised address" means it is "markedly different than purely private conduct, such as writing a letter to a personal friend, or a private conversation." *Id.* at 25. Fair enough. But President Trump cites no evidence to support the contention that the Ellipse Speech was a "nationally televised address." *See id.* at 25–26. He does not, for instance, identify which networks covered the Speech or recount whether it was telecast in its entirety.

But even if the Speech was broadcast nationally, that adds little to the contextual inquiry. An acceptance speech at a party nominating convention is likewise nationally televised, but the D.C. Circuit placed those remarks squarely in the category of unofficial conduct. *See Blassingame*, 87 F.4th at 18. If President Trump means to suggest that the Ellipse Speech was more akin to the State of the Union than a party acceptance speech, he has provided little evidence in support.

\*    \*    \*

In sum, the context-specific evidence cited by President Trump does not establish based on undisputed facts that the Ellipse Speech can reasonably be understood as falling within the outer perimeter of his official duties. There is a genuine dispute as to whether the Speech was drafted and vetted consistent with the protocols of an official act during the President's first term—in fact,

29

there is compelling evidence to the contrary. So, too, as to the Rally's purpose. There is no dispute, however, as to other contextual facts. Other than securing an exception for stage placement, White House personnel played no role in the Rally's planning and execution. The event organizer, WAF, determined the date, location, and timing of the Rally and the Speech. And the claimed national broadcast of the Speech finds no record support and regardless is a fact of little probative value.

That is the sum and substance of President Trump's "objective, context-specific" proof. *Blassingame*, 87 F.4th at 30. It does not establish that the Ellipse Speech was "clothed in the trappings of an official function." *Id.* at 21. Indeed, the only uncontradicted evidence he presents points in the other direction: that the Ellipse Speech was an unofficial "political event[]." *Id.* at 32 (Katsas, J., concurring). If the court were to assess only President Trump's proof, it would conclude that he has not carried his burden at summary judgment to show that the Speech "can reasonably be understood as the official actions of an office-holder rather than the unofficial actions of an office-seeker." *Id.* at 30 (majority opinion).

But Plaintiffs have offered a raft of their own evidence. The court must evaluate that evidence, too. It is to that task the court now turns.

> b.   Plaintiffs' evidence

Plaintiffs have proffered over 350 undisputed facts and submitted 185 exhibits to support their contentions. *See generally* Pls.' SJ Opp'n, Exs.; Def.'s CounterStmt. The court obviously cannot consider each individually here. So, it organizes them into categories that generally correspond to the contextual considerations identified in *Blassingame* or *Trump*.[10] Recall, the

---

[10] President Trump routinely raises boilerplate objections, like hearsay, to evidence Plaintiffs have offered to support their asserted undisputed facts. *See generally* Def.'s CounterStmt. The court cannot possibly separately address each objection. Suffice it to say that if the court cites to a proposed undisputed fact to which President Trump has made evidentiary objections, the court rejects them.

court in *Blassingame* said that if an activity "is organized and promoted by official White House channels and government officials and funded with public resources, it is more likely an official presidential undertaking than if it is organized, promoted, and funded by campaign channels, personnel, and resources." 87 F.4th at 21. The Supreme Court also recognized that "who was involved . . . in organizing" could be relevant to how an activity or communication is classified. 603 U.S. at 630. The court considers the following categories of evidence, which *Blassingame* identified when analyzing the Salute to America event: (1) general event organization; (2) rally funding; (3) pre-rally promotion; (4) post-rally promotion; and (5) rally attendees and participants. *See* 87 F.4th at 22–23. The court then separately addresses evidence relating to the campaign entity Donald J. Trump for President, Inc.'s ("Campaign") involvement in organization and planning. The facts that emerge are largely undisputed.

*General Event Organization.* The court starts with high-level facts about the Save America Rally. A private organization, WAF, conceived of and was primarily responsible for organizing and planning the event. Def.'s CounterStmt. at 196–98 ¶¶ 124–125, 127, 129. WAF was founded by Amy and Kylie Kremer to focus on "pushing the America First agenda." *Id.* at 194 ¶ 123; *see also* Pls.' SJ Opp'n, Ex. 203, ECF No. 152-156, 6:11-23.[11] WAF employed at least two private companies—Event Strategies, Inc., and Salem Strategies, LLC—to carry out event organizing and planning. Def.'s CounterStmt. at 246 ¶ 167, 270 ¶ 188, 374–75 ¶ 255.

WAF secured the permit for the Rally. *Id.* at 263 ¶ 181, 266 ¶ 184; *see also* Rally Permit at 1. The Permit identifies 12 people as "event sponsor(s), coordinator(s), staff assistants and emergency response/security team supervisors who will be on site during the event." Rally Permit

---

[11] In response to this fact assertion, President Trump argues that "[t]here is no indication from [Amy Kremer's] statement that an 'America First agenda' is synonymous with 'President Trump.'" Def.'s CounterStmt. at 195 ¶ 123. President Trump does not say what he means by "synonymous." There can be no doubt, however, from Amy Kremer's testimony that WAF was founded to promote a policy-agenda aligned with the President's own.

at 32–33.  Eight were either former employees of the Campaign or consultants who received sizable payments.  Def.'s CounterStmt. at 267–79 ¶¶ 186–195, 283 ¶ 199.[12]  None were executive branch employees during the weeks leading up to the Rally.  WAF also helped to coordinate logistics, including furnishing marshals and volunteers for crowd control and safety.  *Id.* at 370 ¶ 253.  A "Guidance Memo" addressed to Rally attendees identified four people to whom questions could be directed.  *Id.* at 388 ¶ 262.  None were executive branch employees.  *Id.*

*Rally Funding.*  The Rally was funded entirely by private donations.  *Id.* at 286 ¶ 203. Julie Fancelli was the primary contributor.  She "personally funded" Rally expenses totaling over $2.1 million.  *Id.* at 258–60 ¶¶ 177–178, 286 ¶ 203; Def.'s Stmt. at 110 ¶ 37.  She along with her family had donated over $1.5 million to the "Trump Victory campaign."  Def.'s CounterStmt. at 258–59 ¶ 177.

*Pre-Rally Promotion.*  The first Trump White House "regularly posted on the White House website, www.whitehouse.gov, news items about," among other things, "Presidential speeches, statements, [and] remarks."  *Id.* at 414 ¶ 304.  The White House did not, however, announce the Rally on either its website or official Twitter accounts, @whitehouse and @potus.  *Id.* at 368 ¶ 251, 421–23 ¶¶ 323, 327–328.

President Trump himself promoted January 6 events generally and the Rally specifically on his personal @realDonaldTrump Twitter account.  *Id.* at 322–28 ¶¶ 225–229, 354 ¶ 241.  In one such tweet, President Trump referred to the Save America Rally—though not directly by name— as "The BIG Protest Rally," identified its date and time, and signed off with "StopTheSteal!"  *Id.* at 324 ¶ 227.

---

[12] The court does not include Hannah Salem or William Wilson, as both received only modest payments from the Campaign.  *See* Def.'s CounterStmt. ¶ 199.

Rally promotion occurred exclusively through private channels, including the Campaign's. *See id.* at 9 ¶ 7 (identifying name of campaign entity).  For instance, the Campaign posted a video on its YouTube account @DonaldJTrumpforPresident on January 2, encouraging people to "JOIN THE MARCH" and identifying the Rally's time and location.  *Id.* at 328 ¶ 230.  The next day, the Campaign's official Twitter account, @TeamTrump, circulated a video of an interview of Kylie Kremer promoting the Rally, which President Trump (from his personal account) and Jason Miller, a Senior Advisor to the Campaign, retweeted.  *Id.* at 352–56 ¶¶ 240–242.  WAF also promoted the Rally through at least two news outlets.  *Id.* at 316–17 ¶ 221 (Newsmax affiliate); *id.* at 351 ¶ 239 (interview on One America News).

*Post-Rally Promotion.*  As noted, the White House website "regularly" posted news items about President Trump's speeches and remarks on its official website.  *Id.* at 414 ¶ 304; *see also id.* ¶ 305.  The archived Trump White House website does not, however, contain video or a transcript of the President's Ellipse Speech.  *Id.* at 422 ¶ 325.  Nor does the Trump White House's YouTube video archive.  *Id.* ¶ 326.  By contrast, the White House did post the President's remarks at the Salute to America event on the White House official website.  *Id.* at 416 ¶ 310.

As for the Campaign, it posted on its Twitter and Instagram accounts snippets of the Ellipse Speech from Fox News and images of the Rally.  *Id.* at 363–68 ¶¶ 247–250.

*Rally Attendees and Participants*.  *Blassingame* suggests that the identities of event attendees or participants is a relevant contextual consideration.  *See* 87 F.4th at 22–23.  For the Save America Rally, the speaker line-up was determined by President Trump and private individuals.  Def.'s CounterStmt. at 388–94 ¶¶ 263–270.  No White House official or staff had a role in that decision.  *See id.*  Of note, on January 4, 2021, President Trump met with a former senior campaign advisor, Katrina Pierson, at the White House to discuss the speaker list.  *Id.* at

33

392–93 ¶ 267. At the time, Pierson was only four days removed from her role with the Campaign. *Id.* at 222 ¶ 145.

The final speaker list included one government official: Mo Brooks, a congressman from Alabama. *See Thompson*, 590 F. Supp. 3d at 66. President Trump has not identified any other attendee who was a government official. The other speakers included three family members (Donald Trump, Jr., Eric Trump, and Lara Trump) and three others who either had advised or represented the Campaign (John Eastman, Rudolph Giuliani, and Kimberly Guilfoyle). Def.'s CounterStmt. at 394–96 ¶¶ 271–281; *see also id.* at 209 ¶ 136 (admitting that Guilfoyle "worked for the Trump Campaign and the Trump Victory Fund Committee"). Two were paid for their appearances by a private source: Donald Trump, Jr. and Guilfoyle each received a $30,000 speaker fee from Turning Point Action, an entity founded by Charlie Kirk. *Id.* at 399–400 ¶ 286.

Notable among the speakers was John Eastman. Eastman was President Trump's counsel of record in President Trump's effort to intervene "in his personal capacity as candidate for re-election to the office of President" in a lawsuit brought by Texas before the Supreme Court to challenge election administration by various States. *Id.* at 175–76 ¶¶ 109–110; Pls.' SJ Opp'n, Ex. 200, ECF No. 152-153.

Members of the public could attend and watch the Rally in person but not necessarily from the Ellipse. The event setup included a cordoned-off security perimeter on the Ellipse, which contained designated "VIP Seating" and "Guest Seating" areas in front of the stage. Rally Permit at 23–24 (event diagrams); *id.* at 33 (identifying a "VIP Advisor" and "VIP Lead"). The record does not reveal who would have attended the Rally as a "VIP" or "Guest". Rally attendees who did not have special access likely would have viewed it from the National Mall.

*Campaign Involvement.* Much of the parties' back-and-forth concerns the extent of the Campaign's involvement in organizing and planning the Rally. President Trump's answer is none: the Campaign had no role in "permitting, fundraising, promoting, or executing" the event. *See* Def.'s SJ Reply at 17. Plaintiffs, on the other hand, go to great lengths to tie the Campaign to the Rally. They say that the "Rally was planned, funded, promoted, organized, and executed by the Campaign, Campaign affiliates, and other private individuals dedicated to keeping Trump in office." Pls.' SJ Opp'n at 4. The undisputed facts paint a more nuanced picture.

Some facts are not contested. The Campaign did not lead the organizing and planning of the Rally. That was done by WAF and private event vendors. Campaign funds, except as discussed below, were not used to underwrite the Rally. Funding for the Rally primarily came from a private individual who (along with her family) was a large-dollar donor to the re-election efforts. And the Campaign promoted the Rally through its social media channels. *See supra* Section III.A.2.b.

Beyond these facts, there are others that establish some involvement by the Campaign in Rally funding, planning, and organization. Still other factual assertions are either not borne out by the evidence or disputed.

Rally Funding (Campaign). The Campaign provided some funding for the Rally. Def.'s CounterStmt. at 286–88 ¶ 204. The basis for this fact comes from the Campaign's Answer to the Amended Complaint in *Smith v. Trump*, No. 21-cv-2265-APM (D.D.C.) [hereinafter *Smith Docket*]. Plaintiffs in *Smith* asserted as one of several fact allegations in one paragraph that, "Leading up to the January 6 rally, TRUMP FOR PRESIDENT made payments to Event Strategies Inc., an event staging company that was listed on the permit for the January 6 rally." Am. Compl., *Smith* Docket, ECF No. 89 [hereinafter *Smith* Am. Compl.], ¶ 84. The Campaign answered: "Admitted only that the Trump Campaign made payments to Event Strategies Inc for equipment

35

rental in connection with a rally on or near January 6, 2021. The Entity Defendants deny the remaining allegations contained in this paragraph." *See* Make America Great PAC & Donald J. Trump for President, Inc.'s Answer to Am. Compl., *Smith* Docket, ECF No. 187, ¶ 84.

Plaintiffs contend that this admission establishes that the Campaign paid Event Strategies, the Rally's "production vendor," *see* Rally Permit at 31, for equipment rental costs associated with the Rally.  Def.'s CounterStmt. at 286–87 ¶ 204.  President Trump challenges this fact.  He argues that the *Smith* Answer, as drafted, is ambiguous as to whether the Campaign payment was for Rally equipment rental or something else.  *Id.* at 288–89 ¶ 204 (Def.'s Resp.).[13]

President Trump's position is untenable.  The *Smith* Amended Complaint equates the "January 6 rally" with the Save America Rally.  *See, e.g.*, *Smith* Am. Compl. ¶¶ 83, 87, 114–115, 144.  The Campaign's counsel would have understood it that way given that the pleading's description of the "January 6 rally" matches the Save America Rally.  Thus, the only logical understanding of the allegation and response is that the Campaign paid Event Strategies some amount—how much is not specified—towards staging the Rally.  Also, President Trump submits no evidence to rebut or clarify the response.  *See id.*  Based on the evidence presented, then, the fact is undisputed.

Plaintiffs further maintain that "the Campaign directly compensated some organizers for their work in connection with the Rally."  Pls.' SJ Opp'n at 4 (citing Def's. CounterStmt. ¶¶ 134– 135, 139–144, 140, 152–157, 195–197, 204–209).  That assertion lacks convincing evidentiary support.  For instance, Plaintiffs suggest that the Campaign paid Justin Caporale, who led Event Strategies' efforts, for his Rally-related work.  Def.'s CounterStmt. at 206–07 ¶ 135 (citing Pls.' SJ Opp'n, Ex. 94, ECF No. 152-47, at 1); *see also* Rally Permit at 32 (identifying Caporale as the

---

[13] President Trump lodges various objections to the *Smith* Answer excerpt's admissibility.  But the response is plainly an admission of a party-opponent—the Campaign—that is not hearsay.  *See* Fed. R. Evid. 801(d)(2).

"Project Manager"). But the cited exhibit only shows a pre-Rally payment request from Caporale for services from "12/1 – 12/15." Pls.' SJ Opp'n, Ex. 94, ECF No. 152-47, at 1. Similarly, Plaintiffs assert that the Campaign approved payments to "J. Karwacki and R. McEnany" "in connection with the Rally." Def.'s CounterStmt. at 218 ¶ 143. But the invoices submitted by Karwacki and McEnany do not, at least on their face, explicitly reference the Save America Rally. Def.'s SJ Reply, Exs. 242 & 243, ECF Nos. 174-9 & 174-10.[14]

Rally Organization and Planning (Campaign). The Campaign, acting through its then agents and employees, played a modest role in organizing and planning the Rally. Plaintiffs attempt to argue otherwise. Pls.' SJ Opp'n at 4–5, 32–33. Their position, however, relies largely on the roles played by multiple *former* campaign employees—"campaign affiliates," as Plaintiffs call them—not on persons then employed or hired by the Campaign. *Id.* at 32 (identifying Caporale, Megan Powers, Caroline Wren, and Guilfoyle); *see also* Def.'s SJ Mot., Ex. 28, ECF No. 144-33 (listing paid Campaign staff after December 31, 2020).

The one arguable exception is Pierson. She remained affiliated with the Campaign through December 31, 2020. Def.'s CounterStmt. at 222–23 ¶¶ 145, 147. Her involvement in Rally organizing began by acting as a go-between for the Kremers and other persons interested in funding a January 6 event. Pls.' SJ Opp'n, Ex. 86, ECF No. 152-39, at 29:2–33:23. She also kept Mark Meadows, the President's Chief of Staff, and others in the loop about WAF's event planning. *Id.* at 35:20–37:22. Eventually, she joined a text string with the Kremers on December 30, 2020. Pierson told the Kremers, "You guys have full branding rights to the 6th and the only brand w/ POTUS. I made sure no one else will have the stage branding w/POTUS." Pls.' SJ Opp'n, Ex. 87,

---

[14] The Karwacki invoice, if viewed in the light most favorable to Plaintiffs, does pertain to work on the Save America Rally. His invoice seeks payment for "1/6/2021 rally for Team Trump." Def.'s SJ Reply, Ex. 243, ECF No. 174-10. President Trump offers no reason to believe that the "1/6/2021 rally for Team Trump" was anything other than the Save America Rally.

ECF No. 152-40, at 12.  She also explained that she had been in touch with Wren about funding for the Kremers' event and that Wren "is going to move funds around."  *Id.* at 9.  She continued to help plan the Rally during the first week of January 2021, after her formal role with the Campaign had concluded.  *See id.* at 1–9 (text messages between Pierson and the Kremers leading up to January 6).  Significantly, she met with President Trump in the White House on January 4 to discuss Rally speakers and thereafter worked to finalize the list.  Def.'s CounterStmt. at 392–93 ¶¶ 267–269.  President Trump denies that he decided who ultimately would speak at the Rally.  *Id.* at 393 ¶ 270 (Def.'s Resp.).  Evidently, that determination was made by event organizers.

Rally Promotion (Campaign).  As previously discussed, the Campaign used its social media channels to tout the Rally and Ellipse Speech, both before and after.  *See supra* Section III.A.2.b.  There is also some evidence of coordination as to the promotion and broadcasting of the Ellipse Speech between Caporale and Dan Scavino, the White House Director of Social Media.  *See* Pls.' SJ Opp'n, Exs. 68 & 69, ECF Nos. 155-10 & 155-11 (email exchange between Caporale, using his @donaldtrump.com email address, and Dan Scavino, using a gmail.com address);[15] Def.'s Stmt. at 25 ¶ 5 (Def.'s response identifying Scavino's White House position).  Scavino, however, was likely serving in an unofficial capacity at the time, given that Caporale addressed the inquiry to Scavino's personal email account, not an official White House address, and Scavino used that personal account to respond.

---

[15] President Trump objects to Plaintiffs' use of Exhibits 68 and 69 on various grounds, including late disclosure. *See, e.g.*, Def.'s CounterStmt. at 345–48 ¶ 237 (Def.'s Resp.).  President Trump has not, however, identified any prejudice from the late disclosure.  He also did not seek leave from the court to take additional discovery once Plaintiffs surfaced the exhibits or move to exclude them in a formal motion.

c.        Objective, context-specific assessment

With the undisputed facts now set forth—both as presented by President Trump and Plaintiffs—the court assesses whether he has carried his burden to show he is cloaked with official-acts immunity for the Ellipse Speech.  He has not.

President Trump does not dispute that he remained an office-seeker up to and on January 6. The President's appearance at the Save America Rally, consistent with that status, involved almost no "trappings of an official function."  No public funds were used to put on or promote the event.[16] The White House did not tout the Ellipse Speech through its official website or social media channels beforehand, and it did not publish the President's remarks afterwards.  Nor did any executive branch agency.  Further, the White House played no meaningful role in organizing or planning the Rally.  The only material assistance was to send a single email to the Secretary of the Interior to secure a stage-location waiver from the National Park Service.  Nothing more.  The speaker line-up included only one other public official, Congressman Mo Brooks, and there is no evidence of attendance by any other government official.  In *Blassingame*, the D.C. Circuit observed that the White House's involvement in planning, funding, and promoting the Salute to America event and attendance by multiple government officials "strongly suggest" that the President's speech was "part of an official event."  87 F.4th at 22–23.  Those considerations are entirely missing here.

The opposite is true of private interests closely aligned with President Trump's re-election efforts.  WAF was an entity dedicated to advancing policies that aligned with the President's agenda.  WAF conceived of the Rally, led its organization and planning, secured the permit, and

---

[16] The court excludes any expenditures that were incurred to transport the President to the Ellipse, such as the salaries of Secret Service agents and related costs.  Such public funds would be expended any time the President makes an appearance outside the White House.

promoted it in various ways.  It selected the location, date, and time for the Rally.  The Rally's expenses—over $2.1 million—were largely underwritten by one private donor.  That donor and her family contributed over $1.5 million to the President's re-election efforts.  A former finance advisor of the Campaign (Wren) secured that funding.  Nearly all the individuals who ran the nuts and bolts of the operation were former Campaign officials, paid staff, or consultants, who had concluded their formal work for the Campaign within the 60 days prior to January 6.  In fact, on January 4, the President met with Pierson, still a senior campaign advisor only four days prior, in the White House to discuss the Rally's production elements and speaker list.  She—not White House officials—communicated the President's wishes back to Rally organizers.  The Rally speaker lineup featured all private individuals but one who were closely associated with the Campaign.  They included the President's two sons (one of whom was paid a speaker fee with private funds) and daughter-in-law, a lawyer who represented the President in his personal capacity before the Supreme Court, and two well-known campaign surrogates (one of whom was the President's son's then-fiancée and was paid a speaker fee with private funds).  Members of the public could attend the Rally, but only official "Guests" and "VIPs" could enter the permitted event site on the Ellipse.  These objective considerations all point towards classifying the President's participation in the Save America Rally as an unofficial act of an office-seeker.

President Trump attempts to carry his burden of proof by focusing primarily on the content of the Ellipse Speech and secondarily on its context.  *See* Def.'s SJ Mem. at 7–20.  As already discussed, that inverts the *Blassingame* inquiry.  *See supra* Section II.C.1.

When addressing context, President Trump emphasizes the lack of Campaign involvement in the Rally.  Def.'s SJ Reply at 17.  To be sure, the allegation of one Plaintiff that the Rally was "organized and funded by Trump's campaign organization" has not panned out.  *Blassingame*, 87

F.4th at 30 (quoting Plaintiff Swalwell's complaint). But President Trump's representation to this court that "the January 6th rally is in no way related to the campaign; . . . the campaign doesn't pay [ ] for it; the campaign is not involved with it at all," *id.* (alterations in original) (quoting Hr'g Tr., Jan. 10, 2022, ECF No. 63, at 14:5-8), has not borne out either. The Campaign admits to funding the cost of rental equipment for the Rally (though President Trump now attempts to distance himself from that concession). The Campaign promoted the Rally through its social media channels. And Katrina Pierson, while still associated with the Campaign as a senior advisor, worked with WAF, the Kremers, and other former Campaign staff to organize and plan the Rally. Thus, while it is fair to say that the Rally was not a fully baked campaign event, the Campaign had a hand in it. And when the contributions of donors and the work of former Campaign officials, staff, and consultants are considered, the Rally bears a far stronger resemblance to campaign re-election activity than an official event. These objective, undisputed contextual facts support only one reasonable understanding of the Ellipse Speech: that President Trump delivered it as an office-seeker still attempting to secure re-election and not as an incumbent office-holder. *See Blassingame*, 87 F.4th at 17.

President Trump's other arguments to avoid this conclusion are unpersuasive. He is wrong to suggest that because the Rally was not a fully campaign-sponsored event, his Ellipse Speech therefore must be an official act. *See* Def.'s SJ Reply at 16–23. The court in *Blassingame* never said that. It did not imply that the Ellipse Speech would qualify as unofficial if it could reasonably be understood only as campaign-sponsored. Rather, the question posed was whether it could "reasonably be understood only as re-election campaign activity." *Blassingame*, 87 F.4th at 22–23. The court recognized that re-election campaign activity could take place in venues that were not strictly campaign-sponsored, such as a political party's convention, a fundraiser, or "other

41

political events."  87 F.4th at 20; *id.* at 32 (Katsas, J., concurring) ("Campaign or other political events are unofficial . . . ."); *id.* at 33 ("Unless speaking at some specific campaign or political event, he will thus likely be 'clothed in the trappings' of his Office . . . .").  Accordingly, nothing in *Blassingame* forecloses an event that is "organized, promoted, and funded" by "channels, personnel, and resources" other than those of a campaign from being considered unofficial "if it bears the hallmarks of re-election campaign activity."  *Id.* at 21 (majority opinion).  The Ellipse Speech bore those "hallmarks."

President Trump further argues that the Rally was "in line with the common, well-accepted practice of all presidents . . . [to] use[] private events to further their official duties."  Def.'s SJ Mem. at 25.  He cites as examples the National Prayer Breakfast and a speech before the Economic Club of Chicago.  *Id.*  President Trump is certainly correct that Presidents sometimes act in their official capacities at privately sponsored events.  But what he misses is that merely categorizing the Rally as a "private event" does not resolve the official-acts issue.  The question remains whether at the private event the President is acting as the incumbent office-holder or a candidate for re-election.  Also, President Trump offers no comparator.  He does not say that he appeared at the National Prayer Breakfast, before the Economic Club of Chicago, or at any other private event when he was a declared candidate for President.  And even if there were such events, he offers none that were like the Rally and "clothed in the trappings of an official function."  In fact, the most comparable event on this record—the Dalton, Georgia political rally that occurred only two days prior—points the other way.  Def.'s CounterStmt. at 54 ¶ 41; *see also id*. at 55 ¶ 42, 433–38 ¶ 336.  Merely stating that Presidents have carried out their official duties through "private events" therefore does not satisfy President Trump's burden.

Before moving on, the court returns to where it began its discussion of the Ellipse Speech: its content. Its content "confirms" what the court's "objective assessment of the context makes evident": President Trump has not shown that the Speech reasonably can be understood as falling within the outer perimeter of his Presidential duties. *See Blassingame*, 87 F.4th at 22. The court provided a lengthy summary of the Speech in *Thompson*, *see* 590 F. Supp. 3d at 113–14, and does not repeat it here. For present purposes, it suffices to quote what the court previously held:

> [W]hile the Speech did touch on matters of public concern (namely President Trump's pledge to work on election laws in a second term), the main thrust of the Speech was not focused on policy or legislation. It was to complain about perceived cases of election fraud that led President-elect Biden to win more votes in closely contested states, to urge members of Congress to object to certain state certifications, and to exhort the Vice President to return those certifications to those states to be recertified. Much like the tweets leading up to the January 6 Rally, the words spoken by the President—without delving into the motivation behind them— reflect an electoral purpose, not speech in furtherance of any official duty.

*Id.* at 83. Or, put another way, "President Trump's alleged words and actions were directed toward promoting his victory in the 2020 presidential election rather than carrying out a designated official duty to confirm the integrity of the electoral process, to ensure faithful execution of the laws, or to fulfill other official purposes." *Blassingame*, 87 F.4th at 35 (Rogers, J., concurring) (citing *Thompson*, 590 F. Supp. 3d at 83). The content of the Ellipse Speech confirms that it is not covered by official-acts immunity.

## B.      President Trump's Outreach to State and Local Officials

The court moves next to those allegations relating to President Trump's direct contacts with state and local officials. According to Plaintiffs, "President Trump tried to persuade state and local officials in Michigan, Pennsylvania, and Georgia to use their offices to change the declared results in their jurisdictions." *Id.* at 7 (majority opinion); *see* Pls.' SJ Opp'n at 22. And, in so doing, he

43

"acted as an office-seeker looking to retain office, not as a President engaged in an official duty." *Id.* at 22. Devoting only one page of his summary judgment brief to these allegations, *see* Def.'s SJ Mem. at 27–28, President Trump makes almost no effort to show that these acts were taken in his official capacity.

He starts by claiming to have made these contacts pursuant to his constitutional authority to "take Care that the Laws be faithfully executed," U.S. Const. art II, § 3. Def.'s SJ Mem. at 27. He also quotes from *Trump*: "[T]he President may speak on and discuss [the fairness and integrity of federal elections] with state officials—even when no specific federal responsibility requires his communication—to encourage them to act in a manner that promotes the President's view of the public good." *Id.* (quoting *Trump*, 603 U.S. at 627). And finally, he once again invokes the President's "broad powers to speak on matters of public concern." *Id.* at 28.

President Trump's near complete failure to offer facts to support these contentions ignores *Trump*. When the Supreme Court considered these very same allegations, it said that determining whether these acts qualify as official "requires a close analysis of the indictment's extensive and interrelated allegations." 603 U.S. at 628. It added that "this alleged conduct cannot be neatly categorized as falling within a particular Presidential function. The necessary analysis is instead fact specific, requiring assessment of numerous alleged interactions with a wide variety of state officials and private persons." *Id.*

The President has not heeded those words. Instead of a "close analysis" that is "fact specific," he mainly offers the broad legal arguments noted above. He does allude to one fact to support his position that these were official communications: "To the extent records exist memorializing or referring to these conversations, they are considered official communications maintained by the National Archives." Def.'s SJ Mem. at 27. He cites only a single item of

44

evidence to support that contention. *See id.* (citing Def.'s Stmt. at 68 ¶ 26). It is an image, maintained by the National Archives, of a single tweet from President Trump's @realDonaldTrump Twitter account dated January 3, 2021, linking a story on breitbart.com titled, "Trump Speaks to State Legislators on Call About Decertifying Election." Def.'s SJ Mot., Ex. 17, ECF No. 144-21. That is the only factual context—if it can be called that—he provides regarding his alleged pressuring of state and local officials to reverse the election outcomes in their jurisdictions. This is plainly insufficient to carry his burden at summary judgment.

Given the complete absence of relevant evidence, Plaintiffs were not required to present any of their own to prevail. *See Anderson*, 477 U.S. at 250. But they have. They have identified the relevant statements President Trump made to state and local officials, to whom he made them, when, and how. They are:

- A telephone call to a Pennsylvania State Republican Senate Policy committee hearing on November 25, 2020, Def.'s CounterStmt. at 112 ¶ 75;

- A telephone call to Pennsylvania State Senate Majority Leader Jake Corman and Pennsylvania Speaker of the House of Representatives Bryan Cutler in December 2020, *id.* at 114–19 ¶¶ 77–79;[17]

- A telephone call to Republican Board Members of the Wayne County Board of Canvassers after they certified election results on November 17, 2021, with Republican National Committee (RNC) Chair Ronna Romney McDaniel present, *id.* at 122–31 ¶¶ 81–83;[18]

---

[17] The evidence cited in ¶¶ 77 and 79 is Plaintiffs' Exhibit 115, which are excerpts from the Select Committee's final report. *See* Pls.' SJ Opp'n, Ex. 115, ECF No. 152-68. President Trump has objected to the Report's admission, *see* Def.'s SJ Obj., but that objection is not well taken here because Plaintiffs also have submitted Cutler's testimony before the Select Committee as proof, *see* Pls.' SJ Opp'n, Ex. 191, ECF No. 152-144. The court already has rejected President Trump's objections to considering transcripts of testimony before the Select Committee.

[18] Like the call to Corman and Cutler, *see supra* n.17, the proof offered for the call to the two Wayne County Board members is the Select Committee's final report. As noted, President Trump has objected to its admissibility. The court does not need to decide whether the Select Committee's final report would be admissible at a trial. For present purposes, it is sufficient to show that proposed evidence can be presented in a form that would be admissible at a trial. The Select Committee interviewed Board member Monica Palmer and Republican National Committee Chair Ronna Romney McDaniel about the phone call. *See* Def.'s SJ Obj., Ex. W, ECF No. 173-24, at 315 n.86. Presumably, either or both could testify at a trial or be deposed with their sworn testimony admissible under Federal Rule of Civil Procedure 32(a)(4).

- A telephone call to Michigan Senate Majority Leader Mike Shirkey and Speaker of the Michigan House of Representatives Lee Chatfield on November 18, 2020, *id.* at 131–32 ¶ 84;

- A meeting in the Oval Office with Michigan Senate Majority Leader Mike Shirkey and Speaker of the Michigan House of Representatives Lee Chatfield on November 20, 2020, *id.* at 131–34 ¶¶ 84–85;[19]

- A telephone call to Georgia Governor Brian Kemp in December 2020, *id.* at 139 ¶ 88; and

- A telephone call to Georgia Secretary of State Brad Raffensperger on January 2, 2021, in the presence of Chief of Staff Mark Meadows and Campaign attorneys Cleta Mitchell, Kurt Hilbert, and Alex Kaufman, *id.* at 142–51 ¶¶ 91–95.

President Trump offers no evidence to contextualize any of these statements. Instead, he claims that Plaintiffs' "own evidence shows that [he] reached out to state election officials in his official capacity to discuss the issue of presidential electors, by including the Chief of Staff on phone calls with state officials and meeting with state officials in the Oval Office." Def.'s SJ Reply at 2; *see also id.* at 14–15. But that contention fails to differentiate among the alleged communications. The evidence establishes that the only call involving the Chief of Staff was with Raffensperger and that the only meeting held in the Oval Office was with Michigan officials. For the others—the calls made to Pennsylvania legislators, the first call to Michigan officials, and the call to Governor Kemp—the record contains no contextual facts. The sole clue about the outreach to the Wayne County Board members is that the RNC Chair was on the call, too. Without objective evidence of context, most of these contacts cannot reasonably be understood as the actions of an office-holder rather than an office-seeker.

That leaves the Oval Office meeting with Michigan state legislators on November 20, 2020, and the call to Raffensperger on January 2, 2021. As to the former, *Blassingame* compels its

---

[19] This fact, too, relies on the Select Committee's final report. Because Shirkey testified before the Select Committee, Def.'s SJ Obj., Ex. W, ECF No. 173-24, at 320 n.159, and Plaintiffs presumably could secure his testimony as discussed in note 18, the court will consider this fact.

recognition as an official act.  The sole contextual fact offered is that the meeting took place in the Oval Office.  Def.'s CounterStmt. at 134 ¶ 85.  That is a trapping of the Office.  *See Blassingame*, 87 F.4th at 32–33 (Katsas, J., concurring).  True, President Trump purportedly told Shirkey and Chatfield to "have some backbone and do the right thing," Def.'s CounterStmt. at 134 ¶ 85, but that content is a secondary consideration, *see Blassingame*, 87 F.4th at 22, and can reasonably be construed as official or unofficial, *see Trump*, 603 U.S. at 626–28.  As here, when a "context-specific assessment yields no sufficiently clear answer in either direction," the President must be afforded immunity.  *Blassingame*, 87 F.4th at 21.  President Trump enjoys presidential immunity as to the November 20, 2020 meeting in the Oval Office with Michigan state legislators.

The call to Raffensperger, on the other hand, can only reasonably be viewed as the act of an office-seeker.  President Trump highlights that his Chief of Staff Mark Meadows was on the call.  But the Eleventh Circuit has ruled that Meadows was not acting in an official capacity when speaking to Raffensperger.  *See State v. Meadows*, 88 F.4th 1331, 1349 (11th Cir. 2023).  "Meadows's participation in the call reflected a clear attempt to further Trump's *private litigation interests*: he urged the participants to 'find[] a path forward that's less litigious.'"  *Id.* (alteration in original) (emphasis added).  This court agrees.  The other three participants with the President were all "attorneys for the Trump Campaign, Cleta Mitchell, Kurt Hilbert, and Alex Kaufman."  Def.'s CounterStmt. at 142 ¶ 91.  That context renders the only reasonable understanding of that communication to be re-election activity.  And content confirms that conclusion.  President Trump told the Georgia Secretary of State, among other things, "And the real truth is I won by 400,000 votes.  At least.  That's the real truth.  But we don't need 400,000.  We need less than 2,000."  *Id.* at 146 ¶ 93.  And he continued, "So what are we going to do here folks?  I only need 11,000 votes. . . .  Give me a break.  You know, we have that in spades already."  *Id.* at 148 ¶ 94.  Also, during

the call, the President said to his Campaign lawyer Cleta Mitchell, "[A]ll we have to do Cleta is find 11,000-plus votes." *Id.* at 149 ¶ 95. These are the words of an office-seeker imploring a state official to alter the outcome of Georgia's election, not those of an incumbent President acting in his official capacity.

*    *    *

In sum, President Trump has not carried his burden to prove that his various communications with state and local officials, except one, were official acts entitled to immunity. He offered no meaningful evidence of his own on the subject, and Plaintiffs' evidence largely establishes that these acts can only be reasonably construed as those of an office-seeker. The sole exception is the Oval Office meeting with Michigan state legislators. As to that act, the sole contextual fact on this record—its location—counsels in favor of construing it as falling within the outer perimeter of the President's official duties.

### C.    The Twitter Account

Next up are various tweets sent from President Trump's @realDonaldTrump Twitter account. The court counts more than 35 of them.[20] President Trump has described this Twitter account as "personal" or "private" in various judicial fora, including before the Supreme Court. *See, e.g.*, Def.'s CounterStmt. at 17–22 ¶¶ 12–15, 23 ¶ 17. Those admissions are relevant, *see Blassingame*, 87 F.3d at 15–16, but not dispositive. Even Plaintiffs acknowledge that, "[b]ecause some tweets from @realDonaldTrump were official and some were purely private[] campaign activity, the focus must be on the relevant tweets at issue." Pls.' SJ Opp'n at 15 (internal citation omitted). That is a wise concession. In *Trump*, the Court said that "[w]hether the Tweets . . . involve official conduct may depend on the content and context *of each*." 603 U.S. at 630

---

[20] *See* Def.'s CounterStmt. ¶¶ 1, 21–23, 27–40, 45, 47–49, 90, 225–29, 238, 241, 243–45, 347, 349, 351.

48

(emphasis added).  Among the contextual facts the Court identified as bearing on the issue are "what else was said contemporaneous to the excerpted communications" and "who was involved in transmitting the electronic communications."  *Id.*  Notably, the Court seemed to contemplate that the trial court's task would not be to decide whether tweeting was categorically an official act, but to make that inquiry on a tweet-by-tweet basis.  *See id.*

President Trump largely ignores the "objective," "factbound analysis" that the Supreme Court held might be needed to separate official from unofficial tweets.  *See* Def.'s SJ Mem. at 28–36.  He presents no evidence as to "what else was said contemporaneous" to a particular tweet, who drafted it, or who was involved in its transmission.  *See Trump*, 603 U.S. at 630.  He also offers no other contextual proof that could be relevant, such as his location at the time of the tweet, who else was present (even if not involved in its transmission), or the acts he performed contemporaneously.  *See* Def.'s SJ Mem. at 28–36; Def.'s Stmt. at 1–73 ¶¶ 1–27.  And he makes no effort to delve into any particular tweet's content to support its classification as official.  *See* Def.'s SJ Mem. at 28–36; Def.'s Stmt. at 1–73 ¶¶ 1–27.

Instead, as he did with the Ellipse Speech, President Trump elides the proper legal framework.  He invokes the two-part test that the Supreme Court announced in *Lindke v. Freed* to determine whether a state official's social media message constitutes state action under Section 1983.  *See* Def.'s SJ Mem. at 28–34 (citing *Lindke*, 601 U.S. 187 (2024)).  There, the Court held that "a public official's social-media activity constitutes state action under § 1983 only if the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media."  601 U.S. at 198.  President Trump claims that all his tweets satisfy the second element because he sent them in furtherance of his responsibilities to "tak[e] care that the laws are faithfully executed," to "urg[e] Congress and the states to take action

49

on matters of public concern," and to "'engage' with the public on matters of public concern." Def.'s SJ Mem. at 33. This argument fails for the reasons already discussed: it ignores context and "assumes the answer to the question" the court is asked to decide. *Blassingame*, 87 F.4th at 24; *see supra* Section III.A.1. His approach also does not recognize the Court's admonition in *Lindke* that "[h]ard-to-classify cases require awareness that an official does not necessarily purport to exercise his authority simply by posting about a matter within it" and that "many public officials possess a broad portfolio of governmental authority that includes routine interaction with the public, and it may not be easy to discern a boundary between their public and private lives." 601 U.S. at 203. Ultimately, *Lindke* requires the same kind of fact-intensive inquiry as *Trump* and *Blassingame*: "Categorizing posts that appear on an ambiguous [social media] page . . . is a fact-specific undertaking in which the post's content and function are the most important considerations." *Id.* President Trump mostly eschews this "fact-specific undertaking." *See id.* ("And when there is doubt, additional factors might cast light—for example, an official who uses government staff to make a post will be hard pressed to deny that he was conducting government business.").

The court uses the qualifier "mostly" because President Trump does offer eight "facts" that he says show that his "use of his Twitter account was official conduct." Def.'s SJ Mem. at 34. Those facts are: (1) he labeled the account with his official title, "The 45th President of the United States"; (2) members of his administration described the use of the account as "official"; (3) the White House Press Secretary announced that communications on his Twitter account should be considered "official statement[s] by the President of the United States," and he operated the account with the help of the White House's Director of Social Media, Dan Scavino; (4) he routinely used the account for official communications, and federal agencies monitored his account for such

50

messages; (5) the National Archives preserved the tweets, including (6) those relating to the Save America Rally; (7) a "then-in-force" Second Circuit decision *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2019), ruled that "the President . . . acts in an official capacity when he tweets"; and (8) the Trump Presidential Library cites to @realDonaldTrump as the official Twitter account of the Trump presidency.  *See id.* at 34–36.

But none of these "facts" help to determine whether any particular tweet was an official act.  President Trump does not dispute that he sometimes used @realDonaldTrump for unofficial messages.  *See* Def.'s SJ Reply at 23–24.  Nor could he.  After all, he represented to the Supreme Court that "[s]ince his inauguration, President Trump has continued to use the account for . . . personal purposes," in addition to official ones.  Def.'s CounterStmt. at 21 ¶ 15.  So, the fact that the account bears his official title and that he sometimes used it for official purposes says little about the status of any individual tweet.  The same is true of White House staff pronouncements.  None are specific to the tweets cited by Plaintiffs.  The National Archives' collection of the tweets carries no weight, as there is no evidence that the Archives sought to separate official from unofficial messages as part of its archival function.  Whatever persuasive force the *Knight* decision may have had has evaporated, because the Supreme Court vacated that judgment.  *See Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021).[21]  And the views of the President's Library are of no significance.

The sole fact of some relevance is that President Trump operated the account with the help of Scavino, the White House Social Media Director.[22]  *See Trump*, 603 U.S. at 630; *Lindke*,

---

[21] President Trump concedes that the statements from *Knight* are "not being offered for the truth of the matter asserted therein and [are] only being offered to provide context as to how the @realDonaldTrump account was treated throughout the term of the first Trump Administration and was viewed and understood by those using it during the relevant times, including November of 2020 through January of 2021."  Def.'s Stmt. at 23 ¶ 5 (Def.'s Resp.).

[22] President Trump cites only *Knight* for this fact proposition, *see* Def.'s Stmt. at 21 ¶ 5, and Plaintiffs object to the court's consideration of it as inadmissible, *see id.* (Pls.' Resp.).  The court nevertheless considers the fact to be true, as it presumes that Scavino would confirm it if called to testify.

601 U.S. at 203. But that general statement has little probative value because it is not specific to any of the dozens of tweets identified by Plaintiffs. Because the court's undertaking here is "fact-specific," *Lindke*, 601 U.S. at 203, it cannot presume that Scavino participated in transmitting any specific tweet, let alone all of them, *see Trump*, 601 U.S. at 630.

President Trump bears the burden to show, through contextual evidence, that a particular tweet can reasonably be construed as official conduct. Because he has essentially offered no such evidence, he has not carried his burden as to any tweet.

Content does not help him either, for the most part. Some tweets are plainly the unofficial acts of an office-seeker. Such communications include: (1) his announcement that he would be running for re-election, Def.'s CounterStmt. at 1 ¶ 1; (2) his commentary on the election results and the belief that he prevailed despite vote counts, *id.* at 39 ¶ 30, 42–43 ¶ 32, 45–46 ¶¶ 34–35; (3) his describing steps that he and others would be taking to challenge the results, *id.* at 40–41 ¶ 31, 43–44 ¶ 33, 47–52 ¶¶ 36–39; and (4) his urging of state officials to take action that would help him win, *id.* at 141 ¶ 90 ("If [two state governors] were with us, we would have already won both Arizona and Georgia.").

President Trump's "contemporaneous" tweets on January 5 and 6, *see Trump*, 603 U.S. at 630, about what the Vice President needed to do during the Joint Session also were unofficial. "The presidency itself has no institutional interest in who will occupy the office next. . . . Rather, an incumbent President's interests in winning re-election have the same purely private character as those of his challenger—i.e., 'substantial personal interests as a candidate' to attain (or retain) the office." *Blassingame*, 87 F.4th at 17. The January 5 and 6 tweets are those of a candidate trying to retain office: "The Vice President has the power to reject fraudulently chosen electors," Def.'s CounterStmt. at 59 ¶ 45; "All Mike Pence has to do is send them back to the States, AND

WE WIN," *id.* at 62 ¶ 47; and "If Vice President @Mike_Pence comes through for us, we will win the Presidency," *id.* at 62 ¶ 49. Those are the words of a candidate conveying a personal interest in re-election. That the Campaign issued a similar statement on January 5 confirms their unofficial nature. *See id.* at 60 ¶ 46 ("The Vice President and I are in total agreement that the Vice President has the power to act.").[23]

The same is true of other tweets sent on January 5. They, too, are those of a candidate who is seeking to reverse his election fortunes. *See, e.g.*, *id.* at 358 ¶ 243 ("Washington is being inundated with people who don't want to see an election victory stolen by emboldened Radical Left Democrats."); *id.* at 359 ¶ 244 ("I hope the Democrats, and even more importantly, the weak and ineffective RINO section of the Republican Party, are looking at the thousands of people pouring into D.C. They won't stand for a landslide election victory to be stolen."); *id.* at 361 ¶ 245 ("Get smart Republicans. FIGHT!").

Furthermore, given the court's earlier conclusion that the President has failed to show that the Ellipse Speech was official, his tweets promoting that event or touting the Speech likewise were not within the outer perimeter of his duties. *See, e.g.*, *id.* 322–27 ¶¶ 225–229, 354 ¶ 241, 453 ¶ 347.

Other tweets based on content alone are more difficult to classify. *See, e.g.*, *id.* at 28–30 ¶¶ 21–23 (pre-election commentary on election integrity); *id.* at 52 ¶ 40 (criticizing the Department of Justice for failing to act "despite overwhelming evidence" of voter fraud and concluding "Never give up. See everyone in D.C. on January 6th"). But having failed to produce any evidence of context in his favor, President Trump has not carried his burden as to such tweets.

---

[23] Plaintiffs also cite a post-presidency statement made by President Trump on March 13, 2023, regarding the Vice President's authority to return electoral votes to the States and the blame the Vice-President bears for the events of January 6. Def.'s CounterStmt. at 457 ¶ 352. Based on timing alone, this does not qualify as an official statement.

### D. Tweets After the Riot at the U.S. Capitol Began

That leaves the two tweets sent from @realDonaldTrump after the riot at the Capitol began. *See id.* at 455 ¶ 349, 457 ¶ 351. Neither side has offered specific facts to establish their circumstances. The Select Committee's final report, which is in the record, helps fill the gaps.[24] *See* Def.'s SJ Obj., Ex. W, ECF No. 173-24.

According to the Select Committee, the President learned of the riot at the Capitol around 1:21 p.m. after he returned to the White House from the Ellipse. *See id.* at 592. He then went to the White House dining room and remained there until early evening, leaving only to film a video in the Rose Garden urging his supporters to disperse. *See id.* at 593. After rioters broke into the Capitol at 2:13 p.m., the President's advisors urged him to make a public statement. *See id.* at 595–96. The first tweet during the riot came at 2:24 p.m. Def.'s CounterStmt. at 455 ¶ 349. It said that "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify a corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify. USA demands the truth!" *Id.* The second tweet came at 6:01 p.m. *Id.* at 457 ¶ 351. That tweet expressed solidarity with his supporters and told them, "Go home with love & in peace. Remember this day forever!" *Id.* Between these two tweets, President Trump made and publicly released the Rose Garden video, in which he expressed sympathy for his supporters and then signed off, saying, "But you have to go home now. We have to have peace. We have to have law and order. . . . So go home. We love

---

[24] The court recognizes that the admissibility of the final report in full for its truth is uncertain. *See, e.g.*, *Barry v. Trs. of Int'l Ass'n Full-Time Salaried Officers & Emps. of Outside Loc. Unions & Dist. Couns.'s (Iron Workers) Pension Plan*, 467 F. Supp. 2d 91, 98 (D.D.C. 2006) (setting forth factors to consider in admitting a congressional report under Rule 803(8)). Still, for present purposes, it is better to accept the truth of these facts—the court doubts Plaintiffs contest them—instead of allowing the immunity question as to these tweets to linger beyond the summary judgment stage.

you, you're very special. . . . I know how you feel. But go home, and go home in peace." *Id.* at 456 ¶ 350.

These communications, based on context alone, fall within the outer perimeter of President Trump's official responsibilities. The President was at the White House at the time; he was acting (or not) on the advice of White House advisors; and at least as to his Rose Garden remarks, he prepared them with the assistance of White House staff who presumably used a government-issued recording device. Plaintiffs may view President Trump's efforts to quell the violence at the Capitol as inadequate and even as a complete dereliction of duty. But they reasonably can be construed as the acts of an office-holder and therefore are cloaked in official-acts immunity. Plaintiffs cannot use these two tweets and the Rose Garden video to make their case.

### E. Miscellaneous Activities

Beyond the Ellipse Speech, outreach to state and local officials, and tweets, Plaintiffs identify various other acts taken by President Trump that they assert were not official. Those activities, discussed below, include: (1) statements he made during campaign rallies or other political events, (2) a statement he made in the immediate aftermath of the election, (3) statements, tweets, and other social media postings from his Campaign, (4) court challenges to various States' election results, and (5) his role in the so-called false-elector scheme. President Trump offers no contextual evidence as to any of these. None are official.

*Statements Made During Campaign Rallies or Other Political Rallies.* Plaintiffs identify statements President Trump made during (1) a "Trump Campaign event" on August 17, 2020, *id.* at 31–32 ¶ 24; (2) the Republican National Convention on August 24, 2020, *id.* at 33 ¶ 25; and (3) "a political rally" in Dalton, Georgia, on January 4, 2021, *id.* at 55 ¶ 42. "Campaign or other political events are unofficial," *see Blassingame*, 87 F.4th at 32 (Katsas, J., concurring), and "a

speech at a political party's convention . . . is inherently given in the nominee's private capacity as officer-seeker," *id.* at 18 (majority opinion).  Absent any other context, these statements were unofficial and not immune.

*Statement in the Immediate Aftermath of the Election.*  President Trump made televised remarks at 2:30 a.m. on November 4, 2020, the day after the election, declaring the election results were "a fraud on the American public.  [T]his is an embarrassment to our country.  [W]e were getting ready to win this election.  [F]rankly, we did win this election."  Def.'s CounterStmt. at 34 ¶ 26.  The timing of the statement—after midnight on election night—suggests that it was that of an office-seeker.  Content confirms it.

*Campaign Tweets or Other Social Media Postings*.  Plaintiffs offer several tweets or social media postings from the Campaign's social media accounts.  *Id.* at 136 ¶ 86 (tweet); *id.* at 328 ¶ 230 (YouTube post); *id.* at 362–67 ¶¶ 246–250 (tweets and Instagram posts).  Lacking any context to conclude otherwise, these are not official statements.  *Cf. Blassingame*, 87 F.4th at 21 (identifying a campaign ad fully funded by the campaign as unofficial).

*Lawsuits*.  President Trump or his Campaign mounted a host of lawsuits and other legal challenges contesting various States' election results.  *See* Def.'s CounterStmt. at 162 ¶ 103 to 184 ¶ 114.  These were filed either in his "personal capacity" or on his behalf as a candidate for office.  *See, e.g.*, *id.* at 163 ¶ 104, 170–71 ¶ 107, 175 ¶ 109.  These activities therefore enjoy no immunity.  *See Blassingame*, 87 F.4th at 15–16.

*Fake-Elector Scheme*.  Plaintiffs identify a variety of activities relating to the so-called fake-elector scheme.  *See* Def.'s CounterStmt. at 71 ¶ 57 to 104 ¶ 72.  Most do not directly involve President Trump, but rather members of his campaign.  *But see id.* at 71 ¶ 57 (alleging his general involvement in the scheme); *id.* at 104 ¶ 72 (alleging that the White House Counsel's Office

advised him that the plan was unlawful).  Before the Supreme Court, President Trump suggested that these acts qualified as official conduct.  *See Trump*, 603 U.S. at 626–27.  But here he makes no such argument nor presents any evidence to support that view.  The court therefore treats this alleged conduct as unofficial.

One last category of conduct bears mention: President's Trump interactions with officials from the Department of Justice.  Plaintiffs allege that Attorney General William Barr advised President Trump that purported irregularities in the application of state law were "issues for his [Campaign] to raise with the State" and were "not the business of the Department of Justice." Def.'s CounterStmt. at 186 ¶ 116.  They also assert that the Department of Justice refused the President's demands "to pursue baseless allegations of election fraud."  *Id.* at 188 ¶ 117. The Supreme Court addressed such interactions with the Department of Justice in *Trump*.  *See* 603 U.S. at 621 (holding that President Trump was "absolutely immune from prosecution for the alleged conduct involving his discussions with Justice Department officials").  Here, as there, these "discussions with Justice Department officials" are official acts for which President Trump cannot be held liable.  *Id.*

*    *    *

Before turning to the next motion, the court briefly summarizes its immunity determinations.  Based on the present record of facts not in dispute, with limited exceptions, President Trump has not carried his burden to demonstrate, through "objective, context-specific" evidence, that the acts alleged by Plaintiffs "can reasonably be understood as the official actions of an office-holder rather than the unofficial actions of an office-seeker."  *Blassingame*, 87 F.4th at 30.  President Trump is not immune from suit for that conduct.  That includes the Ellipse Speech, most of his contacts with state and local officials, nearly all tweets from his @realDonaldTrump

57

Twitter account, and various other miscellaneous activities. The exceptions include: his Oval Office meeting with Michigan state legislators, the tweets from his @realDonaldTrump Twitter account at 2:24 p.m. and 6:01 p.m. on January 6, his Rose Garden remarks on January 6, and his interactions with officials from the Department of Justice. These are official acts for which President Trump cannot be held liable. Plaintiffs therefore cannot rely on them to prove their claims.

To be clear, the court's decision today is not a final pronouncement on immunity for any particular act. It is a ruling based on the record evidence and application of the summary judgment standard. President Trump remains free to reassert official-acts immunity as a defense at trial. But the burden will remain his and will be subject to a higher standard of proof. *See Blassingame*, 87 F.4th at 30 (stating that the party asserting immunity bears the burden "throughout"); *id.* at 31 (Katsas, J., concurring) (contemplating that Plaintiffs' allegations as it relates to immunity would need to be "tested on summary judgment or at trial").

## IV.    FIRST AMENDMENT DEFENSE

President Trump previously urged dismissal of these suits because his alleged conduct—consisting almost exclusively of speech—was protected political expression under the First Amendment. *See Thompson*, 590 F. Supp. 3d at 108. The parties focused on the Ellipse Speech, so the court did, too. *See id.* at 113. The issue presented boiled down to whether the President's remarks on January 6 plausibly constituted words of incitement that fell outside the First Amendment's broad protections for political speech. *Id.* Recognizing the "substantial constitutional question" presented, *id.* at 108, the court first discussed in detail the three key Supreme Court decisions on incitement: *Brandenburg v. Ohio*, *Hess v. State of Indiana*, and *NAACP v. Claiborne Hardware Co. See id.* at 110–13. It then reviewed at length the words spoken

by President Trump during the Ellipse Speech. *Id.* at 113–14. Finally, the court applied the key

Supreme Court precedents to those remarks. *Id.* at 115–18. The court concluded:

> Having considered the President's January 6 Rally Speech in its entirety and in context, the court concludes that the President's statements that, "[W]e fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore," and "[W]e're going to try to and give [weak Republicans] the kind of pride and boldness that they need to take back our country," immediately before exhorting rally-goers to "walk down Pennsylvania Avenue," are plausibly words of incitement not protected by the First Amendment. It is plausible that those words were implicitly "directed to inciting or producing imminent lawless action and [were] likely to produce such action."

*Id.* at 115 (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969)). President Trump now asks

the court to reconsider that ruling.

The ostensible reason given for reconsideration is that, after this court's decision, the

Supreme Court decided *Counterman v. Colorado*, 600 U.S. 66 (2023). *See* Def.'s Recons. Mem.

at 5–7. According to President Trump, *Counterman* stands for the principle that a speaker's "intent

can save facially unprotected speech from incitement liability, but it cannot be used the other way

around, to hold a speaker liable for facially protected speech." *Id.* at 5–6. He claims that, contrary

to *Counterman*, this court erroneously "view[ed] the words of the Speech through the prism of

President Trump's supposed understanding and intent" and, as a result, "fail[ed] to properly

analyze the language actually used by the President on January 6 in determining that he implicitly

incited the crowd on that day." *Id.* at 22.

But the true reason President Trump asks for reconsideration is that he simply disagrees

with the court's holding. As discussed below, *Counterman* is not about incitement, and it did not

clarify the law about that category of unprotected speech. *Counterman* is merely the vehicle by

which President Trump dissects the court's reasoning and makes arguments that he did not the first

59

time around.  *See Thompson*, 590 F. Supp. 3d at 116–17 ("In his motions, President Trump largely avoids any real scrutiny of the actual words he spoke or the context in which they were spoken."); *see also* Def.'s Mot. to Dismiss, ECF No. 10, Def.'s Mem. in Supp. of His Mot. to Dismiss, ECF No. 10-1, *Blassingame v. Trump*, No. 21-cv-858-APM (D.D.C.), at 25–26.

Be that as it may, the court proceeds to address the President's arguments.  It will view them through the "as justice requires" standard of Rule 54(b).  *See Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011).  That standard affords the court more flexibility in revisiting a prior decision than if the same argument were made post-judgment. *See Cobell v. Jewell*, 802 F.3d 12, 25–26 (D.C. Cir. 2015).

### A.    *Counterman* and the Court's Alleged Legal Error

*Counterman* is not a case about incitement.  It addressed the requisite mental state, or mens rea, for a different category of unprotected speech, "true threats."  600 U.S. at 69.  The Court held that the government must prove recklessness—"that the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence"—to secure a conviction in a "true threats case."  *Id.*  "The State need not prove any more demanding form of subjective intent to threaten another."  *Id.*

In reaching that conclusion, the Court discussed its incitement doctrine.  Inciting words are those "'directed [at] producing imminent lawless action,' and likely to do so."  *Id.* at 73 (alteration in original) (quoting *Brandenburg*, 395 U.S. at 447).  "Like threats, incitement inheres in particular words used in particular contexts:  Its harm can arise even when a clueless speaker fails to grasp his expression's nature and consequence.  But still, the First Amendment precludes punishment, whether civil or criminal, unless the speaker's words were 'intended' (not just likely) to produce imminent disorder."  *Id.* at 76. (quoting *Hess*, 414 U.S. at 109).  "That rule helps prevent a law

60

from deterring 'mere advocacy' of illegal acts—a kind of speech falling within the First Amendment's core." *Id.* (quoting *Brandenburg*, 395 U.S. at 449). The Court would go on to acknowledge that a recklessness mens rea for a true-threats prosecution was less than its "incitement decisions demand." *Id.* at 81. But that was appropriate because "the reason for that demand is not present here. When incitement is at issue, we have spoken in terms of specific intent, presumably equivalent to purpose or knowledge." *Id.* Such "potency" is required to "ensure that efforts to prosecute incitement would not bleed over, either directly or through a chilling effect, to dissenting political speech at the First Amendment's core." *Id.*[25] That is the totality of what *Counterman* says about incitement.

President Trump's reads *Counterman* as making clear that, for purposes of incitement, "intent is a one-way ratchet." Def.'s Recons. Mem. at 5. That is, "intent can save facially unprotected speech from incitement liability, but it cannot be used the other way around, to hold a speaker liable for facially protected speech." *Id.* at 5–6. It is in this respect, President Trump argues, this court erred. He contends that the court's analysis gave outsized importance to the "element[s]" of "intent" and "imminence" over the actual words spoken by President Trump. *Id.* at 6–7. The court ignored "the reality" that his words were far less incendiary than those deemed protected in the Supreme Court's incitement decisions, and it improperly viewed his words as plausibly inciting by "making impermissible use—*contra Counterman*—of intent to infuse words with meaning that they do not objectively hold." *Id.* at 23; *see also id.* at 28 (arguing that the court "leaned too heavily on . . . the intent the Court inferred President Trump may have had, given past

---

[25] That same "potency" was not needed as a buffer to prosecutions for "true threats" because "the speech on the other side of the true-threats boundary line—as compared with advocacy addressed in our incitement decisions—is neither so central to the theory of the First Amendment nor so vulnerable to government prosecutions." *Counterman*, 600 U.S. at 81. Proof of recklessness therefore struck the appropriate balance between protected expression and the benefits of enforcing laws against true threats. *See id.* at 81–82.

events . . . and . . . the fact of subsequent violence by some of his listeners[], to imbue the words he actually used on January 6 with implicit incitement").

## B.    The Ellipse Speech Plausibly Crossed the Line to Incitement

These criticisms both misstate the law of incitement and mischaracterize this court's reasoning.

Start with the law.   President Trump says that protected expression crosses over to unprotected incitement only if three elements are present: the words "specifically advocate imminent violence," the speaker intends to produce imminent disorder, and the words spoken are likely to have that result.  Def.'s Recons. Mem. at 6–7, 14, 20–21.  Those elements derive from Sixth Circuit caselaw, which this court acknowledged but did not expressly adopt.  *See Thompson*, 590 F. Supp. 3d at 112 (citing *Bible Believers v. Wayne County*, 805 F.3d 228, 246 (6th Cir. 2015) (en banc)).  President Trump takes the elements one step further.  He argues that there is a hierarchy among the elements and that they proceed in a kind of order of operations that *Counterman* "demands."  Def.'s Recons. Mem. at 25.  "[T]he inquiry must begin with the words used by the speaker (*Brandenburg's* element one).  Only if those words are facially unprotected under the first element of the *Brandenburg* test could a speaker *potentially* be penalized if there is *also* a showing of the requisite intent (element two) and imminence (element three)."  *Id.* at 6; *see also id.* at 20.

Neither *Counterman* nor any other Supreme Court case erects the rigid incitement framework that President Trump suggests.  No decision instructs courts to consider as a first step only the words spoken, unmoored from their context, to derive their "objective meaning."  *Id.* at 23.  To the contrary, *Counterman* clearly states that "incitement inheres in particular words used in *particular contexts*."  600 U.S. at 76 (emphasis added).  The importance of context has long been central to the Supreme Court's incitement jurisprudence.  *See Thompson*, 590 F. Supp. 3d at

112 (observing that "both the words spoken and the context in which they are spoken matter" (citing cases)); *see also id.* at 110–11 (describing in detail the contextual facts of *Brandenburg*, *Hess*, and *Claiborne Hardware*). And it was central to this court's holding. *See id.* at 115–17.

Now the court's reasoning. This court did not engage in an "intent-based interpretation" of the Ellipse Speech to create a veneer of incitement that it objectively does not have, *see* Def.'s Recons. Mem. at 25, or, as President Trump colorfully puts it, perform "analysis by psychoanalysis," *id.* The court first identified the words used, then described the relevant context, and finally evaluated those words within the context in which they were spoken. That is precisely what *Counterman* and the Supreme Court's incitement jurisprudence require. *See* 600 U.S. at 76.

More specifically, here is how the court proceeded. After setting forth the controlling legal principles, the court considered the entirety of the Ellipse Speech and summarized it in greater detail than contained in Plaintiffs' complaints. *See Thompson*, 590 F. Supp. 3d at 113–14. The court acknowledged that "[t]he President's words on January 6th did not explicitly encourage the imminent use of violence or lawless action," but it went on to consider whether they did so implicitly. *Id.* at 115. That required the court to recount the context for the Ellipse Speech, *id.* at 115–16, which had to be construed in the light most favorable to Plaintiffs. *See Steele v. United States*, 144 F.4th 316, 320 (D.C. Cir. 2025). The context considered was comprehensive. It encompassed the events leading up to January 6, during which the President "had created an air of distrust and anger among his supporters by creating the false narrative that the election literally was stolen from underneath their preferred candidate by fraud and corruption." *Thompson*, 590 F. Supp. 3d at 115. It also included that the President and his advisors "actively monitored" media coverage about him and would have known that some of his supporters had participated in violence at earlier election-related protests; others (including militia groups) had called for the use

violence on January 6, including against police officers (e.g., "Cops don't have 'standing' if they are laying on the ground in a pool of their own blood."); and a former aide to the President predicted in a widely publicized statement, "there will be violence on January 6th because the President himself encourages it." *Id.* at 65, 115–16.  These facts led the court to find plausible that, "when the President stepped to the podium on January 6th . . . he would have known that some in the audience were prepared for violence." *Id.*

Then, as cases from *Brandenburg* to *Counterman* require, the court considered the President's words within this context.  *Id.* at 116.  The court highlighted some of the more provocative words he used during the Ellipse Speech and then focused on his final exhortation: "We fight.  We fight like hell and if you don't fight like hell, you're not going to have a country anymore." *Id.*  He uttered these words immediately before telling his supporters to "march to the Capitol," the very location where he had moments earlier said that those responsible for stealing the election (e.g., "radical Left Democrats" and "weak Republicans") and those who could reverse those results to secure a victory (such as the Vice President) could be found.  *Id.* at 113, 116. "Importantly, it was the President and his campaign's idea to send thousands to the Capitol while the Certification was underway.  It was not a planned part of the rally.  In fact, the permit expressly stated that it did 'not authorize a march from the Ellipse.'"  *Id.* at 102; *see* Rally Permit at 3 ("[WAF] will not conduct an organized march from the Ellipse at the conclusion of the rally."). In the end, the court held that the President's words plausibly were "an implicit call for imminent violence or lawlessness.  He called for thousands 'to fight like hell' immediately before directing an unpermitted march to the Capitol, where the targets of their ire were at work, knowing that militia groups and others among the crowd were prone to violence." *Thompson*, 590 F. Supp. 3d at 117.  These facts also gave rise to the plausible inference that the President specifically intended

64

for his words to produce imminent violence, and they likely would do so. *See id.* at 116 (quoting *Hess*, 414 U.S. at 108–09); *see also Counterman*, 600 U.S. at 73, 76.

Nowhere in this analysis did the court start with a presumption about President Trump's intent and then apply it to the words he spoke. Just the opposite is true. Based on the "particular words used in [the] particular context[]," the court considered whether it was plausible that the President intended for his words to produce imminent lawlessness and the likelihood of it. *Counterman*, 600 U.S. at 73, 76. His knowledge of what had come before and who would be in the crowd was critical to that analysis and plainly relevant to the inquiry. *See id.* at 81 (equating the "specific intent" in its incitement decisions with "purpose or knowledge"). President Trump is wrong to suggest otherwise. *See* Def.'s Recons. Mem. at 21–22 (asserting that the court "improperly filter[ed] the words used through what it took to be President Trump's understanding of the crowd and its reaction[26] in order to vest them with implicit meaning that the Court acknowledged they did not explicitly contain"); *id.* at 27–28 ("[T]his Court erred when it relied on the 'broader context' to read into President Trump's words a meaning that simply was not there.").

The court quickly disposes of one additional critique of its reasoning. President Trump argues that, even accepting the factual allegations outlined by the court, the most that they establish is that he "was aware of a risk that some listeners might react violently and spoke anyway." Def.'s Recons. Mem. at 22. The court agrees that merely ignoring a known substantial risk—acting recklessly—is not enough to make out incitement, which requires a heightened mental state—the specific intent to produce imminent disorder. *See id.* (citing *Counterman*, 600 U.S. at 78–79, 81).

---

[26] If by "reaction" President Trump means how the crowd perceived the Speech, the court did not take that into account. In fact, the court recognized that the subjective understandings and reactions of listeners was not a relevant consideration. *See Thompson*, 590 F. Supp. 3d at 116–17. For that reason, the court made clear that it had "assiduously avoided relying on any allegations that Plaintiffs made about any person's reaction to the President's January 6 Rally Speech. (And, Plaintiffs did make such allegations. . . .)." *Id.* at 117 (citations omitted).

But the argument about pleading sufficiency fails for the simple reason that, on a motion to dismiss, the well-pleaded facts must be "taken in the light most favorable to the plaintiff[s] and with all reasonable inferences drawn in [their] favor." *Steele*, 144 F.4th at 320 (alterations in original) (internal quotation marks omitted). For the reasons discussed, it is plausible that President Trump had the requisite intent to produce imminent disorder.

Since the court's decision, new allegations have surfaced that only confirm this conclusion. Cassidy Hutchinson, then-assistant to Chief of Staff Mark Meadows, testified before the Select Committee. *See* Pls.' Mot. to Strike, Ex. 2, ECF No. 183-3.[27] Hutchinson was with President Trump immediately before the Ellipse Speech. *See id.* at 11. She described him as angry that the rally space was not full of spectators, and she heard him complain about the Secret Service setting up magnetometers, or "mags," that were preventing people who possessed weapons from entering the rally. *See id.* Hutchinson "overheard the President say something to the effect of, 'You know, I don't F'ing care that they have weapons. They're not here to hurt me. Take the F'ing mags away. Let my people in. They can march to the Capitol from here. Let the people in. Take the F'ing mags away.'" *Id.* at 11–12. After he was told the magnetometers could not be removed, Hutchinson heard the President say "something to the effect of, you know, 'F the Secret Service. I'm the President. Take the F'ing mags away. They're not here to hurt me.'" *Id.* at 12.

Hutchinson's recollections of January 6 heighten the plausibility that President Trump's Ellipse Speech contained words of incitement. If assumed true—and the President disputes their veracity, Hr'g Tr. at 110:23-25—at a minimum, they establish that the President knew that some

---

[27] Hutchinson's testimony is outside the four corners of the complaints, but the court believes it is appropriate to consider it in the present posture where the question is whether "justice requires" reconsideration. *See Capitol Sprinkler*, 630 F.3d at 227. If the court were to grant reconsideration, it would allow Plaintiffs to amend their complaints to reflect Hutchinson's testimony and any additional relevant evidence that has come to light after the court's ruling. It therefore is more efficient to consider those allegations now.

supporters in the crowd had weapons and that those weapons might be used to cause harm, though not to him.  No longer is the President's knowledge about his supporters' willingness to engage in imminent violence based merely on complaint allegations about historical facts preceding January 6.  It is now corroborated by a first-hand account of his state of mind on the day itself, moments before addressing the crowd.  His statements to "Take the F'ing mags away" and that "They're not here to hurt me" may not amount to a confession.  But those words support the reasonable inference that he meant for his Ellipse Speech to be heard as "an implicit call for imminent violence or lawlessness."  *See Thompson*, 590 F. Supp. 3d at 117.  His remarks on January 6 therefore plausibly were inciting words that are not protected by the First Amendment.

## C.    The Rap Concert Analogy

As a final salvo, President Trump resuscitates an argument the court previously rejected but with a twist.  He again insists that an adverse ruling "will open floodgates for incitement decisions" and thereby constrain First Amendment protections.  *Compare* Def.'s Recons. Mem. at 29, *with Thompson*, 590 F. Supp. 3d at 117.  Before, his focus was on the impact such ruling would have on political speech.  *See Thompson*, 590 F. Supp. 3d at 117.  Now his concern is over the "ramifications for public citizen speech."  Def.'s Recons. Mem. at 30.  To illustrate the point, he poses the hypothetical of a popular rapper (bearing some resemblance to Eminem) whose concert performance leads to fan violence.  *See id.* at 30–31.

It goes something like this.  The rapper is known for his provocative and controversial lyrics, which "describe explicit violent acts, including gun violence, rape, and a description of the rapper drowning his wife."  *Id.* at 30.  It is widely reported in the news that his song lyrics are inspiring young people to "act emotionally and sometimes violently."  *Id.* at 30–31.  The rapper is aware of this phenomenon.  Yet, when he takes the stage in front of thousands of fans, he performs

67

his "most aggressive" songs and stokes his audience's passions saying, "Fight the Man!  Fight the Establishment!  Don't let them tell you what to do!  Fight like hell!"  *Id.*  Chaos ensues.  Inspired by these words, concert goers "storm[] the nearest establishments," stealing food from concession stands, attacking vendors, and "beating down security guards to access the backstage areas of the venue."  *Id.*  Presumably, this goes on for hours and the rapper does not unequivocally call for his fans to cease committing acts of violence.

President Trump fears that, under the court's ruling, "there is a compelling argument to be made that the rapper's speech—'in context' (which could include lyrics he published weeks, months, or years prior to the concert)—constitutes incitement to violence."  *Id.*  That result, he says, would represent a major break from First Amendment precedent, which otherwise protects the rapper's expression.  *Id.*

But here is what is missing from the President's hypothetical.  There is no contention that, for weeks before the concert, the rapper told his fans that the Establishment had taken something valuable from *them* through fraud and deceit.  No assertion that the rapper knew his fans had prepared to act violently on that very day (including by bringing weapons to the show) to reclaim what was taken from them.  No averment that during the performance the rapper specifically identified the members of the Establishment who took this thing of value.  And no allegation that, at the show's crescendo, he implored his fans to "Fight the Establishment" and "Fight like hell" *and* then directed them, without warning local law enforcement, to descend thousands strong on the very place the Establishment was working to finally take away that thing of value.  Only if those facts are included does the rap concert begin to resemble January 6, and only then do the artist's song lyrics and exhortation to "Fight like hell" mirror the Ellipse Speech.  The court would

68

agree that, in this revised hypothetical, the rapper's expression plausibly are words of incitement. But not in the incomplete one posed by the President.

Accordingly, the court declines to reconsider its decision not to dismiss based on the First Amendment.

### D.    Certification for Interlocutory Review

Although the court declines to reconsider, it will certify its First Amendment rulings—the denials of the motion to dismiss and the motion for reconsideration—for interlocutory review. *See* 28 U.S.C. § 1292(b).   The certifiable question is: Have Plaintiffs plausibly alleged that President Trump's exhortations at the end of the Ellipse Speech—"We fight.  We fight like hell and if you don't fight like hell, you're not going to have a country anymore," and "[W]e're going to try to and give [weak Republicans] the kind of pride and boldness they need to take back our country"—moments before directing thousands of followers on an unpermitted march to the Capitol are inciting words that fall outside the protections of the First Amendment?

The court's rulings (1) "involve[] a controlling question of law; (2) a substantial ground for difference of opinion concerning the ruling[s] exists; and (3) an immediate appeal would materially advance the litigation." *APCC Servs., Inc. v. Sprint Commc'ns Co.*, 297 F. Supp. 2d 90, 95 (D.D.C. 2003).   The court further believes that "exceptional circumstances" exist to depart from the ordinary policy of not permitting immediate review of interlocutory orders.  *Virtual Def. & Dev. Int'l Inc. v. Republic of Moldova*, 133 F. Supp. 2d 9, 22 (D.D.C. 2001).  These lawsuits involve the sitting President of the United States, raise an important question about the line between protected political expression and unprotected incitement, and involve matters of considerable public interest.  Further, resolving the First Amendment issue in favor of President Trump may accelerate

69

these proceedings against him and result in the dismissal of the cases.[28]   The court therefore

certifies its First Amendment rulings for interlocutory review.

## V.    MOTION TO STRIKE WESTFALL ACT CERTIFICATION

The court finally arrives at the last of the three primary motions before it: Plaintiffs' motion

to strike the Department of Justice's Westfall Act Certification.   Recall, the Department of Justice

filed a Certification that the Attorney General had determined that President Trump's alleged

conduct fell within the scope of his employment as President of the United States.   Under the

Westfall Act, such certification mandates the United States' substitution as the defendant for the

tort claims brought against him.   Plaintiffs have moved to strike the Certification, arguing that the

record evidence does not support the Attorney General's scope-of-employment determination.

*See generally* Pls.' Mot. to Strike.

> Upon certification by the Attorney General that the defendant
> employee was acting within the scope of his office or employment
> at the time of the incident out of which the claim arose, any civil
> action or proceeding commenced upon such claim in a United States
> district court shall be deemed an action against the United States
> under the provisions of this title and all references thereto, and the
> United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1).   A scope-of-employment certification by the Attorney General is not

"conclusive[]," but it does "constitute *prima facie* evidence that the employee was acting within

the scope of his employment." *Council on Am. Islamic Rels. v. Ballenger*, 444 F.3d 659, 662 (D.C.

Cir. 2006) (internal quotation marks omitted).

A plaintiff can challenge a certification.   To do so, the plaintiff "must submit persuasive

evidence—specific evidence or a forecast of specific evidence—that contradicts the certification."

---

[28] The court expresses no opinion as to whether Plaintiffs' claims would be subject to dismissal for failure to state a claim if allegations relating to the Ellipse Speech were to drop out of these suits.

*Steele v. Meyer*, 964 F. Supp. 2d 9, 17 (D.D.C. 2013) (internal quotation marks omitted); *see also Jacobs v. Vrobel*, 724 F.3d 217, 221 (D.C. Cir. 2013) (noting that "[m]ere conclusory statements" are not enough to rebut a Westfall certification (internal quotation marks omitted)).   Plaintiffs believe that the discovery taken and developed on official-acts immunity is sufficient to overcome the Certification.  *See* Joint Status Report, ECF No. 170, at 3 (declining to seek additional Westfall Act discovery).[29]

"To determine whether an employee was acting within the scope of his employment under the Westfall Act, courts apply the *respondeat superior* law of the state in which the alleged tort occurred."  *Wuterich v. Murtha*, 562 F.3d 375, 383 (D.C. Cir. 2009).  Both Plaintiffs and the United States evaluate the Certification's merits under District of Columbia law, so the court does the same.  *See* Pls.' Mot. to Strike at 12–13; U.S. Opp'n to Pls.' Mot. to Strike at 5–6.  The District of Columbia "generally adheres to" the Second Restatement of Agency in delineating the scope of employment.  *Trump v. Carroll*, 292 A.3d 220, 228 (D.C. 2023).  This means, in relevant part, that conduct falls within the scope of employment if "(a) it is of the kind [the person] is employed to perform; (b) it occurs substantially within the authorized time and space limits;" and "(c) it is actuated, at least in part, by a purpose to serve the master."  *Id.* (quoting Restatement (Second) of Agency § 228(1) (A.L.I. 1958)).

The parties scrupulously address each of these factors.  Pls.' Mot. to Strike at 14–28; U.S. Opp'n to Pls.' Mot. to Strike at 9–38.  The court need not do the same.  It grants Plaintiffs'

---

[29] It remains unclear to the court which party bears the ultimate burden of proof when a Westfall Act Certification is challenged.  The plaintiff bears an initial *pleading* burden to show that the defendant's actions exceeded the scope of his employment.  *See Wuterich v. Murtha*, 562 F.3d 375, 382–83 (D.C. Cir. 2009).  Success entitles the plaintiff to discovery.  *See id.*  Thereafter, the plaintiff bears a burden of *production* to come forward "with evidence supporting his allegations both as to scope and as to the merits."  *Kimbro v. Velten*, 30 F.3d 1501, 1509 (D.C. Cir. 1994).  If there is a dispute of material fact as to scope at that point, the trial court must hold a hearing.  *See id.*  In *Kimbro*, the court did not say which party bears the ultimate burden of proof—the plaintiff to disprove scope or the United States to prove it.  And the D.C. Circuit has not done so since.  In any event, the court need not belabor the issue any further, as it decides in Plaintiffs' favor regardless of which side bears the ultimate burden of proof.

71

motion largely for the reasons already discussed: the same activities found to be beyond the outer perimeter of President Trump's official responsibilities also fall outside the scope of his employment as President of the United States.  The similarities between the two inquiries explain why.

Start with official-acts immunity.  Protected conduct must be of the kind tied to the "function" of the office.  *See Clinton v. Jones*, 520 U.S. 681, 694 (1997) (describing the "functional approach" applied to official-acts immunity).  Conduct within the "outer perimeter" thus encompasses not only those Presidential duties enumerated by the Constitution or statute, but also "'discretionary acts' within the 'concept of duty.'"  *Blassingame*, 87 F.4th at 13 (citation omitted).  This functional approach is reflected in the now-familiar outer-perimeter formulation from *Blassingame*: "an act lies within the outer perimeter of an official's duties if it is 'the kind of act not manifestly or palpably beyond [the official's] authority, but rather having more or less connection with the general matters committed by law to his control or supervision.'"  *Id.* (alteration in original) (citation omitted).  Conversely, conduct that has no connection to the official's functions does not enjoy immunity.

The D.C. Court of Appeals has taken a similar "functional approach" in describing the first element of the scope-of-employment test—whether the conduct "is of the kind the person is employed to perform."  *Carroll*, 292 A.3d at 230.  "This language plainly encompasses an employee's performance of their stated job duties."  *Id.*  That includes not only expressly authorized "job functions" but also "informal responsibilities that are as integral to their employment as their formal responsibilities."  *Id.*  Or, to quote the Restatement formulation used by the D.C. Court of Appeals, conduct is of the kind a person is employed to perform if it is "either 'of the same general nature as' *or* 'incidental to' the conduct authorized so as to be within the scope

72

of employment." *Id.* (quoting Restatement (Second) of Agency § 229(1)).  The former "reflect[s] an inquiry into the similarity between the tortious conduct and an individual employee's job functions akin to a plain language reading of § 228(1)(a)."  The latter "reflects a broadening of the permissible nexus between an employee's conduct and their job responsibilities" and asks whether the tortious conduct was the "outgrowth of a job-related controversy."  *Id.* at 231–32 (internal quotation marks omitted).  It is not enough that the employment created the mere opportunity to commit the tort; there must be "some relationship or nexus between the tortious conduct and the employee's responsibilities for it to be an outgrowth of a job-related controversy."  *Id.* at 232.

These scope-of-employment principles map neatly onto the framework for assessing official-acts immunity for Presidential conduct.  Both cover conduct that is "*expressly* authorized." *Id.* at 230.  For the President, those are the core functions delineated by Article II and by statute. But they also go further, reaching conduct having "some relationship or nexus between the tortious conduct and the employee's responsibilities."  *Id.* at 232.  For the President, that would extend to "'discretionary acts' within the 'concept of duty' associated with the office."  *Blassingame*, 87 F.4th at 13.  On the other hand, activities that have no such nexus fall outside the President's scope of employment, just as conduct with no connection to "the general matters committed [to him] by law" falls beyond the outer perimeter and is not immune from civil liability.  *Id.*

The court need not decide whether the scope and outer-perimeter inquiries are always co-extensive when it comes to the acts of the President.  It is enough to say that, in this case, it is hard to discern any daylight between the two.  This follows from the fact that "[t]he presidency itself has no institutional interest in who will occupy the office next."  *Id.* at 17.  "Campaigning to *attain* that office thus is not an official function *of* the office."  *Id.*  And importantly, "an incumbent President's interests in winning re-election have the same purely private character as those of his

73

challengers." *Id.*  If conduct in pursuit of retaining office is not an "official function" and is of a "purely private character," then such conduct likewise is neither the kind of act an incumbent President is employed to perform nor one that bears any relationship or nexus with his responsibilities.  Put more simply, winning re-election is not a function or outgrowth of the job of an incumbent officeholder; therefore, acts in furtherance of that end fall outside the scope of employment under District of Columbia law.

The United States resists applying *Blassingame*'s logic to resolve the scope issue for purposes of the Westfall Act Certification.  U.S. Opp'n to Pls.' Mot. to Strike at 7–8.  The court is not persuaded by these arguments.

First, the United States contends that *Blassingame* is inapt because the District of Columbia's "law of *respondeat superior*, which—in contrast to federal common law on 'official-act immunity'—serves a different purpose and is applied 'very expansively' to achieve the specific policy objectives of D.C. tort law."  *Id.* at 7–8.  But the United States does not explain how the District's *respondeat superior* law is broader than the law on official-acts immunity or why its underlying policy demands a more expansive reading.  One would think the opposite would be true.  "The principal rationale for official immunity—providing an official the maximum ability to deal fearlessly and impartially with the duties of his office— . . . applies to the President with pronounced force."  *Blassingame*, 87 F.4th at 12 (internal quotation marks omitted).  That purpose would seem to warrant a more capacious application of official-acts immunity than when assessing an employer's liability for the tortious acts of its employee in a private action.

Second, the United States argues that "graft[ing]" *Blassingame*'s officer-seeker/office-holder distinction onto the scope issue would be improper because the D.C. Court of Appeals in *Carroll* stated that it has "never adopted a rule that has determined that a certain type of conduct

74

is per se within (or outside of) the scope of employment." U.S. Opp'n to Pls.' Mot. to Strike at 8 (quoting *Carroll*, 292 A.3d at 240). That is true. But the *Carroll* court also said that "the District of Columbia's precedents have consistently adhered to a fact-bound inquiry to determine whether the conduct of an employee is within the scope of employment." *Carroll*, 292 A.3d at 240. The official-acts immunity inquiry described in *Blassingame* requires precisely the same fact-specific assessment. *See Blassingame*, 87 F.4th at 21–22.

Third, the United States asserts that "*Westfall* Act immunity is particularly broad and especially so when applied to the President, whose duties and responsibilities are unmatched, resulting in a wide range of activity falling within scope." U.S. Opp'n to Pls.' Mot. to Strike at 8. But again, it does not explain why that statutory immunity should be construed more broadly than official-acts immunity when it comes to the President. The government quotes a footnote from the Second Circuit's decision in *Carroll v. Trump*, 49 F.4th 759, 765 n.3 (2d Cir. 2022), which states, "Our holding today is that the Westfall Act extended absolute immunity to the President for non-official acts as long as they are within the scope of employment." It is hard to know what to make of this statement. The Second Circuit in that case was not asked to opine on the intersection between official-acts immunity and the Westfall Act—official-acts immunity was not even raised as an issue.[30] And ordinarily appellate courts do not put a "holding" in a footnote. The statement's meaning becomes even murkier given that the Second Circuit did not ultimately "hold" anything but instead certified the scope-of-employment question to the D.C. Court of Appeals. *See id.* at 781. The ambiguous footnote from *Carroll v. Trump* thus does not alter the court's thinking.

---

[30] In the *Carroll* litigation, President Trump failed to move to dismiss on the ground of official-acts immunity or assert the defense in his answer, and the Second Circuit ruled that he had waived it as a result. *See Carroll v. Trump*, 88 F.4th 418, 429 (2d Cir. 2023), *adhered to*, 151 F.4th 50, 65–67 (2d Cir. 2025).

Finally, the United States argues that, even if *Blassingame*'s analysis of official-acts immunity were relevant to the scope question, "*Blassingame* is not the last word on presidential immunity." U.S. Opp'n to Pls.' Mot. to Strike at 8. It asserts that the Supreme Court "declined to adopt the D.C. Circuit's blanket 'office seeker' vs. 'office holder' test to a President's actions," noting that the Court viewed as "official" some acts characterized as "campaign conduct," such as President Trump's interactions with the Vice President and with the Department of Justice. *See id.* But as already described, the Supreme Court did not reject the distinction made by *Blassingame*. *See supra* Section II.C.1. Rather, like the D.C. Circuit, it refused to accept a party's characterization of President Trump's various activities and instead called for judicial review to "differentiate between a President's official and unofficial actions." *Trump*, 603 U.S. at 617. That is precisely what the court has done here. It has distinguished official from unofficial acts. President Trump cannot be held liable for the former. Because those acts have fallen away on immunity grounds, they are no longer a basis for substitution under the Westfall Act. All that remains is conduct that lies beyond the outer perimeter of his official responsibilities and, concomitantly, outside the scope of his employment.

The court therefore strikes the United States' Westfall Act Certification.

## VI.    CONCLUSION AND ORDER

For the foregoing reasons, the court rules as follows:

1.      President Donald J. Trump's Motion for Summary Judgment, ECF No. 144, is denied except as to the conduct that the court has determined were official acts;

2.      President Donald J. Trump's Motion to Reconsider Denial of His Motion to Dismiss on First Amendment Grounds, ECF No. 145, is denied, but the court grants the President's request to certify both the present ruling and the original denial for interlocutory review;

3. Plaintiffs' Motion to Strike the Government's Westfall Act Certification, ECF No. 183, is granted;

4. Plaintiffs' Request for Judicial Notice in Support of Opposition to Defendant's Motion for Summary Judgment, ECF No. 153, is granted insofar as the court has relied on any facts Plaintiffs have requested be judicially noticed; and

5. President Donald J. Trump's Objection to Admission of Select Committee Final Report, ECF No. 173, is denied to the extent the court has cited to the Report to establish facts that the court believes can be converted into admissible evidence.

Dated: March 31, 2026

Amit P. Mehta
United States District Judge

**APPENDIX**

The filings relevant to Defendant's Motion for Summary Judgment on Absolute Presidential Immunity Grounds are: (1) Def.'s Mot. for Summ. J., ECF No. 144 [Def.'s SJ Mot.], Def.'s Mem. of P. & A. in Supp. of Def.'s SJ Mot. on Absolute Presidential Immunity Grounds, ECF No. 144-1 [Def.'s SJ Mem.]; (2) Under Seal - Pls.' Opp'n to Def.'s SJ Mot., ECF No. 155-1 [Pls.' SJ Opp'n];[31] and (3) Def.'s Reply Mem. in Supp. of Def.'s SJ Mot. on Presidential Immunity Grounds, ECF No. 174 [Def.'s SJ Reply].

When referencing the parties' fact statements, the court refers to two filings: (1) Def.'s Resp. to Pls.' Counterstatement to Def.'s Stmt. of Undisputed Facts, ECF No. 175-1 [Def.'s Stmt.], and (2) Def.'s Counterstatement to Pls.' Stmt. of Add'l Undisputed Facts, ECF No. 175-2 [Def.'s CounterStmt.].  Together, these filings set forth each parties' respective statements and responses.

The filings relevant to Def.'s Motion for Reconsideration are: (1) Def.'s Mot. to Recons. Denial of his Mot. to Dismiss on First Am. Grounds, ECF No. 145 [Def.'s Recons. Mot.], Def.'s Mem. of P. & A. in Supp. of Def.'s Recons. Mot., ECF No. 145-1 [Def.'s Recons. Mem.]; (2) Pls.' Opp'n to Def.'s Recons. Mot., ECF No. 154 [Pls.' Recons. Opp'n]; and (3) Def.'s Reply Mem. of P. & A. in Supp. of Def.'s Recons. Mot., ECF No. 171 [Def.'s Recons. Reply].

The relevant filings relating to Plaintiffs' Motion to Strike the Government's Westfall Act Certification are: (1) Pls.' Mot. to Strike the Gov't's Westfall Act Cert., ECF No. 183 [Pls.' Mot. to Strike]; (2) U.S.'s Opp'n to Pls.' Mot. to Strike, ECF No. 188 [U.S. Opp'n to Pls.' Mot. to Strike]; and (3) Pls.' Reply in Supp. of Pls.' Mot. to Strike, ECF No. 190 [Pls.' Mot. to Strike Reply].

---

[31] When the court cites to exhibits filed with Plaintiffs' Summary Judgment Opposition, ECF No. 155-1, the court sometimes cites to exhibits filed with ECF No. 152, Redacted - Plaintiffs' Opposition to Defendant's Motion for Summary Judgment.

78

The relevant evidentiary filings are: (1) Pls.' Request for Jud. Notice in Supp. of Pls.' SJ Opp'n, ECF No. 153 [Pls.' Mot. for Jud. Notice]; (2) Def.'s Mem. of P. & A. in Partial Opp'n to Pls.' Mot. for Jud. Notice, ECF No. 172 [Def.'s Opp'n to Pls.' Mot for Jud. Notice]; and (3) Pls.' Reply in Supp. of Pls.' Mot. for Jud. Notice, ECF No. 181 [Pls.' Jud. Notice Reply]; (4) Def.'s Obj. to Admis. of Select Comm. Final Rep., ECF No. 173 [Def.'s SJ Obj.]; (5) Pls.' Resp. to Def.'s SJ Obj., ECF No. 182 [Pls.' SJ Obj. Opp'n]; and (6) Def.'s Reply in Supp. of Def.'s SJ Obj., ECF No. 187 [Def.'s SJ Obj. Reply].