No. 26-8003

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

BARBARA J. LEE, et al.
*Plaintiffs-Appellees*

v.

DONALD J. TRUMP, et al
*Defendants-Appellants*

---

### On Appeal from the United States District Court
### for the District of Columbia, Case No. 1:21-cv-00400-APM

*Consolidated Member Cases: 21-cv-00586 (APM); 21-cv-00858 (APM); 21-cv-02265 (APM); 22-cv-00010 (APM); 22-cv-00011 (APM); 22-cv-00034 (APM); 23-cv-00038 (APM)*

---

### ANSWER TO PRESIDENT DONALD J. TRUMP'S PETITION FOR LEAVE TO APPEAL INTERLOCUTORY ORDER

---

Joseph M. Sellers, Bar No. 318410
Brian C. Corman, Bar No. 1008635
Allison Deich, Bar No. 1572878
Alisa Tiwari, Bar No. 1780961
Nina Jaffe-Geffner, Bar No. 90011459
COHEN MILSTEIN SELLERS &
TOLL PLLC
1100 New York Ave., N.W., Suite 800
Washington, D.C.  20005
Tel.:  (202) 408-4600
Fax.: (202) 408-4699
jsellers@cohenmilstein.com
bcorman@cohenmilstein.com
adeich@cohenmilstein.com

Janette McCarthy-Wallace,
Bar No. OH066257
Anthony P. Ashton, Bar No.
MD25220
NAACP Office of General Counsel
4805 Mount Hope Drive
Baltimore, MD 21215
Telephone: 410-580-5777
jlouard@naacpnet.org
aashton@naacpnet.org

atiwari@cohenmilstein.com
njaffegeffner@cohenmilstein.com

*Attorneys for Plaintiffs Barbara J. Lee, et
al.*

Edward G. Caspar,
D.C. Bar No. 1644168
Marc P. Epstein,
D.C. Bar No. 90003967
Jeffrey Blumberg, D.C. Bar No. 432928
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street N.W., Suite 900
Washington, DC 20005
Tel: 202-662-8600
ecaspar@lawyerscommittee.org
mepstein@lawyerscommittee.org
jblumberg@lawyerscommittee.org

William J. Blechman, *pro hac vice*
Elizabeth B. Honkonen, *pro hac vice*
SPERLING KENNY
NACHWALTER
Four Seasons Tower – Suite 1100
1441 Brickell Avenue
Miami, FL 33131
Tel: 305-373-1000
wblechman@sperlingkenny.com

*Attorneys for Plaintiffs Conrad Smith,
et al.*

Faith E. Gay, *pro hac vice*
Joshua S. Margolin, *pro hac vice*
Babak Ghafarzade, *pro hac vice*
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
fgay@selendygay.com
jmargolin@selendygay.com
bghafarzade@selendygay.com

Patrick A. Malone, Bar No. 397142
Daniel Scialpi, Bar No. 997556
(application for admission forthcoming)
PATRICK MALONE &
ASSOCIATES, P.C.
1310 L Street N.W., Suite 800

Cameron Kistler, Bar No. 1008922
Kristy Parker, Bar No. 1542111
Erica Newland, Bar No. MD0141
UNITED TO PROTECT
DEMOCRACY
2020 Pennsylvania Avenue N.W.,

Washington, D.C. 20005
Telephone: 202-742-1500
Facsimile: 202-742-1515
pmalone@patrickmalonelaw.com
dscialpi@patrickmalonelaw.com

#163
Washington, D.C. 20006
Telephone: 202-579-4582
cameron.kistler@protectdemocracy.org
kristy.parker@protectdemocracy.org
erica.newland@protectdemocracy.org

Genevieve C. Nadeau, Bar No. 979410
UNITED TO PROTECT
DEMOCRACY
15 Main Street, Suite 312
Watertown, MA 02472
Telephone: 202-579-4582
genevieve.nadeau@protectdemocracy.org

*Attorney for Plaintiffs James Blassingame and Sidney Hemby*

Matthew Kaiser, D.C. Bar No. 486272
KAISER PLLC
1099 Fourteenth Street N.W.
8th Floor Washington, D.C. 20005
Telephone: 202-640-2850
mkaiser@kaiserlaw.com

Philip Andonian, D.C. Bar No. 490792
Joseph Caleb, D.C. Bar No. 495383
CALEBANDONIAN PLLC
1100 H Street N.W. Suite 315
Washington, D.C. 20005
Telephone: 202-953-9850
phil@calebandonian.com
joe@calebandonian.com

*Attorneys for Plaintiff Eric Swalwell*

Mark S. Zaid, Esq., D.C. Bar No. 440532 Bradley P. Moss, Esq., D.C. Bar No. 975905 MARK S. ZAID, P.C.
1250 Connecticut Avenue N.W. Suite 700
Washington, D.C. 20036
Telephone: 202-498-0011
Facsimile: 202-330-5610
Mark@MarkZaid.com

Matthew Kaiser, D.C. Bar No. 486272
Daniel Csigirinszkij, D.C. Bar No. 90017805 KAISER PLLC
1099 Fourteenth Street N.W. 8th Floor Washington, D.C. 20005
Telephone: 202-640-2850
mkaiser@kaiserlaw.com
dcsigirinszkij@kaiserlaw.com

Brad@MarkZaid.com

Philip Andonian, D.C. Bar No. 490792
Joseph Caleb, D.C. Bar No. 495383
CALEBANDONIAN PLLC
1100 H Street N.W. Suite 315
Washington, D.C. 20005
Telephone: 202-953-9850
phil@calebandonian.com
joe@calebandonian.com

*Attorneys for Plaintiff Sandra Garza*

Patrick A. Malone, Bar No. 397142
Daniel Scialpi, Bar No. 997556
PATRICK MALONE &
ASSOCIATES, P.C.
1310 L Street N.W. Suite 800
Washington, D.C. 20005
Telephone: 202-742-1500
Facsimile: 202-742-1515
pmalone@patrickmalonelaw.com
dscialpi@patrickmalonelaw.com

*Attorneys for Plaintiffs Marcus J. Moore
et al.; Bobby Tabron et al.; and Briana
Kirkland*

## TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................1

QUESTION PRESENTED ......................................................................................3

STATEMENT OF FACTS ......................................................................................3

PROCEDURAL HISTORY ....................................................................................6

SUMMARY OF ARGUMENT..............................................................................11

ARGUMENT ........................................................................................................12

I.      President Trump is wrong that there is a controlling question of law as
        to which there is substantial ground for difference of opinion. .......................12

        A.      The Supreme Court has repeatedly held that language must be
                holistically evaluated in its surrounding context. ..................................12

        B.      The district court followed precedent requiring it to consider
                President Trump's speech in context....................................................16

II.     President Trump is wrong that the question presented is appropriate
        for interlocutory review. ..................................................................................20

III.    President Trump is wrong that resolution of the question presented will
        aid judicial economy.........................................................................................21

CONCLUSION.....................................................................................................22

# TABLE OF AUTHORITIES

<u>Page</u>

CASES

*Bible Believers v. Wayne County,*
    805 F.3d 228 (6th Cir. 2015) ...............................................................................16

*Blassingame v. Trump,*
    87 F.4th 1 (D.C. Cir. 2023) ...............................................................................2, 8

*Brandenburg v. Ohio,*
    395 U.S. 444 (1969) ...............................................................................1, 15, 21

*Counterman v. Colorado,*
    600 U.S. 66 (2023) ...............................................................................9, 15, 20, 21

*Hess v. Indiana,*
    414 U.S. 105 (1973) ...............................................................................1, 11, 12, 21

*N.A.A.C.P. v. Claiborne Hardware Co.,*
    458 U.S. 886 (1982) ...............................................................................1, 11, 13, 14, 21

*Nwanguma v. Trump,*
    903 F.3d 604 (6th Cir. 2018) ...............................................................................1, 2, 11, 16, 18

*Thompson v. Trump,*
    590 F.Supp.3d 46 (D.D.C. 2022) ....................2, 3, 4, 5, 6, 7, 8, 13, 15, 16, 17, 18

## INTRODUCTION

President Trump asserts that the "decision below announced a novel theory of 'implicit incitement.'" But what President Trump labels a "novel theory" is just the well-established principle that surrounding circumstances matter when determining whether speech is directed at inciting imminent violence. The Supreme Court has repeatedly enunciated that principle, holistically evaluating the context in which speech occurs. *See, e.g., Hess v. Indiana*, 414 U.S. 105 (1973); *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).

President Trump barely grapples with these cases. Instead, he baldly asserts that "*Brandenburg* demands clear, directed advocacy of imminent lawless action," which, in his view, means "explicit advocacy of imminent lawless action" rather than words that can be "[]characterized . . . through 'context.'"

But *Brandenburg* asks whether "advocacy is *directed* to inciting [] imminent lawless action"—not whether it explicitly does so. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (emphasis added). The focus on direction, rather than explicit content, cannot be squared with President Trump's assertion.

The only other case President Trump relies upon, *Nwanguma v. Trump*, *rejects* his explicitness test, endorsing liability when "speech explicitly *or implicitly* encourage[s] the use of violence or lawless action" and instructing that "in addition to

1

the content and form of the words, [courts] are obliged to consider the context, based on the whole record." 903 F.3d 604, 609, 611 (6th Cir. 2018) (emphasis added).

The district court did exactly that. It carefully considered the content and context of President Trump's speech, explaining that the President "delivered a speech he understood would only aggravate an already volatile situation"—one where rally-goers were eager and prepared for violence. *Thompson v. Trump*, 590 F.Supp.3d 46, 116 (D.D.C. 2022), *aff'd sub nom. Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023). Thus, "when the President said to the crowd at the end of his remarks, 'We fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore,' moments before instructing them to march to the Capitol, the President's speech plausibly crossed the line into unprotected territory." *Id.*

This Court also should deny the petition because it is years too late and the product of gamesmanship. The relevant district court decision is *four years old*. And President Trump did not appeal it. Instead, last year, he manufactured a reason to file a motion for reconsideration. President Trump claimed an intervening Supreme Court case changed the controlling law. But as the district court recognized, that case was inapplicable; President Trump was using the motion to make new arguments he could have made earlier. And now, President Trump has largely abandoned his prior arguments tied to that Supreme Court case.

2

In the meantime, new evidence has emerged supporting Plaintiffs' allegations. That only further demonstrates that this litigation has moved well past the pleading stage.

For the reasons stated above, this Court should deny the petition.

## QUESTION PRESENTED

Whether this Court should review the district court's four-year-old determination that, taking all the complaints' allegations as true, Plaintiffs plausibly alleged that President Trump incited imminent unlawful action on January 6, 2021?

## STATEMENT OF FACTS

The complaints in this case allege as follows: After Election Day and before January 6th, 2021, President Trump fostered anger among his supporters by promoting the false narrative that the election was stolen. *Thompson*, 590 F.Supp.3d at 115. He used threatening words against elected officials who refused to accept his falsehoods. *Id.* at 64. For instance, he called Georgia's Secretary of State an "enemy of the people" and tweeted about him over a dozen times. *Id.* The Secretary and his family were then targeted by some of the President's supporters with threats of violence and death. *Id.* In Michigan, the President falsely declared that he won almost every county in the state. *Id.* The next day, armed protesters went to the home of Michigan's Secretary of State, demanding she overturn the election results. *Id.* Aware of the threats directed against state election officials, the President tweeted, "People are upset, and they have a right to be." *Id.* at 65.

3

Protests occurred around the country. *Id.* Organized militia groups—one of which President Trump publicly instructed to "stand by" at a Presidential Debate—attended protests in Washington, D.C. *Id.* Two of the protests in D.C. turned violent, injuring multiple police officers. *Id.* The President was aware of these rallies and plausibly the accompanying violence too. *Id.*

On December 19, 2020, President Trump announced a rally on January 6th, tweeting, "Big protest in D.C. on January 6th. Be there, will be wild!" *Id.* Pro-Trump message boards and social media lit up after this tweet, which some followers viewed as "marching orders." *Id.* Many explicitly called for violence on January 6th (*e.g.*, called for "hangings and firing squads"; urged that people in the Capitol should "leave in one of two ways: dead or certifying Trump the rightful winner"; and stated "Cops don't have 'standing' if they are laying on the ground in a pool of their own blood."). *Id.* at 115. One user posted, referring to the President's debate statement to a militia group, "standing by no longer." *Id.* at 66. Other supporters explicitly contemplated "[s]torm[ing] the [Capitol]," and some posted about "Operation Occupy the Capitol" or tweeted using the hashtag #OccupyCapitols. *Id.*

The President plausibly knew his supporters had posted such messages: He and his advisors monitored the websites where these posts were made. *Id.* The posts were also discussed on news outlets the President routinely watched. *Id.* On December 28, 2020, in widely publicized remarks, a former White House aide

predicted, "there will be violence on January 6th because the president himself encourages it." *Id.*

The January 6 rally began with a series of prominent Trump supporters telling the crowd, among other things, "[w]e are great because our ancestors sacrificed their blood, their sweat, their tears, their fortunes, and sometimes their lives," and "[t]oday is the day American patriots start taking down names and kicking ass!"; "Let's have trial by combat!" in discussing how disputes over election fraud; and, as a warning to Republican congressmen, "If you're gonna be the zero, and not the hero, we're coming for you, and we're gonna have a good time doing it." *Id.*

President Trump then spoke for 75 minutes. *Id.* He called for Vice President Pence returning Electoral College ballots to the states, allowing them to recertify Electors who supported him. *Id.* He urged rally-goers to "fight like hell," and he told them "you're allowed to go by very different rules" when fraud occurs. *Id.* He concluded by saying that the election loss "can't have happened and we fight, we fight like hell, and if you don't fight like hell, you're not going to have a country anymore." *Id.* at 67. He then directed his supporters to the Capitol. *Id.* The crowd at various points responded, "Fight Like Hell. Fight for Trump," and at other points, "Storm the Capitol," "Invade the Capitol Building," and "Take the Capitol right now." *Id.*

Responding to the President's call for action, thousands marched to the Capitol after he finished. *Id.* The crowd overwhelmed police and exterior barriers and entered

5

the Capitol. *Id.* The Vice President and members of Congress were evacuated. *Id.* Police officers were injured as violent confrontations continued with the President's supporters. *Id.*

## PROCEDURAL HISTORY

Plaintiffs filed suit, seeking to hold President Trump civilly liable for the events on January 6th. President Trump filed a motion to dismiss on various grounds, including immunity and the First Amendment. He contended that the First Amendment's "incitement and 'true threats' standards protect the speech at issue in this case." Doc. 22-1 at 20-21.[1] His core First Amendment argument was that "Plaintiffs cannot [] plausibly allege that President Trump expected, desired, or incited violence" because "[t]he bulk of their allegations consist of general statements, interpreted by others to be calls to violence." Doc. 43 at 14. According to President Trump, "[t]his effect on others is not what is relevant under the First Amendment." *Id.*; *Thompson*, 590 F.Supp.3d at 116-18 (summarizing President Trump's motion-to-dismiss arguments).

In a detailed opinion focused on President Trump's words and context, the district court denied the motion. It laid out the Supreme Court cases that define the incitement exception: *Brandenburg*, *Hess*, and *Claiborne Hardware*. *Id.* at 110-12. It

---

[1] "Doc." refers to documents filed on the D.D.C. court docket (21-cv-00400-APM).

6

explained that, in those cases as well as various other Supreme Court cases, "both the words spoken and the context in which they are spoken matter."

It then applied the law to President Trump's speech. *Id.* at 112. The district court explained:

> The President's statements that, "[W]e fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore," and "[W]e're going to try to and give [weak Republicans] the kind of pride and boldness that they need to take back our country," immediately before exhorting rallygoers to "walk down Pennsylvania Avenue," are plausibly words of incitement not protected by the First Amendment.

*Id.* at 115. That is because the words' significance had to be "viewed within the broader context in which the Speech was made and against the Speech as a whole." *Id.*

The district court explained, after the election but before January 6th, the President spread anger and distrust among his supporters by claiming election fraud. *Id.* Some of his supporters turned to violence in highly publicized events. *Id.* Against this backdrop, the President invited his supporters to Washington, D.C., on January 6th, and some supporters viewed his invitation as a call to violent action. *Id.* President Trump would have known as much because he and his advisors actively monitored the relevant websites and media coverage. *Id.*

"Yet, the President delivered a speech he understood would only aggravate an already volatile situation," wrote the district court. *Id.* at 116. "For 75 uninterrupted minutes, he told rally-goers that the election was 'rigged' and 'stolen'" and identified the culprits at the Capitol: "radical Left Democrats" and "weak" Republicans. *Id.* The

district court emphasized President Trump's instructions not to "concede"; urging his supporters to show "strength" and be "strong," because they would not be able to "take back [their] country with weakness"; directing that "[w]hen you catch somebody in a fraud, you're allowed to go by very different rules"; and warning that they would have an "illegitimate President" if the Vice President did not act, and "we can't let that happen." *Id.* According to the district court, "These words stoked an already inflamed crowd, which had heard for months that the election was stolen and that 'weak politicians' had failed to help the President." *Id.*

"So," the district court explained, President Trump's strongly worded concluding statements combined with directions to march to the Capitol "plausibly crossed the line into unprotected territory." *Id.*

The district court also rejected President Trump's bid for immunity. *Id.* at 73-84. President Trump appealed the immunity holding, but he did not seek review of the district court's First Amendment holding. Doc. 69.

This Court affirmed and remanded solely to address the availability of immunity based on record evidence. *Blassingame,* 87 F.4th 1. Back before the district court, the parties engaged in discovery bearing on immunity for nearly a year.

President Trump then moved for summary judgment on immunity. Doc. 144.

But alongside his summary judgment motion, President Trump filed a motion for reconsideration of the district court's years-old First Amendment holding. Doc.

8

145. The ground for reconsideration was purportedly the intervening Supreme Court decision, *Counterman v. Colorado*, 600 U.S. 66 (2023). Doc. 145-1 at 5. According to President Trump, the district court's focus on "President Trump's supposed intent" was incompatible with *Counterman*, "which holds that intent is a one-way ratchet, the sole constitutionally permissible purpose of which is to protect a speaker, not penalize him." *Id.* at 5. President Trump revised his so-called *Counterman* theory on reply, explaining that the case "ensur[es] only explicit and unambiguous calls to violence may potentially lose protection." Doc. 171 at 9.

The district court denied President Trump's summary judgment motion on immunity as well as his motion for reconsideration. Doc. 219. It rejected the argument that *Counterman* established a controlling standard, explaining, "*Counterman* is not about incitement, and it did not clarify the law about that category of unprotected speech." *Id.* at 59. Although the court recognized President Trump was using *Counterman* to "make[] arguments that he did not the first time around," it addressed President Trump's new argument that "explicit" calls to violence were required. *Id.* at 59-60. It rejected that argument too, explaining "[n]o decision instructs courts to consider as a first step only the words spoken, unmoored from their context." *Id.* at 62. "To the contrary," the court explained "*Counterman* clearly states that 'incitement inheres in particular words used in *particular contexts*,'" and "[t]he importance of context has long been central to the Supreme Court's incitement jurisprudence." *Id.*

9

The district court also mentioned that new evidence had surfaced that supported its denial of President Trump's motion to dismiss. *Id.* at 66. For instance, Cassidy Hutchinson gave congressional testimony that she was with President Trump immediately before the Ellipse Speech and heard him complain about magnetometers (or "mags") preventing armed people from entering the rally. *Id.* Hutchinson "overheard the President say something to the effect of, 'You know, I don't F'ing care that they have weapons. They're not here to hurt me. Take the F'ing mags away. Let my people in. They can march to the Capitol from here. Let the people in. Take the F'ing mags away.'" *Id.* After the Secret Service said the magnetometers could not be removed, Hutchinson heard the President say "something to the effect of, you know, 'F the Secret Service. I'm the President. Take the F'ing mags away. They're not here to hurt me.'" *Id.* According to the district court, "assumed true," President Trump's statements to "[t]ake the F'ing mags away" and that "[t]hey're not here to hurt me" serve to "support the reasonable inference that he meant for his Ellipse Speech to be heard as an implicit call for imminent violence or lawlessness." *Id.* at 66-67.

President Trump now seeks belated review of the district court's First Amendment holding.

## SUMMARY OF ARGUMENT

President Trump's petition should be denied for three reasons:

*First*, no substantial ground for difference of opinion exists with respect to the law applied by the district court. The district court applied the well-recognized principle that context matters in determining whether speech is directed at inciting imminent violence. *See, e.g., Hess*, 414 U.S. 105; *Claiborne Hardware*, 458 U.S. 886. In contrast, President Trump's reading of the law—that liability requires "explicit advocacy of imminent lawless action"—is inconsistent with common sense, with *Brandenburg*, and with the only other case he cites for support (*Nwanguma*, 903 F.3d 604).

*Second*, President Trump's request for review is four years late. The appropriate time for review was 2022, when his motion to dismiss on First Amendment grounds was denied. Years later, he moved for reconsideration by claiming that an inapplicable Supreme Court case was an intervening decision. He then used that motion to raise arguments that he could have and should have raised years earlier. This Court should not permit such gamesmanship.

*Third*, an appeal will not aid judicial economy. Supporting evidence has arisen as this litigation has unfolded that serves to make any review of the five-year-old allegations obsolete and inefficient.

## ARGUMENT

I.    **President Trump is wrong that there is a controlling question of law as to which there is substantial ground for difference of opinion.**

The core of President Trump's motion is a bald assertion that the district court "announced a novel theory of 'implicit incitement.'" Pet. for Appeal ("Pet.") at 1. Not so. What President Trump portrays as a novel theory is the settled principle that context matters in determining whether speech is directed at inciting imminent violence. Indeed, President Trump himself recognized as much in his first set of unsuccessful First Amendment arguments, writing: "President Trump's speech must be considered in context." Doc. 43 at 7. And the Supreme Court has repeatedly articulated this principle, holistically evaluating the context in which speech appears rather than creating a formula that requires explicitly encouraging violence. On the other hand, no case supports President Trump's theory that *only the words spoken* matter and that they must be read without context. Thus, there is no substantial ground for difference of opinion on the law here.

A.    <u>The Supreme Court has repeatedly held that language must be holistically evaluated in its surrounding context.</u>

The Supreme Court has long held that an analysis of the broader context in which speech occurs is necessary to the incitement inquiry. In *Hess v. Indiana*, for instance, the Supreme Court considered whether a defendant's conviction under a disorderly conduct statute could stand. 414 U.S. 105. The Supreme Court explained that the defendant's words ("We'll take the fucking street later" or "We'll take the

fucking street again") "at worst, [] amounted to nothing more than advocacy of illegal action at some indefinite future time." *Id.* at 107-08. Nevertheless—despite the absence of statements explicitly calling for imminent action—the Supreme Court examined the context surrounding the speech. *Id.* at 107-09. Witnesses testified that the defendant "did not appear to be exhorting the crowd to go back into the street," "that his statement did not appear to be addressed to any particular person or group," and that "his tone, although loud, was no louder than that of the other people in the area." *Id.* at 107. Thus, the defendant's "statement was not directed to any person or group of persons." *Id.* Nor did the record demonstrate any "evidence or rational inference from the import of the language, that his words were intended to produce, and likely to produce, imminent disorder." *Id.* at 109.

Because a contextual examination of the defendant's language demonstrated that the defendant's words were not directed at inciting violence, the Supreme Court overturned the conviction. And "[b]y considering the 'import of the language,' and the 'rational inferences' the words produce, the Court signaled that there is no safe haven under *Brandenburg* for the strategic speaker who does not directly and unequivocally advocate for imminent violence or lawlessness, but does so through unmistakable suggestion and persuasion." *Thompson*, 590 F.Supp.3d at 115.

In *Claiborne Hardware*, the Supreme Court confirmed that surrounding context should inform whether a defendant's speech is directed to incite imminent

13

lawlessness. 458 U.S. 886. It started with the overall goals of the defendant's "lengthy addresses": They "generally contained an impassioned plea for black citizens to unify, to support and respect each other, and to realize the political and economic power available to them." *Id.* at 928. In doing so, the Supreme Court explained, the defendant had used "strong language" about boycott violators (*e.g.*, "If we catch any of you going in any of them racist stores, we're gonna break your damn neck."). *Id.* at 928, 902. But that strong language was not, for the most part, immediately "followed by acts of violence." *Id.* at 928. The one "possible exception" was an incident that same month where shots were fired into the home of boycott violators. *Id.* at 928, 905.

The Supreme Court explained that "[i]f there were other evidence [outside of the speeches themselves] of his authorization of wrongful conduct, the references to discipline in the speeches could be used to corroborate that evidence." *Id.* at 929. But that "theory fail[ed] for the simple reason that there [was] no evidence—apart from the speeches themselves—that [the defendant] authorized, ratified, or directly threatened acts of violence." *Id.*

The Supreme Court's consideration of whether outside evidence indicated that the defendant authorized or ratified acts of violence demonstrates that the surrounding circumstances of the speech matter for interpreting whether the speech is directed at inciting violence. And even if the speech does not explicitly connect to acts of violence, evidence of authorization or ratification can suffice to make that connection. *See*

14

*Counterman*, 600 U.S. at 76 ("incitement inheres in particular words used in ***particular contexts*.**" (emphasis added)).

President Trump barely grapples with these cases. Instead, he asserts that "*Brandenburg* demands clear, directed advocacy of imminent lawless action"—which, on President Trump's theory, means "explicit advocacy of imminent lawless action" rather than words that can be "recharacterized . . . through 'context.'" Pet. at 13-14.

But President Trump's telling of the law makes no sense. Imagine a defendant who told his followers that, when he said the words "Selma's Party" in an upcoming speech, his followers should immediately riot. The defendant then uttered those words without any explicit exhortations to violence, and his followers burned down a city block. There would be no debate that the defendant's seemingly innocuous words were directed at inciting imminent violence. The reason is context: As the district court here put it, "the words spoken and the context in which they are spoken matter." *Thompson*, 590 F.Supp.3d at 112.

Contrary to President Trump's assertion, *Brandenburg* is also at odds with any requirement of "explicit advocacy" that ignores "context." *Brandenburg* asks whether "advocacy is *directed* to inciting or producing imminent lawless action"—not whether it explicitly does so. 395 U.S. at 447; *id.* at 448 (seeking to prevent speakers from "preparing a group for violent action and steeling it to such action"). The focus on direction—which necessitates an inquiry into the way words are likely to operate in the

15

real world—cannot be squared with President Trump's theory. Nor can the decades of jurisprudence (discussed above) applying *Brandenburg*.

Plaintiffs know of no cases—and President Trump cites none—that confine incitement to "explicit" advocacy of imminent lawlessness, regardless of context. To the contrary, "[f]ederal appellate courts have understood the *Brandenburg* exception to reach implicit encouragement of violent acts." *Thompson*, 590 F.Supp.3d 115.

Indeed, the only other case President Trump cites as supporting his position, *Nwanguma v. Trump*, actually rejects it. *Nwanguma* explains: "The *Brandenburg* test precludes speech from being sanctioned as incitement to riot unless [] the speech explicitly or *implicitly* encouraged the use of violence or lawless action." 903 F.3d at 609 (quoting *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 246 (6th Cir. 2015)) (emphasis added). And to assess whether such encouragement occurred, "in addition to the content and form of the words, [courts] are obliged to consider the context, based on the whole record." *Id.* at 611.

B.  <u>The district court followed precedent requiring it to consider President Trump's speech in context.</u>

The district court followed well-established law that required considering both the content and context of speech to determine whether it constituted imminent incitement. Before January 6th, the district court explained, President Trump was plausibly aware that the atmosphere among his supporters was building towards violence at the rally, given the apparent "threats against state election officials and

16

[clashes] with police in Washington, D.C., following pro-Trump rallies"; widespread press reports that "supporters explicitly called for violence on January 6th"; and a former Presidential aide's "widely publicized [prediction] that 'there will be violence on January 6th because the President himself encourages it.'" *Thompson*, 590 F.Supp.3d at 115-16. Thus, according to the district court, "when the President stepped to the podium on January 6th, it is reasonable to infer that he would have known that some in the audience were prepared for violence." *Id.* at 116.

The district court then explained how "the President delivered a speech he understood would only aggravate an already volatile situation." *Id.* For instance, he identified the culprits of the election fraud to rally-goers: "radical Left Democrats" and "weak" Republicans; directed the rally-goers not to "concede" and urged them to show "strength" and be "strong" because they would not be able to "take back [their] country with weakness"; told them that the rules did not apply: "When you catch somebody in a fraud, you're allowed to go by very different rules."; and said they would have an "illegitimate President" if the Vice President did not act, and "we can't let that happen." *Id.* Given those words and the inflamed audience, the district court explained:

> When the President said to the crowd at the end of his remarks, "We fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore," moments before instructing them to march to the Capitol, the President's speech plausibly crossed the line into unprotected territory.

*Id.*

And—as the district court noted in denying President Trump's motion for reconsideration—new evidence has emerged that only supports the district court's decision. Although Plaintiffs have not had the opportunity to conduct discovery on the First Amendment issue, evidence collected by the House Select Committee to Investigate the January 6th Attack on the United States Capitol indicates President Trump was well aware of the propensity for violence among the crowd that he dispatched to the Capitol. Doc. 219 at 66-67. For example, Hutchinson testified that she heard President Trump repeatedly urge the removal of the "mags" that were preventing people with weapons from joining the rally and marching to the Capitol, explaining those people were not there to hurt him. *Id.* at 66. Her recollections of January 6 heighten the plausibility that President Trump's speech contained words of incitement.

Thus, the district court did nothing notable in holding that "[i]t is plausible" that "the President's January 6 Rally Speech in its entirety and in context" was "directed to inciting and producing imminent lawless action." *Thompson*, 590 F.Supp.3d at 115.

The only case President Trump cites as contradicting the district court, *Nwanguma v. Trump*, is inapposite. There, the Sixth Circuit considered whether, at a rally in 2016, then-candidate Trump "explicitly or implicitly encourage[d] the imminent use of violence or lawless action," which included examining "the content

18

and form of the words," as well as "the context, based on the whole record." *Nwanguma*, 903 F.3d at 609, 611. But there—unlike here—"what [was] alleged to constitute incitement to riot [was] *just a few words*": then-candidate Trump referring to protesters at the rally and saying "'get 'em out of here,' repeated several times." *Id.* at 611 (emphasis added). No other allegations demonstrated how Trump's words, in context, "specifically advocated" a "physical response," especially because, "by plaintiffs' own allegations, that the words were accompanied by the admonition, 'don't hurt 'em.'" *Id.* at 612.

The Sixth Circuit's holding does not apply to a complaint alleging that President Trump spent 75 minutes telling a crowd of angry supporters—some of whom he knew were prepared to take violent action at the Capitol—that their country's election had been stolen and that "you're allowed to go by very different rules" under those circumstances. The complaint further details how the crowd responded at various points by chanting "Fight Like Hell. Fight for Trump," and at other points, "Storm the Capitol," "Invade the Capitol Building," and "Take the Capitol right now," and President Trump concluded by threatening, "[I]f you don't fight like hell, you're not going to have a country anymore," and instructing the crowd to march to the Capitol. Doc. 11-1 ¶ 88.

19

Thus, President Trump points to no authority, controlling or otherwise, supporting his contention that the district court erred in addressing his First Amendment defense.

## II.    President Trump is wrong that the question presented is appropriate for interlocutory review.

President Trump fails to mention that his motion to dismiss on First Amendment grounds was denied over four years ago. He had the opportunity to file for interlocutory review of the district court's decision at that time. But he did not. Rather, he appealed only the district court's denial of his motion to dismiss on immunity grounds.  Doc. 69. This Court considered President Trump's appeal of the immunity holding, affirmed it, remanded solely on that issue.

Years later, *in 2025*, President Trump used a Supreme Court decision *from 2023* to request reconsideration of the district court's denial of his motion to dismiss. He argued that *Counterman* stands for a principle about a speaker's intent that is irreconcilable with the district court's holding. Doc. 145-1 at 5-7.

But, as the district court correctly recognized, *Counterman* was only the "ostensible reason given for reconsideration":

> [T]he true reason President Trump asks for reconsideration is that he simply disagrees with the court's holding . . . *Counterman* is not about incitement, and it did not clarify the law about that category of unprotected speech. *Counterman* is merely the vehicle by which President Trump dissects the court's reasoning and makes arguments that he did not the first time around.

Doc. 219 at 59-60. The district court easily disposed of those arguments. *Id.*

President Trump now has abandoned his *Counterman* arguments. But he uses the denial of his motion for reconsideration based on *Counterman* to continue to advance an argument that he could have made years ago: that the district court applied a novel and incorrect "implicit incitement" theory.

This Court should not permit President Trump to game his way into a second bite at the apple. It should deny review of a legal question that should have been appealed years prior, especially because—as is discussed in the next Section—the supporting evidence now available makes obsolete an inquiry based solely on the complaints' allegations.

## III. President Trump is wrong that resolution of the question presented will aid judicial economy.

The *Brandenburg* test is typically resolved after factual development—when the circumstances surrounding the speech and its impact have been more fully developed. Indeed, the seminal Supreme Court cases on this issue rely heavily on *evidence*, with the facts being critical to the outcomes in those cases. *Brandenburg*, 395 U.S. at 445 (considering the "evidence" and record from trial); *Hess*, 414 U.S. at 108-09 (same); *Claiborne Hardware*, 458 U.S. at 928-29 (same); *cf. Counterman*, 600 U.S. at 71-72 (same).

Evidence that has arisen as this litigation has unfolded already indicates that discovery would be fruitful. For instance, Hutchinson's testimony about President

Trump's desire to permit weapons at the rally because they would not be used against him suggests that he understood his supporters' willingness to engage in imminent violence against those at the Capitol and desired that they do so. Doc. 219 at 66-67.

The existence of this evidence also demonstrates that this case has moved well past the pleading stage. It does not aid judicial economy on a reasonably developed evidentiary record to jump back to the pleadings; any review of the five-year-old allegations would be obsolete.

What's more, even if this Court were to resolve the incitement question in President Trump's favor, the litigation would not necessarily end (as President Trump claims). As the district court acknowledged, plaintiffs may be able to plead (and prove) that President Trump conspired with or abetted violent supporters through conduct *other than* the Ellipse Speech. Doc. 219 at 70 n.28. And incitement-based arguments were not the only First Amendment arguments that Plaintiffs raised and preserved for appeal.

Thus, this Court should reject President Trump's "implicit incitement" red herring and should confine its review to immunity.

## CONCLUSION

For the reasons above, this Court should deny President Trump's petition.

22

Dated: April 20, 2026          Respectfully submitted,

                               */s/ Joseph Sellers*
                               Joseph M. Sellers, Bar No. 318410
                               Brian Corman, Bar No. 1008635
                               Alison S. Deich, Bar No. 1572878
                               Alisa Tiwari, Bar No. 1780961
                               Nina Jaffe-Geffner, Bar No. 90011459
                               COHEN MILSTEIN SELLERS & TOLL
                               PLLC
                               1100 New York Avenue N.W., Suite 800
                               Washington, D.C. 20005
                               Telephone: 202-408-4600
                               Facsimile: 202-408-4699
                               jsellers@cohenmilstein.com
                               bcorman@cohenmilstein.com
                               adeich@cohenmilstein.com
                               atiwari@cohenmilstein.com
                               njaffegeffner@cohenmilstein.com

                               Janette McCarthy-Wallace, Bar No. OH066257
                               Anthony P. Ashton, Bar No. MD25220
                               NAACP Office of General Counsel
                               4805 Mount Hope Drive
                               Baltimore, MD 21215
                               Telephone: 410-580-5777
                               jlouard@naacpnet.org
                               aashton@naacpnet.org

                               *Attorneys for Plaintiffs Barbara J. Lee, et al.*

                               Edward G. Caspar, D.C. Bar No. 1644168
                               Marc P. Epstein, D.C. Bar No. 90003967
                               Jeffrey Blumberg, D.C. Bar No. 432928
                               LAWYERS' COMMITTEE FOR
                               CIVIL RIGHTS UNDER LAW
                               1500 K Street N.W., Suite 900
                               Washington, DC 20005
                               Tel: 202-662-8600
                               ecaspar@lawyerscommittee.org

23

mepstein@lawyerscommittee.org
jblumberg@lawyerscommittee.org

Faith E. Gay, *pro hac vice*
Joshua S. Margolin, *pro hac vice*
Babak Ghafarzade, *pro hac vice*
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
fgay@selendygay.com
jmargolin@selendygay.com
bghafarzade@selendygay.com

William J. Blechman, *pro hac vice*
Elizabeth B. Honkonen, *pro hac vice*
SPERLING KENNY NACHWALTER
Four Seasons Tower – Suite 1100
1441 Brickell Avenue
Miami, FL 33131
Tel: 305-373-1000
wblechman@sperlingkenny.com

*Attorneys for Plaintiffs Conrad Smith, et al.*

Patrick A. Malone, Bar No. 397142
Daniel Scialpi, Bar No. 997556 (application for admission forthcoming)
PATRICK MALONE & ASSOCIATES, P.C.
1310 L Street N.W., Suite 800
Washington, D.C. 20005
Telephone: 202-742-1500
Facsimile: 202-742-1515
pmalone@patrickmalonelaw.com
dscialpi@patrickmalonelaw.com

Cameron Kistler, Bar No. 1008922
Kristy Parker, Bar No. 1542111
Erica Newland, Bar No. MD0141
UNITED TO PROTECT DEMOCRACY

2020 Pennsylvania Avenue N.W., #163
Washington, D.C. 20006
Telephone: 202-579-4582
cameron.kistler@protectdemocracy.org
kristy.parker@protectdemocracy.org
erica.newland@protectdemocracy.org

Genevieve C. Nadeau, Bar No. 979410
UNITED TO PROTECT DEMOCRACY
15 Main Street, Suite 312
Watertown, MA 02472
Telephone: 202-579-4582
genevieve.nadeau@protectdemocracy.org

*Attorneys for Plaintiffs James Blassingame and
Sidney Hemby*


Mark S. Zaid, Esq., D.C. Bar No. 440532
Bradley P. Moss, Esq., D.C. Bar No. 975905
MARK S. ZAID, P.C.
1250 Connecticut Avenue N.W., Suite 700
Washington, D.C. 20036
Telephone: 202-498-0011
Facsimile: 202-330-5610
Mark@MarkZaid.com
Brad@MarkZaid.com

Matthew Kaiser, D.C. Bar No. 486272
Daniel Csigirinszkij, D.C. Bar No. 90017805
KAISER PLLC
1099 Fourteenth Street N.W. 8th Floor
Washington, D.C. 20005
Telephone: 202-640-2850
mkaiser@kaiserlaw.com
dcsigirinszkij@kaiserlaw.com

Philip Andonian, D.C. Bar No. 490792
Joseph Caleb, D.C. Bar No. 495383
CALEBANDONIAN PLLC

25

1100 H Street N.W., Suite 315
Washington, D.C. 20005
Telephone: 202-953-9850
phil@calebandonian.com
joe@calebandonian.com

*Attorneys for Plaintiff Sandra Garza*

Patrick A. Malone, Bar No. 397142
Daniel Scialpi, Bar No. 997556
PATRICK MALONE & ASSOCIATES, P.C.
1310 L Street N.W., Suite 800
Washington, D.C. 20005
Telephone: 202-742-1500
Facsimile: 202-742-1515
pmalone@patrickmalonelaw.com
dscialpi@patrickmalonelaw.com

*Attorneys for Plaintiffs Marcus J. Moore et al.;*
*Bobby Tabron et al.; and Briana Kirkland*

Matthew Kaiser, D.C. Bar No. 486272
KAISER PLLC
1099 Fourteenth Street N.W.
8th Floor, Washington, D.C. 20005
Telephone: 202-640-2850
mkaiser@kaiserlaw.com

Philip Andonian, D.C. Bar No. 490792
Joseph Caleb, D.C. Bar No. 495383
CALEBANDONIAN PLLC
1100 H Street N.W., Suite 315
Washington, D.C. 20005
Telephone: 202-953-9850
phil@calebandonian.com
joe@calebandonian.com

*Attorneys for Plaintiff Eric Swalwell*

26

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P27(D)(2)(A)

Pursuant to Fed. R. App. P. 32(g), I hereby certify that the preceding opposition brief complies with the type-volume limitation of the Rules, containing 5184 words, excluding the parts of the document exempted by Federal Rules of Appellate Procedure 32(f). I further certify that the document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365, in 14-point Baskerville Old Face font.

/s/ Joseph M. Sellers
Joseph M. Sellers

## CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2026, I caused this document to be filed through the ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Joseph M. Sellers*
Joseph M. Sellers